FILED

2010 Jul-12  PM 02:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE U.S. DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| Alabama Gas Corporation,     ) | |
|         Plaintiff,     ) | |
| v.     ) | **CIVIL ACTION FILE** |
|     ) | NO. _____ |
| Travelers Casualty and Surety     ) | |
| Company, St. Paul Fire and Marine     ) | **JURY DEMAND** |
| Insurance Company, St. Paul Surplus     ) | |
| Surplus Lines Insurance Company, and     ) | |
| St. Paul Mercury Insurance Company,     ) | |
|         Defendants.     ) | |
| _____ ) | |

## COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

COMES NOW Plaintiff Alabama Gas Corporation ("Alagasco") in the above-styled matter, and hereby files this Complaint for Declaratory Relief against the defendants, and alleges as follows:

### INTRODUCTION

1.

Pursuant to 28 U.S.C. 2201-2202, Alagasco seeks a declaration of the rights, duties, and obligation of the parties under liability insurance policies issued by the defendants and covering Alagasco, and damages because of the defendants' breach of contract and bad faith. Since Defendant St. Paul Fire and Marine Insurance Company and its affiliates have refused to provide a defense to Alagasco under the

relevant insurance policies, an actual controversy exists between the parties for which a judgment setting forth their respective rights and obligations is necessary.

## **PARTIES**

2.

Plaintiff Alagasco is a corporation organized under the laws of the State of Alabama, having its principal place of business in Birmingham, Alabama. Alagasco is engaged primarily in the business of distributing natural gas to customers in Alabama.

3.

Defendant St. Paul Fire and Marine Insurance Company ("St. Paul Fire") is a corporation organized under the laws of Minnesota with a principal place of business in St. Paul, Minnesota.  St. Paul may be served through its agent, CSC Lawyers, Inc., 150 South Perry Street, Montgomery, Alabama 36104.

4.

Defendant St. Paul Surplus Lines Insurance Company ("St. Paul Surplus") is a corporation organized under the laws of Minnesota with a principal place of business in St. Paul, Minnesota.  St. Paul Surplus may be served through its agent, CSC Lawyers, Inc., 150 South Perry Street, Montgomery, Alabama 36104.

5.

Defendant St. Paul Mercury Insurance Company ("St. Paul Mercury") is a corporation organized under the laws of Minnesota with a principal place of business in St. Paul, Minnesota.  St. Paul Mercury may be served through its agent, CSC Lawyers, Inc., 150 South Perry Street, Montgomery, Alabama 36104.  On information and belief, through corporate mergers, name changes or other arrangements, St. Paul Mercury is responsible for insurance policies issued by the Minnesota-based company formerly known as St. Paul Mercury Indemnity Company.

6.

Defendant Travelers Casualty and Surety Company ("Travelers Casualty") is a corporation organized under the laws of Connecticut with a principal place of business in Hartford, Connecticut.  Travelers Casualty may be served through its agent, CSC Lawyers, Inc., 150 South Perry Street, Montgomery, Alabama 36104. On information and belief, through corporate mergers, name changes or other arrangements, Travelers Casualty is responsible for insurance policies issued by the company formerly known as Aetna Casualty and Surety Company.

7.

Defendants St. Paul Fire, St. Paul Surplus, St. Paul Mercury and Travelers Casualty are all direct or indirect subsidiaries of The Travelers Companies, Inc.

(together with its relevant subsidiaries hereinafter, "The Travelers"). On information and belief, the insurers operating under The Travelers' umbrella share a variety of internal services, including claims handling for complex environmental matters.

8.

Upon information and belief, the defendants are authorized to do business and are doing and transacting business in Alabama.

## JURISDICTION AND VENUE

9.

This Court has jurisdiction over this matter pursuant to 28 U.S.C. 1332, because there is diversity of citizenship between Alagasco and each of the defendants in this matter, and the amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000.

10.

Venue is proper in this Court pursuant to 28 U.S.C. 1391(a) and (c) because a substantial part of the events or omissions giving rise to this action occurred in Alabama; the property that is the subject of this action is situated in Alabama; and The Travelers is subject to personal jurisdiction in Alabama.

## FACTUAL BACKGROUND

### The Insurance Policies

11.

On or about February 1, 1944, Aetna Casualty and Surety Company issued liability insurance policy 1C522 with a policy period of February 1, 1944 to November 10, 1945, which policy included as an insured the Birmingham Gas Company, one of Alagasco's corporate predecessors.

12.

From the late 1940s until the early 1980s, Alagasco was insured under primary liability insurance policies issued by St. Paul Fire, St. Paul Mercury or St. Paul Surplus, including:

| Policy Number | Period |
|---|---|
| 1101152-1 | July 10, 1947 to July 10, 1948 |
| 1102550-1-4 | July 10, 1948 to July 10, 1949 |
| 1104400-1 | July 10, 1949 to July 10, 1950 |
| 1107000-1 | July 10, 1950 to July 10, 1951 |
| 1108900-1 | July 10, 1951 to July 10, 1952 |
| 1111700-1 | July 10, 1952 to July 10, 1953 |

| 115000 | July 10, 1953 to July 10, 1954 |
|--------|--------------------------------|
| 1118064 | July 10, 1954 to July 10, 1955 |
| 1122997 | July 10, 1955 to July 10, 1956 |
| 1128949 | July 10, 1956 to July 10, 1957 |
| 566JF5661 | July 10, 1957 to July 10, 1960 |
| 566JZ2700 | July 10, 1960 to July 10, 1963 |
| 501JB1000 | July 10, 1967 to July 10, 1983 |
| 501TC0200 | July 10, 1983 to July 10, 1984 |

13.

Attached to this Complaint as **Exhibit A** is a true and correct copy of the material terms of St. Paul Fire policy number 501JB1000 (hereinafter, "Exhibit A").  St. Paul Fire policy number 5010JB1000 was renewed several times so that its policy period is July 10, 1967 to July 10, 1983.

14.

Exhibit A obligates St. Paul Fire, among other things, "[t]o pay any loss by reason of the liability imposed by law or contract upon the Insured for damages because of injury to or destruction of property, including the loss of use thereof." Exhibit A further obligates St. Paul Fire to "[d]efend in the name and on behalf of the Insured any suit against the Insured alleging such . . . damage, or destruction

and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; . . ."  By it terms, <u>Exhibit A</u> applies only to "occurrences" that occur during the policy period.  The term "occurrences" is defined in <u>Exhibit A</u> to include "a continuous or repeated exposure during the policy period to conditions which unexpectedly and unintentionally causes . . . injury to or destruction of tangible property, including the loss or use thereof."

15.

From the late 1940s until the early 1980s, Alagasco was insured under excess liability insurance policies issued by St. Paul Fire, St. Paul Surplus or St. Paul Marine providing in most years $1,000,000 of coverage excess of the primary policies identified in Paragraph 11 of this Complaint, including:

| **Policy Number** | **Period** |
|---|---|
| 1101535 | July 10, 1947 to July 10, 1949 |
| 1105416 | July 10, 1949 to July 10, 1951 |
| 1108902 | July 10, 1951 to July 10, 1952 |
| 1111702 | July 10, 1952 to July 10, 1953 |
| 115001 | July 10, 1953 to July 10, 1954 |
| 1118065 | July 10, 1954 to July 10, 1955 |

| 1122998 | July 10, 1955 to July 10, 1956 |
|---------|-------------------------------|
| 1128947 | July 10, 1956 to July 10, 1957 |
| 566JF662 | July 10, 1957 to July 10, 1960 |
| 566KV5100 | July 10, 1964 to July 10, 1967 |
| 501XA0500 | July 10, 1967 to July 10, 1973 |
| 501XA4515 | July 10, 1973 to July 10, 1976 |
| 501XA7885 | July 10, 1976 to July 10, 1977 |
| 501XA9237 | July 10, 1977 to July 10, 1983 |

## The Former Huntsville, Alabama Gas Plant

16.

From sometime in the latter half of the 19th Century until approximately 1946, gas for lighting, cooking, heating and other purposes was supplied to the customers in Huntsville, Alabama, by a manufactured gas plant located near the intersection of Homes Avenue and Dallas Avenue (the "Huntsville MGP"). The basic operation of the Huntsville MGP involved the superheating of coal or a combination of coke and oil in low oxygen chambers to produce gas that was then purified and fed through a gas distribution system to the citizens of Huntsville.

17.

In 1918, the Huntsville Gas Company was incorporated and acquired an interest in the Huntsville MGP.  Alagasco is a corporate successor to the Huntsville Gas Company.  In or around 1946, Alagasco converted the Huntsville MGP from a gas manufacturing process to a propane air system, although on information and belief, at least some of the former gas manufacturing fixtures and facilities remained in place.  Alagasco sold the Huntsville MGP and the city-wide distribution system to the City of Huntsville in 1949.

18.

On information and belief, the City of Huntsville operated the Huntsville MGP as a propane air operation until March 1952, when a natural gas pipeline reached that part of Alabama and the City converted to natural gas.  On information and belief, the City of Huntsville continued to use the site for various purposes ancillary to its utility services until approximately 1967.

19.

On information and belief, in November 1967, the City of Huntsville conveyed the former Huntsville MGP site to an entity cooperating with the federal Department of Housing and Urban Development ("HUD") and the Huntsville Housing Authority (the "Housing Authority").  Between November 1967 and May 1970, entities working in cooperation with HUD and the Housing Authority

demolished the remains of the former Huntsville MGP and, between May 1970 and April 1971, built the Searcy Homes public housing project on that site. On information and belief, title to Searcy Homes passed to the Housing Authority in 1971.

20.

Although gas plants like the Huntsville MGP were once considered technological marvels, the operations often left behind various constituents that are now considered hazardous substances under federal and state environmental laws. Constituents of concern associated with gas plants include a variety of polycyclic aromatic hydrocarbon compounds associated with tars, and various inorganic compounds such as arsenic, cyanide, mercury, and lead associated either with burning coal or reactions from the purification process.

21.

By letters dated June 2, 1998, Alagasco's corporate parent, Energen Corporation, notified the defendants that Alagasco was the current or former owner of several manufactured gas plant sites in Alabama, including the Huntsville MGP, and that such sites posed a potential for claims related to personal injury or property damage, although none had been asserted against Alagasco as of that time.

10

22.

By the time of Alagasco's initial notice of the potential for claims involving the Huntsville MGP in June 1998, the defendants were already well aware of the potential for significant environmental problems associated with former manufactured gas plant sites.  Indeed, by the time of that initial notice from Alagasco, the defendants had already been involved for years in litigation regarding insurance coverage for other gas plant sites formerly owned or operated by utilities elsewhere in the country.

23.

On October 8, 2008, Alagasco received from the United States Environmental Protection Agency ("EPA") an information request related to the Huntsville MGP issued under the authority of section 104(e) of the Comprehensive Environmental Response, Compensation and Liability Act (the "Information Request"), along with a Pollution Report dated September 22, 2008 (the "Pollution Report").  Among other things, the Pollution Report alleged that the Huntsville MGP met the "requirements for a time-critical removal" because of potential exposure of residents to chemical constituents of concern.  The Pollution Report also alleged that, "[e]arth moving or grading during construction of the Searcy Homes development may have spread the contaminated soils" beyond the original site boundaries of the Huntsville MGP.  It further stated that:

EPA's Enforcement Section is preparing an assessment of liability and ability to pay on Potential Responsible Parties (PRPs) related to the site. If it is determined that one or more PRPs are able to complete a removal action, [the agency] *may* pursue an Administrative Order on Consent (AOC) with them to carry out the time-critical removal action and provide reimbursement for past costs."

(Emphasis in the original.)

24.

On information and belief, EPA has not attempted to initiate similar removal actions at any of the more than a dozen former manufactured gas plant sites located elsewhere in Alabama. On information and belief, the reason the Huntsville MGP site has received special attention from EPA is not due to the size of the site nor the extent of the impacts, which are relatively modest compared to other manufactured gas plants. On information and belief, rather than the size of the plant or the extent of the impacts, the main reason the Huntsville MGP has received special attention from EPA compared to other such sites in Alabama is because of the presence of residents living in the housing development built on the former plant site.

25.

On information and belief, between the time of Alagasco's initial notice of potential claims to the defendants in June 1998 and the time of EPA's Information Request and Pollution Report in October 2008, none of the defendants hired any consultant or other expert to evaluate the risks posed by the Huntsville MGP.

26.

On information and belief, between the time of Alagasco's initial notice of potential claims to the defendants in June 1998 and the time of EPA's Information Request and Pollution Report in October 2008, none of the defendants sent any of its own employees or other representatives to Huntsville to investigate or otherwise evaluate the Huntsville MGP.

27.

On information and belief, between the time of Alagasco's initial notice of potential claims to the defendants in June 1998 and the time of EPA's Information Request and Pollution Report in October 2008, none of the defendants performed any research on the current or historical use of the Huntsville MGP site.

28.

On information and belief, between the time of Alagasco's initial notice of potential claims to the defendants in June 1998 and the time of EPA's Information Request and Pollution Report in October 2008, none of the defendants performed any file reviews, interviews with relevant regulators or otherwise perform research into any publicly available information regarding the environmental condition of the Huntsville MGP or its regulatory status.

29.

On information and belief, between the time of Alagasco's initial notice of potential claims to the defendants in June 1998 and the time of EPA's Information Request and Pollution Report in October 2008, none of the defendants performed any independent research into the Huntsville MGP beyond asking Alagasco to provide them with information Alagasco might possess or develop.

30.

On October 29, 2008, Alagasco sent The Travelers copies of the Information Request and the Pollution Reports, stating that "Alagasco believes EPA's Information Request may constitute a claim under policies issued by [the carriers]."  True and correct copies of the October 29, 2008 letters to The Travelers (and to St. Paul Fire), along with the Information Request and Pollution Report enclosed therewith, are attached to this Complaint as **Exhibit B**.  As part of the letters attached at Exhibit B, Alagasco tendered the defense of EPA's claims and demanded coverage.

31.

On November 10, 2008, The Travelers acknowledged receipt of the materials attached as Exhibit B but asserted that EPA's Information Request and associated Pollution Report did not constitute a "formal claim."  The Travelers further stated that it could not determine its potential coverage obligations to

Alagasco "unless and until such a claim or lawsuit is received." A true and correct copy of The Travelers' November 10, 2008 letter is attached to this Complaint as **Exhibit C**.

32.

On November 18, 2008, Alagasco provided The Travelers with an update regarding the matter. As part of that update, Alagasco informed the carriers that it had met with EPA and that EPA had invited Alagasco to enter into an AOC under which it would carry out a time-critical removal at the Huntsville MGP. Alagasco explained that it had told EPA it would need to check with its insurers before it could determine whether entering into an AOC would be an appropriate step. Alagasco requested that the carriers provide immediate guidance on how Alagasco should proceed. True and correct copies of Alagasco's November 18, 2008 letters to The Travelers and St. Paul Fire are attached to this Complaint as **Exhibit D**.

33.

On November 25, 2008, The Travelers acknowledged receipt of the materials attached as Exhibit D, and stated:

> Once we have had an opportunity to review the captioned matter in conjunction with any potentially applicable policies issued to Alagasco, we will be in further contact with you regarding our coverage position. Accordingly, at this time, we can only advise that Alagasco act in a manner that it believes will best protect its interests with respect to the USEPA's AOC.

15

A true and correct copy of The Travelers' November 25, 2008 letter to Alagasco is attached to this Complaint as **Exhibit E**.  On information and belief, Ms. Gail P. Dalton, the author of the letter attached as Exhibit E, was formerly Ms. Gail Peterson.   On information and belief, Ms. Dalton (f/k/a Ms. Peterson) corresponded with Alagasco or its parent organization regarding the Alabama MGP sites as far back as 1998.

34.

On December 12, 2008, having learned of the previous merger or combination of the St. Paul companies and The Travelers, Alagasco wrote The Travelers asking whether it should continue sending separate letters to both St. Paul Fire and The Travelers or if there would be a single point of contact.  A true and correct copy of Alagasco's December 12, 2008 letter to The Travelers is attached to this Complaint as **Exhibit F**.

35.

On January 29, 2009, Alagasco wrote The Travelers updating the carrier on the ongoing discussions with EPA regarding a possible administrative order on consent and again asking whether there would be a single point of contact for both the St. Paul comanies and The Travelers.  A true and correct copy of Alagasco's January 29, 2009 letter to Travelers is attached to this Complaint as **Exhibit G**.

36.

On February 3, 2009, The Travelers' assistant account executive, Ms. Nicole Tarczanin, wrote to Alagasco.  Ms. Tarczanin reported that she had also sent a December 19, 2008 letter and, further, reiterated that she would be the single point of contact regarding the claim for both the St. Paul companies and The Travelers. A true and correct copy of The Travelers' February 3, 2009 letter to Alagasco is attached to this Complaint as **Exhibit H**.  A true and correct copy of Ms. Tarczanin's December 19, 2008 letter is attached as **Exhibit I**.  In the letter at Exhibit I, Ms. Tarczanin had indicated that The Travelers had "taken over St. Paul."

37.

On June 22, 2009, Alagasco provided The Travelers with an update, detailing verbal exchanges with EPA and providing The Travelers with a cost estimate for the removal action being required by EPA.  As part of its June 22 letter, Alagasco informed The Travelers of discussions with the Housing Authority regarding possible settlement of claims that might exist between Alagasco and the Housing Authority.   Alagasco also explained to The Travelers that its "failure to come forward with a definitive coverage position risks jeopardizing [Alagasco's] efforts to contain the exposure" posed by the Huntsville MGP matter.  A true and

correct copy of Alagasco's June 22, 2009 letter to The Travelers is attached to this

Complaint as **Exhibit J**.

38.

On June 24, 2009, The Travelers' Ms. Tarczanin wrote:

> As I previously advised [Alagasco], I am currently in the process of
> reviewing the file for this matter, in conjunction with any potentially
> applicable policies issued to Alagasco or any other entity under which
> Alagasco may qualify as an insured. Once I have had an opportunity
> to complete my review, I will be in further contact with you regarding
> our coverage position. At this time, I can only continue to advise that
> Alagasco act in a manner that it believes will best protect its interests
> with respect to this matter.

Ms. Tarczanin's letter, however, also purported to reserve the right to decline

coverage due to, among other reasons, "voluntary payments". A true and correct

copy of The Travelers' June 24, 2009 letter to Alagasco is attached to this

Complaint as **Exhibit K**.

39.

On June 25, 2009, Alagasco informed The Travelers that, on the prior day, it

had received a formal Notice of Potential Liability and Offer to Negotiate from

EPA (the "Liability Notice and Offer to Negotiate") and draft AOC (the "Draft

AOC"). Alagasco stated that the Liability Notice and Offer to Negotiate "plainly

constitutes a claim under policies of insurance issued by The Travelers and its

predecessors." Among other things, Alagasco pointed out that EPA had given it

only fourteen days to indicate whether it would negotiate, and insisted that The

Travelers either assume the defense or consent to entry into the AOC.  A true and correct copy of Alagasco's June 25, 2009 letter, along with the Liability Notice and Offer to Negotiate and Draft AOC, is attached to this Complaint as **Exhibit L**.

40.

Upon sending the correspondence attached as <u>Exhibit L</u> by email, counsel for Alagasco received an automatic reply indicating that Ms. Tarczanin was going to be out of the office for an extended period.  Therefore, counsel for Alagasco forwarded the message to Ms. Gail P. Dalton who, on information and belief, is Ms. Tarczanin's direct or indirect supervisor.  A copy of that forwarding message is attached to this Complaint as **Exhibit M**.

41.

Ms. Dalton and counsel for Alagasco then discussed the matter by phone. Ms. Dalton again stated that The Travelers had not had sufficient time to evaluate the matter to be able to state a coverage position.  Alagasco noted its frustration because it had been corresponding with The Travelers about the MGP issues for more than ten years and The Travelers had known about EPA's specific attempts to have Alagasco enter into an AOC for roughly eight months.  A true and correct copy of the message Alagasco's counsel sent Ms. Dalton following up on this conversation is attached to this Complaint as **Exhibit N**, along with copies of earlier correspondence included therewith.

19

42.

On June 26, 2009, Ms. Dalton again confirmed The Travelers' position that it was not yet able to state a coverage position and it advised Alagasco that it "act in a manner that it believes will best its interest [*sic*] with regard to" the Huntsville MGP matter. A true and correct copy of The Travelers' June 26, 2009 letter is attached to this Complaint as **Exhibit O**.

43.

On information and belief, between the time of Alagasco's notice to The Travelers of EPA's Information Request and Pollution Report in October 2008 and The Travelers' letter of June 26, 2009 attached as <u>Exhibit O</u> to this Complaint, The Travelers did not hire any consultant or other expert to evaluate the risks posed by the Huntsville MGP.

44.

On information and belief, between the time of Alagasco's notice to The Travelers of EPA's Information Request and Pollution Report in October 2008 and The Travelers' letter of June 26, 2009 attached as <u>Exhibit O</u> to this Complaint, The Travelers did not send any of its own employees or other representatives to Huntsville to investigate or otherwise evaluate the Huntsville MGP.

45.

On information and belief, between the time of Alagasco's notice to The Travelers of EPA's Information Request and Pollution Report in October 2008 and The Travelers' letter of June 26, 2009 attached as <u>Exhibit O</u> to this Complaint, The Travelers did not perform any research on the current or historical use of the Huntsville MGP site.

46.

On information and belief, between the time of Alagasco's notice to The Travelers of EPA's Information Request and Pollution Report in October 2008 and The Travelers' letter of June 26, 2009 attached as <u>Exhibit O</u> to this Complaint, The Travelers did not perform any file reviews, interviews with relevant regulators or otherwise perform research into any publicly available information regarding the environmental condition of the Huntsville MGP or its regulatory status.

47.

On information and belief, between the time of Alagasco's notice to The Travelers of EPA's Information Request and Pollution Report in October 2008 and The Travelers' letter of June 26, 2009 attached as <u>Exhibit O</u> to this Complaint, The Travelers did not perform any independent research into the Huntsville MGP beyond asking Alagasco to provide the carrier with information Alagasco might possess or develop.

48.

On October 13, 2009, Alagasco informed The Travelers that it had reached agreement on terms and intended to enter into an AOC with EPA.  A true and correct copy of Alagasco's October 13, 2009 letter, along with the proposed AOC, is attached to this Complaint as **Exhibit P**.  Alagasco reiterated its demand for a defense and repeated its view that The Travelers' protracted failure to state a coverage position was unreasonable and appeared to be in bad faith.

49.

On October 29, 2009, Alagasco and the Housing Authority executed an AOC with EPA.  A true and correct copy of that AOC, along with an associated Enforcement Memorandum prepared by EPA, is attached hereto as **Exhibit Q**.  As part of the resolution embodied in the final AOC attached as Exhibit Q, the Housing Authority paid Alagasco $250,000.00.

50.

On February 3, 2010, more than fifteen months after Alagasco's notice that EPA had sent the Information Request and Pollution Report, more than a year after Alagasco had informed The Travelers that EPA was insisting that it enter into an AOC, more than seven months after Alagasco had informed The Travelers of the Liaibility Notice and Offer to Negotiate, and more than three months after Alagasco's notice to The Travelers that it intended to enter into an AOC, The

Travelers wrote that it did not believe any of the foregoing constituted a "suit" such that it did not believe it had "any potential defense obligations at this time." A true and correct copy of The Travelers' February 3, 2010 letter is attached to this Complaint as **<u>Exhibit R</u>**.

51.

On information and belief, between the time of Alagasco's notice to The Travelers of EPA's Information Request and Pollution Report in October 2008 and The Travelers' letter of February 3, 2010 attached as <u>Exhibit R</u> to this Complaint, The Travelers did not hire any consultant or other expert to evaluate the risks posed by the Huntsville MGP.

52.

On information and belief, between the time of Alagasco's notice to The Travelers of EPA's Information Request and Pollution Report in October 2008 and The Travelers' letter of February 3, 2010 attached as <u>Exhibit R</u> to this Complaint, The Travelers did not send any of its own employees or other representatives to Huntsville to investigate or otherwise evaluate the Huntsville MGP.

53.

On information and belief, between the time of Alagasco's notice to The Travelers of EPA's Information Request and Pollution Report in October 2008 and The Travelers' letter of February 3, 2010 attached as <u>Exhibit R</u> to this Complaint,

23

The Travelers did not perform any research on the current or historical use of the Huntsville MGP site.

54.

On information and belief, between the time of Alagasco's notice to The Travelers of EPA's Information Request and Pollution Report in October 2008 and The Travelers' letter of February 3, 2010 attached as <u>Exhibit R</u> to this Complaint, The Travelers did not perform any file reviews, interviews with relevant regulators or otherwise perform research into any publicly available information regarding the environmental condition of the Huntsville MGP or its regulatory status.

55.

On information and belief, between the time of Alagasco's notice to The Travelers of EPA's Information Request and Pollution Report in October 2008 and The Travelers' letter of February 3, 2010 attached as <u>Exhibit R</u> to this Complaint, The Travelers did not perform any independent research into the Huntsville MGP beyond asking Alagasco to provide the carrier with information Alagasco might possess or develop.

56.

On information and belief, at no time during the more than a decade between the time of Alagasco's initial notice to Travelers Casualty and St. Paul in 1998 and The Travelers' letter of February 3, 2010 attached as <u>Exhibit R</u> to this Complaint,

The Travelers did not perform a thorough and complete review of its records for any and all evidence of insurance coverage potentially relevant to the Huntsville MGP.

### 57.

Attached to this Complaint is an Exhibit List faithfully identifying each of the Exhibits identified herein.

## COUNT I

## <u>DECLARATION OF DUTY TO DEFEND</u>

### 58.

Alagasco repeats each and every allegation contained in Paragraphs 1 through 57 as if fully set forth herein.

### 59.

EPA's Information Request, Pollution Report, Liability Notice and Offer to Negotiate, and its repeated assertions that Alagasco was the lead liable party to which EPA looked for the undertaking of a removal action at the Huntsville MGP, constituted a "suit" within the meaning of the insurance policy attached as <u>Exhibit A</u> to the Complaint.

60.

EPA's allegations as laid out in the Pollution Report to the effect that "[e]arth moving or grading during construction of the Searcy Homes development may have spread the contaminated soils" beyond the original site boundaries of the Huntsville MGP and, further, the assertion that the potential exposures to resident individuals flowing from the conversion of the former Huntsville MGP from an industrial use to a residential use through the construction of Searcy Homes, all of which occurred between approximately 1969 and 1971, would, if proven to be true, constitute one or more "occurrences" causing property damage during the 1967 to 1983 policy period for the policy attached as Exhibit A to the Complaint.

61.

Alagasco is entitled to a declaratory judgment that The Travelers is obligated to provide a defense against the claims asserted by EPA regarding the Huntsville MGP until such time as it is impossible that any of the allegations, if proven to be true, could give rise to a covered claim under any of the insurance policies for which The Travelers is liable.

## COUNT II

## **REIMBURSEMENT FOR DEFENSE COSTS**

### 62.

Alagasco repeats each and every allegation contained in Paragraphs 1 through 61 as if fully set forth herein.

### 63.

Alagasco has already incurred more than $250,000.00 in legal and investigative costs defending EPA's claims relating to the Huntsville MGP, all of which qualify as defense costs under Alabama law.

### 64.

The Travelers is obligated under policies of insurance for which it is liable to reimburse the defense costs Alagasco has incurred or will incur in the future defending EPA's claims relating to the Huntsville MGP.

## COUNT III

## **BAD FAITH**

### 65.

Alagasco repeats each and every allegation contained in Paragraphs 1 through 64 as if fully set forth herein.

66.

The Travelers lacked reasonable legal or factual justification for its assertion that EPA's Information Request, Pollution Report, Liability Notice and Offer to Negotiate, and its repeated assertions that Alagasco was a liable party obligated to undertake a removal action at the Huntsville MGP did not constitute a "suit" within the meaning of the insurance policies at issue in this litigation.

67.

The Travelers had a duty to make an independent investigation of the EPA's claims and allegations to determine whether the agency's posture was sufficiently adversarial to constitute a "suit" within the meaning of the insurance policies at issue in this litigation.

68.

The Travelers failed to make an independent, good faith investigation of Alagasco's claims.  Instead, The Travelers abandoned its insured in the face of threats of substantial liability made by the federal government.

69.

On information and belief, The Travelers has failed to make a thorough search for policy records regarding potential coverage in favor of Alagasco regarding the Huntsville MGP.

70.

The Travelers negligently or intentionally misrepresented the extent to which it was investigating the claims relating to the Huntsville MGP, and negligently or intentionally misrepresented whether it would consider a "formal claim" such as was embodied in the Liability Notice and Offer to Negotiate as constituting a suit under its policies of insurance.

71.

The Travelers' failure to investigate, its misrepresentations regarding the extent to which it was investigating the matter, its failures to conduct a thorough search for policy records relevant to this matter, its failure to state a coverage position within a reasonable time, and its failure to enter a defense on behalf of Alagasco based on the assertion that EPA's claims and allegations relating to the Huntsville MGP did not constitute a suit under The Travelers' policies of insurance, all constitute bad faith under Alabama law.

72.

The Travelers is liable to Alagasco for damages as a result of its bad faith, including punitive damages as determined by a struck jury.

## COUNT IV

## <u>DECLARATION OF DUTY TO INDEMNIFY</u>

### 73.

Alagasco repeats each and every allegation contained in Paragraphs 1 through 72 as if fully set forth herein.

### 74.

The Travelers' failure to state a coverage position with regard to EPA's claims relating to the Huntsville MGP site in a reasonable time constituted a denial of coverage.

### 75.

The Travelers' denial of coverage for the EPA's claims relating to the Huntsville MGP resulting from its unreasonable delay in stating a coverage position was wrongful under the terms of its insurance policies.

### 76.

Alagasco's entry into the AOC with EPA and the accompanying arrangements with the Housing authority were reasonable and justifiable methods of settling at least portions of its liability in the face of the claims asserted by EPA in light of The Travelers' wrongful refusal to defend Alagasco against EPA's claim.

77.

Alagasco is entitled to a declaratory judgment that The Travelers must pay for all of the costs it has incurred or may incur in the future carrying out the AOC entered into with EPA.

## COUNT V

## **WAIVER AND ESTOPPEL**

78.

Alagasco repeats each and every allegation contained in Paragraphs 1 through 77 as if fully set forth herein.

79.

Although The Travelers purported on many occasions to reserve rights based on a variety of theories, it has failed to come forward with any specific facts that would support any of the purportedly reserved grounds for limiting or denying coverage other than its argument that the EPA's claims do not constitute a "suit" under the relevant policies of insurance.  Having had more than a year prior to its announcement in the letter attached as Exhibit R during which to investigate the claim and having come forward with no other specific factual basis for refusing to defend, The Travelers has waived the right to assert any other policy conditions as

a basis for refusing to defend besides the argument that the EPA's claims do not constitute a "suit" under the relevant policies of insurance.

80.

In the November 10, 2008 letter attached as <u>Exhibit C</u>, The Travelers represented to Alagasco that it would be able to determine its duty to defend when a "formal claim" or a "a claim or lawsuit is received."

81.

Alagasco reasonably relied upon The Travelers' representation that a "formal claim" would be sufficient for The Travelers to determine its duty to defend and that it did not need to resist EPA's threats until such time as the agency filed a lawsuit in court. Alagasco's decision to enter into the AOC was in part informed by The Travelers' representations regarding the sufficiency of a "formal claim" for purposes of determining coverage.

82.

Having represented to Alagasco that it could determine its duty to defend based upon a "formal claim" by EPA, The Travelers is estopped to argue that it has no duty to defend under its policies of insurance until an actual suit is filed in court against Alagasco.

83.

On numerous occasions, The Travelers directed Alagasco to act in its best interest with regard to entering into the AOC and negotiating with the Housing Authority. Alagasco justifiably relied upon direction from The Travelers in deciding to enter into the AOC with EPA and the associated arrangements with the Housing Authority.

84.

Having represented to Alagasco that it should act in a manner it believes protects its interest with regard to the AOC with EPA, The Travelers is estopped to argue that it has no duty to indemnify Alagasco for the costs of carrying out the AOC.

## **PRAYER FOR RELIEF**

WHEREFORE, Alagasco respectfully prays as follows:

a. That this Court enter judgment declaring that the defendants are obligated under their liability insurance policies to defend Alagasco against EPA's claims associated with the Huntsville MGP.

b. That this Court enter judgment against the defendants and in favor of Alagasco awarding Alagasco the cost it has incurred in defending against the EPA's claims relating the Huntsville MGP.

c.  That this Court enter judgment declaring that the defendants are obligated to   pay for all costs Alagasco incurs in carrying out the AOC in connection with the Huntsville MGP site.

d.  That this Court grant Alagasco a trial by jury with regard to its claims for bad faith damages against the defendants.

e.  That this Court enter judgment against the defendants awarding punitive damages in favor of Alagasco in an amount sufficient to punish and deter the defendants' bad faith in handling the claim relating to the Huntsville MGP.

f.  That this Court enter judgment against the defendants awarding Alagasco its reasonable attorneys' fees, interest, costs and the expenses of this action.

g.  That this Court grant such other and further relief as it deems just and proper.


**PLAINTIFF DEMANDS TRIAL BY STRUCK JURY ON
ALL FACTUAL ISSUES RAISED IN
COUNT III (BAD FAITH)**

Respectfully submitted this 9th day of July, 2010.

REBECCA WRIGHT PRITCHETT
ASB-5146-T83R
Counsel for Plaintiff
PRITCHETT LAW FIRM LLC
2001 Park Place, Suite 810
Birmingham, Alabama 35203
Tel:  (205) 583-9090
Fax: (205) 583-9098
rebecca@pritchettlawfirm.com

## IN THE NORTHERN DISTRICT COURT OF ALABAMA
## SOUTHERN DIVISION

Alabama Gas Corporation,              )
                            Plaintiff,      )
v.                                   )        CIVIL ACTION FILE NO.
                                   )        _____
Travelers Casualty and Surety        )
Company, St. Paul Fire and Marine    )        **JURY DEMAND**
Insurance Company, St. Paul Surplus  )
Surplus Lines Insurance Company, and )
St. Paul Mercury Insurance Company,  )
                         Defendants.     )
_____)

## APPENDIX OF EXHIBITS TO COMPLAINT

**Exhibit A**    St. Paul Fire policy number 501JB1000 and associated policy documents.

**Exhibit B**    October 29, 2008 letters from Alagasco to Travelers and to St. Paul, along with EPA Information Request and Pollution Report.

**Exhibit C**    November 10, 2008 letter  from Travelers to Alagasco.

**Exhibit D**    November 18, 2008 letters from Alagasco to Travelers and St. Paul.

**Exhibit E**    November 25, 2008 letter from Travelers to Alagasco.

**Exhibit F**    December 12, 2008 letter from Alagasco to Travelers.

**Exhibit G**    Janaury 29, 2009 letter from Alagasco to Travelers

**Exhibit H**    February 3, 2009 letter from Travelers to Alagasco.

**Exhibit I**    December 19, 2008 letter from Travelers to Alagasco.

**Exhibit J**    June 22, 2009 letter from counsel for Alagasco to Travelers.

**Exhibit K**    June 24, 2009 letter from Travelers to counsel for Alagasco.

**Exhibit L**    June 25, 2009 letter from counsel for Alagasco to Travelers, with EPA's Liability Notice and Offer to Negotiate and Draft AOC.

**Exhibit M**    June 25, 2009 email correspondence from counsel for Alagasco to Travelers.

**Exhibit N**    June 26, 2009 email from counsel for Alagasco to Travelers, with attachments of earlier correspondence transmitted therewith.

**Exhibit O**    June 26, 2009 letter from Travelers to counsel for Alagasco.

**Exhibit P**    October 13, 2009 letter from counsel for Alagasco toTravelers, along with the draft Participation Agreement concerning the AOC

**Exhibit Q**    Executed AOC, along with an associated Enforcement Memorandum prepared by EPA.

**Exhibit R**    February 3, 2010 letter from Travelers to counsel for Alagasco.