FILED
 2010 Sep-03  PM 05:15
 U.S. DISTRICT COURT
    N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| Alabama Gas Corporation, | ) |
|               Plaintiff, | ) |
| v. | ) |
|  | )   2:10-cv-1840-IPJ |
| Travelers Casualty and Surety | ) |
| Company, et al., | ) |
|               Defendants. | ) |
|  | ) |

## ALABAMA GAS CORPORATION'S BRIEF IN SUPPORT OF MOTION TO BIFURCATE DUTY TO DEFEND FROM BAD FAITH AND DUTY TO INDEMNIFY ISSUES, TO EXPEDITE CONSIDERATION OF DUTY TO DEFEND, AND TO STAY ALL PROCEEDINGS ON BAD FAITH AND DUTY TO INDEMNIFY

Plaintiff, Alabama Gas Corporation ("Alagasco"), files this Brief in Support of its Motion pursuant to Rules 42 and 57 to ask the Court to bifurcate the duty to defend issues from those relating to bad faith and the duty to indemnify, to expedite consideration of Defendant St. Paul Fire and Marine Insurance Company's ("St. Paul Fire's") duty to defend, and to stay all proceedings on bad faith and the duty to indemnify. As explained further below, the duty to defend issues in this Lawsuit can be decided as a matter of law with no discovery, and clarity on the duty to defend may allow the parties to resolve the remainder of the

dispute.  In contrast, the issues surrounding whether the Defendants'[1] handling of this claim constituted bad faith and the extent of their duty to indemnify may require extensive discovery, motions practice and perhaps a trial by jury.  Since the sequence proposed herein will minimize the use of judicial resources and, further, any inconvenience to the Defendants would be slight, Alagasco respectfully asks the Court to order that this litigation proceed in multiple phases with the first phase addressing only the duty to defend.

## BACKGROUND

The underlying claims giving rise to this insurance coverage dispute stem from the United States Environmental Protection Agency's ("EPA") decision to seek a "time-critical removal" at the Searcy Homes housing project in Huntsville, Alabama.  *See Complaint*, ¶23 (Doc. 1).  Although it is unclear what, if anything, representatives of the Huntsville Housing Authority (the "Housing Authority")

---

[1]  All the Defendants are direct or indirect subsidiaries of The Travelers Company, Inc. and have responded to the claims at issue through common representatives. *See Complaint*, ¶7 (Doc. 1).  Accordingly, when referring to the Defendants' actions leading up to this litigation, Alagasco will refer to them collectively as "Travelers".  Alagasco contends that St. Paul Fire is obligated to defend the underlying claims in their entirety pursuant to the terms of the insurance policy attached to Alagasco's Complaint as Exhibit A.  *See id.* at Ex. A.  Therefore, although all the Defendants have managed this claim under the common "Travelers" umbrella, the first phase of the litigation under the sequence requested by Alagasco would only relate to St. Paul Fire's contractual duties.

knew about the history of the property when Searcy Homes was built during 1970 and 1971, the site had been the location of a manufactured gas plant ("MGP") dating back to the 1800s. *See id*. at Ex. B, p. 16.

Like most MGPs, the basic operation of the Huntsville plant involved the superheating of coal or a combination of coke and oil in low-oxygen chambers to produce gas that was then purified and fed through a gas distribution system throughout the town. *See id.* at ¶16. Such gas plants were once considered technological marvels, but they often left behind various constituents that are now considered hazardous substances under modern environmental laws. *See id.* at ¶20. Constituents of concern associated with MGPs include a variety of polycyclic aromatic hydrocarbon compounds associated with tars, and various inorganic compounds such as arsenic, cyanide, mercury, and lead associated either with burning coal or reactions from the purification process. *See id*.

In October 2008, EPA asserted that Alagasco, as one of several historical operators of the Huntsville MGP, was jointly and severally liable for the costs of whatever cleanup might prove necessary to abate the risks posed at Searcy Homes. *See id*. at Ex. B, p. 5. EPA alleged that the site met the requirements for a time-critical removal because of potential exposure of residents to hazardous substances. *See id*. at Ex. B, p. 20. EPA also alleged that "[e]arth moving or grading during

construction of the Searcy Homes development may have spread the contaminated soils" beyond the original site boundaries of the Huntsville MGP. *See id.* at 21.

Alagasco was insured under primary and first layer excess liability policies issued by the Defendants from the middle 1940's until 1983. Among these insurance contracts was St. Paul Fire policy number 5010JB1000 (the "Policy"), which had an extended 16-year policy period running from July 10, 1967 to July 10, 1983. *Id.* at Ex. A, p. 1. The Policy requires St. Paul Fire "[t]o pay any loss by reason of the liability imposed by law or contract upon the Insured for damages because of injury to or destruction of property, including the loss of use thereof." *Id.* at 2. It also obligates the carrier to "[d]efend in the name and on behalf of the Insured any suit against the Insured alleging such . . . damage, or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; . . ." *Id.* at 3.

Alagasco first notified Travelers of the possibility of claims associated with a number of Alabama MGP sites back in 1998. *See id.*, ¶21. Upon receiving notice of EPA's Huntsville-related claims in October 2008, Alagasco promptly forwarded the agency's correspondence and associated reports to Travelers, stating that the EPA's communications may constitute a claim under its insurance policies. *See id.* at Ex. B, p. 3. Alagasco also tendered the defense and made a demand for

coverage in that notice. *See id.* Travelers sent its initial response on November 10, 2008, stating that it did not think that the EPA's assertions constituted a "formal claim" and that it was unable to state a coverage position until "such a claim or lawsuit is received." *See id.* at Ex. C, p. 3.

For much of the next year, EPA and Alagasco held talks during which EPA made it clear that it viewed Alagasco as the lead potentially responsible party ("PRP") and that it expected Alagasco to enter into an administrative order on consent ("AOC"). Alagasco updated Travelers on these communications on multiple occasions, each time reiterating the demand for a defense. *See, e.g., id.* at Exs. D, F, G, and J. Travelers responded in general stating it was reviewing its file or otherwise investigating the matter and advised Alagasco that it should "act in a manner that it believes will best protect its interests." *See., e.g., id.* at Exs. E and K.

On June 24, 2009, Alagasco received from EPA a Notice of Potential Liability and Offer to Negotiate (the "PRP Letter") (*see id.* at Ex. L, p. 5) and draft AOC (the "Draft AOC"). *See id.* at Ex. L, p. 9. Significantly, EPA gave Alagasco just fourteen days to decide whether it would enter into formal negotiations regarding the terms of the AOC. *See id.* at Ex. L, p. 7. Alagasco sent the PRP Letter and the Draft AOC to Travelers, noting specifically that EPA had called for

a response in just fourteen days.  *See id.* at Ex. L, p. 1.  Travelers yet again replied saying it was still reviewing the file and that Alagasco should act in what it believed to be its own best interests.  *See id.* at Ex. O, p. 1.

On November 24, 2009, Alagasco and the Housing Authority entered into an AOC with EPA.  *See id.* at Ex. Q, p. 32.  Under its terms, Alagasco is obligated to complete an investigation and address the most significant risks.  *Id.*  Following these initial investigations and removal actions, EPA may still attempt to require Alagasco to perform additional investigations and to undertake what the agency views as less time-critical corrective action measures.

On February 3, 2010, more than fifteen months after Alagasco's notice that EPA was seeking to require it to perform a time-critical removal, more than seven months after EPA had given Alagasco a fourteen-day deadline to agree to negotiations, and more than three months after Alagasco's notice to Travelers that it intended to enter into an AOC, Travelers wrote that it did not believe any of the foregoing constituted a "suit", such that it did not believe it had "any potential defense obligations at this time."  *See id.* at Ex. R, p. 3.

Alagasco contends that St. Paul Fire owes it a defense under the 1967 to 1983 Policy because EPA's claims constitute a suit resulting from one or more occurrences transpiring during that 16-year period.  More specifically, EPA alleges

a response in just fourteen days.  *See id.* at Ex. L, p. 1.  Travelers yet again replied saying it was still reviewing the file and that Alagasco should act in what it believed to be its own best interests.  *See id.* at Ex. O, p. 1.

On November 24, 2009, Alagasco and the Housing Authority entered into an AOC with EPA.  *See id.* at Ex. Q, p. 32.  Under its terms, Alagasco is obligated to complete an investigation and address the most significant risks.  *Id.*  Following these initial investigations and removal actions, EPA may still attempt to require Alagasco to perform additional investigations and to undertake what the agency views as less time-critical corrective action measures.

On February 3, 2010, more than fifteen months after Alagasco's notice that EPA was seeking to require it to perform a time-critical removal, more than seven months after EPA had given Alagasco a fourteen-day deadline to agree to negotiations, and more than three months after Alagasco's notice to Travelers that it intended to enter into an AOC, Travelers wrote that it did not believe any of the foregoing constituted a "suit", such that it did not believe it had "any potential defense obligations at this time."  *See id.* at Ex. R, p. 3.

Alagasco contends that St. Paul Fire owes it a defense under the 1967 to 1983 Policy because EPA's claims constitute a suit resulting from one or more occurrences transpiring during that 16-year period.  More specifically, EPA alleges

that the risks posed by the Huntsville MGP flow from the presence of resident individuals on and around the Searcy Homes housing project.  Therefore, the construction of Searcy Homes, along with the associated demolition and earth moving activities cited by EPA, constituted "accidents" or "continuous . . . exposure during the policy period to conditions which unexpectedly and unintentionally causes . . . injury to or destruction of tangible property, including the loss of use thereof." *Id.* at Ex. A, p. 4.

Travelers' refusal to honor its duty to defend has forced Alagasco to fight two different battles relating to the Huntsville MGP.  On one front, Travelers has forced Alagasco to defend itself against EPA, which has required Alagasco to spend more than $250,000 in defense costs to date.  On a second front, Travelers has now forced Alagasco to litigate in order to secure the benefits of its bargain under the Policy.  Accordingly, expedited consideration of St. Paul Fire's duty to defend will help avoid additional prejudice to Alagasco.  In contrast, staying the issues surrounding Travelers' duty to indemnify, as well as those surrounding whether Travelers' lengthy delays in investigating the claims and providing its insured with a coverage position constitute bad faith, will work no cognizable hardship on the carriers.

## II.  **LEGAL ARGUMENT**

A.  **The Court Has the Inherent Power to Bifurcate Issues, to Expedite Consideration of the Duty to Defend, and to Stay Portions of the Litigation in the Interest of Avoiding Prejudice to Parties and Promoting Judicial Economy.**

Federal Rule of Civil Procedure 57 provides that the "court may order a speedy hearing of an action for a declaratory judgment and may advance it on the calendar."  Rule 42(b) authorizes bifurcation of claims or issues:

> For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more issues, claims, cross claims, counterclaims, or third-party claims.

The decision to bifurcate is in the sound discretion of the district court.  *Popham v. City of Kennesaw*, 820 F.2d 1570, 1577, n.2 (11th Cir. 1987) (*reh'g en banc denied* Aug. 27, 1987).  *See also*, *U.S. v. Lunceford*, 2009 U.S. Dist. LEXIS 75034 (S.D. Ala. 2009).

B.  **The Duty to Defend in this Lawsuit Presents Questions of Law Capable of Immediate Summary Adjudication, While the Duty to Indemnify and Bad Faith Present Questions of Fact Which Will Require Extensive Discovery to Resolve.**

Alabama law is clear that an insurer's duty to defend is separate from and more extensive than its duty to indemnify.  *See Pa. Nat'l Mut. Cas. Ins. Co. v. Roberts Bros., Inc.*, 550 F. Supp. 2d 1295, 1304 (S.D. Ala. 2008), *citing Tanner v.*

*State Farm Fire & Cas. Co.*, 874 So. 2d 1058, 1063 (Ala. 2003). *See also Hartford Cas. Ins. Co. v. Merchants & Farmers Bank*, 928 So. 2d 1006, 1011 (Ala. 2005) (*reh'g denied* Nov. 18, 2005). It is also the settled law of Alabama that an insurer's duty to defend is determined primarily by the allegations in the underlying complaint. *Pa. Nat'l v. Roberts Bros.*, 550 F. Supp. 2d at 1304. *See also U.S. Fid. & Guar. Co. v. Armstrong*, 479 So. 2d 1164, 1168 (Ala. 1985). In determining whether an action must be defended by an insurer, if the allegations set forth in the underlying claim show an occurrence within the coverage of the policy, then the insurer is obligated to defend, regardless of the ultimate liability of the insured. *Hartford Cas. v. Merchants,* 928 So. 2d at 1009, *citing Ladner and Co. v. Southern Guar. Ins. Co.*, 347 So. 2d 100, 102 (Ala. 1977).

In short, Alabama law requires insurance companies to defend first and ask questions later. As such, an insurer should need no discovery to prove whether its failure to provide a defense was justified, especially where the insurer has had months or even years to evaluate its position. In *Blackburn v. Fidelity,* 667 So. 2d 661 (Ala. 1995), the Alabama Supreme Court discussed the insurer's broad duty to defend, stating as follows:

> The insurer's duty to defend is determined by the allegations of the complaint against the insured, whether true or groundless, and if there is any uncertainty as to whether the complaint alleges facts that would invoke the duty to defend, the insurer

> must investigate the facts surrounding the incident that gave rise to the complaint in order to determine whether it has a duty to defend the insured.

*Blackburn*, 667 So. 2d at 668. *See also Colonial Tanning Corp. v. Home Indem. Co.*, 780 F. Supp. 906, (N.D.N.Y. 1991) (since "the court is required to decide the defense duty claim solely by reference to the underlying complaint and the applicable insurance policy provisions, then discovery beyond the DEC complaint and the insurance policies is not relevant to the duty to defend").

Like the insurer in *Blackburn*, Travelers has had ample time and opportunity to investigate the facts that gave rise to EPA's claims in order to determine whether it has a duty to defend Alagasco. Accordingly, if Travelers does not already have in its possession solid grounds on which to refuse to defend the underlying EPA claim, then its failure to defend constitutes bad faith under Alabama law.[2] Therefore, Alagasco requests that the Court direct the parties in

---

[2] Alagasco's Complaint also asserts that Travelers has acted in bad faith by failing to investigate, by misrepresenting the extent of its investigations, by failing to conduct a thorough search for policy records, by failing to state a coverage position within a reasonable time, and by failing to enter a defense on behalf of Alagasco based on the "no suit" assertion. In the event the Court agrees with Alagasco that St. Paul Fire owes it a defense, Alagasco would ask the Court to establish a subsequent discovery and briefing schedule to consider the bad faith claims along with duty to indemnify issues. In the event the Court finds the carrier has no such duty to defend, the bad faith claims would be moot.

this Lawsuit to proceed immediately with dispositive motions on the duty to defend with no discovery.

**C.    Bifurcation of Duty to Defend from the Duty to Indemnify and a Stay of Proceedings Relating to the Duty to Indemnify Will Promote Judicial Economy and Minimize Prejudice.**

As explained above, the duty to defend comes down primarily to the narrow question of whether EPA's claims constitute a suit triggering the duty to defend, which can be decided as a matter of law based upon current record.  In contrast, the duty to indemnify would involve detailed factual questions requiring discovery into facts, some of which have not yet become entirely fixed.[3]  Significantly, even if Travelers contends that various limitations apply such that only some fraction of the underlying EPA claim could result in an indemnified loss, St. Paul Fire would still be obligated to defend the matter.  *See Blackburn v. Fid. & Deposit*, 667 So. 2d at 670.  *See also Acceptance Ins. Co. v. Brown*, 832 So. 2d 1, 14 (Ala. 2001).  In other words, the mere possibility that some of the claim might fall outside the scope of coverage is no excuse for an insurer to fail to defend

---

[3]   Although Alagasco and EPA have entered into an AOC, the actual costs associated with the removal at the site are not yet determined as the work is not yet complete.  Further, following the removal action, EPA may attempt to require additional investigation and corrective action measures.

so long as there is any chance that at least some of those allegations, if proven to be true, might be covered.

Requiring Alagasco to endure protracted discovery regarding Travelers' duty to indemnify and bad faith prior to a decision on the duty to defend would only serve to exacerbate the dual front war Alagasco is being made to fight. While there are several factors for a court to consider in deciding the sequencing of issues and matters, "the paramount consideration must remain a fair and impartial trial to all litigants through a balance of benefit and prejudice." *Kimberly-Clark Corp. v. James River Corp. of Va.*, 131 F.R.D. 607, 609 (N.D. Ga. 1989). *See also Harrington v. Cleburn County Bd. of Educ.*, 251 F.3d 935, 938 (11th Cir. 2001) (the district court's discretion in permitting bifurcation is not a high standard, and the district court's concern for clarifying the issues to be tried suffices to permit the court to separate trials). Proceeding with the duty to indemnify issues in this lawsuit prior to resolution of the duty to defend risks substantial prejudice to Alagasco. In contrast, neither the bifurcation nor stay would cause Travelers any legally cognizable prejudice since their resources would be preserved by not having to litigate the duty to indemnify issues, which rulings on the duty to defend might well render moot.

### III.     CONCLUSION

For the foregoing reasons, Alagasco respectfully asks the Court to: 1) bifurcate consideration of the duty to defend from issues surrounding bad faith and the duty to indemnify; 2) expedite consideration of the duty to defend; and 3) stay all proceedings relating to bad faith and the duty to indemnify pending resolution of St. Paul Fire's duty to defend.

### CERTIFICATE AS TO TYPE SIZE

The undersigned hereby certifies that the foregoing document has been prepared with 14-point type as required by the Court in its Administrative Procedures for Filing, Signing, and Verifying Pleadings and Documents at Section II(A)(1).

(REMAINDER OF PAGE LEFT INTENTIONALLY BLANK)

Dated:  September 3, 2010.

                                  Respectfully submitted,

                                  /s/ W. SCOTT LASETER
                                W. SCOTT LASETER
                                Georgia Bar No. 438515

Kazmarek Geiger & Laseter LLP
3490 Piedmont Road, NE
Suite 201
Atlanta, GA  30305
Tel:  404-812-0839
Fax: 404-812-0845
slaseter@kglattorneys.com

                                REBECCA WRIGHT PRITCHETT
                                ASB- 5146-T83R
                                FRED R. DELEON, JR
                                ASB-0761-R80D

Pritchett Law Firm LLC
2001 Park Place, Suite 810
Birmingham, Alabama 35203
Tel:  (205) 583-9090
Fax: (205) 583-9098
fdeleon@pritchettlawfirm.com

                                *Counsel for Plaintiff Alabama Gas Corporation*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 3, 2010, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

>Andrew J. Sinor, Esq.
>Hand Arendall, LLC
>1200 Park Place Tower
>2001 Park Place North
>Birmingham, Alabama 35203

>Respectfully submitted,
>
>/s/ W. SCOTT LASETER
>W. SCOTT LASETER
>Georgia Bar No. 438515

Kazmarek Geiger & Laseter LLP
3490 Piedmont Road, NE
Suite 201
Atlanta, GA  30305
Tel:  404-812-0839
Fax: 404-812-0845
slaseter@kglattorneys.com

>*Counsel for Plaintiff Alabama Gas Corporation*