FILED

2011 Oct-13  PM 02:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

## APPENDIX OF UNPUBLISHED CASES CITED IN

## <u>ALAGASCO'S RESPONSE TO TRAVELERS' MOTION TO STRIKE</u>

**Cases:**                                                                      **Page(s)**

*Butron v. Centerpoint Energy,*
　　2011 U.S. Dist. LEXIS 58620
　　(S.D. Tex. May 31, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

*Competitor Liaison Bureau, Inc. v. CESS-NA Aircraft Co.,*
　　2011 U.S. Dist. LEXIS 33121
　　(M.D. Fla. March 4, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*In re Complaint of Atlantic Marine Property Holding Co.*,
　　2009 U.S. Dist. LEXIS 84309
　　(S.D. Ala. March 20, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Cowley v. Sunset Yacht Charters, Inc.*,
　　2011 U.S. Dist. LEXIS 78380
　　(S.D. Fla. July 19, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Trinity Homes, LLC v. Ohio Casualty Insurance Co. Group*,
　　2011 U.S. Dist. LEXIS 61701
　　(S.D. Ind. June 8, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30



ANGEL BUTRON, Plaintiff, v. CENTERPOINT ENERGY, Defendant.

**Case No. 4:10-CV-0369**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION**

*2011 U.S. Dist. LEXIS 58620*

**May 31, 2011, Decided**
**May 31, 2011, Filed**

**CORE TERMS:** summary judgment, termination, disorder, terminated, truck, psychotic, entitlement, genuine, expert testimony, infliction, symptoms, notice, reinstatement, outrageous, emotional distress, deposition, diagnosis, clinical, police officer, emotional distress, expert witness, unauthorized use, substantive rights, poor performance, gap-filler, emergency, training, illness, jail, police department

**COUNSEL:** [*1] For Angel Butron, Plaintiff: Dawn D Rogers, LEAD ATTORNEY, PRO HAC VICE, Attorney at Law, Houston, TX.

For Centerpoint Energy, Defendant: Michael James Muskat, LEAD ATTORNEY, Muskat, Martinez & Mahony, Houston, TX.

**JUDGES:** KEITH P. ELLISON, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** KEITH P. ELLISON

**OPINION**

**MEMORANDUM AND ORDER**

Pending before the Court is Defendant's Motion for Summary Judgment (Doc. No. 15) and Defendant's Motion to Exclude the Report and Expert Testimony of Stephen L. Tate (Doc. No. 17). Upon considering the Motions, all responses thereto, and the applicable law, the Court finds that the Motion for Summary Judgment must be granted and the Motion to Exclude the Report and Expert Testimony of Stephen L. Tate must be granted in part and denied in part.

**I. BACKGROUND**

Plaintiff Angel Butron ("Plaintiff" or "Butron") has brought claims under the Family and Medical Leave Act ("FMLA"), *29 U.S.C. § 2601 et seq.*, against his former employer Centerpoint Energy ("Defendant" or "Centerpoint") arising out of events immediately preceding the termination of his employment by Centerpoint.

Prior to his termination, Butron had been employed for approximately twenty years by Centerpoint. (Angel Butron Dep. 89:4.) In his [*2] last position as senior service representative, Butron responded on an emergency basis to gas leaks, restored service, terminated service, and performed other maintenance tasks. (*Id.* 18:21-19:13.) Centerpoint provided a company vehicle for Butron's use and allowed him to keep the vehicle at his home. (Angel Butron Dep. 74:16-19.)

As a senior service representative, Butron was covered by a collective bargaining agreement ("CBA") between his union and Centerpoint. (Lewis Decl. ¶ 3; Lewis Decl. Ex. A.) The CBA contains policies specific to the bargaining unit, incorporates company-wide rules, and allows Centerpoint to establish other rules and regulations that do not conflict with the CBA. (Lewis Decl. Ex. A at 3.) Two such company-wide rules included the "Operating Vehicles on Company Business" policy (the "Company Vehicle Policy") and the "Performance Expectations" policy (the "Employee Performance Policy"). (Lewis Decl. Exs. B, C.) The Company Vehicle Policy authorized Centerpoint's employees to drive company vehicles for specific business needs and prohibits vehicles from being "used [*3] for personal business of any type without specific permission from the appropriate member of management." (Lewis Decl. Ex. B at 2.) The Employee Performance Policy states that employees are

2011 U.S. Dist. LEXIS 58620, *

expected to report to work on every scheduled workday and to personally notify their immediate supervisor if the employee must be absent or tardy, unless a verifiable emergency makes it impossible to do so. (Lewis Decl. Ex. C at 1.) If an employee is unable to reach a supervisor, the employer is required to leave a telephone number where he or she could be reached. (*Id.*) An employee may be immediately terminated for absenteeism for more than three consecutive scheduled days without notice to supervision or unauthorized use of a company vehicle. (*Id.* at 2.) The CBA also contains an "Attendance Control Program" that outlines various types of employee absences, such as illness or personal leave, and the number of points assigned to each type of absence. (Lewis Decl. Ex. D.) Qualified and approved absences under FMLA do not receive points. (*Id.*) Once twenty-three points are accumulated, an employee may be terminated. (*Id.*)

In mid-December 2008, Butron discovered that his wife Maria Butron ("Maria"), [*4] a Houston Police Department ("HPD") officer, had an affair with a fellow HPD officer. (Angel Butron Dep. 23:24-24:1, 30:24-25; Maria Butron Dep. 116:15-25.) Butron worked on Tuesday, December 16th without incident. (Lewis Decl. ¶ 6.) He had previously arranged to take vacation days from Wednesday, December 17th to Friday, December 19th. (*Id.* ¶ 6.) His next scheduled day of work was Monday, December 22nd. (*Id.* ¶ 6.)

On December 17th, Butron, accompanied by Maria, confronted the HPD officer with whom Maria had an affair. (Angel Butron Dep. 24:19-25:17, 30:20-22; Maria Butron Dep. 117:1-13.) Butron learned that the affair with the HPD officer had taken place approximately two years prior, but that Maria had also engaged in a second affair more recently. (Angel Butron Dep. 28:24-29:24.) After learning of his wife's extramarital affairs, Butron began to feel irrational and could not think straight. (*Id.* 38:23-24.)

On Saturday, December 20th, Butron skipped a fundraising barbeque for his child's baseball team. (*Id.* 32:12-14, 38:17-18.) By that point, Butron had not slept in several days. (*Id.* 32:13-14.) Butron's father took Butron to see Dr. Robert Castillo, who prescribed Clonazepam. (*Id.* [*5] 43:11-44:4.) Dr. Castillo did not diagnose Butron with a psychotic disorder. (Castillo Decl. ¶ 2.) In the late night of December 20th and early morning of December 21st, Butron had a confrontation with Maria. (Angel Butron Dep. 47:21-49:9; Maria Butron Dep. 47:11-48:22.) Butron's brother, Jose Butron ("Jose"), called the police department to report a disturbance. (Angel Butron Dep. 48:1-11.) The police arrived and interviewed Butron and Maria, but did not make an arrest. (*Id.* 49:22-25.)

On Monday, December 22nd, Butron was scheduled to report to work at 8:00 a.m. (*Id.* 55:13-25.) Prior to the start of his shift, Butron called his immediate supervisor, Jezell Lyles ("Lyles"), and told him that he needed a sick day because he wasn't feeling well. (*Id.* 51:13-15, 56:1-57:16; Doc. No. 22, Ex. B at 2) Butron did not request emergency leave. (Angel Butron Dep. 58:2-59:25; Doc. No. 22, Ex. B at 2) Butron spent December 22nd and some of the following days wandering the streets of Houston and spent at least one night in an abandoned van behind a church. (Angel Butron Dep. 60:23-63:4.) On December 22nd, he attempted to contact his friend Roel Ibarra, a fellow Centerpoint employee, by reporting [*6] a fake gas leak and hoping that Ibarra would respond to the leak. (*Id.* 63:20:65:11.) Instead, a Centerpoint employee named Hubert Tigner responded, saw Butron, and realized that the reported leak was bogus. (*Id.* 63:18, 66:22-67:16.)

On the morning of Tuesday, December 23rd, Butron again tried to contact Lyles before his shift to ask for another sick day. (*Id.* 69:12-18.) Lyles was unavailable so Butron spoke to Jose Castro ("Castro"), a crew leader, instead. (*Id.* 69:12-15, 72:24.) Butron asked Castro to let Lyles know that Butron needed another sick day. (*Id.* 73:11-14.) Castro agreed to relay the message. (*Id.* 73:20-21.) Maria also called Lyles to find out whether Butron had gone to work, since, by that point, she was no longer staying with him. (Maria Butron Dep. 143:3-8.) She also told Lyles that she and Butron had an incident on December 21st, that she was no longer staying with Butron, and that Butron did not seem "normal" and was not acting "right." (*Id.* 144:1-5.) Lyles confirmed that Butron had called in on Monday and Tuesday. (*Id.* 143:10-11.) Later that day, Butron went to his ex-wife's workplace, became lost, and asked Maria to pick him up. (Angel Butron Dep. 115:25-116:2.) In [*7] Maria's car, Butron told Maria to be quiet and took the battery out of his cell phone because he was afraid that people were following him and that his phone was tapped. (*Id.* 116:2-5.)

On Friday, December 26th, Butron drove in his Centerpoint-owned truck across the United States-Mexico border crossing at Laredo, Texas. (*Id.* 79:3-14, 81:19-22.) Butron had with him only his company-issued identification and some cash, but did not have other identification, his credit cards, or his cell phone. (*Id.* 82:5-20.) He parked the truck at a bus station on the Mexican side of the border and took a bus to San Luis Potosi, where he stayed with relatives. (*Id.* 80:4-5, 81:1-3.)

At some point over the next several days, Maria again called Lyles to ask whether Butron had called in to work. (Maria Butron Dep. 144:8-20.) Maria told Lyles that Butron had been missing and that no one had heard

or seen from him. (*Id.* 144:10-13.) Lyles told Maria that Butron had not called in. (*Id.* 144:24-25.)

Antonio Butron ("Antonio"), Butron's older brother, went to Centerpoint's office and spoke to Lyles in person. (Antonio Butron Dep. 19:7-16.) Antonio asked Lyles for information about his brother and whether he had called [*8] in to work. (*Id.* 20:1-7.) Lyles told Antonio that he hadn't heard anything from Butron, but that he had heard something about cheating. (*Id.* 20:16-17, 26:2-3.) According to Antonio, Lyles said that he had noticed Butron acting strangely in the preceding weeks. (*Id.* 26:17-24.) Antonio told Lyles that he believed Butron was having problems and that Butron was in a "schizophrenic mode." (*Id.* 27:1-9.) Lyles told Antonio that Butron was required to come into work on Monday. (*Id.* 30:25-31:2.) Antonio offered to bring in a doctor's note for Butron and Lyles said that he would take a look at the note. (*Id.* 31:3-14.)

Antonio went to the office of Dr. Castillo, who had seen Butron on December 20th, and obtained a note excusing Butron from work until December 31st. (Doc. No. 15, Ex. 7; Antonio Butron Dep. 43:10-13, 44:23-45:4.) Antonio then delivered Dr. Castillo's note to Lyles. (Antonio Butron Dep. 47:21-22.) According to Antonio, Lyles stated that the note was good enough to excuse Butron from work until December 31st. (*Id.* 48:14-16.)

On December 29th, Antonio received a call from a Centerpoint corporate security representative, who asked about the location of Butron's company truck. (*Id.* 40:2-4.) [*9] Antonio told the representative that the truck was not at Butron's house, but did not say anything about Butron's illness. (*Id.* 40:7-12.) Centerpoint filed an auto theft report with the Houston Police Department. (Lewis Decl. ¶ 9.)

Butron eventually called his family. (Antonio Butron Dep. 36:11-13.) Butron's parents and two older brothers visited him in San Luis Potosi and attempted to convince him to return. (*Id.* 85:17-23.) Eventually, on January 5, 2009, Butron returned to the United States alone. (Angel Butron Dep. 86:1, 125:4-8.) He picked up the company truck from the bus station in Mexico and attempted to drive it back to the United States. (*Id.* 86:4-5.) At the checkpoint, federal agents detained Butron and called a Webb County police officer. (*Id.* 86:13-24.) The police officer called Centerpoint to ask about the company truck. (*Id.* 89:1-11; Lewis Decl. ¶ 10.) According to Butron, Centerpoint managers told the police officer that Butron had been terminated, asked the officer to impound the truck, and left it up to the police officer to decide what to do with Butron. (Angel Butron Dep. 89:1-11.) The police officer arrested Butron and took him to Webb County jail. (*Id.* 86:23-87:10.) [*10] Maria, her father, and Butron's sister bailed Butron out of

jail and brought him back to Houston. (Maria Butron Dep. 122:11-123:5.)

On January 8th, Butron, accompanied by Maria, visited Dr. Marisa Suppatkul in Houston. (Angel Butron Dep. 27:16-19, 36:14-16.) Dr. Suppatkul diagnosed Butron with "Brief Psychotic Disorder" and Adjustment Disorder with anxiety. (Doc. No. 22, Ex. G. at 10-11.) Dr. Suppatkul prescribed Ambien in the event that Butron's anxiety or sleeplessness resurfaced. (Angel Butron Dep. 95:7-9.) Centerpoint officially terminated Butron's employment on this day, effective January 5, 2009. (Lewis Decl. ¶ 11.)

After his return to Houston, Butron called his union's chairman, Freddie Pruitt ("Pruitt"), to determine whether and how he could obtain his position at Centerpoint again. (Angel Butron Dep. 97:12-22.) Pruitt provided Butron with a form to be completed by Dr. Suppatkul. (*Id.* 98:12-18.) Butron did not call any of his Centerpoint managers or supervisors directly, and did not report to work, on the advice of Pruitt. (*Id.* 106:7-10.) After failing to receive further guidance from Pruitt, Butron called another union representative, Tyson Pradia. (*Id.* 104:22-23, 108:13-14.) [*11] Pradia agreed to write a grievance on Butron's behalf, to call Russell Lewis (Centerpoint's North District Operations Manager), and to forward the form completed by Dr. Suppatkul to Centerpoint. (*Id.* 107:10-17; Maria Butron Dep. 134:1-4; Lewis Decl. ¶ 2.) On January 16th, Butron called Russell Lewis on the advice of Pradia to confirm that he had been terminated. (Angel Butron Dep. 125:16-25; Lewis Decl. ¶ 12; Doc. No. 15, Ex. 8.) Butron did not say anything to Lewis during this call about his health condition. (Lewis Decl. ¶ 12; Doc. No. 15, Ex. 8.)

On January 22nd, Butron's union officially filed a grievance on his behalf. (Lewis Decl. ¶ 13.) The grievance explained that Butron had been suffering from a health condition. (*Id.* ¶ 13.) At the conclusion of the grievance proceeding, Centerpoint confirmed that Butron had been terminated for just cause because of his violations of the company's attendance and use of company vehicle policies. (*Id.* ¶ 14.)

Butron filed the present suit against Centerpoint asserting violations of the FMLA and intentional infliction of emotional distress. Centerpoint has moved for summary judgment on Butron's FMLA and intentional infliction of emotional distress [*12] claims and to exclude Butron's expert witness. Butron has responded. The motions are ripe for disposition.

### III. MOTION TO EXCLUDE

Centerpoint has moved to exclude the opinion Butron's expert witness Dr. Stephen Tate, Psy.D., as un-

2011 U.S. Dist. LEXIS 58620, *

reliable due to the purported insufficiency of facts upon which it is based.

## A. Legal Standard

*Federal Rule of Evidence 702* provides for the admission of expert testimony that assists the trier of fact to understand the evidence or to determine a fact in issue. A court is charged with a "gatekeeping function" to ensure expert testimony is both reliable and relevant. *Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)*. Reliability is analyzed under *Rule 702*, which requires that: (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. *Fed. R. Evid. 702*. Experts are permitted to render opinions even if based on inadmissible evidence so long as the inadmissible evidence is of the type reasonably relied upon by experts in that field. *See Fed. R. Evid. 703*; *Daubert, 509 U.S. at 595*. Inadmissible [*13] facts or data that serve as a basis for the expert's opinion may not be disclosed to the jury by the proponent of the expert testimony unless a court determines "that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect." *Fed. R. Evid. 703*.

Further, the expert witness must be qualified "by knowledge, skill, experience, training, or education . . . ." *Fed. R. Evid. 702*. A court must exclude an expert witness "if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Wilson v. Woods, 163 F.3d 935, 937 (5th Cir. 1999)*; However, "*Rule 702* does not mandate that an expert be highly qualified in order to testify about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Huss v. Gayden, 571 F.3d 442, 452 (5th Cir. 2009)* (citing *Daubert, 509 U.S. at 596*).

The party seeking to rely on expert testimony bears the burden of establishing, by a preponderance of the evidence, that all requirements have been met. *Daubert, 509 U.S. at 593, n.10*; *Moore v. Ashland Chem., Inc., 151 F.3d 269, 276 (5th Cir. 1998)*.

## B.  [*14] Analysis

Dr. Tate a licensed clinical psychologist and possesses a Doctor of Psychology (Pys.D.) degree in Clinical Psychology. (Tate Forensic Rep. at 1-2.) He has approximately twenty years of experience providing clinical therapy and psychological testing to groups and individuals in a number of settings. (*Id.* at 2-3.) For example, Dr. Tate serves as a clinical psychologist to the Houston Police Department to serve the needs of police officers and their families, and has provided services to at-risk children, married couples, and the elderly. (*Id.*) Dr. Tate also possesses experience conducting psychological examinations for forensic purposes. (*Id.*)

Dr. Tate's expert report sets out his opinion that, during December 2008, Butron exhibited symptoms that would merit the diagnosis of Brief Psychotic Disorder as defined in the Diagnostic and Statistical Manual of Mental Disorders, 4th edition ("DSM-IV"). Dr. Tate based his opinion on a few different sources. First, he based his opinion on symptoms that were gathered by a mental health professional from a psychiatric facility in Laredo, Texas. Second, he based his opinion on symptoms that were reported by Butron to Dr. Suppatkul in Houston. [*15] (Tate Dep. 29:2-30:24.) Third, his opinion is based on symptoms that were described by Maria in a report to HPD. (Tate Dep. 36:23-37:15.) Fourth, Butron reported these symptoms directly to Dr. Tate beginning in January 2009. (Tate Dep. 42:9-23.) Dr. Tate himself observed "odd" behavior during his initial meeting with Butron. (Tate Dep. 77:3-81:12.) Dr. Tate offers an opinion about the type of behavior displayed by individuals with Brief Psychotic Disorder. He finally offers an opinion about the likely precipitating factors that led to Butron's mental health condition.

Centerpoint seeks to exclude Dr. Tate's opinions on two bases. First, Centerpoint argues that Dr. Tate's opinion that Butron suffered from a "brief psychotic disorder" is not based upon sufficient facts as required by *Rule 702*. Centerpoint contends Dr. Tate never visually observed and did not have first-hand knowledge of Butron's condition at any time. According to Centerpoint, Dr. Tate based his opinion on a diagnosis that was provided at the Webb County Jail. However, no mental health professional at the Webb County Jail actually diagnosed Butron with a brief psychotic disorder. In addition, Dr. Tate based his opinion [*16] on Dr. Suppatkul's diagnosis of Butron as having suffered a brief psychotic disorder. Such reliance upon the opinion of an undesignated expert like Dr. Suppatkul is improper.

We decline, however, to strike Dr. Tate's opinion on this ground. It is clear from Dr. Tate's deposition testimony that he primarily relied on Dr. Suppatkul's notes, direct observations of Butron's behavior, and Butron's reports of his symptoms, when arriving at the opinion that Butron suffered from Brief Psychotic Disorder. These constitute sufficient facts for the type of diagnosis that Dr. Tate has provided. Any questions regarding "the accuracy and truthfulness of the underlying medical history is subject to meaningful exploration on cross-examination and ultimately to jury evaluation." *Cooper v. Carl A. Nelson & Co., 211 F.3d 1008, 1021 (7th Cir. 2000)*. Neither is Dr. Tate's reliance on Dr. Suppatkul's notes and diagnosis improper. Dr. Tate, a

clinical psychologist, is within a similar field as Dr. Suppatkul, a psychiatrist. Both routinely diagnose and treat individuals with mental health disorders, though only Dr. Suppatkul is authorized to prescribe medication for those disorders. This is not a case where  [*17] Butron seeks to introduce Dr. Suppatkul's opinions through an individual who has no knowledge of the relevant specialty. *See **Abrams v. Ciba Specialty Chems. Corp., 2010 U.S. Dist. LEXIS 19155, 21-22 (S.D. Ala. Mar. 2, 2010)**. Rather, Dr. Tate is familiar with the methods and reasoning used by Dr. Suppatkul and can independently assess whether Dr. Suppatkul's data are appropriate for his opinion. In addition, Dr. Tate gathered his own data regarding Butron's symptoms and behavior in marital counseling sessions with Butron and his wife. *See Cooley v. Lincoln Elec. Co., 693 F. Supp. 2d 767, 781 (N.D. Ohio 2010)*.

Second, Centerpoint contends that Dr. Tate's opinion that Butron suffered a "serious health condition" under the FMLA is also based on insufficient facts under *Rule 702* and was not included in his expert report as required by *Federal Rule of Civil Procedure 26*. Butron does not make a response regarding this challenge. It is clear from Dr. Tate's expert report that he did not offer an opinion regarding whether Butron's Brief Psychotic Disorder constituted a "serious health condition." Further, his deposition testimony shows that Dr. Tate was unfamiliar with the legal standard that  [*18] must be met before one qualifies as having a "serious health condition" under the FMLA. For these reasons, we must exclude any opinion that Dr. Tate offers with respect to Butron suffering a "serious health condition" under the FMLA.

## IV. SUMMARY JUDGMENT LEGAL STANDARD

A motion for summary judgment requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. *FED. R. CIV. P. 56(c)*. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kee v. City of Rowlett, 247 F.3d 206, 210 (5th Cir. 2001)* (quotations omitted). A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party. *Crawford v. Formosa Plastics Corp., 234 F.3d 899, 902 (5th Cir. 2000)*. The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact but need not negate the elements of the nonmovant's case. *Exxon Corp. v. Oxxford Clothes, Inc., 109 F.3d 1070, 1074 (5th Cir. 1997)*.  [*19] If the movant meets this burden, then the nonmovant is required to go beyond its pleadings and designate, by competent summary judgment evidence, the specific facts showing that there is a genuine issue for trial. *Id.* The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Id.* Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence. *F.R.C.P. 56(e)(1)*; *See, e.g., Eason v. Thaler, 73 F.3d 1322, 1325 (5th Cir. 1996), McIntosh v. Partridge, 540 F.3d 315, 322 (5th Cir. 2008)*; *see also Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994)* (noting that a non-movant's burden is "not satisfied with 'some metaphysical doubt as to the material facts.'" (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986))*.

## III. ANALYSIS

Centerpoint moves for summary judgment on Butron's FMLA claims on two separate and independent grounds. First, Centerpoint argues that neither Butron nor his family members gave Centerpoint notice of Butron's alleged need for leave under the relevant FMLA statutory provisions.  [*20] Due to the failure to provide notice, Centerpoint was entitled to delay or deny protected leave. Second, Centerpoint contends that, even assuming that Butron suffered from an FMLA-covered health condition and provided proper notice of his need for FMLA leave, Butron would have been terminated for his unauthorized use of the Company truck regardless of any FMLA entitlement. In addition, Centerpoint moves for summary judgment on Butron's intentional infliction of emotional distress claim because Butron has available to him common law and statutory remedies for his claims.

In response, Butron argues that there are genuine issues of material fact regarding his entitlement to FMLA benefits and Centerpoint's interference with his FMLA rights. In addition, he contends that his intentional infliction of emotional distress claim should survive because Centerpoint's conduct was extreme and outrageous.

## A. FMLA Claim

The FMLA contains two distinction provisions. *See Nero v. Industrial Molding Corp., 167 F.3d 921, 927 (5th Cir. 1999)* (quoting *Bocalbos v. National W. Life Ins. Co., 162 F.3d 379, 383 (5th Cir. 1998))*. Under the "entitlement" or "interference" provision, the FMLA provides employees with  [*21] a series of substantive rights and prohibits employers from interfering with, restraining, or denying the exercise of these rights. *See 29 U.S.C. § 2615(a)(1)*; *Nero, 167 F.3d at 927*; *Bocalbos, 162 F.3d at 383*. Such entitlements include the right to take unpaid leave for up to 12 workweeks in any 12-month period for covered health conditions and the right to be reinstated to the employee's former position.

*See 29 U.S.C. § 2612(a)(1), 2614(a)*; *Bocalbos, 162 F.3d at 383*. Under the "discrimination" or "retaliation" provision, an employer is prohibited from discriminating or discharging an employee due to his exercise of FMLA rights. *See 29 U.S.C. § 2615(a)(2)*.

Here, Butron contends that Centerpoint denied or interfered with his entitlement to FMLA leave under *26 U.S.C. § 2612(a)(1)* and *29 C.F.R. § 825.301(d)*. Centerpoint contends that Butron has also asserted an entitlement to job restoration under *29 U.S.C. § 2614(a)(1)*. [1] Although the term "interference" is not defined in the FMLA, DOL regulations explain that "[i]nterfering [*22] with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." *29 C.F.R. § 825.220*; *Crown v. Nissan North Am., Inc., 634 F. Supp. 2d 688, 691 (S.D. Miss. 2009)*. If an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a violation has occurred. *King v. Preferred Technical Group, 166 F.3d 887, 891 (7th Cir. 1999)*. "Because the issue is the right to an entitlement, the employee is due the benefit if the statutory requirements are satisfied, regardless of the intent of the employer." *Hodgens v. General Dynamics Corp., 144 F.3d 151, 159 (1st Cir. 1998)*.

> 1    Butron's complaint also appears to assert a claim of retaliation as a result of his attempts to exercise his FMLA rights: "CenterPoint denied Butron FMLA benefits to which he was entitled and wrongfully terminated him for needing time off for his serious medical illness." (Pl. Orig. Compl. at 6.) However, Butron did not reference a retaliation-based theory in his opposition to Centerpoint's motion for summary judgment. Thus, we find that Butron has abandoned his claim of retaliation [*23] in violation of the FMLA. *See Hargrave v. Fibreboard Corp., 710 F.2d 1154, 1164 (5th Cir. 1983)* (plaintiff abandoned theory pleaded in complaint but not raised in opposition to summary judgment motion).

However, as several courts have recognized, the substantive right to reinstatement and the substantive right to medical leave are not absolute. As stated in *29 U.S.C. § 2614(a)(1)*, the substantive right to reinstatement "shall [not] be construed to entitle any restored employee to . . . any right, benefit, or position of employment other than any right, benefit or position to which the employee would have been entitled had the employee not taken the leave." Courts have extended this limitation on the right to reinstatement to also serve as a limitation on the right to noninterference with medical leave. *See Krutzig v. Pulte Home Corp., 602 F.3d 1231*

*(11th Cir. 2010)*; *Arban v. West Publishing Corp., 345 F.3d 390, 401 (6th Cir. 2003)*; *Gunnell v. Utah Valley State Coll., 152 F.3d 1253, 1262 (10th Cir. 1998)*. "An employee who requests or takes protected leave under the FMLA is not entitled to any greater rights of benefits than he would be entitled to had he not requested or taken leave." [*24] *Grubb v. Southwest Airlines, 296 Fed. Appx. 383, 391 (5th Cir. 2008)* (quoting *Serio v. Jojo's Bakery Rest., 102 F. Supp. 2d 1044, 1051 (S.D. Ind. 2000))*. "An employee lawfully may be dismissed, preventing him from exercising his statutory rights to FMLA leave or reinstatement, but only if the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave." *Arban, 345 F.3d at 401*; *see also Smith v. Diffee Ford-Lincoln-Mercury, Inc., 298 F.3d 955, 961 (10th Cir. 2002)*. If an employer can prove that it would have fired the employee for poor performance had the employee not exercised the employee's FMLA rights, the employer will not be liable for interference. *Throneberry v. McGehee Desh Cnty. Hospital, 403 F.3d 972, 977 (8th Cir. 2005)* (employer bears burden of proving whether employee would or would not have been dismissed for reasons unrelated to FMLA leave). The FMLA does not excuse poor performance by an employee even if the problems are caused by the condition for which FMLA leave is taken. *See Grubb, 296 Fed. Appx. at 383*; *McBride v. Citgo Petroleum Corp., 281 F.3d 1099, 1108 (10th Cir. 2002)*.

Here, even if we assume that Butron possessed a "serious [*25] health condition" and provided sufficient notice to Centerpoint of his need for leave by December 31st, Centerpoint's termination of his employment would have occurred regardless of his request for FMLA leave. By January 8, 2011, when Centerpoint officially terminated Butron, Centerpoint had received notice that Butron had taken his truck into Mexico, in violation of the company's policies. Centerpoint has introduced competent summary judgment evidence that Butron's personal use of a company vehicle is a ground for termination and served as one of the reasons for his termination. [2] Butron has not introduced any facts that raise a "genuine" issue of fact regarding the seriousness of this violation or that it may serve as a ground for termination. He states in his deposition that Centerpoint employees are allowed to use company trucks for routine personal errands performed on the way to or from work. However, he also acknowledges that use of the truck to travel when off-duty for a purely personal trip would not be permitted. (Angel Butron Dep. 77:20-23.) In fact, he admits that taking the truck down to Mexico would violate Centerpoint's policies "[i]f I was in the right state of my mind, [*26] thinking straight, yes." (*Id.* 79:20-24.)

> 2    Centerpoint also introduces competent summary judgment evidence that Butron's violation

2011 U.S. Dist. LEXIS 58620, *

of the CBA's Attendance Control Program was a separate and independent ground for his termination. Centerpoint contends that Butron did not appear or call in for work on six days (December 26, 29, 30, 31 and January 2 and 5). (Lewis Decl. ¶ 11.) We believe there are factual questions regarding Lyles' approval of Butron's absences on December 26, 29, 30, and 31, based on Antonio's deposition testimony stating that Lyles accepted a doctor's note excusing Butron from work until December 31st. As for Butron's absences on January 2 and 5, these may not have been excused through a doctor's note, but may be characterized as qualifying FMLA leave as a result of the communications from Butron's family members, Maria and Antonio, to Lyles about Butron's situation. We need not resolve whether these communications constitute sufficient notice of the need for FMLA leave, thereby excusing Butron from work on January 2 and 5, because we hold that Centerpoint's other ground for Butron's termination (i.e. violation of the company vehicle policy) precludes him from entitlement  [*27] to FMLA leave.

Butron has not come forward with any summary judgment evidence to suggest that his firing for unauthorized use of the vehicle would not have happened but for his need for medical leave. *See Arban, 345 F.3d at 401.* He points to internal emails, notes and reports purportedly demonstrating Centerpoint's awareness of his illness and his request for emergency leave. (Doc. No. 22, Ex. B, C, L.) However, these documents do not raise an issue of genuine fact as to the validity of Centerpoint's proffered reason for his termination--i.e., his violation of the vehicle use policy. In addition, they do not suggest that Centerpoint would not have terminated him had he not requested FMLA leave. As such, we find that Centerpoint has met its burden of establishing that its termination of Butron would have occurred regardless of the employee's request for or taking of FMLA leave.

Though Butron argues that the unauthorized use of the truck occurred due to his brief psychotic disorder, courts have repeatedly refused to excuse poor performance that arises out of the same condition that serves as the basis for the FMLA leave. In *Grubb*, the plaintiff, a flight instructor, was fired for sleeping  [*28] on the job, a condition that the plaintiff alleged was due to his sleep apnea. The Fifth Circuit found, in an unpublished opinion, that the plaintiff's termination for poor performance would have been appropriate if he was unprotected by the FMLA, thus extinguishing his right to leave. In *McBride*, the Tenth Circuit found that the termination of an employee due to her failure to process invoices timely, to report to work on time, and to be at her desk during

working hours was appropriate under the FMLA even though her poor performance may have been caused by her FMLA-covered depression. In another Tenth Circuit case, *Renaud v. Wyoming Dep't of Family Servs., 203 F.3d 723 (10th Cir. 2000)*, the court upheld the jury finding that the plaintiff had been terminated for showing up to work drunk, even though the termination occurred after the plaintiff had taken FMLA leave for his alcoholism. In contrast, in *Smith*, the Tenth Circuit found that the termination of an employee who had failed to conduct certain training requested by her employer would not have happened "had she not taken FMLA leave." *298 F.3d at 961.* The employer had failed to subject her to serious discipline regarding the alleged  [*29] deficiencies in her performance and did not formally emphasize the importance of training activities. The evidence allowed an inference that, had Smith been healthy, her employer would have permitted her to continue indefinitely at her job without training anyone. *Id.*

From these cases, we understand that Butron's violations of Centerpoint's vehicle use policy, even though they stemmed from the same root cause as his health condition, may serve as an independent reason for Centerpoint's termination of his employment. It is unfortunate that Centerpoint did not provide Butron, by all accounts a hard-working employee for approximately twenty years, with a greater opportunity to explain and cure his behavior. However, Centerpoint has provided competent summary judgment evidence that Butron was terminated for a valid reason other than his need for or requests for FMLA leave. Butron has not controverted this evidence with evidence that raises a "genuine" issue of fact surrounding Centerpoint's decision to terminate his employment. Therefore, we hold that Butron was not entitled to substantive FMLA rights to leave and reinstatement and grant summary judgment to Centerpoint on this claim.

## B. Intentional  [*30] Infliction of Emotional Distress Claim

To recover damages for intentional infliction of emotional distress, a plaintiff must establish that: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe. *Standard Fruit & Vegetable Co. v. Johnson, 985 S.W.2d 62, 65 (Tex. 1998).* Extreme and outrageous conduct is conduct "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Twyman v. Twyman, 855 S.W.2d 619, 621 (Tex. 1993)* (quoting *RESTATEMENT (SECOND) OF TORTS § 46 cmt. d* (1965)). Liability

2011 U.S. Dist. LEXIS 58620, *

does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. *GTE Southwest, Inc. v. Bruce, 998 S.W.2d 605, 612 (Tex. 1999)*; *RESTATEMENT (SECOND) OF TORTS § 46 cmt. d* (1965). It is for the court to determine, in the first instance, whether a defendant's conduct was extreme and outrageous. *GTE Southwest, Inc., 998 S.W.2d at 616*. But when reasonable minds may  [*31] differ, it is for the jury, subject to the court's control, to determine whether, in the particular case, the conduct was sufficiently extreme and outrageous to result in liability. *Id.*

The Texas Supreme Court has recognized that a plaintiff may bring an IIED claim in limited circumstances:

> "[T]he intentional infliction of emotional distress [is], first and foremost, a 'gap-filler' tort, judicially created for the limited purpose of allowing recovery in those rare instances in which a defendant intentionally inflicts severe emotional distress in a manner so unusual that the victim has no other recognized theory of redress. The tort's 'clear purpose,' we noted, was 'to supplement existing forms of recovery by providing a cause of action for egregious conduct' that might otherwise go unremedied. We cautioned, however, that the tort was 'a 'gap-filler' tort that should not be extended to circumvent the limitations placed on the recovery of mental anguish damages under more established tort doctrines.'"

*Hoffmann-La Roche, Inc. v. Zeltwanger, 144 S.W.3d 438, 447 (Tex. 2004)* (quoting *Standard Fruit, 985 S.W.2d at 68*) (omitting internal citations). Since an IIED claim is a "gap-filler" tort,  [*32] it cannot be used to evade "legislatively-imposed limitations on statutory claims or to supplant existing common law remedies." *Id.* An IIED claim cannot be brought when the plaintiff's injuries can be remedied by existing statutory or common law remedies, even if those avenues are barred. *Creditwatch, Inc. v. Jackson, 157 S.W.3d 814, 816 (Tex. 2005)* (IIED claim arising out sexual harassment must be dismissed due to availability of TCHRA remedy, even though plaintiff's TCHRA was time-barred).

Here, the FMLA is available to Butron as a remedy for the allegedly wrongful conduct of which he complains. Although Butron is unable to succeed on the merits of his FMLA claim, we cannot say that FMLA is unavailable to him. As such, an IIED claim cannot be used as a gap-filler tort in this situation. Therefore, the IIED claim fails as a matter of law and we grant summary judgment to Centerpoint on Butron's IIED claim.

## IV. CONCLUSION

Defendant's Motion for Summary Judgment, (Doc. No. 15), is **GRANTED.** Defendant's Motion to Exclude the Report and Expert Testimony of Stephen L. Tate, (Doc. No. 17), is **GRANTED IN PART** and **DENIED IN PART.**

**IT IS SO ORDERED.**

**SIGNED** this the 31st day of May, 2011.

/s/ Keith P. Ellison [*33]

KEITH P. ELLISON

UNITED STATES DISTRICT JUDGE



7 of 44 DOCUMENTS

**COMPETITOR LIAISON BUREAU, INC., NASCAR, INC., Plaintiffs, -vs- CESS-
NA AIRCRAFT COMPANY, Defendant.**

**Case No. 6:08-cv-2165-Orl-28GJK**

**UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF
FLORIDA, ORLANDO DIVISION**

*2011 U.S. Dist. LEXIS 33121*

**March 4, 2011, Decided
March 4, 2011, Filed**

**SUBSEQUENT HISTORY:** Magistrate's recommenda-
tion at *Competitor Liaison Bureau, Inc. v. Cessna Air-
craft Co., 2011 U.S. Dist. LEXIS 33076 (M.D. Fla., Mar.
8, 2011)*
Magistrate's recommendation at *Competitor Liaison Bu-
reau, Inc. v. Cessna Aircraft Co., 2011 U.S. Dist. LEXIS
33065 (M.D. Fla., Mar. 9, 2011)*
Adopted by, Motion denied by, Motion granted by, in
part, Motion denied by, in part *Competitor Liaison Bu-
reau, Inc. v. Cessna Aircraft Co., 2011 U.S. Dist. LEXIS
33071 (M.D. Fla., Mar. 28, 2011)*

**CORE TERMS:** supplemental report, aircraft, weather,
radar, certification, wire, syncrophaser, propeller, manu-
factured, appendix, wiring, deposition, ground fire,
crash, in-flight, testing, expertise, burning, expert re-
ports, recommended, inspection, insulation, post-impact,
rebuttal, harmless, deposed, expert testimony, disclose,
untimely, cockpit

**COUNSEL:** [*1] For Competitor Liaison Bureau, Inc.,
NASCAR, Inc., f/u/b/o their Insurers, Including the
United States Aircraft Insurance Group, Plaintiffs: F.
Bradley Hassell, LEAD ATTORNEY, Michael B. Ely,
LEAD ATTORNEY, PRO HAC VICE, Thomas Corley
Smith, Hassell, Moorhead & Carroll, Daytona Beach,
FL.

For Lexington Insurance Company, Intervenor Plaintiff:
Dennis M. O'Hara, Robert C. Bauroth, LEAD ATTOR-
NEYS, Wicker, Smith, O'Hara, McCoy & Ford, PA, Ft
Lauderdale, FL.

For Westchester Fire Insurance Company, Intervenor
Plaintiff: Joel D. Adler, LEAD ATTORNEY, Marlow,
Connell, Abrams, Adler, Newman & Lewis, Coral Ga-
bles, FL; Robert E. Geisler, Marlow, Connell, Abrams,
Adler, Newman & Lewis*, Coral Gables, FL.

For Cessna Aircraft Company, Defendant: J. Nixon
Daniel, III, John R. Zoesch, III, LEAD ATTORNEYS,
Thomas F. Gonzalez, Beggs & Lane, RLLP, Pensacola,
FL; Richard W. Smith, Russell K. Dickson, Jr., LEAD
ATTORNEYS, Fisher, Rushmer, Werrenrath, Dickson,
Talley & Dunlap, PA, Orlando, FL..

**JUDGES:** GREGORY J. KELLY,UNITED STATES
MAGISTRATE JUDGE.

**OPINION BY:** GREGORY J. KELLY

**OPINION**

**REPORT AND RECOMMENDATION**

**TO THE UNITED STATES DISTRICT
COURT:**

This cause came on for consideration without oral
argument on the following motions:

> **MOTION:** [*2] **PLAINTIFFS'
> MOTION TO EXCLUDE THE SUP-
> PLEMENTAL REPORT AND TES-
> TIMONY OF EXPERT WITNESS
> RAY CLAXTON (Doc. No. 64)**
>
> **FILED: November 5, 2010**

2011 U.S. Dist. LEXIS 33121, *

THEREON it is **RECOMMEND-ED** that the motion be **DENIED.**

**MOTION: PLAINTIFFS' MOTION *IN LIMINE* TO EXCLUDE PORTIONS OF THE TESTIMONY OF EXPERT WITNESS RAY CLAXTON (Doc. No. 71)**

**FILED: November 16, 2010**

THEREON it is **RECOMMEND-ED** that the motion be **GRANTED in part and DENIED in part.**

**MOTION: PLAINTIFFS' AMENDED MOTION TO EXCLUDETHE AMENDED SUPPLEMENTAL REPORT AND THE TESTIMONY OF EXPERT WITNESS RAY CLAXTON (Doc. No. 89)**

**FILED: November 30, 2010**

THEREON it is **RECOMMEND-ED** that the motion be **DENIED.**

## I. BACKGROUND.

This case arises from an aircraft accident that occurred on July 10, 2007, near Sanford, Florida. Doc. Nos. 2, 34-35. The aircraft (the "Aircraft"), a twin-engine Cessna 310R, which was manufactured by Cessna Aircraft Company ("Cessna") in 1977 (*see* Doc. No. 99-18 at 4), was owned by Competitor Liaison Bureau, Inc. ("CLB") and operated by NASCAR, Inc. ("NASCAR"). Doc. Nos. 2 at 2, 34 at 2, 35 at 2.

On July 9, 2007, during a flight of the Aircraft, the pilot, Andrew Tumicki, reported that the weather radar system was not working. Doc. No. 99-18 at 6. Mr. Tumicki [*3] attempted to reactivate the weather radar system, but began smelling "electrical components burning." Doc. No. 99-18 at 6. Mr. Tumicki then disengaged the circuit breaker for the weather radar system and the smell dissipated. *Id.* Mr. Tumicki wrote an "operational discrepancy" form stating that the weather radar system was inoperable. *See* Doc. Nos. 76 at 2 (containing a copy of the original operational discrepancy form); 72-1 at 8. Mr. Tumicki placed the original in the Aircraft's maintenance discrepancy binder and placed the binder on the Aircraft's throttle quadrant in the cockpit. Doc. Nos. 72-1 at 8; 99-18. Mr. Tumicki testified that he reported the incident to NASCAR and gave a copy of the discrepancy report to NASCAR's maintenance personnel. Doc. No. 72-1 at 8. The copy of the discrepancy report is not in

NASCAR's records. However, the original was recovered at the crash site. Doc. No. 72-1 at 9-11. Mr. Tumicki was not involved in the July 10, 2007 flight.

On July 10, 2007, shortly after takeoff from Daytona Beach, Florida, the pilots of the Aircraft declared an emergency, stating there was smoke in the cockpit, and diverted to Sanford, Florida. Doc. No. 72-1 at 2. The Aircraft [*4] collided with trees and houses, killing the two pilots and three people on the ground, and inflicting other bodily injury and property damage. Doc. No. 64 at 1-2. After the crash and subsequent ground fire, there were very few identifiable pieces of the Aircraft left for inspection and testing.

CLB and NASCAR (hereinafter collectively, "NASCAR") were insured by United States Aviation Underwriters, Inc., Lexington Insurance Company, and Westchester Fire Insurance Company. Doc. Nos. 2, 34-35. Various claims were asserted against NASCAR by injured parties or their representative, and although NASCAR was without knowledge as to who was ultimately responsible for their damages, the claims were paid in full with a reservation of rights to seek reimbursement against the party or parties who were ultimately responsible. Doc. Nos. 2, 34-35. Thereafter, NASCAR, on behalf and for the benefit of the above named insurance companies, filed suit against Cessna asserting negligence (Count I), strict liability (Count II), and breach of warranty (Count III). Doc. Nos. 2, 34-35. NASCAR seeks equitable subrogation, legal subrogation, indemnity, and contribution. Doc. Nos. 2, 34-35.

The cause of the July [*5] 10, 2007 crash is a central issue in this case. That issue has lead the parties to focus on two of the Aircraft's systems - the propeller syncrophaser and weather radar systems, which are discussed below. The case presents complex issues of fact and, understandably, the parties have retained numerous experts in various disciplines to assist the jury in resolving those issues.

NASCAR's theory of the case is the Aircraft was manufactured in an unreasonably dangerous manner because polyvinyl chloride plastic material ("PVC") was used as insulation for various wires in the cockpit, including the wires for the Aircraft's propeller syncrophaser system. Doc. Nos. 109 at 2; 64-1 at 5. [1] NASCAR maintains that Cessna should have known at the time the Aircraft was manufactured, and did know after the Aircraft was manufactured, that PVC insulated wires were not flame resistant and would create dangerous quantities of toxic fumes when ignited. Doc. Nos. 109 at 2; 99-18 at 10. NASCAR asserts that Cessna was negligent in using PVC insulated wires and that such use violates Federal Regulations. Doc. No. 109 at 2. Generally, NASCAR maintains that during the July 10, 2007

flight, a short in the wires  [*6] of the propeller syncrophaser system ignited the PVC insulation leading to large quantities of toxic fumes entering the cockpit, incapacitating the pilots and, ultimately, causing the crash.

> 1    A propeller synchrophaser is an electronic system designed to match the propeller revolutions per minute (RPM) and propeller phase angle on twin-engine airplanes. Doc. No. 99-18 at 4. The syncrophaser is a "device that automatically coordinates the speed of the engines so that the propellers rotate at the same speed" and pitch. Doc. No. 73-1 at 7. The Aircraft's propeller syncrophaser system and accompanying wiring was manufactured and installed by Cessna in 1977. *Id.*

Cessna's theory of the case is two-fold. First, Cessna maintains that: it did not manufacture the Aircraft in a negligent manner; the Aircraft was manufactured pursuant to all certification requirements of the Federal Aviation Administration; Cessna owed no duty to NASCAR; and NASCAR's claims are barred by a statute of repose. Doc. No. 109 at 2. Second, Cessna maintains that the cause of the crash, or the origin of the in-flight fire, was not the syncrophaser system. Doc. No. 109 at 3. Rather, Cessna contends that the fire that caused  [*7] the July 10, 2007 crash was a continuation of a fire or electric failure of the Aircraft's weather radar system, which occurred during the flight on July 9, 2007. *Id.* The weather radar system was manufactured by Benidix-King, Corp. and installed in the Aircraft on May 27, 1988. Doc. No. 72-1 at 6. Cessna asserts NASCAR's failure to remedy the problems with the weather radar system caused the crash. Doc. No. 109 at 3. The trial term for this case begins on April 1, 2011. Doc. No. 40 at 2.

This Report and Recommendation addresses three motions brought by NASCAR concerning one of Cessna's experts, Dr. Raymond Claxton, Ph.D., a metallurgical and mechanical engineer. [2] Dr. Claxton has offered three reports, or an original report, a supplemental report, and an amended supplemental report. Doc. Nos. 64-1, 64-9, 76-4. In order to properly frame the issues raised in the motions, it is necessary to discuss the chronology of Dr. Claxton's reports and certain related aspects of the case.

> 2    Metallurgy is the science or study of metals and their properties in bulk and at the atomic level. *See The American Heritage Dictionary,* Second College Edition (1985).

On July 30, 2010, Cessna retained Dr. Claxton  [*8] as an expert. Doc. No. 64-1 at 3. The deadline for NASCAR and Cessna to disclose their expert reports, respectively, were August 13, 2010 and September 13, 2010. Doc. Nos. 40, 47, 48. On August 13, 2010, NAS-

CAR served its expert reports, with the exception of Dr. Richard McSwain's expert report. Doc. No. 76 at 4. On August 24, 2010, an inspection of the remains of the Aircraft was conducted in Palm Coast, Florida, for the benefit of Cessna's experts, including Dr. Claxton. Doc. Nos. 64 at 2. On September 3, 2010, an inspection of various selected components of the Aircraft was conducted at Dr. Claxton's laboratory, Materials Analysis, Inc., in Dallas, Texas. Doc. No. 64-1 at 4. On September 13, 2010, Cessna served NASCAR with Dr. Claxton's first expert report (the "Report"). Doc. Nos. 64-1; 64-2; 64-3; 64-4.

Dr. Claxton's Report, based on observation and laboratory testing of syncrophaser harness and the 23 associated wires, concluded that: none of the 23 wires associated with the syncrophaser connecter bore evidence of electrical arching; each of the 23 wires bore evidence of thermal melting; the five fused junctions on the 23 wire syncrophaser connector indicate that the syncrophaser  [*9] system was electrically de-energized when the melting took place; melting of the 23 wires occurred in the post accident ground fire; all of the avionics wiring in the Aircraft was non-PVC insulated. Doc. No. 64-1 at 1-12. [3] Dr. Claxton's Report did not address whether the weather radar system was the likely cause of the in-flight fire on July 10, 2007. Doc. No. 64-1.

> 3    In this case, the parties generally refer to the wiring in an around the instrument panel as "avionic wiring." As applied in Dr. Claxton's Report, the syncrophaser system is not part of the Aircraft's avionics. Doc. No. 64-5 at 30-31.

On September 24, 2010, Cessna took the deposition of NASCAR's expert, Dr. Merritt M. Birky, Ph.D. Doc. No. 82-1. In Dr. Birky's August 12, 2010 report, he generally opines that in-flight fire that occurred on July 10, 2007, originated in the propeller syncrophaser system and, due to the PVC insulated wire in that system, emitted high concentrations of toxic fumes and smoke into the cockpit, incapacitating the pilots and causing the crash. Doc. No. 99-16 at 2-16. On September 29, 2010, an inspection and testing of selected components of the Aircraft, including the syncrophaser system and weather [*10] radar system, was conducted at Dr. Richard McSwain's laboratory in Pensacola, Florida. Doc. Nos. 64 at 3; 99-3. [4] Dr. Claxton attended the McSwain inspection, participated in, and observed the testing. Doc. Nos. 64 at 3; 64-5 at 117; 64-9 at 3; 98 at 7. While Dr. McSwain's initial report (Doc. No. 99-3) does not address the weather radar system, it was inspected and photographed during the McSwain inspection. Doc. Nos. 64-5 at 14-18; 98 at 7.

4    Although it is not exactly clear from the parties' submissions, at some point in time prior to the September 29, 2010 McSwain inspection, NASCAR notified Cessna that Dr. McSwain would be offering a rebuttal expert report. Doc. No. 76 at 3.

On October 8, 2010, Cessna deposed another NASCAR expert, Douglas Stimpson. Doc. No. 85. In his report, Mr. Stimpson opines that the weather radar system was properly deactivated on July 9, 2007, remained deactivated during the July 10, 2007 flight, removing or performing maintenance on the weather radar system would not have averted the crash, the source of the in-flight fire was the propeller syncrophaser system, and the Aircraft crashed because the pilots were overcome by toxic fumes emitted by the burning [*11] of the PVC insulated wiring. Doc. No. 99-20 at 14. During his deposition, Mr. Stimpson stated that the failure of the weather radar weather system on July 9th and the crash of July 10th were not necessarily unrelated because the failure of the weather radar system on July 9th was most likely the result of the problems coming from the propeller syncrophaser system. Doc. No. 85-2 at 4-5.

On October 15, 2010, Cessna served NASCAR with Dr. Claxton's supplemental report (the "Supplemental Report"). Doc. No. 64-9. [5] In the Supplemental Report, Dr. Claxton states that his original findings and conclusions regarding the syncrophaser system remain unchanged, but he added an additional basis for concluding that the syncrophaser wires melted due to thermal heating rather than electrical activity. Doc. No. 64-9 at 5. Dr. Claxton opined that the presence of calcium and sulfur on the insulation remnants of the insulation on the syncrophaser wires, but the absence of those elements on the bare wires themselves, is consistent with the syncrophaser harness burning during the post-impact ground fire. Doc. No. 64-9 at 4-5. Dr. Claxton also offered a new opinion regarding the weather radar system. Doc. [*12] No. 64-9 at 5-7. Dr. Claxton opined that the circuit board associated with the weather radar system suffered electrical failure and burned in-flight, on July 9th and July 10th, and was the "root cause of smoke in the cockpit during the final flight." Doc. No. 64-9 at 8. Dr. Claxton also offered observations and/or criticisms of Dr. McSwain's September 29, 2010 testing. Doc. No. 64-9 at 3-5.

5    Mr. Stimpson's deposition was not available at the time of Dr. Claxton's October 15, 2010 Supplemental Report. Doc. No. 76 at 7. Cessna acknowledges that Dr. Claxton had not read Dr. Birky's deposition prior to issuing his Supplemental Report. Doc. No. 98 at 2.

On October 18, 2010, NASCAR served Cessna with Dr. McSwain's rebuttal expert report (the "McSwain Report"). Doc. No. 99-3 at 2-14. The McSwain Report concludes that the wires of syncrophaser system utilized PVC insulation. Doc. No. 99-3 at 8-9. In the "Case Literature" section of the McSwain Report, he lists the Supplemental Report has having been reviewed as part of his analysis. Doc. No. 99-3 at 14.

On October 20, 2010, NASCAR deposed Dr. Claxton regarding his testing, observations, and opinions contained in the Report and Supplemental Report. [*13] Doc. No. 64-5. On October 25, 2010, Cessna deposed Dr. McSwain regarding the McSwain Report as well as Dr. Claxton's Supplemental Report. Doc. No. 98-3 at 76-82. Dr. McSwain stated that he disagreed with Dr. Claxton's findings in the Supplemental Report regarding the weather radar system; Dr. McSwain had performed additional testing; and he would be performing more additional testing. Id.

On November 12, 2010, NASCAR served Cessna with Dr. McSwain's supplemental report (the "McSwain Supplemental Report") wherein he disputes Dr. Claxton's Supplemental Report opinion that the weather radar system, specifically the weather radar antenna circuit board, underwent an in-flight fire on July 10th. Doc. No. 98-5 at 1-4. Dr. McSwain opines that the weather radar circuit board was damaged by the post-impact ground fire. Id. On November 19, 2010, Cessna served NASCAR with Dr. Claxton's amended supplemental report (the "Amended Supplemental Report"). Doc. No. 89-3. In the Amended Supplemental Report, Dr. Claxton changes the thermal degradation temperature of Teflon, which Cessna maintains was a result of a factual error contained in a well-known publication Dr. Claxton relied upon. See Doc. Nos. [*14] 89-3 at 6; 98 at 3. Although the underlying opinions in the Report and Supplemental Report are unchanged, the Amended Supplemental Report does contain certain changes regarding Dr. Claxton's analysis of the weather radar system and his related opinions. Compare Doc. No. 64-9 at 6 with Doc. No. 89-3 at 6. [6]

6    For example, in the Supplemental Report Dr. Claxton states: "The important conclusion that can be drawn from the fact that the antenna circuit board was melted and severely heat damaged while the wire insulation on one side and the aluminum on the other side remained undamaged is that the weather radar antenna assembly was not involved in the post-impact ground fire." Doc. No. 64-9 at 6 (emphasis added). In the Amended Supplemental Report, Dr. Claxton states that: "The important conclusion that can be drawn . . . is that weather radar antenna assembly may not have been involved in the post impact

2011 U.S. Dist. LEXIS 33121, *

ground fire." Doc. No. 89-3 at 6 (emphasis added). That is one example of how Dr. Claxton refined the language in his most recent report. *Compare* Doc. No. 64-9 at 6-8 *with* 89-3 at 6-8.

On November 23, 2010, Dr. McSwain was deposed again and testified about Dr. Claxton's Supplemental Report [*15] and Amended Supplemental Report. Doc. Nos. 64-12 at 2; 98 at 9. Neither party provided the Court with a transcript of Dr. McSwain's November 23, 2010 deposition.

## II. MOTIONS TO STRIKE.

On November 6, 2010, NASCAR filed a Motion to Exclude the **Supplemental Report** and Testimony of **Expert** Witness Ray Claxton (the "Motion to Strike"). Doc. No. 64. NASCAR maintains that the **Supplemental Report** is untimely because it was served after the September 13, 2010 deadline for Cessna to disclose its **experts'** reports. Doc. No. 64 at 5. NASCAR contends that the Supplemental Report is neither a rebuttal report as contemplated under *Rule 26(a)(2)(C)(ii), Federal Rules of Civil Procedure*, nor a supplemental report as contemplated under *Rule 26(e), Federal Rules of Civil Procedure*. Doc. No. 64 at 5-8 (citing *Keener v. United States, 181 F.R.D. 639, 640 (D. MT 1998)* (A report constitutes rebuttal evidence only if it is intended solely to contradict or rebut evidence on same subject matter identified by other party, and a supplemental report is intended to correct inaccurate or incomplete information)). NASCAR requests that pursuant to *Rule 37(c)(1), Federal Rules of Civil Procedure*, the Court enter an order [*16] striking the Supplemental Report and prohibit Dr. Claxton from testifying at trial concerning any matter contained therein. Doc. No. 64 at 4, 11-12. NASCAR argues that Cessna lacks substantial justification for failing to timely disclose the Supplemental Report and that failure is not **harmless**. Doc. No. 64 at 8-12.

On November 19, 2010, Cessna filed a response to the Motion to Strike arguing that the Supplemental Report was a timely rebuttal report of the opinions expressed in Dr. Birky and Mr. Stimpson's depositions, and a rebuttal of September 29, 2010 McSwain testing. Doc. No. 76 at 4-9. Cessna also maintains that even if the **Supplemental Report** is untimely, it is **harmless** to NASCAR because it had an opportunity to: present the **Supplemental Report** to its **experts;** depose Dr. Claxton as to the opinions contained in the **Supplemental Report;** have its **experts** conduct their own tests; and offer a rebuttal report. Doc. No. 76 at 14. On December 17, 2010, NASCAR filed a reply to Cessna's response arguing that the Supplemental Report is not a rebuttal report because, during his deposition, Dr. Claxton admitted that the Supplemental Report contained new opinions and was not intended to contradict [*17] or

rebut any prior opinions. Doc. No. 103 at 1-4 (citing Doc. No. 64-5 at 14-16).

On November 30, 2010, NASCAR filed an Amended Motion to Exclude the Amended **Supplemental Report** and to Limit the Testimony of **Expert** Witness Ray Claxton (the "Second Motion to Strike"). Doc. No. 89. NASCAR maintains that the Amended Supplemental Report is also untimely, there is no substantial justification for Cessna's failure to timely disclose the report, and Cessna's failure is not **harmless**. Doc. No. 89 at 12-18. NASCAR states in order to properly address the Amended **Supplemental Report**, it will be necessary for each of NASCAR's **experts** to offer new opinions addressing the Amended **Supplemental Report**, which will require a new round of depositions. Doc. No. 89 at 13-14. NASCAR acknowledges that the Amended Supplemental Report corrects inaccuracies contained in the Supplemental Report, which would normally constitute a proper supplemental report under the Federal Rules of Civil Procedure. However, NASCAR argues the Supplemental Report is untimely and should be stricken. *Id.* at 16-17. Pursuant to *Rule 37(c)(1), Federal Rules of Civil Procedure*, NASCAR requests that the Court enter an order striking the [*18] Amended Supplemental Report and excluding any testimony at trial concerning it. Doc. No. 89 at 18.

On December 13, 2010, Cessna filed a response to the Second Motion to Strike. Doc. No. 98. Cessna maintains that the Amended Supplemental Report addressed a factual error contained in the Supplemental Report regarding the thermal degradation temperature of Teflon, and that Dr. Claxton's substantive opinions did not change. Doc. No. 98 at 3. Cessna maintains that if the Supplemental Report and Amended Supplemental Report are untimely, the error is harmless to NASCAR because Dr. McSwain reviewed the Supplemental Report and cited it in the McSwain Report; Dr. McSwain was deposed regarding the Supplemental Report; the McSwain Supplemental Report addressed the Supplemental Report; and Dr. McSwain was deposed again after the Amended Supplemental Report was served on NASCAR and addressed both the supplemental reports. Doc. No. 98 at 9.

## III. ANALYSIS OF MOTIONS TO STRIKE.

*Federal Rule of Civil Procedure 37(c)(1)* states: "If a party fails to provide information or identify a witness as required by *Rule 26(a)* or *(e)*, the party is not allowed to use that information or witness to supply evidence on [*19] a motion, at a hearing, or at a trial, unless the failure was *substantially justified* or is *harmless*." *Fed. R. Civ. P 37(c)(1)* (emphasis added). "The district court has broad discretion to admit or exclude untimely submissions under this rule." *Lambert v. Monaco Coach Corp.,*

*No. 8:04-cv-608-T-30TBM, 2005 U.S. Dist. LEXIS 45942, 2005 WL 5960175, at *1 (M.D. Fla. Feb. 10, 2005) (citing Bearint v. Dorell Juvenile Group, Inc., 389 F.3d 1339 (11th Cir. 2004)).*

"'Substantial justification requires justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request. The proponent's position must have a reasonable basis in law and fact. The test is satisfied if there is [a] genuine dispute concerning compliance.'" *Earle v. State Farm Fla. Ins. Co., No. 6:07-cv-17-Orl-31DAB, 2008 U.S. Dist. LEXIS 168, 2008 WL 53916, at *1 (M.D. Fla. Jan. 2, 2008) (quoting Home Design Services, Inc. v. Hibiscus Homes of Florida, Inc., Civ. No. 6:03cv1860-Orl-19KRS, 2005 U.S. Dist. LEXIS 41745, 2005 WL 2465020, *2 (M.D. Fla. Oct.6, 2005) (quoting Ellison v. Windt, No. 6:99-cv-1268-Orl-KRS, 2001 U.S. Dist. LEXIS 1347, 2001 WL 118617, at *2 (M.D. Fla. Jan. 24, 2001)).*

If a party lacks substantial justification for failing to timely [*20] disclose an expert report, then that party is not permitted to use that evidence at trial, unless the failure is harmless. *Rule 37(c)(1), Federal Rules of Civil Procedure.* "In evaluating whether the failure to disclose a witness is harmless, the Eleventh Circuit considers "(1) the importance of the testimony; (2) the reason for the appellant's failure to disclose the witness earlier; and (3) the prejudice to the opposing party if the witness had been allowed to testify." *Hosea v. Langley, No. Civ. A. 04-0605-WS-C, 2006 U.S. Dist. LEXIS 5935, 2006 WL 314454, at *4 (S.D. Ala. Feb. 6, 2006) (quoting Bearint ex rel. Bearint v. Dorell Juvenile Group, Inc., 389 F.3d 1339, 1353 (11th Cir.2004)).* "Failure to timely make the required expert witness disclosures is harmless when the party entitled to the disclosure suffers no prejudice." *Earle, 2008 U.S. Dist. LEXIS 168, 2008 WL 53916, at *1.*

This case was filed in 2008, but Cessna did not retain Dr. Claxton until July 30, 2010. Doc. No. 64-1 at 3. Dr. Claxton did not inspect or conduct an analysis of the weather radar system until after September 13, 2010, the date Cessna's expert disclosures were due. *See Doc. No. 64-5 at 15-20.* Accordingly, it is recommended that the Court find the supplemental [*21] reports are untimely and Cessna has failed to demonstrate substantial justification for failing to timely disclose them.

After Dr. Claxton issued his Report, the components of the Aircraft were inspected by Drs. McSwain and Claxton, on September 29, 2010. Dr. Claxton's Supplemental Report addressing the weather radar system was served only two weeks later, on October 14, 2010. Doc. No. 64-9. Dr. McSwain reviewed the **Supplemental Report** as part of his first **expert report**, the McSwain

**Report,** which was completed on October 18, 2010, two days prior to Dr. Claxton's deposition. Doc. No. 99-3 at 14. NASCAR deposed Dr. Claxton about his Supplemental Report. *See Doc. No. 64-5.* On October 25, 2010, Dr. McSwain was deposed concerning the Supplemental Report. Doc. No. 98-3 at 76-82. Thereafter, on November 12, 2010, Dr. McSwain offered a supplemental report, the McSwain Supplemental Report, addressing the weather radar system. Doc. No. 98-5. During Dr. McSwain's supplemental deposition on November 23, 2010, he was questioned concerning the Amended Supplemental Report. *See Doc. No. 64-12 at 2.* Although the **Supplemental Report** was untimely and not substantially justified, NASCAR had sufficient [*22] information and opportunity to submit any new bases or opinions contained therein to their **expert** for a rebuttal opinion and, in fact did so. [7] Furthermore, NASCAR has deposed Dr. Claxton about his **Supplemental** Report. The Amended Supplemental Report was properly provided to correct an error and does not contain any new or otherwise materially altered opinions. Accordingly, it is recommended that the Court find the failure to timely produce the supplemental reports at issue is **harmless** and NASCAR has suffered no prejudice.

> 7    NASCAR generally alleges prejudice or harm resulting from the supplemental reports, but fails to identify any specific harm resulting from the same. Doc. No. 89 at 13-14. Given the facts set forth above, it is clear NASCAR had the opportunity to avoid any such harm and, in fact, rightfully took action to do so.

## IV. *DAUBERT* MOTION.

On November 16, 2010, NASCAR filed a Motion In Limine to Exclude Portions of the Testimony of Expert Ray Claxton pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)* (the "Daubert Motion"). Doc. No. 71. NASCAR argues that Dr. Claxton should be excluded from offering opinions concerning: 1) the Aircraft's certification [*23] basis and compliance with Civil Air Regulations; 2) the source or origin of the in-flight fire and smoke; and 3) the weather radar system, including whether the damage to the weather radar circuit board occurred in-flight or during the post-impact ground fire. Doc. No. 71 at 5-11. NASCAR maintains that Dr. Claxton lacks the necessary expertise to offer opinions as to the Aircraft's certification and compliance with Civil Air Regulations, and cause and origin of the fire. Doc. No. 71 at 5-6. NASCAR asserts that Dr. Claxton's opinion that the weather radar system burned in-flight, produced the smoke in the cockpit, and was not likely damaged in the post-impact ground fire lacks factual support. Doc. No. 71 at 6-9. Finally, NASCAR contends that Dr.

Claxton's opinions concerning the weather radar system are based on speculation rather than reliable scientific principles. Doc. No. 71 at 9-10. [8]

> 8   NASCAR does not request the exclusion Dr. Claxton's opinions regarding the propeller syncrophaser system. *See* Doc. No. 71.

On December 16, 2010, Cessna filed a response to the Daubert Motion. Doc. No. 96. Cessna asserts that Dr. Claxton will not offer any opinions concerning the certification basis [*24] of the Aircraft, including whether the Aircraft was properly certified by the Federal Aviation Administration. Doc. No. 96 at 10-11. However, Cessna contends that Dr. Claxton possess the requisite expertise to offer an opinion as to whether the PVC insulated wiring installed on the Aircraft meets the Civil Air Regulations requirement of "slow burning," "flame resistant wiring" that does not "emit dangerous or toxic fumes." Doc. No. 96 at 11. Cessna also asserts that Dr. Claxon has the requisite knowledge, skill, experience, training, and education to offer opinions as to whether the weather radar circuit board burned in-flight or after the post-impact ground fire. Doc. No. 96 at 12-13.

Cessna argues that Dr. Claxton's opinions regarding the weather radar system are supported by sufficient facts. Doc. No. 96 at 13-17. According to Cessna, Dr. Claxton's opinions are based upon the failure of the weather radar system on July 9, 2007 and the smell of "electrical components burning," and his own laboratory analysis of the weather radar system. Doc. No. 96 at 13-7. Finally, Cessna maintains that Dr. Claxton's opinions regarding the weather radar system are supported by sound scientific methods [*25] and principles. Doc. No. 96 at 18.

A. Law.

*Federal Rule of Evidence 702* states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

*Fed.R.Evid. 702*. In *Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)* and *Daubert, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469*, the Supreme Court held that the trial court must perform a "gatekeeper" function designed to ensure that any and all expert testimony is both relevant and reliable. "The burden of laying a proper foundation for the admissibility of an expert's testimony is on the party offering the expert, and the admissibility must be shown by a preponderance of the evidence." *Hall v. United Ins. Co. of America, 367 F.3d 1255, 1261 (11th Cir. 2004)*. The party offering the expert has "the burden to show that his [*26] expert [is] "qualified to testify competently regarding the matters he intend[s] to address; [] the methodology by which the expert reache[d] his conclusions is sufficiently reliable; and [] the testimony assists the trier of fact.'" *McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1257 (11th Cir. 2002)* (quoting *Maiz v. Virani, 253 F.3d 641, 664 (11th Cir. 2001)*).

In *Daubert*, the Supreme Court identified the following non-exclusive list of factors a court should consider when determining the admissibility and reliability of expert testimony:

> 1) whether the expert's methods or techniques can be or have been tested;
> 2) whether the technique, method, or theory has been subject to peer review and publications;
> 3) whether the known or potential rate of error of the technique or theory when applied is acceptable; and
> 4) whether technique, method, or theory has been generally accepted in the scientific community.

*509 U.S. 579, 594-95, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)*. In *Kumho Tire Co.*, the Supreme Court held that the *Daubert* factors applied not only to expert testimony based on scientific knowledge, but also to expert testimony based on general principles, technical knowledge, and other specialized knowledge. *526 U.S. 137, 141, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)*. [*27] Nonetheless, the trial court's "gatekeeping" function ""inherently require[s] the trial court to conduct an exacting analysis' of the *foundations* of expert opinions to ensure they meet the standards for admissibility under *Rule 702*." *U.S. v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004)* (quoting *McCorvey, 298 F.3d at 1257*) (emphasis supplied). However, it is not the province of the trial court to make "ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Technology DC-8 v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1341 (11th Cir. 2003)*. "Quite the contrary, "[v]igorous

cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Quiet Technology, 32 F.3d at 1341* (quoting *Daubert, 509 U.S. at 596*).

For instance, if an analysis or study is based on inaccurate date, such flaws are more appropriate for cross-examination. *See Quiet Technology, 326 F.3d 1333, 1345 (11th Cir. 2003)* (citing *Daubert, 509 U.S. at 596*). "[I]n most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of [*28] the evidence rather than its admissibility." *Quiet Technology, 326 F.3d at 1345* (quoting *Hemmings v. Tidyman's Inc., 285 F.3d 1174, 1188 (9th Cir. 2002))*. According to the Supreme Court, the "failure to include variables will affect the analysis' probativeness [rather than] its admissibility." *Bazemore v. Friday, 478 U.S. 385, 400, 106 S. Ct. 3000, 92 L. Ed. 2d 315 (1986)*. Thus, "[s]o long as the expert's testimony rests upon "good grounds,' it should be tested by the adversary process-competing expert testimony and active cross-examination-rather than excluded from jurors['] scrutiny for fear that they will not grasp its complexities or satisfactory [sic] weigh its inadequacies." *Quiet Technology, 326 F.3d at 1345* (internal citations and quotations omitted).

B. Analysis.

Dr. Claxton received his Ph.D. in metallurgical engineering in 1971. Doc. No. 64-4 at 8. His curriculum vitae states that he has:

> Thirty-five years combined experience in failure analysis, research, mechanical and metallurgical engineering, manufacturing and business management. Specific areas of expertise include the following: failure analysis; stress analysis; corrosion; fractography and metallography; metallurgical processing; metallurgical structure/property [*29] relationships; machine design; scanning electron microscopy; chemical analysis; mechanical testing; combustion and heat transfer. Licensed in the states of Texas and Alabama.

Doc. No. 64-4 at 8. Dr. Claxton hold numerous patents, belongs to many professional societies, has authored numerous publications, and has lectured and taught classes on aviation accidents. Doc No. 64-4 at 9-10. Dr. Claxton has previously testified at trial and at depositions

as an expert in metallurgical engineering. Doc. No. 64-4 at 12-21.

Dr. Claxton's list of reviewed materials, inspections, methodologies, testing, analysis, and opinions are set forth in his reports. Doc. Nos. 64-1; 89-3. [9] As part of his analysis, Dr. Claxton reviewed videos and photos of the accident site; the cockpit voice recordings; the depositions of numerous witnesses ? including Mr. Tumicki's testimony regarding his July 9, 2007 flight; the National Transportation Safety Board's reports concerning the crash; the Cessna Mishap Report and associated photographs of the crash; other experts' reports; military wire specifications; Federal and Civil Air Regulations; various technical papers, reference texts, and industrial product references [*30] on wire, wire insulation, and wire flammability; and photos of the propeller syncrophaser system and weather radar system. Doc. Nos. 64-1 at 4-5; 89-3 at 5-20. Dr. Claxton also conducted two non-destructive inspections of selected components of the Aircraft; laboratory analysis of arc-melted wires; laboratory analysis, including Energy Dispersive Spectroscopy ("EDS"), EDS analysis in an scanning electron microscope ("SEM"), and Fourier Transform Infrared ("FTIR") spectroscopic analysis of insulated wires from samples of an exemplar aircraft and of wires from the Aircraft's syncrophaser system; laboratory analysis of a single wire 12 gauge wire salvaged from the crash site; photographic analysis of the weather radar circuit board; and EDS analysis of the sheet metal where the weather radar circuit board was mounted. Doc. Nos. 64-1 at 5-11; 89-3 at 3-20.

> 9   The reason all of Dr. Claxton's opinions are not solely contained in the Amended Supplemental Report is because Dr. Claxton's opinions regarding the propeller syncrophaser system did not change between the Report and Supplemental Report -- although Dr. Claxton did provide an additional basis for his opinion regarding that system in his [*31] Supplemental Report -- and Dr. Claxton did not restate his original opinions in the Supplemental Report. *See* Doc. Nos. 64-1; 64-9; 89-3.

1. Aircraft Certification and Compliance with Civil Air Regulations.

Attached as Appendix A to the Report, Dr. Claxton provides an "Analysis of the Type Certificate Requirements for Electrical Cable," wherein he describes the wiring originally installed on the Aircraft, related Federal and Civil Air Regulations, and industry flammability standards for wiring. Doc. No. 64-2 at 14-17. Dr. Claxton concludes:

The applicable certification basis for the involved aircraft require that the wiring be "in accordance with recognized standards for electric cable of a slow burning type. . . ." The material installed in the involved aircraft at the time of manufacture was produced in accordance with MIL-W-5086/7, a valid military specification with a requirement that the supplied product burn slower than a specified rate. Both the test method and allowable maximum burn rate required by the cited military specification were consistent with the "slow burning rating" of widely-accepted industrial standard UL94-HB. The burn characteristics of the wiring installed in the [*32] involved aircraft at the time of manufacture were in accordance with the certification bases contained in the applicable Type Certificate.

Doc. No. 64-2 at 15-16 (emphasis added). Thus, in Appendix A of the Report, Dr. Claxton concludes that the Aircraft, at the time of manufacture, met the required certification basis under the Civil Air Regulations. Doc. No. 64-2 at 15.

NASCAR seeks to exclude Dr. Claxton from offering any opinions regarding the Aircraft's certification basis or compliance with the Civil Air Regulations because Dr. Claxton lacks the requisite expertise. Doc. No. 71 at 5-6. Cessna responds that it "has no intention of using Dr. Claxton to offer legal opinions as to whether this [A]ircraft was properly certified by the [Federal Aviation Administration]." Doc. No. 96 at 11. However, Cessna goes on to state that Dr. Claxton has the expertise necessary to testify as to whether the Aircraft's wiring was manufactured in compliance with the Civil Air Regulations, which requires slow burning, flame resistant wiring that does not emit dangerous quantities of toxic fumes. Doc. No. 96 at 11-12.

During Dr. Claxton's deposition, the following exchanges occurred:

Q. [D]o you intend [*33] to offer opinions in this case on the certification basis of this [Aircraft

A. No, I don't. . . . We did work in that.

Q. I understand, and I wanted to ask you about that, because it was an appendix to your report.

A. That's right.

Q. But I also note that Cessna has a certification expert, Mr. Burnett, who holds himself out as being qualified in that area.

A. Yes.

Q. So you don't see that as part of your function in this case.

A. Well, our function in this case - - before Mr. Burnett was engaged, there was apparently an allegation that surfaced that - - something to the effect that the [A]ircraft didn't meet the - - didn't meet the proper federal regs when it was first manufactured. And someone needed to investigate that, and I offered to, not as a regulations] expert, but you don't need to be a [regulations] expert to dig up the [regulations] and see what [regulations] the [A]ircraft was supposed to be manufactured to and whether it was, in fact manufactured to those [regulations] and what [regulations] it was not manufactured to. And that's basically what we did, and we put together a package that was then to be transferred to the person who was going to be doing the testifying and offer [*34] the opinions on regulations.

Q. Okay. So, in that regard, there is an appendix to your report - - or it's not really an appendix, it's a technical . . . file notes.

A. Well, it is Appendix A to our report.
. . .

Q. My question to you is this: Was this something that you prepared simply to furnish to Mr. Burnett, so he could use that as a basis for testifying, or do you yourself plan to give opinions in this case regarding the certification basis of the [A]ircraft

A. I don't anticipate being asked any questions about certification basis. If asked questions about this particular document I could probably answer them, but I'm not going to offer myself as a certification expert.

Q. Now, this particular document - - by "this particular document," I'm again talking about [Appendix A], how was this prepared in your office?

A. An engineer under my direction researched the subject and prepared the document with the attachments. . . .

Q. Do you know what he did to pre-
pare this document, what sort of research
he may have done?

A. He researched - - I don't know the
details, but from the document itself, it
seems that he looked at the type certificate
for the aircraft and saw the certifications
to which [*35] the aircraft was to be
manufactured, dug up those certifications,
looked at them, then looked at the allega-
tion. There was some reference to a [reg-
ulation] in the allegation, and he looked
that up and, you know, saw that that was
not part of the [regulations] to which the
[A]ircraft was manufactured. And I don't
think any opinions are in here, I just think
we just - - I think we just presented all the
data and the facts, and the purpose of it
was just to combine all those findings, if
you will, into one document so they could
be turned over to others.

Q. Have you done any independent re-
search into the certification basis of the
aircraft, other than what [was] provided
[by] you in [Appendix A]?

A. No, I have not.

Q. And I notice when I look at your
actual . . . report - - when I go to the con-
clusions, I really don't see any conclusions
about this aspect of the case, the certifica-
tion [basis]. . . . And the question is, since
you did not provide an opinion in your
report as to the certification, this would
not be your intention to provide such an
opinion at trial.

A. That's correct.

Doc. No. 64-5 at 7-10 (emphasis added).

The stated purpose of Appendix A is to address
whether or not the Aircraft, [*36] as manufactured,
meets the certification basis under the Civil Air Regula-
tions, which includes having wiring that is "slow burn-
ing" and does not "emit dangerous or toxic fumes." Doc.
No. 64-2 at 14-17. Appendix A concludes that the Air-
craft met the required certification basis. Doc. No. 64-2
at 15-16. NASCAR seeks to exclude Dr. Claxton from
offering any opinions regarding the Aircraft's certifica-
tion basis or compliance with the Civil Air Regulations
because Dr. Claxton lacks the requisite expertise. Doc.
No. 71 at 5-6.

As set forth above, Dr. Claxton acknowledged that
he is not an expert in certification bases and will not of-
fer himself as such. Doc. No. 64-5 at 7-8. Dr. Claxton

has also acknowledged that Appendix A directly ad-
dresses whether or not the Aircraft met the certification
basis under the Civil Air Regulations at the time it was
manufactured. *Id.* Aside from Appendix A, neither the
Report nor Amended Supplemental Report contain any
opinions concerning the Aircraft's certification basis or
any discussion of whether or not the wiring installed
could be considered slow burning under the Civil Air
Regulations. *See* Doc. Nos. 64-1; 89-3. Dr. Claxton testi-
fied that although Appendix [*37] A addresses the cer-
tification basis of the Aircraft, he does not think it con-
tains any opinions and it was intended to be turned over
to others. Doc. No. 64-5 at 7-10. Moreover, Cessna has a
certification expert, Mr. Burnett, who is qualified to tes-
tify about the certification basis of the Aircraft. Accord-
ingly, it is recommended that the Court find that Dr.
Claxton lacks the necessary expertise to offer an opinion
regarding the Aircraft's certification basis or of any mat-
ter contained in Appendix A, and that any such testimo-
ny should be excluded. [10]

> [10]   Furthermore, there is no indication Dr.
> Claxton has any expertise regarding polymer wire
> insulation and/or determining what constitutes
> dangerous or toxic fumes.

2. Weather Radar System.

NASCAR seeks to exclude Dr. Claxton from testi-
fying about his analysis and opinions of the weather ra-
dar system because he lacks expertise regarding analysis
of fire cause and origin, his opinions are not supported
by sufficient facts, and because his opinions are mere
speculation. Doc. No. 71 at 6-10. Dr. Claxton acknowl-
edged in his deposition that he does not hold himself out
as an expert in fire cause or origin. *See* Doc. No. 64-5 at
46. Dr. Claxton does [*38] have thirty-five years expe-
rience in the study and application of mechanical and
metallurgical engineering, including failure analysis.
Doc. No. 64-4 at 8. In this case, Dr. Claxton has con-
ducted an analysis of the propeller syncrophaser system
and weather radar system to determine whether they
burned electrically while in-flight, or thermally while on
the ground. [11] After conducting an analysis of the weather
radar system, Dr. Claxton concluded weather radar sys-
tem likely suffered an in-flight electric fire because the
weather radar circuit board was melted and severely heat
damaged, but the surrounding wire insulation and alu-
minum sheet remained largely undamaged. Doc. No.
89-3 at 6. Thus, while a post-impact ground fire cannot
be completely ruled out, Dr. Claxton concluded that the
absence of damage to the surrounding wire insulation
and aluminum sheet made it less likely that the damage
to the weather radar system occurred in the ground fire. [12]
Dr. Claxton's opinions relate directly to his training and
experience as a mechanical and metallurgical engineer.

Accordingly, it is recommended that the Court find that Dr. Claxton has the expertise to render opinions about the origin [*39] or cause of the in-fight fire.

> 11    Dr. Claxton's analysis of the propeller syncrophaser system, which is not challenged by NASCAR in this Daubert Motion, concluded that the burning of the propeller syncrophaser system most likely occurred in the post-impact ground fire due to the lack of electric fire evidence. Doc. No. 64-1.
>
> 12    Dr. Claxton opined that if the weather radar system had burned in the post-impact ground fire, then due to thermal degradation temperatures of aluminum and the Teflon insulated wire surrounding the weather radar circuit board, he would have expected to see greater damage to the surrounding components. Doc. No. 89-3 at 6-8.

Dr. Claxton based his opinions regarding the weather radar system upon physical and photographic inspection of the system, laboratory testing of the aluminum sheet, Mr. Tumicki's description of the July 9, 2007 failure of the weather radar system, and the voice recordings and transcript of July 10, 2007 flight. Doc. No. 89-3 at 3-7. It is recommended that the Court find that Dr. Claxton's opinion is based upon sufficient facts and data. Dr. Claxton's methods, techniques, and ultimate opinions can and have been tested by other experts, namely Dr. [*40] McSwain. If Dr. Claxton's methods, techniques, and opinions are flawed or contain inadequacies, then they are more appropriate for cross-examination and competing expert testimony. Accordingly, it is recommend that the Court find that Dr. Claxton's opinions concerning the weather radar system are the product of reliable principles and methods, rather than mere conjecture, and will assist the trier of fact in this case.

## V. CONCLUSION.

Based upon the forgoing, it is **RECOMMENDED** that the Court:

> 1. **DENY** the Motion to Strike (Doc. No. 64);

> 2. **DENY** the Second Motion to Strike (Doc. No. 89)

> 3. **GRANT in part and DENY in part** the Daubert Motion (Doc. No. 71) as follows:

>> a. **GRANT** the Daubert Motion to extent Dr. Claxton should be precluded from offering opinions as to the Aircraft's certification basis or any matter contained in Appendix A (Doc. No. 64-2 at 14-17) because he lacks the requisite expertise; and

>> b. **DENY** the remainder of the Daubert Motion because Dr. Claxton's opinions are based on sufficient facts or data, are the product of reliable principles and methods, and will assist the trier of fact.

Failure to file written objections to the proposed findings and recommendations contained in this [*41] report **on or before Friday, March 11, 2011** shall bar an aggrieved party from attacking the factual findings on appeal.

**Recommended** in Orlando, Florida on March 4, 2011.

/s/ Gregory J. Kelly

GREGORY J. KELLY

UNITED STATES MAGISTRATE JUDGE



20 of 44 DOCUMENTS

**IN THE MATTER OF THE COMPLAINT OF ATLANTIC MARINE PROPERTY HOLDING CO., INC., and ATLANTIC MARINE, INC., Owners of the Barge, MOBILE HEAVY LIFTER; BENDER SHIPBUILDING & REPAIR CO., INC., Charterer and Disponent Owner of the Barge, MOBILE HEAVY LIFTER, ABS ID NO. 7700124, for exoneration from or limitation of liability.**

CIVIL ACTION NO. 06-0100-CG-B

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF ALABAMA, SOUTHERN DIVISION

*2009 U.S. Dist. LEXIS 84309*

**March 20, 2009, Decided**

**SUBSEQUENT HISTORY:** Motion denied by *In re Complaint of Atl. Marine Prop. Holding Co., 2009 U.S. Dist. LEXIS 37915 (S.D. Ala., Apr. 29, 2009)*

**PRIOR HISTORY:** *In re Complaint of Atl. Marine, 2008 U.S. Dist. LEXIS 105264 (S.D. Ala., Dec. 31, 2008)*

**CORE TERMS:** expert report, scheduling, disclosure, rebuttal, supplemental report, expert testimony, shipyards, timely filed, repairs, rebuttal testimony, burden of proof, harmless, information contained, rebuttal evidence, substantially justified, supplemental, proponent's, helpful, genuine, vessel, depose

**COUNSEL:** [*1] For Atlantic Marine, Inc., Owner of the Barge MOBILE HEAVY LIFTER, Plaintiff: Michael E. Upchurch, Robert J. Mullican, LEAD ATTORNEYS, Kathryn Abbie Thompson Hamilton, Frazer, Greene, Upchurch & Baker LLC, Mobile, AL; Douglas W. Fink, Hand Arendall, L.L.C., Mobile, AL.

For Bender Shipbuilding & Repair Co., Inc., Charterer and Disponent Owner of the Barge MOBILE HEAVY LIFTER, ABS ID NUMBER 7700124, Plaintiff: A. Clay Rankin, III, LEAD ATTORNEY, Douglas W. Fink, Norman Matt Stockman, Hand Arendall, L.L.C., Mobile, AL.

For Pemex Exploracion Y Produccion, Claimant: Alan C. Christian, Thomas S. Rue, LEAD ATTORNEYS, Johnstone, Adams, Bailey, Gordon & Harris, Mobile, AL; Keith B. Dalen, LEAD ATTORNEY, PRO HAC VICE, Hill Rivkins & Hayden, LLP, New York, NY; Robert Glen Moll, LEAD ATTORNEY, PRO HAC VICE, Hill Rivkins & Hayden, LLP, Houston, TX; Douglas W. Fink, Hand Arendall, L.L.C., Mobile, AL; George F. Chandler, III, Hill, Rivkins & Hayden, Houston, TX.

For Grupo Nacional Provincial, S.A., KOT Insurance Company, Claimants: Donald C. Radcliff, LEAD ATTORNEY, Thomas Justice Radcliff, Brady Radcliff & Brown LLP, Mobile, AL.

For Pemex Exploracion Y Produccion, Counter Defendant: Keith B. Dalen, [*2] LEAD ATTORNEY, PRO HAC VICE, Hill Rivkins & Hayden, LLP, New York, NY; Robert Glen Moll, LEAD ATTORNEY, PRO HAC VICE, Hill Rivkins & Hayden, LLP, Houston, TX; Thomas S. Rue, LEAD ATTORNEY, Johnstone, Adams, Bailey, Gordon & Harris, Mobile, AL; George F. Chandler, III, Hill, Rivkins & Hayden, Houston, TX.

For Pemex Exploracion Y Produccion, Cross Defendants: Keith B. Dalen, LEAD ATTORNEY, PRO HAC VICE, Hill Rivkins & Hayden, LLP, New York, NY; Robert Glen Moll, LEAD ATTORNEY, PRO HAC VICE, Hill Rivkins & Hayden, LLP, Houston, TX; George F. Chandler, III, Hill, Rivkins & Hayden, Houston, TX.

For Pemex Exploracion Y Produccion, Cross Defendant: Keith B. Dalen, LEAD ATTORNEY, PRO HAC VICE, Hill Rivkins & Hayden, LLP, New York, NY; Robert

2009 U.S. Dist. LEXIS 84309, *

Glen Moll, LEAD ATTORNEY, PRO HAC VICE, Hill Rivkins & Hayden, LLP, Houston, TX.

**JUDGES:** Callie V. S. Granade, CHIEF UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Callie V. S. Granade

**OPINION**

***ORDER***

This cause is before the court on the motion of Pemex Exploracion y Produccion ("PEP") to strike the supplemental expert report of Ray Koon (Doc. 541), the response thereto of Bender Shipbuilding & Repair Co., Inc. ("Bender") and Atlantic Marine, Inc. (Doc. 547) and PEP's reply (Doc. 548). The court [*3] finds that the Mr. Koon's supplemental report was appropriately and timely filed under the scheduling order entered in this case. Therefore, PEP's motion is due to be denied.

PEP moves to strike the supplemental report because it did not merely correct or clarify information contained in the original report and because the newly expressed opinions should have been included in the initial expert report. Bender and Atlantic Marine, on the other hand, contend that the supplemental report was filed as rebuttal and was timely under the scheduling order.

This court's second amended Rule 16(b) scheduling order includes the following with regard to expert testimony:

> 6. *EXPERT TESTIMONY.* The disclosure of expert testimony (on the issue of damages), as required by *Fed.R.Civ.P. 26(a)(2)*, is to be made by the claimants by **January 9, 2009,** and by the limitation Plaintiffs **February 6, 2009.**
>
> * * * *
>
> 7. *REBUTTAL.* Expert rebuttal evidence, as authorized by *Rule 26(a)(2)(C)*, shall be disclosed on or before **February 17, 2009.** A rebuttal expert's deposition, if taken, must be noticed and completed within thirty (30) days of the date on which the expert's report is disclosed.

(Doc. 494, p. 2). PEP timely filed [*4] its disclosure of expert testimony on January 9, 2009. Bender & Atlantic Marine timely filed Mr. Koon's initial report on February 6, 2009. Bender and Atlantic Marine then filed Koon's supplemental report on February 17, 2009. PEP correctly states that "[w]hile *Fed.R.Civ.P. 26(e)* requires a party to

supplement or correct disclosure upon information later acquired, that provision does not license parties to freely circumvent deadlines established in the Court's scheduling orders." *Byther v. City of Mobile,* 2005 WL 1527677 at *1 (S.D. Ala. June 17, 2005).

> To rule otherwise would create a system where preliminary reports could be followed by supplementary reports and there would be no finality to expert reports, as each side, in order to buttress its case or position, could "supplement" existing reports and modify opinions previously given.

*Id.* (quoting *Beller v. United States of America, 221 F.R.D. 689, 695 (D.N.M. 2003))*. However, in this case, the scheduling order specifically permitted the parties to file expert rebuttal evidence on or before February 17, 2009, the date of Mr. Koon's second report. PEP argues that Mr. Koon's second report "was in no way a 'rebuttal' report since it [*5] did not address any matter not contained in PEP's expert reports served on January 9, 2009, and PEP had not made any additional expert disclosures since January 9." (Doc. 541, p. 3). However, a review of the portions of the expert reports submitted by the parties reveals that the opinions expressed in Koon's second report directly rebuts opinions expressed in PEP's expert report.

PEP states that Mr. Koon's first report contained a rebuttal of PEP's expert report and argues that an expert must give all opinions in his report. In support of this assertion, PEP cites *DeFazio v. Hollister, Inc., 2008 U.S. Dist. LEXIS 110004, 2008 WL 5113654, (E.D. Cal. Dec. 1, 2008)*, which states the following:

> Even assuming that defendants have the burden of proof on the issue of proper valuation, *see Howard v. Shay, 100 F.3d 1484, 1490 (9th Cir. 1996)*, plaintiffs certainly have a burden of production. And that production should have been made in the court-ordered simultaneous disclosures; an expert in such a situation must give all opinions regardless of whether those opinions are directed to a claim on which the plaintiffs have the burden of proof, do not have the burden of proof, or an affirmative defense. Rebuttals are reserved [*6] for those issues on which a party was "surprised" by the initial disclosure of the adversary.

2009 U.S. Dist. LEXIS 84309, *

*DeFazio, 2008 U.S. Dist. LEXIS 110004, 2008 WL 5113654 at \*3*. However, in *DeFazio*, the initial disclosure contained only general accounting platitudes and was described as being "not necessarily helpful" whereas the second report contained the real information and opinions. *Id.* The court stated the following:

> Where an initial disclosure is so incomplete that it does not satisfy *Rule 26(a)(2) (B)*, and the second report contains the information, reasoning, and opinions which must be disclosed in the initial disclosure, the expert may be limited to testifying to only opinions disclosed in the timely initial report.

*2008 U.S. Dist. LEXIS 110004, [WL] at \*2* (citing *Keener v. U.S., 181 F.R.D. 639, 642 (D.Mont. 1998))*. The *DeFazio* court therefore found that the second expert report was in fact an initial report, not a rebuttal report. [1] In contrast, while only portions of Koon's initial report were provided to the court, there has been no assertion that it contained little information or was too general to be helpful. The notation on the bottom of the pages provided to the court indicate that the report was 56 pages long. Mr. Koon's second report consists [*7] of 3 pages written in letter form. Additionally, the opinions expressed in the second report are not really new, but expand upon Koon's statement in the first report that "there were numerous shipyards along the Gulf of Mexico that had available capacity to accept a vessel such as the CHEMUL for repairs." (Doc. 541, Ex. 1, p. 33 of 56). The first report stated that the basis of Koon's opinion was that his "personal involvement in the industry at the time of Hurricane Katrina required that [he] be in contact with the various shipyards regarding capability and capacity situations." *Id.* Koon's second report merely details which shipyards he opines were capable of dry docking and/or quayside berthing the CHEMUL for repairs at the time period in question. Thus, it does not appear that Bender and Atlantic Marine were attempting to "hide the ball" or deceive PEP by neglecting to include any real information or opinions in the first report.

> 1   The court notes that the *DeFazio* court ultimately did not find it appropriate to exclude the supplemental report. *DeFazio, 2008 U.S. Dist. LEXIS 110004, 2008 WL 5113654 at \*6* (finding that such penalty "did not fit the crime").

Under the scheduling order, the parties were permitted [*8] to file their expert rebuttal testimony up until February 17, 2009, regardless of when the other party's original expert report had been disclosed. Bender and Atlantic Marine timely submitted Mr. Koon's first report which included opinions supporting their position that there were shipyards capable of repairing the CHEMUL at the time in question. Under the scheduling order they were not required at that time to rebut every detail raised in PEP's expert report. Considering the express language of the scheduling order and the circumstances described above, the court finds that Mr. Koon's second report was timely filed.

Even if the court were to find that the second report was not proper expert rebuttal testimony and violated the scheduling order, the court finds the violation was substantially justified or harmless. The sanctions to be imposed for violations of *Rule 26(a)* or *26(e)* are controlled by *Federal Rule of Civil Procedure 37(c)*. *Rule 37(c)(1)* contains a "narrow escape hatch" that allows the court to admit belatedly proffered evidence only if the proponent's failure to reveal it was either substantially justified or harmless. *Lohnes v. Level 3 Communications, Inc., 272 F.3d 49, 60 (1st Cir. 2001)*.

> Substantial [*9] justification requires justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request. The proponent's position must have a reasonable basis in law and fact. The test is satisfied if there is [a] genuine dispute concerning compliance.

*Chapple v. State of Alabama, 174 F.R.D. 698, 701 (M.D. Ala. 1997)* (quoting *Nguyen v. IBP, Inc., 162 F.R.D. 675, 680 (D. Kan. 1995)*. Under the circumstances, the court finds that there was a genuine dispute concerning compliance. Bender and Atlantic Marine's position that the second report was rebuttal testimony that was not due under the scheduling order until February 17, 2009, has a reasonable basis in law and fact. Thus, the alleged late filing of Mr. Koon's second report was justified.

The court finds also that the failure to disclose was **harmless**. PEP was free to depose Mr. Koon to further identify the bases for his opinion that "there were numerous shipyards along the Gulf of Mexico that had available capacity to accept a vessel such as the CHEMUL for repairs." While, "merely having to depose a party on information that should have been disclosed [*10] in a Rule 26 **Report** is a form of **prejudice**," *McClain v. Metabolife International, Inc., 193 F.Supp.2d 1252, 1259 (N.D. Ala. 2002)*, the court finds the information contained in the **report** was sufficient for defendants to prepare for effective cross examination and perhaps arrange for **expert** testimony from other witnesses to counter the opinions expressed in the reports.

2009 U.S. Dist. LEXIS 84309, *

**CONCLUSION**

For the reasons stated above, the motion of Pemex Exploracion y Produccion to strike the supplemental expert report of Ray Koon (Doc. 541) is **DENIED.**

**DONE** and **ORDERED** this 20th day of March, 2009.

/s/ Callie V. S. Granade

CHIEF UNITED STATES DISTRICT JUDGE



4 of 44 DOCUMENTS

**WILLIAM T.F. COWLEY, Plaintiff, v. SUNSET YACHT CHARTERS, INC., Defendant.**

**Case No. 10-61928-CIV-COHN/SELTZER**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA**

*2011 U.S. Dist. LEXIS 78380*

**July 19, 2011, Decided**
**July 19, 2011, Entered**

**SUBSEQUENT HISTORY:** Motion denied by *Cowley v. Sunset Yacht Charters, Inc., 2011 U.S. Dist. LEXIS 79095 (S.D. Fla., July 20, 2011)*

**CORE TERMS:** handrail, vessel, guidelines, supplemental, disclosure, expert testimony, unseaworthy, industry standard, methodology, untimely, unseaworthiness, reliable, yacht, coach, boat, marine, roof, crew, substantially justified, seaworthiness, deposition, custom, probative value, undermanned, seamanship, expertise, maritime

**COUNSEL:** [*1] For William T. F. Cowley, Plaintiff: Clay Michael Naughton, Michael T. Moore, Scott Andrew Wagner, Moore & Company, Coral Gables, FL; David Neal Gambach, Hamilton, Miller, & Birthisel, LLP, Miami, FL.

For Sunset Yacht Charters, Inc., Defendant: David Neal Gambach, LEAD ATTORNEY, Michael John Dono, Hamilton, Miller, & Birthisel, LLP, Miami, FL; Michael T. Moore, Moore & Company, Coral Gables, FL.

**JUDGES:** JAMES I. COHN, United States District Judge.

**OPINION BY:** JAMES I. COHN

**OPINION**

**ORDER DENYING MOTION TO EXCLUDE AND/OR LIMIT THE TESTIMONY OF JAMES W.**

**ALLEN & MOTION TO PRECLUDE REFERENCE TO INAPPLICABLE STANDARDS**

**THIS CAUSE** is before the Court on Defendant Sunset Yacht Charters, Inc.'s Motion to Exclude and/or Limit the Testimony of James W. Allen & Motion to Preclude Reference to Inapplicable Standards [DE 24]. The Court has considered the motion, Plaintiff William T.F. Cowley's Response [DE 29], Defendant's Reply [DE 32], and the record in this case, and is otherwise advised in the premises.

**I. BACKGROUND**

This case arises out of Plaintiff's injuries allegedly sustained while working aboard Defendant's 85' private pleasure motor yacht, the *Astrelle*. According to the Complaint [DE 1], Plaintiff sustained his injuries [*2] on October 15, 2007, when he fell after repairing a broken windshield wiper. He continued to suffer pain and undergo various medical treatment after the incident.

The Complaint brings three counts against Defendant: Jones Act negligence (Count I); unseaworthiness (Count II); and failure to provide prompt and adequate maintenance and cure (Count III). Plaintiff seeks to introduce Mr. James W. Allen as an expert witness on the unseaworthiness count. Mr. Allen submitted an Initial Report [DE 18] and a Supplemental Report [DE 24-1] stating his opinion that "the M/Y Astrelle was an unseaworthy vessel due to the workload and being undermanned," Initial Rep. at 5, and that the lack of handrails on the steps leading to the coach roof "creat[ed] another unseaworthy condition . . . by failing to provide a safe place to work," Supp. Rep. at 3.

2011 U.S. Dist. LEXIS 78380, *

## II. DISCUSSION

In the instant motion, Defendant requests that the Court: (1) exclude as untimely Mr. Allen's testimony regarding the lack of handrails on the *Astrelle*'s steps; (2) prohibit Mr. Allen from referencing the American Boat and Yacht Counsel ("ABYC") guidelines and the International Maritime Organization ("IMO") standards; and (3) preclude Mr. Allen  [*3] from testifying as an expert relative to management and operations of the *Astrelle*. The Court will address each request in turn.

### A. Timeliness

Plaintiff submitted Mr. Allen's Initial Report on April 19, 2011. Thereafter, on May 13, 2011, Plaintiff submitted Mr. Allen's Supplemental Report. Defendant seeks to exclude the information regarding the lack of handrails contained in the Supplemental Report as untimely under the Federal Rules of Civil Procedure and the Local Rules for the Southern District of Florida.

The Federal Rules and Local Rules require "a party [to] disclose to the other parties the identity of any witness it may use at trial to present evidence under *Federal Rule of Evidence 702, 703*, or *705*." *Fed. R. Civ. P. 26(a)(2)(A)*; see also *S.D. Fla. L.R. 16.1(k)*. "[T]his disclosure must be accompanied by a written report . . . if the witness is one retained or specially employed to provide expert testimony in the case . . ." *Fed. R. Civ. P. 26(a)(2)(B)*. According to the committee notes on section 2 of *Rule 26*, "This paragraph imposes an additional duty to disclose information regarding expert testimony sufficiently in advance of trial that opposing parties have a reasonable opportunity  [*4] to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses." Advisory Committee Notes, 1993 Amendments, *Fed. R. Civ. P. 26*. *Rule 26(e)* requires a party who has made a *Rule 26(a)* disclosure to supplement the disclosure "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." *Fed. R. Civ. P. 26(e)(1)(A)*; see also *Fed. R. Civ. P. 26(a)(2)(E)* (requiring parties to supplement expert disclosures pursuant to *Rule 26(e)*).

The deadline for expert disclosures and initial reports in this case was April 19, 2011. See *Fed. R. Civ. P. 26(a)(2)(D)*. On that date, Plaintiff submitted Mr. Allen's Initial Report. Three days later, at Plaintiff's deposition, Defendant revealed photographs depicting the *Astrelle*'s coach deck steps. Thereafter, Mr. Allen reviewed the deposition testimony and the photographs, and on May 11, 2011, he wrote his Supplemental Report, including

an opinion regarding the lack of handrails on the *Astrelle*'s steps. Plaintiff  [*5] emailed the Supplemental Report to Defendant on May 13, 2011 at 5:17 p.m. See Supp. Rep. Discovery closed on May 16, 2011. See Order Granting in Part and Denying in Part Motion for Enlargement of Time [DE 22].

Defendant seeks to exclude the information regarding the lack of handrails as untimely because it was submitted after the April 19, 2011 initial expert disclosure deadline and constituted "a new and previously undisclosed opinion, *i.e.* that the vessel was unseaworthy because the steps leading to the coach roof did not have a handrail." Mot. at 2. However, the information regarding the lack of handrails was a proper supplement to Mr. Allen's Initial Report pursuant to the procedures outlined in *Rule 26*. Therefore, the Supplemental Report and the information regarding the *Astrelle*'s alleged unseaworthiness contained therein, including the statements regarding the lack of handrails, was not untimely.

Furthermore, even if this disclosure was untimely, any delay in disclosing Mr. Allen's opinion regarding the lack of handrails was both substantially justified and **harmless**. Pursuant to *Federal Rule of Civil Procedure 37(c)(1)*, "[i]f a party fails to provide information or identify a  [*6] witness as required by *Rule 26(a)* or *(e)*, the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, *unless the failure was substantially justified or is harmless*." *Fed. R. Civ. P. 37(c)(1)* (emphasis added). Mr. Allen's failure to include the information regarding the lack of handrails in his Initial Report was substantially justified because he did not know that the *Astrelle*'s steps lacked handrails until Defendant presented the pictures at Plaintiff's deposition, after Mr. Allen submitted his Initial Report. Also, the timing of the information's disclosure did not unfairly **prejudice** Defendant because "Mr. Allen was *deposed on both his initial opinions and his supplemental opinions by Defendant's counsel*." Resp. at 6-7. Defendant contends that the late disclosure was prejudicial regardless of the fact that Defendant's counsel deposed Mr. Allen on both opinions because Defendant did not have sufficient time to designate a rebuttal witness on the handrail issue. Yet, the deadline for designating a rebuttal witness had not passed when Defendant received Mr. Allen's **Supplemental Report,** and regardless, Defendant's own **expert,**  [*7] Mr. Thomas Danti, submitted his own **Supplemental Report** [DE 30-1] on June 10, 2011, after reviewing Mr. Allen's **Supplemental** Rebuttal Report. In Mr. Danti's report, as a direct response to Mr. Allen's opinion on the lack of handrails, Mr. Danti offered his own opinion "that there was no requirement for a handrail at the steps at issue." Supp. Reb. Rep. at 3. Therefore, the Court will not exclude the opinion testimony regarding the lack of hand-

rails as untimely because the disclosure was timely pursuant to *Rule 26* and *Local Rule 16.1*, and even if it were not timely, the disclosure was substantially justified and harmless.

## B. Applicability of Standards

Mr. Allen's reports reference the IMO standards and the ABYC guidelines. Initial Rep. at 4; Supp. Rep. at 3. Defendant seeks to exclude both references as inapplicable and more prejudicial than probative under *Federal Rule of Evidence 403*.

*Rule 403* provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Fed. R. Evid. 403*. [*8] Defendant argues that Mr. Allen's use of the ABYC guidelines and IMO standards "raises the distinct danger that a jury might decide the case on an improper basis, *i.e.* application of these *inapplicable* standards." DE 24 at 6.

### 1. ABYC Guidelines

Defendant argues that the ABYC standards are not binding on the *Astrelle* because their recommendations are "for all boats, associated equipment and systems manufactured or installed *after July 31st, 2007*," ABYC Standards § H-41 at 1 [DE 24-4], and the *Astrelle* was built in 1988. Defendant also suggests the guidelines are inapplicable because the paragraph mentioned in Mr. Allen's report is limited to "Handhold Devises" and Weatherdecks intended to be used while underway, such as for handling ground tackle and docklines," see id. at 2, and there is no evidence apart from Mr. Allen's own words that the coach roof was a "weather deck intended to be used while the vessel was underway," Mot. at 5. However, neither Plaintiff nor Mr. Allen disputes that the ABYC guidelines are not binding on the *Astrelle*. The fact that they are not binding does not render the guidelines irrelevant.

Mr. Allen merely includes the guidelines as a reference to the industry [*9] standard he uses in his opinion. As Plaintiff states, "It is proper for an expert to provide expert testimony as to what violates an industry standard in support of his opinion that there was [an] inherent seaworthiness condition aboard a Vessel. This is exactly what Mr. Allen has done with regard to his use of the ABYC guidelines vis-à-vis the lack of handrails on the coach roof steps." Resp. at 10. The Court agrees.

Defendant quotes *Bryant v. Partenreederei-Ernest Russ, 330 F.2d 185, 189 (4th Cir. 1964)*, for the proposition that evidence of industry standards is improper in an unseaworthiness claim, but Bryant discusses trade cus-

tom, not industry standards. Id. ("It is an established principle, however, that in negligence actions under the Jones Act, prevailing *trade customs* cannot furnish the legal standard of due care . . . . This being true, we fail to perceive any logical reason why *trade customs* should be permitted to form the legal standard of seaworthiness in actions under general maritime law." (emphasis added)). In actuality, evidence of industry standard is not prohibited in a maritime law claim. See, e.g., *Pappas v. Potomac Party Cruises, Inc., Case No. 98-2212, 2000 U.S. App. LEXIS 12443, 2000 WL 724054, at *3 (4th Cir. 2000)* [*10] (allowing expert to reference ABYC guidelines in opinion as to a vessel's seaworthiness even when both parties' experts "admit[ted] that the standards they used in forming their testimony are not applicable as a matter of law."); *Kiesel v. Am. Trading & Prod. Corp., 347 F. Supp. 673, 678 (D. Md. 1972)* ("While this court is aware that a trade custom is not a measure of negligence or seaworthiness, . . . the evidence of prevailing industry standards may be considered as some evidence that the ship was not unseaworthy and that the defendant was not negligent in connection with the flaking of the springlines and the lighting in the area of the thwartships doorway."). Therefore, the ABYC guidelines are applicable and relevant to this case, even if they do not bind the *Astrelle*.

Furthermore, the Court finds that the probative value of Mr. Allen's references to the ABYC guidelines are not substantially outweighed by the danger of prejudice, confusing the issues, or misleading the jury. See *Fed. R. Evid. 403*. Instead, like the Pappas Court, which found the ABYC guidelines persuasive, the jury might also find these guidelines persuasive. Of course, Defendant's counsel will be free to argue that [*11] the guidelines are not applicable and to cross examine Mr. Allen in an attempt to diminish the weight and the applicability of the ABYC guidelines to the instant case. The jury can then decide for itself whether the vessel was unseaworthy. However, the Court will not exclude reference to the ABYC guidelines under *Rule 403*.

### 2. IMO Standards

Defendant seeks to exclude reference to the IMO standards as inapplicable because according to Mr. Allen's own testimony, these standards do not apply to the *Astrelle*. Mot. at 6-7 (citing Allen Dep. at 80:14-20 ("Q: But, again, [the IMO standards are] not applicable to the ASTRELLE, correct? A: That's correct."). Plaintiff's Response does not offer any argument to contest Defendant's request. However, as discussed above, the fact that a standard is inapplicable as a matter of law does not render the standard altogether irrelevant or inadmissible as evidence. See *Pappas, 2000 U.S. App. LEXIS 12443, 2000 WL 724054, at *3*. For the same reasons as dis-

2011 U.S. Dist. LEXIS 78380, *

cussed above, the prejudice derived from a reference to the IMO standards does not outweigh its probative value. Therefore, the Court will not exclude reference to the IMO standards under *Rule 403*.

## C. Mr.  [*12] Allen's Qualifications and Methodology

Defendant argues that the Court should preclude Mr. Allen from offering an expert opinion on vessel design or on the operations and management of private pleasure yachts like the *Astrelle* because he lacks expertise in these areas and his methodology is not sufficiently reliable. *Federal Rule of Evidence 702* controls determinations regarding the admissibility of expert testimony. See *Fed. R. Evid. 702*; see also *Rink v. Cheminova, Inc., 400 F.3d 1286, 1291 (11th Cir. 2005)*. Pursuant to *Rule 702*, trial courts perform a three-part inquiry to determine the admissibility of expert testimony and "[t]he party offering the expert has the burden of satisfying each of these three elements by a preponderance of the evidence." *Rink, 400 F.3d at 1292* (citing *Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999)*). Specifically, a court must determine the following:

> 1. Whether the expert is qualified to testify competently regarding the matters he intends to address;
>
> 2. Whether the methodology by which the expert reaches his conclusions is sufficiently reliable; and
>
> 3. Whether the testimony assists the trier of fact, through the application of scientific,  [*13] technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1340 (11th Cir. 2003)*. District courts make such a determination "'to ensure that speculative, unreliable expert testimony does not reach the jury' under the mantle of reliability that accompanies the appellation 'expert testimony.'" *Rink, 400 F.3d at 1291* (quoting *McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1256 (11th Cir. 2002)*). Stated differently, "district courts must act as 'gatekeepers' which admit expert testimony only if it is both reliable and relevant." Id. (citing *Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)*). Defendant's motion challenges both Mr. Allen's qualifications and his methodology.

1. Qualifications

An expert witness may be qualified to testify and give his opinions by way of his knowledge, skill, experience, training, or education. *Fed. R. Evid. 702*. Plaintiff seeks to offer Mr. Allen's testimony as evidence in support of the unseaworthiness claim. Mr. Allen's Initial Report describes him as an expert "in the field of marine safety consulting." Initial Rep. at 3. His Initial Report [*14] includes opinions that "the M/Y Astrelle was an unseaworthy vessel due to the workload and being undermanned." Id. at 5. He specifies that "this vessel would require at lest a three man crew at a minimum," id. at 4, and that when Defendant failed to provide a third crew member, it "willfully and continually exposed its crew and passengers to unreasonable risk of physical harm," id. In his Supplemental Report, Mr. Allen compares Plaintiff's hours to the industry standard, Supp. Rep. at 2, and reiterates that the vessel lacked an adequate crew, id. at 2-3. Additionally, in his Supplement Report, Mr. Allen states that due to the lack of a handrail, "it is apparent the steps or ladder leading to the coach roof do not comply with American Boat and Yacht Standard 41.5.2," id. at 3, which "creat[ed] another unseaworthy condition, aboard the M/Y Astrelle, by failing to provide a safe place to work. This is an unsafe condition both at sea and in port," id.

At his deposition, Mr. Allen testified that his expertise is "in seamanship, boat handling, navigation on ships and boats." Allen Dep. at 8:19-20. He has served as a master captain, expert seaman, and coast guard officer. See Allen Curriculum  [*15] Vitae [DE 18-1]. According to his Curriculum Vitae, Mr. Allen has thirty years of experience in the coast guard serving as a Boatswains Mate and Chief Warrant Officer. Allen C.V. at 1. He has experience in "the operation, navigation, and maintenance of vessels ranging from ships to small craft, maintenance of docks, piers, and aids to navigation." Id. Mr. Allen has inspected over 100 vessels like the *Astrelle* in an effort to make sure the vessels complied with the Federal safety standards. Allen Dep. at 23:12-25; 24:1-19. He has also "[c]onducted appropriate investigations when necessary, as well as inspected and issued citations for vessels . . ." Allen C.V. at 1. He is currently a marine safety consultant. Id.

Based on this experience, Mr. Allen is qualified to issue his opinions as to whether the conditions on the *Astrelle* made the vessel unseaworthy, including whether the vessel was undermanned, whether Plaintiff was overworked, and whether the lack of handrails contributed to the vessel's unseaworthiness. Defendant's argument that Mr. Allen has not previously captained a boat exactly like the *Astrelle* or testified on these precise issues, see Mot., is inapposite. Mr. Allen's opinion  [*16] is based on his extensive experience and knowledge of the marine industry as well as the industry's safety re-

2011 U.S. Dist. LEXIS 78380, *

quirements and industry standards, in addition to his understanding of the services performed on the vessel and the circumstances surrounding Plaintiff's actions on the vessel. Accordingly, the Court finds that Plaintiff has met his burden to prove by a preponderance of the evidence that Mr. Allen is qualified to testify competently regarding opinions contained in his Initial Report and Supplemental Report. See *Rink, 400 F.3d at 1292*; *Quiet Tech. DC-8, Inc., 326 F.3d at 1340*.

2. Methodology

To determine whether an expert's methodology is sufficiently reliable, the Court may make the following inquiries regarding the proposed expert's theory or technique:

1. Whether it can be (and has been) tested;

2. Whether it has been subjected to peer review and publication;

3. What is its known or potential rate of error; and

4. Whether it is generally accepted in the field.

*Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 145, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)* (citations omitted). Notwithstanding, the Court has "substantial discretion" in deciding how to test an expert's reliability. *Rink, 400 F.3d at 1292* (quoting *United States v. Majors, 196 F.3d 1206, 1215 (11th Cir. 1999)).*

Together, [*17] Mr. Allen's Initial Report and Supplemental Report provide a detailed accounting of his opinions and the basis for his conclusions premised upon his relevant experience. Defendant does not suggest that Mr. Allen's reports are untested, would fail peer review, or are subject to any kind of rate of error, nor does Defendant suggest that Mr. Allen's methods are unaccepted in the marine safety industry. Rather, Defendant conclusively states, "there is nothing to suggest that he has employed any sort of reliable methodology in reaching his opinions. Instead, he references inapplicable standards." Mot. at 9. Plaintiff responds that "[u]nlike other *Daubert* decisions, this case does not involve scientific, technical, or break-through type research, analysis and opinion, but instead involves the application of regimented seamanship principles." Resp. at 13. Mr. Allen has applied a methodology based on accepted seamanship principles

applied to the issues in this case. He compares the safety conditions on the *Astrelle* to his knowledge of the marine safety industry. In forming his opinion, he evaluates the number of crew members, the number of hours Plaintiff worked, and the lack of handrails [*18] according to the applicable standards, and concludes that the vessel was unseaworthy. Under the circumstances, the Court finds that Plaintiff has met his burden to prove by a preponderance of the evidence that Mr. Allen's methods are sufficiently reliable. See *Rink, 400 F.3d at 1292*; *Quiet Tech. DC-8, Inc., 326 F.3d at 1340*. Therefore, the Court will not preclude Mr. Allen from testifying as an expert.

### III. CONCLUSION

In light of the foregoing, it is hereby

**ORDERED AND ADJUDGED** as follows:

1. Defendant Sunset Yacht Charters, Inc.'s Motion to Exclude and/or Limit the Testimony of James W. Allen & Motion to Preclude Reference to Inapplicable Standards [DE 24] is **DENIED**;

2. Defendant's Motion in Limine to Preclude Reference to Inapplicable ABYC Guidelines and Higher Duties of Care [DE 50] is **DENIED as moot**;

3. Defendant's Motion in Limine to Preclude Reference to Inapplicable IMO Standards [DE 53] is **DENIED as moot**;

4. Defendant's Motion in Limine to Preclude the Untimely Handrail Opinion of Plaintiff's Expert, James W. Allen [DE 55] is **DENIED as moot**.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this 19th day of July, 2011.

/s/ James I. Cohn

JAMES I. COHN

United States [*19] District Judge



1 of 8 DOCUMENTS

**TRINITY HOMES, LLC, et al., Plaintiffs, v. OHIO CASUALTY INSURANCE COMPANY GROUP, et al., Defendants.**

**CASE NO. 1:04-cv-01920-SEB-DML**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF INDIANA, INDIANAPOLIS DIVISION**

*2011 U.S. Dist. LEXIS 61701*

**June 8, 2011, Decided**
**June 8, 2011, Filed**

**PRIOR HISTORY:** *Trinity Homes LLC v. Ohio Cas. Ins. Co., 629 F.3d 653, 2010 U.S. App. LEXIS 25985 (7th Cir. Ind., 2010)*

**CORE TERMS:** disclosure, expert reports, deadline, deposition, new reports, harmless, coverage, supplemental, disclose, supplemental reports, substantially justified, summary judgment, mediation, drastic, expert opinions, discovery, preparation, briefing, prepare, expert witnesses, opposing party, good faith, incomplete, scheduled, baseless, untimely, serving, reply, failure to disclose, failure to serve

**COUNSEL:** [*1] For TRINITY HOMES, LLC, BEAZER HOMES INVESTMENT CORP., INC., Plaintiffs: J. Lee McNeely, MCNEELY STEPHENSON THOPY & HARROLD, Shelbyville, IN; Justin C. Jeffries, Michael M. Raeber, Zachary A. McEntyre, PRO HAC VICE, KING & SPALDING, LLP, Atlanta, GA.

For OHIO CASUALTY INSURANCE COMPANY GROUP, Defendant: Bruce L. Kamplain, Scott A. Harkness, NORRIS CHOPLIN & SCHROEDER LLP, Indianapolis, IN.

For CINCINNATI INSURANCE COMPANY, Defendant: Kristy Marie Rans, Martin Jacob Gardner, GARDNER & RANS, South Bend, IN.

**JUDGES:** Debra McVicker Lynch, United States Magistrate Judge.

**OPINION BY:** Debra McVicker Lynch

**OPINION**

Order on Motion to Strike Expert Reports

This matter came before the court on the motion (Dkt. 392) by plaintiffs Trinity Homes LLC and Beazer Homes Investments LLC (together, "Beazer") to strike two expert reports served by defendant Cincinnati Insurance Company ("CIC") later than CIC's expert disclosure deadline. CIC contends that the two reports are supplemental reports within the meaning of *Fed. R. Civ. P. 26(e)(2)* it was duty-bound to provide, and that even if they are not supplemental reports, CIC's late disclosure was substantially justified or is harmless. Having examined the facts in light of the applicable [*2] standards, the court DENIES the motion to strike.

Background

The Plaintiffs' Claims

This is an insurance coverage case. Beazer is a home builder that seeks coverage from CIC and defendant Ohio Casualty Insurance Company ("Ohio Casualty") for actions brought against Beazer for damages allegedly caused by faulty work performed by Beazer's subcontractors. Ohio Casualty issued one or more commercial general liability policies to Beazer, and CIC issued an umbrella policy. In September 2009, the court granted summary judgment to CIC and Ohio Casualty, ruling that, as a matter of law, the policies issued by them did not provide coverage. Beazer appealed; in the meantime, the Indiana Supreme Court decided *Sheehan Constr. Co. v. Continental Casualty Co., 935 N.E.2d 160 (Ind. 2010)*, a case that materially changed the precedential land-

scape. As a result, the Seventh Circuit reversed the court's grant of judgment to CIC and Ohio Casualty, remanded for reconsideration in light of *Sheehan*, and left to this court other issues affecting coverage, including other exclusions or limitations in the insurance policies CIC and Ohio Casualty had raised as defenses to coverage. And because this court's earlier [*3] summary judgment ruling in favor of the insurers rendered the amount of coverage due moot, that issue also remains--if the insurers ultimately have some coverage liability.

**Expert Disclosure Deadlines**

Under the court's amended scheduling order (Dkt. 315), Beazer was required to disclose its experts and serve *Fed. R. Civ. P. 26(a)(2)(B)* expert reports no later than February 16, 2009, and the insurance defendants' expert disclosure deadline was April 15, 2009. Beazer met its February 16, 2009 deadline. CIC asked for another 30 days, until May 15, 2009, to disclose its experts and their reports, and the court granted that request. (Dkt. 340). On May 15, 2009, CIC made its disclosures and served reports for four experts--Messrs. Rick Keller, Lawrence Grauvogel, Donald Fozo, and Jim Groves. (*See* Ex. B to Dkt. 392). The expert reports were not used in connection with the parties' summary judgment briefing, which was essentially complete before Beazer's expert disclosures were made. The court's scheduling order gave the parties until June 15, 2009, to complete their expert discovery and any other discovery not related to dispositive motions (Dkt. 340), though that deadline was extended to September [*4] 15, 2009, while the parties attended to mediation in late June 2009. (Dkt. 353). When mediation failed to achieve a settlement, the parties scheduled expert depositions, including depositions of CIC experts Rick Keller and Lawrence Grauvogel.

According to CIC, in June of 2009 (shortly after its expert disclosures had been made), CIC discussed with Mr. Keller and Mr. Grauvogel during preparation for mediation "various issues pertaining to the reasonableness" of Beazer's alleged damages, and later obtained from them supplements to their expert reports "to include [their] more detailed opinions . . . that were formulated as a result of CIC's preparation for mediation." (Dkt. 394 at p. 3). CIC provided Beazer with these "supplemental" reports for Mr. Keller and Mr. Grauvogel on July 30, 2009, about a month in advance of their depositions scheduled for August 25 and 26, 2009. CIC's cover letter to Beazer's counsel identified the reports as "expert supplemental reports," but otherwise provided no description of the contents of the reports or their relationship to Mr. Keller's and Mr. Grauvogel's original reports. Beazer pressed CIC to provide an explanation why the new reports were served [*5] after CIC's expert disclosure deadline, but CIC never responded (*see* Dkt. 393 at pp.

2-3), leading Beazer to file its motion to strike the supplemental reports by Mr. Keller and Mr. Grauvogel. The parties agreed to postpone the depositions of CIC's experts until the court ruled on the motion to strike. The briefing on Beazer's motion to strike was completed in early September 2009, a few weeks before the court granted summary judgment in favor of CIC and Ohio Casualty, which mooted Beazer's motion to strike.

After the Seventh Circuit's remand, the court addressed with the parties remaining pretrial preparation and the parties' briefing of any remaining summary judgment issues. The court ordered that discovery was closed except for depositions of certain fact witnesses by CIC and Beazer's depositions of CIC's expert witnesses. The court also reinstated Beazer's motion to strike the supplemental expert reports, which is no longer moot. (Dkt. 391).

**Analysis**

**Governing Standards**

*Rule 37(c)* addresses failures to provide information or identify witnesses as required under *Rules 26(a) and (e)*, including expert witness disclosures. *Rule 26(a)(2)(D)* requires a party to disclose the identity of any [*6] expert witnesses and to provide their expert reports "at the times and in the sequence that the court orders." *Rule 37(c)(1)* states that a party is not allowed to use evidence or a witness that it failed to provide or disclose as required under *Rule 26(a)* or *Rule 26(e)* "unless the failure was substantially justified or is harmless." *Rule 37(c)(1)* also permits the court to choose a sanction other than exclusion of the evidence or witness. *See also Dura Automotive Systems of Indiana, Inc. v. CTS Corp., 285 F.3d 609, 615-16 (7th Cir. 2002)* (court not *required* to strike late expert report even where party does not show that his late disclosure was justified or harmless).

The burden to show that late disclosure was substantially justified or is harmless is on the party that missed its deadline. *Finley v. Marathon Oil Co., 75 F.3d 1225, 1230 (7th Cir. 1996)* (where party fails to timely make its expert disclosures as required under *Rule 26*, exclusion of expert testimony proper unless the party shows that its violation was either justified or harmless"); *see also Allgood v. General Motors Corp., 2007 U.S. Dist. LEXIS 8123, 2007 WL 647496 at *6 (S.D. Ind. Feb. 2, 2007)* (*Rule 37(c)* presumes that exclusion of late expert [*7] disclosures "is the appropriate remedy, unless the proponent can show that the failure was either justified or harmless") (citing *Salgado v. General Motors Corp., 150 F.3d 735, 742 (7th Cir. 1998)*). The Seventh Circuit has said that the district court's *Rule 37(c)(1)*'s sanctions determination should be guided by the following factors: (1) prejudice or surprise to the opposing party; (2) ability

to cure the prejudice; (3) likelihood of disruption to the trial; and (4) bad faith or willfulness involved in the party's failure timely to disclose its evidence. *David v. Caterpillar, Inc., 324 F.3d 851, 857 (7th Cir. 2003)*.

### CIC's new reports are not "supplemental."

CIC contends that its disclosure of Mr. Keller's and Mr. Grauvogel's supplemental reports was timely--not late at all--because the reports were "supplements" within the meaning of *Rule 26(e)* that CIC was *required* to provide. Though CIC recites the language of *Rule 26(e)*, it does not inform the court how and why the reports are supplements and not simply reports of new expert opinions. CIC does not cite any authority defining supplemental disclosures under *Rule 26(e)*, and it ignores all the decisions that have. CIC's response brief [*8] does not even inform the court about the nature of Mr. Keller's and Mr. Grauvogel's opinions expressed in their original reports or explain any relationship between those opinions and the ones expressed in the second reports. CIC suggests that the opinions in Mr. Keller's and Mr. Grauvogel's second reports are ones that CIC did not previously disclose to Beazer and in fact were formulated after the original reports were provided and when CIC was preparing for mediation in June 2009. (See Dkt. 394 at p. 3). Beazer's reply brief summarizes the opinions Mr. Keller and Mr. Grauvogel offered in their first reports as contrasted to the opinions in their second reports, and provides copies of the first and second reports. It is obvious--and CIC does not contest--that the second reports offer opinions about new matters not mentioned in the original reports but which are based on information and data available to CIC before its May 2009 expert disclosure deadline. *See, e.g.*, the statements of the scope of assignment in Mr. Grauvogel's original report (Dkt. 395; Ex. C) compared to the scope of assignment in his second report (Dkt. 395; Ex. D).

Even a cursory review of the published decisions addressing [*9] the *Rule 26(e)* duty to supplement expert reports should have demonstrated to CIC that its new reports from Mr. Keller and Mr. Grauvogel were not timely "supplements" to their first reports.

Although *Rule 26(e)* does not itself define the word "supplement" except in terms of requiring a timely supplement to fix a discovery response that is incorrect or incomplete in a material respect,[1] common sense suggests (and numerous decisions confirm) that an expert report that discloses new opinions is in no way a mere supplement to a prior report. *Barlow v. General Motors Corp., 595 F. **Supp.** 2d 929, 935-36 (S.D. Ind. 2009)* (unreasonable for parties to read *Rule 26(e)*'s duty to **supplement** as permitting it to "spring **late** surprises on their opponents under the guise of a **'supplement'** to earlier **disclosures**"); *In re Ready-Mixed Concrete Anti-*

*trust Litigation, 261 F.R.D. 154, 159 (S.D. Ind. 2009)* (internal quotations omitted) (*Rule 26*'s supplemental **disclosure** obligation does not extend a party's original expert **disclosure** deadline and cannot be used to "sandbag one's opponent with claims and issues which should have been included" in the original **expert report**); *Welch v. Eli Lilly & Co., 2009 U.S. Dist. LEXIS 21417, 2009 WL 700199 at *4 (S.D. Ind. March 16, 2009)* [*10] (*Rule 26(e)* is not a license to disregard discovery deadlines and offer new expert opinions "under the guise of the **supplement** label"); *Allgood v. General Motors Corp., 2007 U.S. Dist. LEXIS 8123, 2007 WL 647496 at *3 (S.D. Ind. Feb. 2, 2007)* (baseless for party to claim that expert's second report was a **supplement** to the first one when the new report provided entirely new expert opinion on issues that have always been in the case).

> 1    *Rule 26(e)* provides, in pertinent part: (1) "A party who has made a disclosure under *Rule 26(a)* . . . must supplement or correct its disclosure or response: (A) in a timely manner if the party learns that in some material respect the disclosure . . . is incomplete or incorrect. . . . (2) For an expert whose report must be disclosed under *Rule 26(a)(2)(B)*, the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition. . . .

As courts have commented, if *Rule 26(e)* could be used as a vehicle for bolstering an inadequate or incomplete original report, expert reports could be continually expanded and refined without finality to the process. *See Allgood, 2007 U.S. Dist. LEXIS 8123, 2007 WL 647496 at *3-4 (S.D. Ind. Feb. 2, 2007)* (quoting *Beller v. United States, 221 F.R.D. 689, 695 (D.N.M. 2003)*) [*11] (*Rule 26(e)* does not create opportunity for stream of reports providing preliminary analysis only to be later supplemented with new analysis, and on and on, with no finality to the process). That kind of practice would effect an end-run around the expert disclosure rules in the first instance that require an expert report to contain a "complete statement of all opinions" the expert will give, the basis and reasons for those opinions, the facts or data considered by the expert in forming the opinions, and the exhibits that will be used to summarize or support the opinions. *See Rule 26(a)(2)(B)*; *Metavante Corp. v. Emigrant Savings Bank, 619 F.3d 748, 762 (7th Cir. 2010)* (purpose of expert reports is to provide substance of expert's opinion so that opponent can rebut, cross-examine, offer competing expert if necessary, and otherwise prepare intelligently for trial).

### CIC's failure to disclose the new opinions of its experts within the deadline was not substantially justified.

2011 U.S. Dist. LEXIS 61701, *

CIC has relied on its contention that its new reports are "supplements" under *Rule 26(e)* and therefore timely; that contention, as explained above, is baseless. CIC [*12] also has offered no basis for the court to find that its failure to serve these disclosures by the deadline was substantially justified, nor could it. CIC had all of the factual information underlying the new opinions. It apparently just developed these new opinions in the course of preparing for mediation with its experts.

**Consideration of the "harmlessness" factor leads the court to conclude that the drastic sanction of striking the reports is not warranted here, but some sanction is warranted**.

Having determined that the new expert reports are not timely "supplements" and that CIC has not demonstrated that its failure to disclose them by the deadline was substantially justified, the court now turns to the last consideration that could excuse the late filing. CIC maintains in response to Beazer's motion to strike that CIC's failure to serve the disclosures sooner is harmless. CIC bears the burden of making that showing. *See Finley, 75 F.3d at 1230 (7th Cir. 1996)*.

In determining whether an untimely disclosure is harmless under *Fed. R. Civ. P. 37(c)(1)*, courts have considered a number of factors, including (1) prejudice to the opposing party, (2) whether that prejudice can be cured, (3) [*13] the importance of adherence to court-imposed deadlines and the likelihood of disruption to the resolution of the case, and (4) the good faith, or lack thereof, of the party who has made the late disclosure. *See, e.g., David v Caterpillar, 324 F.3d at 857; Hill v. Porter Memorial Hosp., 90 F.3d 220, 224 (7th Cir. 1996)* (affirming district court's striking of late expert reports; "Adhering to established deadlines is essential if all parties are to have a fair opportunity to present their positions"). In addition, the court must weigh whether the drastic sanction of striking the late disclosure is warranted under the circumstances or whether a lesser sanction is more appropriate and commensurate with any perceived harm caused by the untimely report. *See Dura Automotive, 285 F.3d at 615-16 (7th Cir. 2002)* (citing *United States v. Johnson, 228 F.3d 920, 926 (8th Cir. 2000))*.

Beazer contends that it is prejudiced by the late second reports because having second reports means that its preparation for the **depositions** of Mr. Keller and Mr. Grauvogel is made more difficult and more time-consuming because it has more topics to address with second reports than it had without second reports. If [*14] that **prejudice** were enough, then late disclosures could never be considered harmless. And Beazer would have had to prepare to address these new opinions even if the new opinions had been included in CIC's original

disclosures. Moreover, new disclosures always mean something new to address and confront, but when there is time in the schedule to do so without disrupting the trial, the new disclosures may be considered harmless under *Rule 37(c)*, or any **prejudice** may be considered cured, as discussed in *David v. Caterpillar, 324 F.3d at 857 (7th Cir. 2003)*. The court finds that the **prejudice** to Beazer factor weighs in favor of permitting the reports.

That said, the court has the obligation and the right to enforce adherence to its case management plans to ensure the just, speedy, and inexpensive determination of the matters brought before it. *See Fed. R. Civ. P. 1; Raymond v. Ameritech Corp., 442 F.3d 600, 606 (7th Cir. 2006)*. The absence of a current trial setting does not render the late disclosures harmless. Missing expert disclosure deadlines tends to work particular havoc on case management. In this case, it has already caused the delay of expert depositions and the briefing of summary [*15] judgment.

In addition, the court finds that CIC's handling of the new expert reports falls short of the good faith mark. Its assertion that the new reports were merely "supplemental" was baseless, as it was not grounded in the facts or in the applicable law. Rather than insisting after the fact on a position it surely knew would not withstand scrutiny, CIC should have sought leave to serve the late disclosures, setting out the importance of the testimony to this case and attempting to show (as it could have) that serving the reports after the deadline would not prejudice Beazer. Indeed, it is not clear that Beazer would have opposed such a straightforward request.

In light of the factors discussed above, the court finds that some sanction is warranted for CIC's conduct in serving new expert reports without seeking leave to do so. Beazer urges the striking of the new reports, arguing that the sanction of striking is not too drastic because it would not "cause CIC to lose" this case, in which, according to CIC, a $50 million claim is at issue.

But the new reports do address an issue of substantial monetary consequence; they assert that Beazer's claim (if there is coverage) is overstated [*16] by at least $10 million. The inability to contest by expert opinion $10 million in claimed damages is enough of a loss to be deemed drastic and *too* drastic given the relative harmlessness of the late disclosure to Beazer. *See Sherrod v. Lingle, 223 F.3d 605, 612-13 (7th Cir. 2000)* (finding that district court had abused discretion in striking late expert report when, among other things, the trial was a long way off and the opposing party had plenty of time to prepare for the expert's deposition); *Mid-America Tablewares, Inc. v. Mogi Trading Co., Ltd., 100 F.3d 1353, 1363 (7th Cir. 1996)* (district court did not abuse discretion when it refused to exclude untimely supple-

mental expert report when party had time after receiving the new report to prepare for deposition of the expert).

The court's desire for cases to be decided on their merits and its recognition that striking these expert reports would be a drastic sanction (*see Dura Automotive, 285 F.3d at 621* (Wood, J., dissenting)), convince the court under the facts presented here that striking the new reports would be a sanction disproportionate to the foul. The new reports were served two months past the deadline, a month in advance  [*17] of the scheduled depositions of the experts, and the trial date had been vacated while the court ruled on dispositive motions (motions that CIC won at the district court level).

***Rule 37(c) permits the court, as an alternative to exclusion, to "order payment of the reasonable expenses, including attorney's fees, caused by" a party's late disclosure.***

In the court's view, CIC's conduct in serving late expert disclosures without seeking leave to do so and basing its action on the groundless assertion they were supplemental caused Beazer--justifiably--to seek relief from the court. Although the court has not awarded the remedy Beazer sought, it has vindicated Beazer's position on the merits. As a sanction, the court therefore awards Beazer its reasonable fees incurred in drafting the motion to strike, the brief in support, and its reply brief.

Beazer shall submit a statement of those fees (with supporting documentation) to CIC within 14 days of this order. CIC shall, within 14 days thereafter, either pay those fees or file with the court an objection to Beazer's fee statement that demonstrates why the fees are unreasonable in whole, or in part. CIC shall bear the burden of proof on this issue.  [*18] Beazer's response and any reply by CIC shall be filed according to Local Rule 7.1. The court expects the parties to use CIC's 14-day period to negotiate in good faith over any dispute about the amount of the fees in an effort to avoid the need for the court's intervention.

## Conclusion

For the foregoing reasons, Beazer's motion (Dkt. 392) to strike the second expert reports of Mr. Keller and Mr. Grauvogel is DENIED. However, Beazer is awarded certain attorney fees as set forth in this order.

So ORDERED.

Date: 06/08/2011

/s/ Debra McVicker Lynch

Debra McVicker Lynch

United States Magistrate Judge

Southern District of Indiana