FILED
2011 Nov-03  PM 06:21
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit B

Page 1

IN  THE  UNITED  STATES  DISTRICT  COURT

FOR  THE  NORTHERN  DISTRICT  OF  ALABAMA

SOUTHERN  DIVISION


CASE NO:   2:10-CV-1840 IPJ


ALABAMA GAS CORPORATION,

PLAINTIFF,

V.

TRAVELERS CASUALTY and SURETY COMPANY, et al.,

DEFENDANTS.




DEPOSITION

OF

Hon. Bernard Harwood

October 26, 2011


REPORTED BY:  April Sargent

Certified Court Reporter

and Notary Public

Page 2

```
 1              S T I P U L A T I O N

 2              IT IS STIPULATED AND AGREED,

 3   by and between the parties, through their

 4   respective counsel, that the deposition of Hon.

 5   Bernard Harwood may be taken before April

 6   Sargent, Commissioner, Certified Court Reporter

 7   and Notary Public;

 8                That the signature to and reading

 9   of the deposition by the witness is NOT WAIVED,

10   the deposition to have the same force and effect

11   as if full compliance had been had with all laws

12   and rules of Court relating to the taking of

13   depositions;

14                That it shall not be necessary for

15   any objections to be made by counsel to any

16   questions, except as to form or leading

17   questions, and that counsel for the parties may

18   make objections and assign grounds at the time

19   of trial, or at the time said deposition is

20   offered in evidence, or prior thereto.

21

22

23

24

25
```

Page 3

```
 1               A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFF:

 4          Mr. W. Scott Laseter

 5          Attorney at Law

 6          KAZMAREK GEIGER & LASETER, LLP

 7          One Securities Center

 8          3490 Piedmont Road NE, Suite 350

 9          Atlanta, Georgia 30305

10          Tel (404)812-0844

11          E-mail slaseter@kglattorneys.com

12

13    FOR THE DEFENDANT:

14          Mr. Frank Winston, Jr.

15          Attorney at Law

16          STEPTOE & JOHNSON, LLP

17          1330 Connecticut Avenue, NW

18          Washington, DC 20036-1795

19          Tel (202) 429-6482

20          E-mail fwinston@steptoe.com

21

22

23

24

25
```

Page 4

```
 1            INDEX OF EXAMINATION

 2

 3                                Page:

 4

 5   EXAMINATION BY MR. LASETER          5

 6

 7

 8            INDEX OF EXHIBITS

 9                                Page:

10

11   Exhibit 1                       35

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 5

1              I, April Sargent, a Certified Court

2  Reporter and Notary Public for the State of

3  Alabama at Large, acting as Commissioner,

4  certify that on this date, pursuant to Rule 30

5  of the Alabama Rules of Civil Procedure and the

6  foregoing stipulation of counsel, there came

7  before me at the offices of Hand Arendall, 1200

8  Park Place Tower, Birmingham, Alabama, on

9  October 26, 2011, commencing at 9:01 a.m., The

10 Hon. Bernard Harwood, witness in the above

11 cause, for oral examination, whereupon the

12 following proceedings were had:

13

14              HON. BERNARD HARWOOD,

15 being first duly sworn, was examined and

16 testified as follows:

17

18 EXAMINATION BY MR. LASETER:

19      Q.    Good morning, Judge Harwood.  Could

20 I have you state your full name for the record?

21      A.    Robert Bernard Harwood, Jr.

22      Q.    My name again is Scott Laseter.  I

23 represent Alabama Gas Corporation, plaintiff in

24 the case that we're here for today.  Are you at

25 least generally familiar with this lawsuit?

Case 2:10-cv-01840-IPJ    Document 120-2    Filed 11/03/11    Page 7 of 87

Page 6

```
 1        A.      I am.
 2        Q.      Do you mind if I call you Judge
 3   Harwood?
 4        A.      As long as everybody understands
 5   that I recognize I'm no longer a judge.  But
 6   it's sort of a courtesy title that some people
 7   use.  So that'd be fine.
 8        Q.      And I noticed that in one of the
 9   prior transcripts I'd read that the transcript
10   referred to you still as The Honorable Bernard
11   Harwood.  Is that appropriate?
12        A.      Well, and as I say, that's an
13   honorific, a courtesy title.  I mean never
14   introduce myself as that.  I introduce myself as
15   Mr. Harwood.  But because of my fairly long
16   career, the Alabama lawyers always tend to just
17   use that term which is I think is sort of
18   traditional for retired judges.
19        Q.      I want to ask you a few questions
20   about your education.  It's not my practice to
21   ask a lot of questions that I already know th
22   answer to.  So I'm going to assume that you went
23   to college and went to law school and graduated
24   and became a lawyer.
25        A.      Correct.
```

Page 7

```
 1        Q.      I wanted to ask whether during the

 2   course of your formal education you ever took

 3   any courses that were relevant to the insurance

 4   issues?

 5        A.      You mean including law school?

 6        Q.      Yes.

 7        A.      Certainly a lot of the courses I

 8   took, and most of that was the case book method,

 9   included or employed cases that dealt with

10   insurance matters.  I don't recall taking a

11   course called insurance construction or

12   something like that.

13        Q.      To be sure I understand, the case

14   method examples that you were giving would be

15   the same cases that anybody that went to law

16   school would be studying; is that correct?

17        A.      Right.  So that in contracts,

18   torts, many of those courses, the cases would

19   involve insurance construction or insurance

20   matters.

21        Q.      So nothing about your education was

22   specially in tort insurance?

23        A.      No.

24        Q.      Have you ever worked for an

25   insurance company?
```

Page 8

```
 1        A.     Well, as a lawyer I been engaged by
 2   an insurance companies.  And during the first 28
 3   years of my practice, it had evolved to where I
 4   pretty much was exclusively a defense attorney
 5   representing insurance companies.  As you know,
 6   we try to maintain the distinction of saying
 7   that I represent the client until a tri-parte
 8   relationship you secondarily represent the
 9   insurance company.  But I'm not employed by the
10   insurance company.
11        Q.     And I asked a really bad question,
12   but you gave an excellent answer to it.  I meant
13   to ask that, aside from your work as a lawyer,
14   had you ever worked for an insurance company as
15   an employee.
16        A.     No.
17        Q.     Am I correct that you went straight
18   from law school into the practice of law?
19        A.     I did.
20        Q.     You described your practice as
21   being what might be described as an insurance
22   defense practice?
23        A.     Correct.
24        Q.     I saw from the report that you had
25   written in the Hartford, the Mitchell & Company
```

Page 9

1    case that you'd also said in that, that you'd

2    done coverage opinions?

3           A.     Right.

4           Q.     And advised insurance companies on

5    their duties under policies?

6           A.     Correct.

7           Q.     Is that distinct from what you

8    think of as an insurance defense practice?

9           A.     I'll give you a lawyer-like answer,

10   yes and no.  For example, I did all the work in

11   that geographical area for USF&G.  Shows you how

12   long ago it was because they no longer exist.

13   But they would from time to time ask me to give

14   coverage opinions in cases in which case for

15   which I was not otherwise involved.  Naturally

16   if I was the retained counsel for a defense,

17   they would have other counsel do coverage

18   opinions.  So from time to time a lot of the

19   different insurance companies that I represented

20   might ask me for a coverage opinion.

21          Q.     You mentioned USF&G as one of your

22   clients.  Can you recall other of your insurance

23   company clients?

24          A.     I would say this, about any

25   insurance company that existed back then, I had

**Page 10**

1  from time to time did work.  Because I did a lot

2  of conflict work, in other words, the regular

3  lawyer for say St. Paul or Utica Mutual or INA,

4  big and little Aetna.  If they had a conflict,

5  they would quite often refer to me, because in

6  Tuscaloosa, if it was that area, I probably was

7  as an active insurance company lawyer as

8  anybody.  So that's where you inherited a lot of

9  that.

10         Q.    I think you said big and little

11  Aetna.  What does that mean?

12         A.     Well, they had Aetna that they

13  spelled with a small "a" and an Aetna they

14  spelled with a capital "a" back in those days,

15  so they would generally refer to it as big and

16  little Aetna.  I did all the work for Horris,

17  Mann.  I did all the work for Mutual Assurance.

18  And if given time I could probably come up with

19  some 20 or 30 insurance companies, some of which

20  I was their exclusive area lawyer, but many of

21  which I was, you know, always the bridesmaid,

22  never the bride.  But that was fine with me

23  because enough overflow work came my way.

24         Q.    Was Travelers on that list?

25         A.     Yes, they would have been.  But

**Alabama Gas Corporation v. Travelers Casualty and Surety Company, et al. 2:10-CV-1840 IPJ**
**Hon. Bernard Harwood**                              **October 26, 2011**

**Page 11**

```
 1   it's hard for me to remember when they might ave
 2   emerged.  You know, certain companies were
 3   taking over other companies.  Certain companies
 4   were coming into being.  And as I indicated
 5   certain companies were just disappearing.
 6         Q.     In your report you identified
 7   approximately 1981 as the date of the emergence
 8   of the tort of bad faith breach of insurance
 9   contract.  Did I get that right?
10         A.     Right.
11         Q.     And you were still practicing at
12   that time?
13         A.     Oh, yeah.
14         Q.     Did you ever handle bad faith
15   claims as a practicing attorney?
16         A.     I did.
17         Q.     On of behalf of insurers.
18         A.     It would probably be 90 percent on
19   behalf of insurers.  I was sort of a, and still
20   am an equal opportunity employer so to speak.
21   If I don't have a conflict, I work both sides of
22   the street.  If it's a legitimate case and
23   people want to hire me, I don't worry about
24   whether I'm representing the insurance company
25   or the insured.
```

Page 12

```
 1        Q.      Can you give me an approximation of

 2   how many bad faith claims you would've handled

 3   as a lawyer?

 4        A.      Well, before 1981, I think that was

 5   the Chaviers case, and then in 1982 we had I

 6   think one called Bowen.  And then there was

 7   Safeco versus Lee in 1983.  I mean, the tort was

 8   in its emergent state.  We were all still

 9   wrestling with it.  There had been a case prior

10   to then where I think Justice Jones, Red Jones,

11   had written a special occurrence St. Vincent's

12   case in which he sort of projected the contour.

13              So everybody knew this was

14   something that was on the horizon.  We had a lt

15   of suits of people claiming bad faith that were

16   coming out initially.  But to give you a number,

17   I'd be hard pressed.  You know, it started off

18   slow and began to build.

19        Q.      Sure.  And I may have asked a bad

20   question.  I wasn't meaning to ask you to recite

21   those reported decisions in a bad faith area,

22   but rather was asking which cases you had

23   yourself handled.  Did you understand my

24   question that way?

25        A.      No.  And as far as giving you a
```

Page 13

```
 1   name, I don't recall the name of any case up

 2   until I went on the bench in '91.

 3        Q.    So you weren't involved in the

 4   Bowen case, then?

 5        A.    Oh, no.

 6        Q.    And I'll accept an objection to

 7   asked and answered, but I just want to make sure

 8   I have this clear.

 9             Sitting here today, you can't give

10   an approximate number of bad faith claims you

11   handled as an attorney during that roughly

12   10-year period?

13        A.    If I just had to guesstimate, I'd

14   say approximately 20.

15        Q.    And any of those result in reported

16   decisions?

17        A.    Not that I recall.

18        Q.    You were appointed to the trial

19   bench in 91; is that right?

20        A.    Correct.

21        Q.    Who appointed you?

22        A.    Governor Guy Hunt.

23        Q.    Did you have a relationship with

24   Guy Hunt?

25        A.    No.
```

Alabama Gas Corporation v. Travelers Casualty and Surety Company, et al. 2:10-CV-1840 IPJ
Hon. Bernard Harwood                                    October 26, 2011

**Page 14**

1           MR. WINSTON:  Objection.  Calls for

2    speculation.  Vague.

3           A.      Well, I had a relationship to the

4    extent that six months before I was appointed by

5    him, a vacancy had come open.  And we have in

6    Tuscaloosa County a judicial selection committee

7    where the committee winnows out the applicable

8    names and submits three.  I was one of three

9    submitted to that vacancy.  And Governor Hunt

10   sent word back that I would not be considered

11   because I had given money to his opponent in the

12   last gubernatorial race.  So when the next

13   vacancy came about, friends of mine who had some

14   entree with him basically got together and went

15   to call on him and said this is who we want.  We

16   think he's qualified.  And so I established a

17   relationship at that point.

18           Q.      Very good.  Did you hear any bad

19   faith cases while you were sitting as a trial

20   judge?

21           A.      Yeah.

22           Q.      Can you give an idea of how many

23   that would have been?

24           A.      I was a trial judge for a little

25   over 10 years.  Certainly one a year, but beyond

Page 15

1    that, I wouldn't feel that it was exaggerating

2    to say two a year.  But when you say here, you

3    know, a lot of them might go out on the summary

4    judgment stage.  A lot of them I might do all

5    the work up to the point and then they got

6    settled.  Bad faith was really beginning to get

7    its sea legs at that time.  And probably if you

8    wanted to say "here" meaning that they came

9    before me to some degree, probably 10 a year.

10           Q.    Do you recall any reported

11   decisions that came out of your trial work as a

12   judge?

13           A.    In dealing with bad faith?

14           Q.    Correct.

15           A.    No, I do not.

16           Q.    Were you elected to the Supreme

17   Court initially?

18           A.    Yes.

19           Q.    In 2001?

20           A.    Actually in 2000 and took office in

21   January 2001.

22           Q.    And justices serve a six-year term;

23   is that correct?

24           A.    Correct.

25           Q.    You served one six-year term?

Page 16

1          A.      Correct.

2          Q.      During your term on the Supreme

3     Court, did you hear any bad faith cases?  Let me

4     ask a better question.  Were you on the panel

5     deciding bad faith cases in that time period?

6          A.      I was.  Actually the way the Court

7     worked, we didn't deal in panels like the, for

8     example, 11th Circuit does.  But rather we were

9     divided into two divisions, four associate

10    justices and the chief justice sits as the fifth

11    member on each.  And so if there's a unanimous

12    five-member vote on the division to which the

13    case is referred to initially, it goes out in

14    that fashion.  If there's any dissent, question,

15    or somebody just says, I'd like to discuss, then

16    it goes to the entire Court.  And then there are

17    a whole category of cases that are required by

18    statute or rule to go to the entire Court

19    initially.  So to the extent that sometimes that

20    would be a division case, I did sit on a

21    division that -- and it was my regular division.

22    These things didn't rotate.

23          Q.      Do you recall any decisions by name

24    that you sat on?

25                  MR. WINSTON:  Objection.  Are you

**Alabama Gas Corporation v. Travelers Casualty and Surety Company, et al. 2:10-CV-1840 IPJ**
**Hon. Bernard Harwood**                                                   **October 26, 2011**

```
 1   referring to bad faith cases or just any case at
 2   all.
 3              MR. LASETER:  That's absolutely a
 4   good objection.  Let me try to ask a better
 5   question.
 6        Q.      During your tenure on the Supreme
 7   Court, do you recall any of the names, even a
 8   slang name, if you will, for any of the bad
 9   faith cases?
10        A.      I remember one of them was Brown.
11   And I just recall there were a lot more.  One
12   reason I have a little difficulty there is that
13   over the years naturally I've read and reread a
14   lot of bad faith cases.  And it's hard for me to
15   remember now which ones I'm so intimately
16   familiar with I just read a lot and which ones I
17   actually participated in.
18        Q.      That's fair.  And actually you can
19   enlighten me about the inner-workings of the
20   Alabama Supreme Court.  I didn't understand
21   before.  The two divisions, would those two
22   divisions sit separately to hear oral arguments?
23        A.      No.  Oral arguments are always on
24   bond.
25        Q.      And can you look at a reported
```

Page 18

1    Alabama Supreme Court decision and tell from the

2    reported decision which division of justices

3    appeared?

4         A.     Yes, because we had what we called,

5    initially when I went on there, the See division

6    and the Houston division, named after the two

7    senior associate justices.  The first-most

8    senior associate justice heads up one division

9    and the second-most associate heads up that and

10   they are usually referred to by name in that

11   fashion.  So if I looked and saw that Justice

12   See was participating, I know that was the See

13   division.

14               MR. LASETER:  And for the court

15   reporter, that's Justice See, S-E-E.

16        A.     And sometimes you'd have a judge

17   recused or not be able to sit for some reason

18   and you'll have another judge from another

19   division come in.  But nonetheless you could

20   look at the composition and say, okay, that's

21   either the See division or Houston division.

22        Q.     Do you recall if you wrote any

23   opinions on bad faith while a Supreme Court

24   justice?

25        A.     You know, I wouldn't be surprised

Page 19

 1    if I did, and --

 2         Q.    Sitting here today, none come to

 3    mind?

 4         A.    No.

 5         Q.    Sitting here today do you recall

 6    dissenting on any bad faith cases?

 7         A.    Not specifically.  But again,

 8    that's just a function of that thing I think I'm

 9    intimately familiar with bad faith case that

10    happened during that six-year tenure.  But then

11    every one that's happened since then, I've read

12    and reread.  And it's just -- and also the Court

13    asks me still to sit with them from time to time

14    when there's a disqualification, the number

15    drops down.  So I've been recommissioned, I

16    guess you'd say, probably four or five times by

17    the Court.  I don't recall any of those were bad

18    faith cases.

19         Q.    You're doing a very good job of

20    being one step ahead of my outline here, so

21    thank you for that.  Can you tell me how that

22    commissioning process works when you get called

23    back to be a judge?

24         A.    Usually it's, the clerk of the

25    court contacts me.  Most recently it was the

**Page 20**

1    staff attorney for the chief justice.  They

2    would say, we've got a case in which we need to

3    have a special justice sit.  And either I'd ask

4    or they'd volunteer, here are the facts, here

5    are the parties.  I'd run a conflict check

6    within my firm, not giving the details other

7    than, might say this is a breach of contract

8    case because I want to make sure that nobody in

9    my firm has something going on wherein my

10   participation might benefit them.  And so if

11   there's no conflict, then I agree to do it.

12        Q.    Do you have to do anything special

13   to maintain that eligibility to be called back?

14        A.    No.

15        Q.    Are there other judges that

16   actively do that now?

17        A.    Yeah.  They reach out to -- we've

18   got a number of retired justices.  So I've seen

19   recently Justice Lyons has sat, Justice Houston

20   has sat.  I think maybe former Chief Justice

21   Nabers has sat.  A former justice from a long

22   time ago, Janie Shores, I've seen her name as

23   special justice.

24        Q.    Are you aware of any other former

25   Supreme Court justices that are currently giving

Page 21

1   expert testimony in cases among private parties?

2        A.      I am.

3        Q.      Who are those?

4        A.      I know I've seen a situation where

5   Justice Maddox has, Justice Houston has, Justice

6   Nabers, N-A-B-E-R-S, has.  I do recall those

7   three.  And Justice See, I recall one from him

8   also.

9        Q.      How did you come to be aware that

10  they had given expert opinions?

11       A.      Because I was also retained as an

12  expert and was given either their report or they

13  were involved in the case.

14       Q.      Were any of those cases bad faith

15  cases?

16       A.      You know, I don't recall.  I don't

17  think so.  If I go back in my mind sort of

18  thinking generally about the bad faith cases

19  I've been involved in as an expert, I don't

20  recall that any of them were an opposing expert.

21       Q.      Are there any rules of ethics that

22  inform how former judges have to decide whether

23  or not an expert assignment is appropriate?

24       A.      Well, certainly you would not

25  participate if the case was one that had

Page 22

1    formerly come before the court and you had

2    actively participated.  That'd just be my rule.

3    I would not.

4            Q.    You mean that's not a written rule?

5            A.    Yeah.  I had a situation where I

6    actually called down to the legal counsel of the

7    State Bar to ask for an advisory opinion because

8    there was a case in which an incidental matter

9    had come before the court when I had sat on it

10   and now a continuation of that litigation was

11   going on and I was asked to serve as an expert

12   witness.  And there is a rule in the Canons of

13   -- or rather in the Rules of Professional

14   Conduct that says if you are judge even of a

15   multi-judge court, you cannot act as a lawyer,

16   you cannot represent a matter which previously

17   came before the Court which I think it says

18   substantially participated in.  So I called to

19   ask, what's the situation where I'm not

20   representing the party but I'm being asked to

21   serve as an expert.  And the answer I got, it

22   was verbally over the phone, is, well, we've

23   dealt with that several times.  Our position is

24   that an expert doesn't represent anybody.  An

25   expert is supposed to -- they have to give an

**Page 23**

1    objective opinion, and so our view and our

2    position is you're not precluded by any of the

3    rules of professional ethics in serving as an

4    expert even if the matter had come before the

5    Court.  But I elected in that case not to go

6    forward anyway.

7         Q.    Are you aware of any published

8    opinions with regard to ethical constraints, if

9    you will, on expert testimony by former judges?

10        A.    I am not.

11        Q.    Are you still active in the bar?

12        A.    Oh, yes, yes.

13        Q.    What sort of roles are you taking

14   on now?

15              MR. WINSTON:  Objection.

16   Relevance.  If the witness recalls, he can go

17   ahead and answer.

18        A.    Well, I'm chair of the advisory

19   committee to the Alabama Supreme Court on the

20   Alabama Rules of Evidence.  And that's a

21   committee appointed by the Supreme Court.  And

22   we're just wrapping up a two-year study of all

23   the Alabama Rules of Evidence, comparing them to

24   the Federal Rules and going to make in

25   confidence a recommendation to the Court on what

Page 24

```
 1    changes or updates should be made.  By
 2    appointment of the Supreme Court, I'm on the
 3    Committee for the Alabama Rules of Pattern Jury
 4    Instruction for Civil Cases.  And I've served on
 5    a number of other committees like that.  I'm on
 6    a committee for the Alabama Law Institute and
 7    several subcommittees looking at proposed
 8    legislation of different types.  We're working
 9    on one now dealing with I think, uniform
10    enforcement of foreign judgments.
11         Q.     Pretty exciting.
12         A.     Yeah, riveting.
13               (Off-the-record discussion.)
14         Q.     Let me try to narrow my question
15    about your current bar-related activities.  I
16    was trying to understand whether or not any of
17    your current bar activities have anything to do
18    with an insurance sub-group or subcommittee.
19         A.     No.  I am a member, in the American
20    Bar Association with the exception on insurance
21    on law.
22         Q.     Do you have any leadership roles
23    there?
24         A.     No.
25         Q.     Have you ever had a leadership role
```

**Alabama Gas Corporation v. Travelers Casualty and Surety Company, et al. 2:10-CV-1840 IPJ**
**Hon. Bernard Harwood**                                    **October 26, 2011**

Page 25

```
 1    in the American Bar?
 2         A.     No.
 3         Q.     I know from your reports that
 4    you've had various leadership roles in the
 5    Alabama Bar and as well as the local Tuscaloosa
 6    Bar; is that correct?
 7         A.     Correct.
 8         Q.     Let me transition from your
 9    background if I can to talk about first some
10    general principles that I think have informed
11    your opinions here and that govern, outline
12    insurance law.  First of all, am I correct that
13    it's a principle of Alabama insurance law that,
14    at least absent a statute or a law to the
15    contrary, that words in an insurance policy
16    where clear will be given their plain meaning?
17         A.     Correct.
18         Q.     Is it also correct that the defense
19    obligation is generally understood to be broader
20    than the indemnity obligation in liability
21    policies?
22         A.     Correct.
23         Q.     Is it also correct that an
24    ambiguity is understood to exist when either a
25    term isn't clear or whether there are two or
```

Page 26

1    more possible meanings for that term?

2         A.    Correct.

3              MR. WINSTON:  Well, give me time to

4    object.  I would object to that question both on

5    the grounds of compound and also calling for

6    legal collusion.

7         Q.    Is it also correct that

8    ambiguities, as we just defined them, are

9    construed in favor of finding coverage.

10        A.    I would say ambiguities are

11   construed in favor of the insured.  Whether that

12   second construction results in a finding of

13   coverage would be a secondary consideration.

14        Q.    So it would be better to say that

15   ambiguities are construed in favor of the

16   insured?

17        A.    Correct.

18        Q.    And likewise, with regard to the

19   duty to defend, doubts about whether there's a

20   duty are resolved in favor of the insured?

21        A.    Well, doubts if there's an

22   ambiguity.

23        Q.    How about doubts with regards to

24   factual matters?

25              MR. WINSTON:  Could you read back

Page 27

```
 1    that question?

 2              THE COURT REPORTER:  Let's go back

 3    and listen to it.

 4              MR. LASETER:  If you will, to save

 5    time let me --

 6        Q.    The preceding question was a

 7    question about whether or not doubts with regard

 8    to the existence of a duty to defend were

 9    resolved in favor of the insured.  And you

10    answered that, I believe, by saying it depended

11    on whether it was a question of law or excuse me

12    policy interpretation or the facts.  Did I get

13    that right?

14              MR. WINSTON:  Objection.

15        A.    No.  I said if there was an

16    ambiguity, you would construe the ambiguity

17    favorably to the insured.

18        Q.    And then with regard to an

19    uncertainty or a doubt with regard to a factual

20    situation, should that also resolved in favor of

21    finding a duty to defend?

22        A.    Basically the duty to defend is a

23    function of what the circumstances described in

24    the complaint.

25        Q.    Are you familiar with the term,
```

Page 28

```
 1    "the four corners test"?
 2         A.     Right.
 3         Q.     And what you just described is the
 4    four corners test?
 5         A.     Correct.
 6         Q.     Alabama also recognized an
 7    obligation to look beyond the complaint?
 8         A.     Alabama said, the best I can
 9    paraphrase it, is that if facts come to the
10    attention of the insurance company, it would
11    show coverage despite the fact they're not clear
12    in the complaint.  Then they should consider
13    those also.  But you start out with the fact
14    that if you've got a complaint you look to the
15    facts or circumstances described in that
16    complaint.
17         Q.     And to be sure I understand what
18    you're saying -- to be sure I understand the
19    distinction I think that you're drawing, are you
20    familiar with something, a term called "the
21    eight corners test"?
22         A.     Not by that name.
23         Q.     Are you familiar with the practice
24    of defending, of insurance companies defending
25    cases under reservation of rights?
```

Page 29

1        A.      Correct.

2        Q.      Can you explain why insurers do

3   that?

4        A.      If an insurance company is

5   uncertain as to the duty to defend or just as a

6   pragmatic decision it decides it would be

7   helpful to go forward and be involved in the

8   defense, then it can either send a reservation

9   of rights letter to the insured or enter into a

10  nonwaiver agreement with the insured.  But

11  essentially what the reservation of rights

12  letter says is that we'll go ahead and enter

13  into a defense but we're doing so without

14  prejudice to our rights to later withdrawal from

15  counsel.  In other words, not waiving any of the

16  reasons we might have for not providing a

17  defense or not indemnifying just by entering

18  into the defense.

19       Q.      Is it possible for an insurance

20  company in Alabama to enter into a defense under

21  reservation of rights and then seek a

22  declaratory judgment on the uncertainty?

23       A.      It is.

24       Q.      Is that common?

25               MR. WINSTON:  That's too vague.

Page 30

```
 1        A.     I don't know that I'd say it's

 2   common.  It happens.

 3        Q.     Have you been involved in cases out

 4   of trial court or Supreme Court where the issues

 5   involved a -- there's a fact pattern involved, a

 6   company having entered a defense under

 7   reservation of rights and then sought a

 8   declaratory judgment?

 9             MR. WINSTON:  Objection.  Vague.

10   You mean the insurance company?

11             MR. LASETER:  Correct.

12        A.     Yeah, I can recall situations like

13   that.

14        Q.     Do you recall any of them by name?

15        A.     No, I don't.

16        Q.     Continuing on with some more

17   general points, I understand from your report

18   that you believe that California law is

19   articulated in the Foster case -- and by the

20   Foster case, I mean the case that you cited in

21   your report.  It essentially mirrors the

22   counterpart standards for policy interpretation

23   of Alabama law, is that --

24        A.     Yeah, a lot of the sort of tests or

25   rubrics, they referred to as informing their
```

Page 31

1    approach to the analyses of the ones I'm used to

2    seeing Alabama courts adopt.

3           Q.    In the process of formulating your

4    opinions for this case, did you evaluate the

5    degree to which, to pick a state, Illinois'

6    approached to insurance problems mirrored the

7    standards in Alabama?

8                 MR. WINSTON:  Objection.  Vague.

9           A.    As I read some of those cases, I

10   probably noted that, but I didn't make an

11   intentional sort of comparison or checklist.

12          Q.    And so the same thing would be true

13   with any of the other jurisdictions where you

14   reviewed the cases.  You didn't make a specific

15   comparison to see whether they were to the same

16   degree, more, or less, or similar than

17   California in Alabama?

18                MR. WINSTON:  Object to the form.

19          A.    I would've noted it as I read the

20   opinion, but I didn't retain it to the extent of

21   trying to say, okay, this state did it this way

22   or this state did it that way.

23                MR. LASETER:  And Mr. Winston,

24   other than perhaps me mumbling, can you explain

25   the form or objection of that question.

Page 32

1            MR. WINSTON:  It was compound on

2    multiple levels.  It was leading, and it was

3    vague.

4            MR. LASETER:  I think I get to lead

5    him.  Let me see if I can break it down so that

6    it's not compound.

7       Q.     And I think your answer is clear

8    enough.  But did you evaluate whether any of the

9    other jurisdictions were less similar to Alabama

10   law with regard to approach to insurance policy

11   evaluation in California?

12      A.     I would've gained that impression

13   as I was going through the case, but I don't

14   retain it as far as any particular state.

15      Q.     And likewise you didn't evaluate

16   whether any other jurisdiction was equally as

17   similar to Alabama as California?

18      A.     No.

19      Q.     And likewise you didn't evaluate

20   whether any other jurisdictions were less

21   similar to Alabama law than California law?

22      A.     No.

23      Q.     In the course of preparing your

24   opinion in this case, did you review any

25   decisions that were critical of that Foster

**Page 33**

1    decision?

2         A.    Well, I read pretty much the whole

3    body of cases that you all variously have cited.

4    But I don't recall specifically now which ones

5    came after it and took note of it.

6         Q.    I may not have asked a good

7    question.  I meant to ask you whether you recall

8    reading a case that was expressly critical of

9    Foster?

10              MR. WINSTON:  Objection.  Asked and

11   answered.

12        A.    Not as such.

13        Q.    Do you recall the Porterfield

14   decision that you authored?

15        A.    I remember that name.  You'll have

16   to give me a little better guidance on which one

17   it was.

18        Q.    I believe Porterfield, the Autobahn

19   Insurance Company?

20        A.    Autobahn, I do.

21        Q.    In that case I believe you observed

22   that whether or not courts in other

23   jurisdictions have reached differing views with

24   regard to the interpretation of the term is at

25   least some evidence with regard to whether or

1   not that term was ambiguous?

2        A.     Yeah, among all the different thing

3   you might consider, if you entertain the idea

4   that there's an ambiguity -- of course since you

5   mentioned the four corners test, if you decide

6   there's no ambiguity, then you don't start

7   looking to extrinsic evidence like that.

8        Q.     But assuming that you have decided

9   that there could be an ambiguity and you're

10  looking whether or not other courts in other

11  jurisdictions have reached different opinions is

12  at least some evidence of that ambiguity?

13       A.     Well, I would say that you'd want

14  to read their opinions and see what analysis and

15  reasoning they used, not just a numerical count,

16  but to see can you gain any further incite by

17  saying the rationales they employed.

18            (Off-the-record discussion.)

19       Q.     Judge Hardwood, I'm showing you

20  what's been marked Harwood Exhibit number 1.  If

21  you'd take a moment and look that over and let

22  me know when you've had a chance.

23       A.     Right.

24       Q.     Is Exhibit 1 your expert report in

25  this case?

Page 35

1        A.      It is.

2        Q.      Are there any additions or changes

3   you want to make to that?

4        A.      No.

5        Q.      I don't have a particular question

6   about it right now.  I was just using this

7   moment to go ahead and mark it.

8        A.      Okay.

9                (Whereupon, Exhibit 1 was marked

10               for identification.)

11       Q.      Am I correct of whether or not an

12  insurer had a debatable reason for refusing

13  coverage is one of the elements of the tort of

14  bad faith breach of insurance contract in

15  Alabama?

16       A.      I agree.

17       Q.      And that's actually an element of

18  what's called normal bad faith?

19       A.      It's an element of normal bad

20  faith.  It's also an element of abnormal bad

21  faith.

22       Q.      Is whether or not a reason given by

23  an insurance company for denying coverage is

24  debatable a jury question?

25       A.      It has been treated as such.

Alabama Gas Corporation v. Travelers Casualty and Surety Company, et al. 2:10-CV-1840 IPJ
Hon. Bernard Harwood                                        October 26, 2011

Page 36

1        Q.      In your view is that something that
2    would be better decided by a judge?
3        A.      Well, to the extent it's based on
4    the factual mix of what was going on at the time
5    the decision is made.  There are probably always
6    going to be factual questions involved.  So it's
7    best, I guess, a mixed question of fact and law.
8        Q.      Is bad faith measured from the time
9    that the insurance company denies the claim?
10        A.      Yeah.  I think it's sort of like
11    you take a snapshot at that point.  What did the
12    insurance have before it in reaching that
13    decision.
14        Q.      In other words, information
15    developed after the time they denied coverage
16    shouldn't be considered in deciding whether or
17    not they had a debatable reason at the time they
18    denied?
19        A.      Alabama Supreme Court has said
20    that.
21        Q.      Have you read or at least reviewed
22    the pleadings in this case?
23        A.      I have.
24        Q.      Are you aware that Judge Johnson
25    has already ruled that a PRP letter -- strike

Page 37

1    that.  Do you understand what the term "PRP

2    letter" means?

3            A.      I do.

4            Q.      Are you aware that Judge Johnson

5    has already ruled that a PRP letter is a suit in

6    Alabama law for purposes of this case?  And if

7    it helps, I'm referring to the summary judgment.

8            A.      Yeah, I have her order, and I

9    was -- and I want to look at the exact way.  She

10   just says that she -- for all of the reasons she

11   expressed -- was followed the majority of other

12   states and find that the PRP letters satisfy the

13   EPA to the plaintiff, falls within the broad

14   definition of suit and thus triggers the

15   defendant's duty to defend.

16           Q.      I assume you don't plan in this

17   case to tell Judge Johnson that she was wrong in

18   issuing that opinion?

19           A.      Say that to a federal judge?  No.

20           Q.      And I assume you don't plan to tell

21   the jury that Judge Johnson was wrong in issuing

22   that opinion.

23           A.      No.  I think Judge Johnson takes

24   one view of the debate.

25           Q.      Do you consider yourself to be any

Page 38

1  better qualified than Judge Johnson to help the

2  jury understand how to determine whether or not

3  Travelers had a debatable reason to deny

4  coverage?

5            MR. WINSTON:  Objection.

6  Argumentive.

7       A.    Well, I don't think Judge Johnson

8  has reached that issue.

9       Q.    That seems right to me too and so

10  my question is whether you think that you're any

11  better qualified to help the jury with that than

12  she would be.

13       A.    Well, I think under I guess Rule

14  702 of the Federal Rules of Evidence, if,

15  drawing on my specialized knowledge, my opinion

16  would be helpful to the trier of fact or the

17  finder of fact, even though it relates to an

18  ultimate issue, then it's permissible as an

19  expert opinion.  But that's all subject to Judge

20  Johnson's opinion.  I mean, she'll decide

21  whether mine or anyone else's expert opinion

22  would be helpful to the jury in the

23  circumstances.

24       Q.    And I believe this is inherent in

25  your earlier testimony, but I want to be sure.

**Page 39**

1    Your abilities to offer opinions with regard to

2    the bad faith at issue in this case are based on

3    your legal knowledge and expertise; is that

4    right?

5         A.    Yeah, and my having been present,

6    you might say, at the beginning when the tort of

7    bad faith began to emerge.  I followed it along,

8    watched its evolution, seen the contours or its

9    shape.  So I guess what I'm saying is, having

10   lived with it intimately as lawyer, trial judge,

11   and Supreme Court Justice, I feel that gives you

12   a pretty good prospective.

13        Q.    And simply to be sure that I'm

14   clear on this, you're not suggesting that your

15   ability to offer an opinion on that is grounded

16   in any way in experience in the insurance

17   industry aside from acting as a lawyer

18   representing insurance companies?

19        A.    I would generally agree with that.

20   I've had a lot of experience, quote, in the

21   insurance industry simply because when I came

22   along you didn't have as much of a separation as

23   what you might now have.  I mean, I did

24   basically what was adjusting work a lot in my

25   earlier career.  Insurance companies would call,

**Alabama Gas Corporation v. Travelers Casualty and Surety Company, et al. 2:10-CV-1840 IPJ**
**Hon. Bernard Harwood**                          **October 26, 2011**

**Page 40**

```
 1   we've had a wreck.  Go out and take statements.
 2        Q.     But they were hiring you as a
 3   lawyer to go out and do that, not as an
 4   adjustor?
 5        A.     Right.  But I'm just saying that
 6   you were assigned a lot of tasks that an
 7   adjustor or a claims superintendent might do.  I
 8   think the cleavage is now more distinct.  They
 9   respect the fact that you're the lawyer and this
10   is the claims department.  So I went to claims
11   meetings.  I went to -- there was a monthly
12   meeting of all the claims representatives that
13   everybody attended in Birmingham.  And I, along
14   with some of the adjustors from there, would
15   drive up there.  So I had that sort of insight
16   participation, but I was never formerly a part
17   of any claims committee.  And as I said earlier,
18   I was never employed by an insurance company as
19   such.
20        Q.     Turning now to Exhibit 1 -- and I'm
21   not asking you to look at any particular part.
22   But I'm going to ask you some more specific
23   questions about your opinion now.  And if it
24   helps to refer, please feel free to.  In looking
25   at the report, do I understand correctly that
```

Alabama Gas Corporation v. Travelers Casualty and Surety Company, et al. 2:10-CV-1840 IPJ
Hon. Bernard Harwood                                              October 26, 2011

Page 41

1    you'll offer an opinion Travelers did not act in

2    bad faith in this case?

3         A.    Yes.

4         Q.    Do I also understand correctly that

5    you'll offer an opinion on the relationship

6    between the term "suit" as it appears -- and

7    suit should probably be in quotations marks --

8    "suit" as it appears in the policy and the word,

9    "claim" that appears in the policy?

10        A.    Well, to the extent that I

11   addressed that in the report, yes.

12        Q.    And if I understand the way you

13   address it in the report, you'll offer an

14   opinion that the policy language makes a

15   distinction between the term "suit" and the term

16   "claim"?

17        A.    Right.  Consistently throughout the

18   policy, anytime either of those terms is used,

19   that distinction is honored.

20        Q.    I'll alert you in advance that this

21   may be a complicated-sounding question, and I'll

22   do my best.  Did I also understand correctly

23   that you will offer an opinion that under

24   Alabama juris prudence that Court will put more

25   -- and by court I mean the Alabama Supreme Court

Page 42

1   -- will put more weight on what it views to be

2   the better reasoned approach rather than looking

3   to the weight of majority versus minority

4   decisions on a given issue elsewhere?

5       A.      Yeah, I think rather than just

6   doing the counting of noses, the Alabama Supreme

7   Court would look to the underlying reasons and

8   rationales and adopt that which appeared to be

9   the -- as they've used the term,

10  "better-reasoned" approach.

11      Q.      And finally, am I correct that

12  you'll offer an opinion that Travelers' basis of

13  denial was at least debatable under Alabama law?

14      A.      Correct.

15      Q.      And if it helps to take a moment

16  and look through your report -- I believe I've

17  summarized your major points.  And by asking

18  this question I don't mean to try to exclude any

19  particular sentence here, but is that a fair

20  summary of your major points?

21          MR. WINSTON:  Well, objection.  The

22  document speaks for itself.

23      Q.      Let me try to ask a better

24  question.  Are you aware of major points of your

25  opinion that I've omitted in this list I just

Alabama Gas Corporation v. Travelers Casualty and Surety Company, et al. 2:10-CV-1840 IPJ
Hon. Bernard Harwood                                                October 26, 2011

Page 43

1    gave?

2                    MR. WINSTON:  Same objection.

3          A.     I really can't assign major in

4    minor.  The opinions I've expressed are all laid

5    out there.  I can't really champion them in a

6    hierarchy.

7          Q.     Fair enough.  I'm sitting here

8    today, having not thoroughly read this report,

9    are there points you believe important that that

10   I have not articulated here?

11                   MR. WINSTON:  Objection.  It's

12   cumulative.  The document speaks for itself.

13         A.     Well, I don't say there it is, but

14   I'm just saying if it's in the report, then I

15   consider it worthy of consideration as part of

16   my opinion.

17         Q.     And fair enough.  And my reason for

18   asking those questions is that often times --

19   and I've actually seen this in some of your

20   prior reports -- expert witnesses will give sort

21   of a summary bullet of their opinions and then

22   follow that with a more detailed analysis.  In

23   this case you didn't do that, so I'm just trying

24   to be sure I understand sort of in a summary

25   fashion what your opinions will be.

Page 44

 1              MR. WINSTON:  Is that a question?

 2     Well, objection.  There's no question.

 3              MR. LASETER:  I'll put a question

 4     mark at the end of that.  No.  It was simply an

 5     explanation for the last question I've been

 6     giving.

 7        Q.     And my reason for trying to ask you

 8     whether or not what I had done would be a

 9     reasonable summary of those major points, again

10     not meaning to exclude the underlying, or

11     anything left out.

12              MR. WINSTON:  Let me just object

13     because it's been asked and answered and also

14     because the document speaks for itself.

15        A.     I mean, I could elaborate on a lot

16     of the things that are in the opinion, or rather

17     in the report, but I don't have some sag issue

18     that I anticipate interjecting that's not

19     foreshadowed in the report.

20        Q.     But if it's foreshadowed in the

21     report, you do intend to testify about it at

22     trial?

23        A.     Yeah, and I don't mean that there's

24     something lurking that I sort of hinted at that

25     I've held back.  But I would just say that if

Page 45

1    you're on the stand for some length of time,

2    just like in this deposition, you'd begin to

3    have elaborations upon things in the report.

4         Q.    Fair enough.  Let me shift gears

5    slightly to one of these sub points which is the

6    question of the weight of majority versus

7    minority opinions.  You cite the attorneys

8    insurance case in here.  Do you recall that?

9         A.    Uh-huh.

10        Q.    Do you recall the facts of the

11   attorneys insurance case?

12        A.    I think it related to whether you

13   had to show prejudice in connection with late

14   notice to the insurance company.

15        Q.    And there was a particularly

16   peculiar term in the policy that hadn't been

17   addressed in Alabama; is that correct?

18             MR. WINSTON:  Objection.  The

19   opinion speaks for itself.  The question is

20   vague.

21        Q.    And is your understanding that that

22   same issue had not been addressed in any other

23   jurisdiction?

24             MR. WINSTON:  Same objection.

25        A.    I don't recall that aspect of the

Page 46

1    case.

2         Q.     You don't recall one way or

3    another?

4         A.     No.  I know it was an issue for the

5    Alabama Supreme Court to decide whether there

6    had been any other court that had decided, but I

7    don't think that ever entered into it.

8         Q.     Do you recall having read the

9    Alabama Plating case?

10        A.     I do.

11        Q.     Do you recall in that case that

12   there were actually two points on which the

13   Court was looking to other jurisdictions for

14   some clarification?

15               MR. WINSTON:  Objection.  The case

16   speaks for itself.

17        A.     I generally recall that.

18        Q.     Do you recall what those issues

19   were?

20        A.     One had to do with whether damages

21   as used in the CGL policy would embrace the idea

22   of ordered cleanup costs I believe.  I believe

23   it was the EPA in that case, or maybe it was the

24   state ADEM agency.  I really don't know.  But

25   the idea of whether damages, that term as used

**Alabama Gas Corporation v. Travelers Casualty and Surety Company, et al. 2:10-CV-1840 IPJ**
**Hon. Bernard Harwood**                                    **October 26, 2011**

**Page 47**

 1    in the CGL policy, would cover those sort of

 2    cleanup costs.

 3            Q.      Can you recall any other issues?

 4            A.      Seemed it had to do with things

 5    relating to boiler policies.  It seemed to me I

 6    remember there was discussion of the fact that

 7    certain courts had interpreted, that the courts

 8    had uniformly interpreted a phrase a certain

 9    way, that is, there wasn't any split, but just

10    that was the uniform interpretation.  Therefore

11    when the insurer drafted and issued a policy

12    using that term, it would presumably have known

13    that the judicial gloss on it would've indicated

14    that that was the interpretation that would be

15    accorded to it.

16            (Off-the-record discussion.)

17            Q.      Do you recall in the Alabama

18    Plating decision the Alabama Supreme Court using

19    the term "a narrow majority"?

20            A.      I do.

21            Q.      Do you know what count of

22    jurisdictions it called the narrow majority?

23            A.      I don't recall.

24            Q.      Do you recall them describing

25    another majority as a clear majority?

Page 48

1        A.      I believe I recall that phrase,
2    yeah.
3        Q.      And do you recall what count they
4    were referring to as a clear majority?
5        A.      I don't recall that.
6        Q.      I'm going to borrow a question Mr.
7    Winston had asked witnesses earlier.  Is there a
8    possible majority of jurisdictions on a given
9    issue that would be so one-sided as to render
10   the likely outcome under Alabama law not fairly
11   debatable?
12       A.      Well, again I would say not on the
13   basis of numerical account but on the basis of
14   reading those opinions.  And obviously if it had
15   garnered that much support or there was uniform
16   support, the underpinnings of its logic
17   rationale must be pretty competitive.  So that's
18   what I think would persuade the Alabama Supreme
19   Court, not just the numerical account.
20       Q.      But with regard to whether or not
21   an insurance company has a debatable reason,
22   would the insurance company be expected to look
23   at that overwhelming majority plus the
24   underlying rationale in deciding whether or not
25   it had a debatable reason?

Page 49

1          A.      Well, I think you'd look first to
2     decide do we consider this to be an ambiguous
3     term.  In this case is "suit" ambiguous as used
4     in our policy where we go to such pains to
5     contrast it with "claim."  And if you decide
6     within the four corners that we don't have an
7     ambiguity here and that's legitimately a
8     debatable reason, then going forward I would say
9     you haven't been guilty of bad faith.
10          Q.      Am I correct to understand that
11     you're not going to go so far in your opinions
12     as to actually predict what the Alabama Supreme
13     Court would do with that "suit" question with
14     regard to PRP letters?
15          A.      That's correct.
16          Q.      Rather your opinion is that the
17     meaning of "suit" is still at this point unclear
18     under Alabama law; is that right?
19          A.      It's an open question.
20          Q.      Does the trend of decisions make
21     any reference in the analysis of whether or not
22     it's a debatable reason?
23          A.      That's something the Court looks at
24     from time to time.  And it's a mix.  They look
25     at a lot of different things.  And I have seen

Page 50

1    cases where the trend, particularly if you had a

2    lot of cases from maybe turn of the century or

3    at a different time and then subsequent to then

4    the clear trend is away of from that, that's

5    something you consider.

6              Q.      And you cite in your report an area

7    of insurance law in which Alabama has existing

8    jurisprudence in a minority of jurisdictions

9    around the country.  Do you recall that?

10             A.      I'm sorry.  You're going to have to

11   repeat that question.  Or maybe you can just

12   refer me --

13             Q.      Yeah, let me see if I can find it

14   in your report.  I'm looking on page 4 in the

15   last sentence of the first paragraph on the

16   page.  It says, "the Court is not reluctant."

17   Do you see that sentence?

18             A.      Right.

19             Q.      And the significance of that, if

20   I'm understanding correctly, is that there are

21   at least some examples where Alabama

22   jurisprudence would be within the minority rule

23   across the country on insurance issues?

24             A.      Yeah, in that case involving the

25   insurance law issue, that's the one I thought

Page 51

1    you were referring to earlier when I said I

2    recalled a case when we had a minority position

3    on both need to show prejudice.  So if that

4    wasn't the case you were referring to, then that

5    answer was misplaced as far as the facts of the

6    case.

7          Q.    And then to try to clarify, with

8    regard to the position in Midwest Employers

9    Casualty Company, the one cited here in your

10   report, that was a situation where there was an

11   existing line of cases in Alabama rather than a

12   situation where the Court was looking at an

13   undecided issue on Alabama law; is that right?

14         A.    Right.  So the fact -- the whole

15   line of cases or the line of cases in Alabama

16   was reaffirmed despite the fact that it

17   represented a minority view.

18         Q.    And in all of your research and

19   preparation for this case and your familiarity

20   with Alabama insurance law, are you aware of any

21   situations where the Alabama Supreme Court has

22   adopted in a decision addressing an insurance

23   question the first impression of Alabama what

24   constitutes a minority view across the country?

25         A.    Nothing comes to mind.

**Alabama Gas Corporation v. Travelers Casualty and Surety Company, et al. 2:10-CV-1840 IPJ**
**Hon. Bernard Harwood**                                    **October 26, 2011**

**Page 52**

```
 1        Q.      Turning to page 6 of your report,
 2   one of the Rule 26 questions posed is a listing
 3   of publications in the last four years.  I don't
 4   see any listed here.  Am I correct that you
 5   haven't had any published papers or books or the
 6   like in the last four years?
 7        A.      I guess it depends on what you mean
 8   by published.  I've given -- in fact I got an
 9   award at the Bar meeting about three years ago
10   for having given over 200 CLE presentations.
11   I've given six this year and am giving one
12   November the 2nd, I think.  So you always have
13   to have -- and I try to have very elaborate
14   handouts because otherwise they can't get their
15   CLE credit.  And these are published in booklet
16   forms that go out to all the attendees or
17   anything when that started.  So to that extent
18   published, but not in the sense of Treatise law
19   review article or anything like that.
20        Q.      Where regard to those papers, or
21   written materials that you just described, have
22   any of those addressed bad faith?
23        A.      In years past they have.  I
24   remember I was asked give a -- back when I was
25   practicing law, so this would be the first 20
```

**Alabama Gas Corporation v. Travelers Casualty and Surety Company, et al. 2:10-CV-1840 IPJ**
**Hon. Bernard Harwood**                                      **October 26, 2011**

1    years of practice, to the Alabama Circuit of

2    District Court Judges Association which I did on

3    bad faith.  And there was a paper that went with

4    it and an oral presentation.

5           Q.    And is that paper preserved

6    somewhere to your knowledge?

7           A.    Not that I know of.

8           Q.    And it's not in some compendium of

9    CLE books that you know of?

10          A.    No.  And, frankly, given its age, I

11   doubt that any of the judges would have retained

12   it because it would be somewhat dated now.  I

13   would think a lot of it still held true, but

14   nonetheless a lot of water has gone under the

15   bridge since then.

16          Q.    And any other presentations that

17   you can recall where you gave out materials that

18   the subject matter would have been an insurer

19   bad faith?

20          A.    You know, I think their have been

21   more than one back during that time.  I know

22   there were, but not preserved as you said in

23   some sort of compendium.

24          Q.    And to be sure I understand the

25   limitation you're making.  Since the time you

Page 54

1    took the bench as a Supreme Court justice, you

2    haven't made a presentation in which there would

3    be written materials on the topic of bad faith?

4        A.    I don't believe so.

5        Q.    Looking at page 6 of your exhibit,

6    I see five cases listed here.  Could we just

7    walk down these cases, starting with Gary

8    Dewayne and it's Shearin, S-H-E-A-R-I-N, case

9    and have you tell me what that case was about?

10       A.    The best I can recall that was a

11   situation where an insurance policy had been

12   financed through a finance group and as part of

13   the paperwork involved in that relationship the

14   finance group was given the authority to cancel

15   the policy if premiums weren't paid to it.

16   Premiums were not paid to it.  It sent notice to

17   the carrier who cancelled the policy.  The

18   insured then cured the default.  The finance

19   company accepted and at some point in time sent

20   notice to the insurance company, we want to in

21   effect reinstitute the policy.  And the

22   insurance company took the position, well, we

23   don't have to honor that.

24       Q.    And what topic or subject did you

25   give an opinion on in that case?

Page 55

1          A.      I'm not sure if it was that one or

2    that one and another one.  But at one point I

3    relied on the fact we've got a line of Alabama

4    cases that say that improper or negligent

5    wrongful cancellation of the policy is not bad

6    faith.  It's separate area of the law.  There

7    may have been other issues involved in that

8    Shearin case.  It shows the case number that the

9    case was filed in '05.  I don't remember just

10   when I did it, but that was -- I didn't come off

11   the Supreme Court bench until January '07, so

12   sometime probably early on in that time is when

13   I was approached.

14          Q.      Am I understanding correctly,

15   though, that although this may have involved

16   something normally described as bad faith, it's

17   not the normal, abnormal bad faith line of cases

18   that we're talking about in this case?

19          A.      Yeah, I think so.

20          Q.      I'm going to ask a term in slang to

21   make this easier.  If this is objectionable, we

22   can do it more formally.  But can you tell me

23   which side of that case you were on?

24          A.      I was retained by the insurance

25   company.  Better said, I was retained by counsel

Page 56

1   rather than the insurance company to ask if I

2   would look at the materials and give an opinion

3   of whether there was bad faith.

4          Q.     Fair enough.  And I'm going to ask

5   that same question in the next four cases.  Can

6   we adopt the "which side are you on?"  as being

7   shorthand for being retained by --

8               MR. WINSTON:  Why don't you just

9   ask him whether he represented the policyholder

10  or the insurance company?

11              MR. LASETER:  I can do that too.

12  But I think the Judge might have the same

13  qualification there.

14         A.     Well, I recognize the reality, you

15  approach, you're paid by somebody.  But I don't

16  consider myself as representing them.

17         Q.     That's --

18         A.     I mean, I have turned -- I have had

19  a lot of people hire me.  I give an opinion.

20  They say, thanks, we'll get back to you if we

21  need you and I know they didn't like the

22  opinion.

23         Q.     Was the Gary Dewayne Shearin case

24  your first experience as a testifying expert?

25         A.     I think so.  The one where it

Page 57

1    actually reached a point where I gave, what this

2    question asked about, either trial or

3    deposition.  There had been others where I'd

4    given opinions.  I know one where I did a

5    lengthy written opinion not too long ago.

6    Apparently that part of the lawyers carried the

7    day and they got summary judgment and it's no

8    longer involved.

9         Q.     I may have asked a bad question.  I

10   was trying to find out whether this was the

11   first time that you had given an opinion the

12   best you can remember sitting here today.

13        A.     It would have been one of the early

14   ones.  But I don't remember, if you consider

15   written opinions, if you've done that didn't

16   involve --

17        Q.     I understand.

18        A.     -- deposition testimony.

19        Q.     I understand your clarification.

20   Thank you.  Let me read down the next one.

21   United American Resources.  What was that case

22   about?

23        A.     That involved what was known as a

24   coal mine role up, which is sort of a term of

25   art where the company was collecting a lot of

Page 58

1   coal mine leases and was going to try to put

2   together a big project.  One of the other

3   parties, we'll just use the term loosely,

4   interfered with their opportunity to do it.  The

5   deal fell through so they sued them for having

6   killed the deal.  And they were seeking to

7   recover all of their due diligence expenses;

8   attorneys' fees and other things that they had

9   done in putting the deal together.  So I was

10  asked an opinion on which of these matters would

11  be appropriate attorneys' fee work as a part of

12  the due diligence you should do in that sort of

13  situation.

14       Q.    Were you retained by counsel for

15  the plaintiff or for the defendant in that case?

16       A.    Would have been counsel for the

17  plaintiff United American Resources.

18       Q.    Was there an insurance element

19  involved in that case?

20       A.    Not that I recall.  Certainly my

21  involvement in it didn't touch on insurance.

22       Q.    The next one down is Ali Eslami,

23  E-S-L-A-M-I, and Ali is A-L-I.  Could you tell

24  me what that case is about?

25       A.    That is a case where I was asked by

Alabama Gas Corporation v. Travelers Casualty and Surety Company, et al. 2:10-CV-1840 IPJ
Hon. Bernard Harwood                                    October 26, 2011

Page 59

1    the attorneys representing Mr. Eslami to give an
2    opinion as to whether it was potentially bad
3    faith for the insurance company in that case
4    Allstate Insurance Company to have denied him
5    coverage or payment under a homeowners policy,
6    or maybe it was a casualty policy, where his
7    home burned down.  They denied coverage on the
8    basis they thought there was sufficient evidence
9    of arson driven principally by what they thought
10   they had found out about his financial
11   circumstances as a result of the EUO thing, the
12   examination under oath.  And during that
13   examination they never really inquired of him
14   about what other assets he had, did he have a
15   savings account, was this paid for.  And based
16   on the fact that they felt that he had certain
17   mortgage payments or other debt -- I forget the
18   exact picture -- they decided that was enough to
19   show that he had financial need and therefore
20   had a motive and they denied the coverage.  My
21   opinion was that given the assertion as it was
22   made by the plaintiffs that he had ample other
23   assets, that he wasn't in a bind, if they had
24   just investigated and looked into that, they
25   would've found that out, that that was

Page 60

1    potentially was bad faith.  Failure to

2    investigate type of bad faith.

3          Q.      An abnormal bad faith?

4          A.      Right.

5          Q.      And what happened in that case?

6          A.      I'm not sure.  At one point the

7    lawyer who retained me, Judge Johnson's son,

8    told me that some conflict had developed and he

9    was going to have to refer the case to someone

10   else.  And I've just not -- whether it's gone

11   away, whether it's gone forward, I don't know.

12         Q.      You issued a report and gave a

13   deposition in that case?

14         A.      I know I issued a report, and

15   obviously if I've listed it here, I gave a

16   deposition.

17         Q.      You didn't testify at trial, then,

18   though?

19         A.      No, it's not gone to trial.

20         Q.      And I should've asked this about

21   United American Resources.  Did you testify at

22   trial there?

23         A.      No.  As far as I know, it's still

24   meandering along.

25         Q.      Did you testify at trial in the

Page 61

1   Gary Dewayne Shearin case?

2          A.      No.   Again, don't know what ever

3   happened to it.

4          Q.      Moving back down to the Hartford

5   Fire Insurance Company, the fourth one listed,

6   can you describe that case for me?

7               MR. WINSTON:  Let me object.   The

8   fourth one down, you're calling it Hartford

9   Fire?

10              MR. LASETER:  Yeah, there's not a

11  space between --

12              MR. WINSTON:  Okay.  I see what

13  you're saying.  Got it.

14         A.      That was sort of a convoluted

15  situation.  I'll tell you the best I can recall.

16  It was alleged that there had been bad faith in

17  the refusal of the insurance company, which was

18  Hartford, to pay a theft claim or embezzlement

19  claim.  It was a lot of different claims of

20  misdoing by an employee of a company with

21  respect to payment under the fidelity bond.  The

22  plaintiffs retained an expert.  And the expert

23  opined in the end that, well, what the bad faith

24  really consisted of.  He said, I'm not going to

25  offer an opinion on that.  What I say the bad

**Alabama Gas Corporation v. Travelers Casualty and Surety Company, et al. 2:10-CV-1840 IPJ**
**Hon. Bernard Harwood                                    October 26, 2011**

Page 62

```
 1   faith was, was that the insurance company,

 2   Hartford, having interviewed several principles

 3   within the company then later shared some of

 4   that information with the plaintiff's lawyer,

 5   the plaintiff being the fired employee who had

 6   sued or countersued saying actually, I'm owed a

 7   lot of money and they knew I was doing these

 8   sorts of things.  It was all a part of this

 9   freewheeling approach I was taking.

10              The Hartford and the attorneys for

11   the company, that is Mitchell Company, had

12   entered into an agreement and said, we'll share

13   all this information and we'll keep it

14   confidential, except if there's any litigation

15   between us, then that's -- we're at liberty to

16   use that information.

17              So the plaintiffs sued for bad

18   faith on this first theory.  Hartford then at

19   some point talking to the employee's lawyer

20   trying to get together with the situation,

21   shared some of the information it had gained in

22   those interviews.  The expert testified in his

23   deposition, that's the bad faith I'm talking

24   about.  You should not have shared that

25   information.  So my opinion was, well, if that's
```

Page 63

1    what -- we're now focusing on the bad faith --

2    and he was explicit to that opinion, I'm not

3    giving an opinion on these other ones.  I'm just

4    giving an opinion that you should not -- you've

5    breached a fiduciary duty by sharing this

6    information with the people he's suing or rather

7    with the person who's suing them.  And my

8    opinion was essentially, well, that doesn't fall

9    within the parameters of what Alabama has

10   defined as the bad faith or failure to pay or

11   failure to provide benefit.  Whatever you want

12   to call that, that's not bad faith.  Alabama has

13   been pretty strict about saying bad faith only

14   applies in the insurance context.  We're not

15   going to recognize the tort of bad faith in

16   other situations, and here's what bad faith

17   consists of.  So that's what it came down to.

18   Essentially, my opinion is, the circumstances

19   you are asserting now as the wrongful conduct,

20   whatever you want to call them, doesn't fall

21   within the domain of bad faith.

22        Q.    And I think this is implicit, but

23   you were retained by counsel for the insurance

24   company in that case?

25        A.    Right.

Alabama Gas Corporation v. Travelers Casualty and Surety Company, et al. 2:10-CV-1840 IPJ
Hon. Bernard Harwood                                          October 26, 2011

Page 64

1        Q.      And then lastly on the list is
2    Category 5 Management Group, LLC?
3        A.      Uh-huh.
4        Q.      Can you tell me what that case was
5    about?
6        A.      National Casualty Company, I think,
7    was the primary company and Ace American Made
8    was excess.  But at any rate they had a total,
9    as I recall, 4 million liability coverage for
10   this trucking company.  An employee of the
11   trucking company was involved in a wreck driving
12   a company truck but supposedly on his personal
13   business.  He was going over to another area to
14   pay a fine.  As I recall he didn't have a
15   driver's license.  He was drinking.  He had
16   cocaine in his system and he ran a red light and
17   hit a car in which the mother, who was the
18   driver, was killed, and a 3-year-old child was
19   rendered a quadriplegic.  Very serious case.
20   Very serious liability.
21              So the insurance companies, on
22   behalf of their named insured and another
23   company who would qualify as an additional
24   insured reached out to the plaintiff's lawyer
25   and said, we'll tender our policy limits.  The

Page 65

1   plaintiff's lawyer said, at this point it's
2   premature.  I don't want to settle anything.
3   I've got a child's case.  I don't know what
4   other companies I may find that have some
5   involvement, because these companies were all
6   involved in hurricane cleanup and they sub out a
7   lot of work.  So there was a whole constellation
8   of different companies involved.  After that
9   while the insurance companies were still trying
10  to work out a, you know, take our offer, this is
11  all we've got-- and the insurance policies had
12  an exhaustion of benefits division.  Once we've
13  exhausted out coverage, then we don't have any
14  duty to defend.  A third company surfaced and
15  said, I think I qualify as an additional insured
16  under some of these descriptions.  At that point
17  the plaintiff's lawyer let the insurance company
18  lawyers know, I'm ready to settle now.  I'm
19  ready to take your offers.  So they settled on
20  behalf of the two insured they proffered it for
21  and then denied a defense to the third one,
22  saying, we've exhausted limits.  Its contention
23  was, you should never have exhausted the limits
24  without taking care of all the insureds,
25  therefore it's bad faith.

Page 66

1           And my opinion was that under the
2  circumstances that existed and given the way the
3  negotiations went, it was not bad faith to honor
4  the primary needs of the first two insureds and
5  pay off the policy limits and then the policy
6  provision of exhaustion of coverage was due to
7  be honored.
8       Q.    Were you retained by counsel for
9  the primary policy in that?
10      A.    They were working together.  I
11 think they put together an aggregate of 4
12 million primary and excess.  There was never any
13 distinction between the two insurance companies.
14      Q.    But you were hired by the counsel
15 for the insurance company?
16      A.    Correct.
17      Q.    Are there any other, aside from the
18 case you're testifying in today, are there any
19 other cases not listed on this where you've
20 given deposition or trial testimony?
21      A.    No.
22      Q.    And I failed to ask with regards to
23 the Hartford case whether you testified at
24 trial.
25      A.    It has not gone to trial as far as

Page 67

```
 1   I know.
 2        Q.    How about the Category 5 case?
 3        A.    I was told I had trial testimony
 4   they were trying to line me up for, and then I
 5   got a fairly brief e-mail saying, we've gotten
 6   summary judgment.
 7        Q.    Have you ever testified at trial as
 8   an expert?
 9        A.    No.  Well, you say as an expert.  I
10   mean, back during my first time, attorneys fees
11   and that sort, but never really anything in bad
12   faith.
13        Q.    And that first time, you're
14   referring to before becoming a judge?
15        A.    Right, the first 28 years.
16             MR. WINSTON:  Why don't we take a
17   short break here if we can?  I think we've been
18   sitting here quite a while.
19                  (Whereupon, a break was had from
20                  10:21 a.m. until 10:31 a.m.)
21             MR. LASETER:  I have no more
22   questions.
23             MR. WINSTON:  I have no questions.
24   We will read and sign the transcript.  I will
25   also note that I would like to designate it as
```

Page 68

1    confidential, a protective order in the case.

2    As always Mr. Laseter will deal with that

3    separately.

4              MR. LASETER:  And just for the

5    record, to clarify, I'll understand that to be a

6    request to have the transcript, when prepared,

7    made a confidential document under the

8    protective order.  And I'll give you a response.

9              MR. WINSTON:  We will read and

10   sign.

11

12        (Deposition concluded at 10:33 a.m.)

13

14        FURTHER THE DEPONENT SAITH NOT

15

16

17

18

19

20

21

22

23

24

25

Page 69

```
 1              C E R T I F I C A T E

 2

 3    STATE OF ALABAMA

 4    JEFFERSON COUNTY

 5

 6                I hereby certify that the above and

 7    foregoing deposition was taken down by me in

 8    stenotypy, and the questions and answers thereto

 9    were reduced to typewriting under my

10    supervision, and that the foregoing represents a

11    true and correct transcript of the deposition

12    given by said witness upon said hearing.

13                I further certify that I am neither

14    of counsel nor of kin to the parties to the

15    action, nor am I in anywise interested in the

16    result of said cause.

17

18

19              APRIL SARGENT

20               COMMISSIONER-NOTARY PUBLIC

              ACCR LICENSE NO. 579

21

22

23

24

25
```

**Alabama Gas Corporation v. Travelers Casualty and Surety Company, et al.  2:10-CV-1840 IPJ**
**Hon. Bernard Harwood**

October 26, 2011
Page 70

**A**

abilities (1)
39:1
ability (1)
39:15
able (1)
18:17
abnormal (3)
35:20 55:17 60:3
absent (1)
25:14
absolutely (1)
17:3
accept (1)
13:6
accepted (1)
54:19
accorded (1)
47:15
account (3)
48:13,19 59:15
ACCR (1)
69:20
Ace (1)
64:7
act (2)
22:15 41:1
acting (2)
5:3 39:17
action (1)
69:15
active (2)
10:7 23:11
actively (2)
20:16 22:2
activities (2)
24:15,17
additional (2)
64:23 65:15
additions (1)
35:2
address (1)
41:13
addressed (4)

41:11 45:17,22
52:22
addressing (1)
51:22
ADEM (1)
46:24
adjusting (1)
39:24
adjustor (2)
40:4,7
adjustors (1)
40:14
adopt (3)
31:2 42:8 56:6
adopted (1)
51:22
advance (1)
41:20
advised (1)
9:4
advisory (2)
22:7 23:18
Aetna (5)
10:4,11,12,13,16
age (1)
53:10
agency (1)
46:24
aggregate (1)
66:11
ago (4)
9:12 20:22 52:9
57:5
agree (3)
20:11 35:16 39:19
AGREED (1)
2:2
agreement (2)
29:10 62:12
ahead (4)
19:20 23:17 29:12
35:7
al (1)
1:10

**Alabama (55)**
1:2,7 5:3,5,8,23
6:16 17:20 18:1
23:19,20,23 24:3
24:6 25:5,13 28:6
28:8 29:20 30:23
31:2,7,17 32:9,17
32:21 35:15 36:19
37:6 41:24,25
42:6,13 45:17
46:5,9 47:17,18
48:10,18 49:12,18
50:7,21 51:11,13
51:15,20,21,23
53:1 55:3 63:9,12
69:3
alert (1)
41:20
Ali (2)
58:22,23
alleged (1)
61:16
Allstate (1)
59:4
ambiguities (3)
26:8,10,15
ambiguity (9)
25:24 26:22 27:16
27:16 34:4,6,9,12
49:7
ambiguous (3)
34:1 49:2,3
American (6)
24:19 25:1 57:21
58:17 60:21 64:7
ample (1)
59:22
analyses (1)
31:1
analysis (3)
34:14 43:22 49:21
answer (7)
6:22 8:12 9:9 22:21
23:17 32:7 51:5

answered (4)
13:7 27:10 33:11
44:13
answers (1)
69:8
anticipate (1)
44:18
anybody (3)
7:15 10:8 22:24
anytime (1)
41:18
anyway (1)
23:6
anywise (1)
69:15
Apparently (1)
57:6
appeared (2)
18:3 42:8
appears (3)
41:6,8,9
applicable (1)
14:7
applies (1)
63:14
appointed (4)
13:18,21 14:4
23:21
appointment (1)
24:2
approach (6)
31:1 32:10 42:2,10
56:15 62:9
approached (2)
31:6 55:13
appropriate (3)
6:11 21:23 58:11
approximate (1)
13:10
approximately (2)
11:7 13:14
approximation (1)
12:1
April (4)

1:20 2:5 5:1 69:19
area (7)
9:11 10:6,20 12:21
50:6 55:6 64:13
Arendall (1)
5:7
Argumentive (1)
38:6
arguments (2)
17:22,23
arson (1)
59:9
art (1)
57:25
article (1)
52:19
articulated (2)
30:19 43:10
aside (3)
8:13 39:17 66:17
asked (15)
8:11 12:19 13:7
22:11,20 33:6,10
44:13 48:7 52:24
57:2,9 58:10,25
60:20
asking (4)
12:22 40:21 42:17
43:18
asks (1)
19:13
aspect (1)
45:25
asserting (1)
63:19
assertion (1)
59:21
assets (2)
59:14,23
assign (2)
2:18 43:3
assigned (1)
40:6
assignment (1)

Alabama Gas Corporation v. Travelers Casualty and Surety Company, et al.   2:10-CV-1840 IPJ
Hon. Bernard Harwood

October 26, 2011

Page 71

21:23
**associate (4)**
16:9 18:7,8,9
**Association (2)**
24:20 53:2
**assume (3)**
6:22 37:16,20
**assuming (1)**
34:8
**Assurance (1)**
10:17
**Atlanta (1)**
3:9
**attended (1)**
40:13
**attendees (1)**
52:16
**attention (1)**
28:10
**attorney (6)**
3:5,15 8:4 11:15
13:11 20:1
**attorneys (7)**
45:7,11 58:8,11
59:1 62:10 67:10
**authored (1)**
33:14
**authority (1)**
54:14
**Autobahn (2)**
33:18,20
**ave (1)**
11:1
**Avenue (1)**
3:17
**award (1)**
52:9
**aware (7)**
20:24 21:9 23:7
36:24 37:4 42:24
51:20
**A-L-I (1)**
58:23
**a.m (4)**

5:9 67:20,20 68:12

———————
**B**
**back (14)**
9:25 10:14 14:10
19:23 20:13 21:17
26:25 27:2 44:25
52:24 53:21 56:20
61:4 67:10
**background (1)**
25:9
**bad (59)**
8:11 11:8,14 12:2
12:15,19,21 13:10
14:18 15:6,13
16:3,5 17:1,8,14
18:23 19:6,9,17
21:14,18 35:14,18
35:19,20 36:8
39:2,7 41:2 49:9
52:22 53:3,19
54:3 55:5,16,17
56:3 57:9 59:2
60:1,2,3 61:16,23
61:25 62:17,23
63:1,10,12,13,15
63:16,21 65:25
66:3 67:11
**bar (8)**
22:7 23:11 24:17
24:20 25:1,5,6
52:9
**bar-related (1)**
24:15
**based (3)**
36:3 39:2 59:15
**basically (3)**
14:14 27:22 39:24
**basis (4)**
42:12 48:13,13
59:8
**becoming (1)**
67:14
**began (2)**

12:18 39:7
**beginning (2)**
15:6 39:6
**behalf (4)**
11:17,19 64:22
65:20
**believe (11)**
27:10 30:18 33:18
33:21 38:24 42:16
43:9 46:22,22
48:1 54:4
**bench (4)**
13:2,19 54:1 55:11
**benefit (2)**
20:10 63:11
**benefits (1)**
65:12
**Bernard (6)**
1:17 2:5 5:10,14,21
6:10
**best (6)**
28:8 36:7 41:22
54:10 57:12 61:15
**better (10)**
16:4 17:4 26:14
33:16 36:2 38:1
38:11 42:2,23
55:25
**better-reasoned (1)**
42:10
**beyond (2)**
14:25 28:7
**big (4)**
10:4,10,15 58:2
**bind (1)**
59:23
**Birmingham (2)**
5:8 40:13
**body (1)**
33:3
**boiler (1)**
47:5
**bond (2)**
17:24 61:21

**book (1)**
7:8
**booklet (1)**
52:15
**books (2)**
52:5 53:9
**borrow (1)**
48:6
**Bowen (2)**
12:6 13:4
**breach (3)**
11:8 20:7 35:14
**breached (1)**
63:5
**break (3)**
32:5 67:17,19
**bride (1)**
10:22
**bridesmaid (1)**
10:21
**bridge (1)**
53:15
**brief (1)**
67:5
**broad (1)**
37:13
**broader (1)**
25:19
**Brown (1)**
17:10
**build (1)**
12:18
**bullet (1)**
43:21
**burned (1)**
59:7
**business (1)**
64:13

———————
**C**
**C (3)**
3:1 69:1,1
**California (5)**
30:18 31:17 32:11

32:17,21
**call (5)**
6:2 14:15 39:25
63:12,20
**called (10)**
7:11 12:6 18:4
19:22 20:13 22:6
22:18 28:20 35:18
47:22
**calling (2)**
26:5 61:8
**Calls (1)**
14:1
**cancel (1)**
54:14
**cancellation (1)**
55:5
**cancelled (1)**
54:17
**Canons (1)**
22:12
**capital (1)**
10:14
**car (1)**
64:17
**care (1)**
65:24
**career (2)**
6:16 39:25
**carried (1)**
57:6
**carrier (1)**
54:17
**case (78)**
1:5 5:24 7:8,13 9:1
9:14 11:22 12:5,9
12:12 13:1,4
16:13,20 17:1
19:9 20:2,8 21:13
21:25 22:8 23:5
30:19,20,20 31:4
32:13,24 33:8,21
34:25 36:22 37:6
37:17 39:2 41:2

Alabama Gas Corporation v. Travelers Casualty and Surety Company, et al.  2:10-CV-1840 IPJ
Hon. Bernard Harwood
October 26, 2011
Page 72

43:23 45:8,11
46:1,9,11,15,23
49:3 50:24 51:2,4
51:6,19 54:8,9,25
55:8,8,9,18,23
56:23 57:21 58:15
58:19,24,25 59:3
60:5,9,13 61:1,6
63:24 64:4,19
65:3 66:18,23
67:2 68:1
**cases (35)**
7:9,15,18 9:14
12:22 14:19 16:3
16:5,17 17:1,9,14
19:6,18 21:1,14
21:15,18 24:4
28:25 30:3 31:9
31:14 33:3 50:1,2
51:11,15,15 54:6
54:7 55:4,17 56:5
66:19
**casualty (4)**
1:10 51:9 59:6 64:6
**category (3)**
16:17 64:2 67:2
**cause (2)**
5:11 69:16
**Center (1)**
3:7
**century (1)**
50:2
**certain (6)**
11:2,3,5 47:7,8
59:16
**certainly (4)**
7:7 14:25 21:24
58:20
**Certified (3)**
1:21 2:6 5:1
**certify (3)**
5:4 69:6,13
**CGL (2)**
46:21 47:1

**chair (1)**
23:18
**champion (1)**
43:5
**chance (1)**
34:22
**changes (2)**
24:1 35:2
**Chaviers (1)**
12:5
**check (1)**
20:5
**checklist (1)**
31:11
**chief (3)**
16:10 20:1,20
**child (1)**
64:18
**child's (1)**
65:3
**Circuit (2)**
16:8 53:1
**circumstances (6)**
27:23 28:15 38:23
59:11 63:18 66:2
**cite (2)**
45:7 50:6
**cited (3)**
30:20 33:3 51:9
**Civil (2)**
5:5 24:4
**claim (6)**
36:9 41:9,16 49:5
61:18,19
**claiming (1)**
12:15
**claims (9)**
11:15 12:2 13:10
40:7,10,10,12,17
61:19
**clarification (2)**
46:14 57:19
**clarify (2)**
51:7 68:5

**CLE (3)**
52:10,15 53:9
**cleanup (3)**
46:22 47:2 65:6
**clear (9)**
13:8 25:16,25
28:11 32:7 39:14
47:25 48:4 50:4
**cleavage (1)**
40:8
**clerk (1)**
19:24
**client (1)**
8:7
**clients (2)**
9:22,23
**coal (2)**
57:24 58:1
**cocaine (1)**
64:16
**collecting (1)**
57:25
**college (1)**
6:23
**collusion (1)**
26:6
**come (10)**
10:18 14:5 18:19
19:2 21:9 22:1,9
23:4 28:9 55:10
**comes (1)**
51:25
**coming (2)**
11:4 12:16
**commencing (1)**
5:9
**Commissioner (2)**
2:6 5:3
**COMMISSION...**
69:20
**commissioning (1)**
19:22
**committee (7)**
14:6,7 23:19,21

24:3,6 40:17
**committees (1)**
24:5
**common (2)**
29:24 30:2
**companies (18)**
8:2,5 9:4,19 10:19
11:2,3,3,5 28:24
39:18,25 64:21
65:4,5,8,9 66:13
**company (49)**
1:10 7:25 8:9,10,14
8:25 9:23,25 10:7
11:24 28:10 29:4
29:20 30:6,10
33:19 35:23 36:9
40:18 45:14 48:21
48:22 51:9 54:19
54:20,22 55:25
56:1,10 57:25
59:3,4 61:5,17,20
62:1,3,11,11
63:24 64:6,7,10
64:11,12,23 65:14
65:17 66:15
**comparing (1)**
23:23
**comparison (2)**
31:11,15
**compendium (2)**
53:8,23
**competitive (1)**
48:17
**complaint (5)**
27:24 28:7,12,14
28:16
**compliance (1)**
2:11
**complicated-sou...**
41:21
**composition (1)**
18:20
**compound (3)**
26:5 32:1,6

**concluded (1)**
68:12
**conduct (2)**
22:14 63:19
**confidence (1)**
23:25
**confidential (3)**
62:14 68:1,7
**conflict (6)**
10:2,4 11:21 20:5
20:11 60:8
**Connecticut (1)**
3:17
**connection (1)**
45:13
**consider (8)**
28:12 34:3 37:25
43:15 49:2 50:5
56:16 57:14
**consideration (2)**
26:13 43:15
**considered (2)**
14:10 36:16
**consisted (1)**
61:24
**Consistently (1)**
41:17
**consists (1)**
63:17
**constellation (1)**
65:7
**constitutes (1)**
51:24
**constraints (1)**
23:8
**construction (3)**
7:11,19 26:12
**construe (1)**
27:16
**construed (3)**
26:9,11,15
**contacts (1)**
19:25
**contention (1)**

Alabama Gas Corporation v. Travelers Casualty and Surety Company, et al.  2:10-CV-1840 IPJ
Hon. Bernard Harwood
October 26, 2011
Page 73

65:22
**context (1)**
63:14
**continuation (1)**
22:10
**Continuing (1)**
30:16
**contour (1)**
12:12
**contours (1)**
39:8
**contract (3)**
11:9 20:7 35:14
**contracts (1)**
7:17
**contrary (1)**
25:15
**contrast (1)**
49:5
**convoluted (1)**
61:14
**corners (5)**
28:1,4,21 34:5 49:6
**Corporation (2)**
1:7 5:23
**correct (32)**
6:25 7:16 8:17,23
9:6 13:20 15:14
15:23,24 16:1
25:6,7,12,17,18
25:22,23 26:2,7
26:17 28:5 29:1
30:11 35:11 42:11
42:14 45:17 49:10
49:15 52:4 66:16
69:11
**correctly (5)**
40:25 41:4,22
50:20 55:14
**costs (2)**
46:22 47:2
**counsel (15)**
2:4,15,17 5:6 9:16
9:17 22:6 29:15

55:25 58:14,16
63:23 66:8,14
69:14
**count (3)**
34:15 47:21 48:3
**counterpart (1)**
30:22
**countersued (1)**
62:6
**counting (1)**
42:6
**country (3)**
50:9,23 51:24
**County (2)**
14:6 69:4
**course (4)**
7:2,11 32:23 34:4
**courses (3)**
7:3,7,18
**court (50)**
1:1,21 2:6,12 5:1
15:17 16:3,6,16
16:18 17:7,20
18:1,14,23 19:12
19:17,25 20:25
22:1,9,15,17 23:5
23:19,21,25 24:2
27:2 30:4,4 36:19
39:11 41:24,25,25
42:7 46:5,6,13
47:18 48:19 49:13
49:23 50:16 51:12
51:21 53:2 54:1
55:11
**courtesy (2)**
6:6,13
**courts (5)**
31:2 33:22 34:10
47:7,7
**cover (1)**
47:1
**coverage (17)**
9:2,14,17,20 26:9
26:13 28:11 35:13

35:23 36:15 38:4
59:5,7,20 64:9
65:13 66:6
**credit (1)**
52:15
**critical (2)**
32:25 33:8
**cumulative (1)**
43:12
**cured (1)**
54:18
**current (2)**
24:15,17
**currently (1)**
20:25

_____

**D**
**damages (2)**
46:20,25
**date (2)**
5:4 11:7
**dated (1)**
53:12
**day (1)**
57:7
**days (1)**
10:14
**DC (1)**
3:18
**deal (5)**
16:7 58:5,6,9 68:2
**dealing (2)**
15:13 24:9
**dealt (2)**
7:9 22:23
**debatable (10)**
35:12,24 36:17
38:3 42:13 48:11
48:21,25 49:8,22
**debate (1)**
37:24
**debt (1)**
59:17
**decide (6)**

21:22 34:5 38:20
46:5 49:2,5
**decided (4)**
34:8 36:2 46:6
59:18
**decides (1)**
29:6
**deciding (3)**
16:5 36:16 48:24
**decision (9)**
18:1,2 29:6 33:1,14
36:5,13 47:18
51:22
**decisions (7)**
12:21 13:16 15:11
16:23 32:25 42:4
49:20
**declaratory (2)**
29:22 30:8
**default (1)**
54:18
**defend (7)**
26:19 27:8,21,22
29:5 37:15 65:14
**defendant (2)**
3:13 58:15
**DEFENDANTS (...**
1:11
**defendant's (1)**
37:15
**defending (2)**
28:24,24
**defense (12)**
8:4,22 9:8,16 25:18
29:8,13,17,18,20
30:6 65:21
**defined (2)**
26:8 63:10
**definition (1)**
37:14
**degree (3)**
15:9 31:5,16
**denial (1)**
42:13

**denied (6)**
36:15,18 59:4,7,20
65:21
**denies (1)**
36:9
**deny (1)**
38:3
**denying (1)**
35:23
**department (1)**
40:10
**depended (1)**
27:10
**depends (1)**
52:7
**DEPONENT (1)**
68:14
**deposition (15)**
1:15 2:4,9,10,19
45:2 57:3,18
60:13,16 62:23
66:20 68:12 69:7
69:11
**depositions (1)**
2:13
**describe (1)**
61:6
**described (7)**
8:20,21 27:23 28:3
28:15 52:21 55:16
**describing (1)**
47:24
**descriptions (1)**
65:16
**designate (1)**
67:25
**despite (2)**
28:11 51:16
**detailed (1)**
43:22
**details (1)**
20:6
**determine (1)**
38:2

Alabama Gas Corporation v. Travelers Casualty and Surety Company, et al.  2:10-CV-1840 IPJ
Hon. Bernard Harwood
October 26, 2011
Page 74

**developed (2)**
36:15 60:8
**Dewayne (3)**
54:8 56:23 61:1
**different (8)**
9:19 24:8 34:2,11
  49:25 50:3 61:19
  65:8
**differing (1)**
33:23
**difficulty (1)**
17:12
**diligence (2)**
58:7,12
**disappearing (1)**
11:5
**discuss (1)**
16:15
**discussion (4)**
24:13 34:18 47:6
  47:16
**disqualification (1)**
19:14
**dissent (1)**
16:14
**dissenting (1)**
19:6
**distinct (2)**
9:7 40:8
**distinction (5)**
8:6 28:19 41:15,19
  66:13
**District (3)**
1:1,2 53:2
**divided (1)**
16:9
**division (14)**
1:3 16:12,20,21,21
  18:2,5,6,8,13,19
  18:21,21 65:12
**divisions (3)**
16:9 17:21,22
**document (4)**
42:22 43:12 44:14

68:7
**doing (4)**
19:19 29:13 42:6
  62:7
**domain (1)**
63:21
**doubt (2)**
27:19 53:11
**doubts (4)**
26:19,21,23 27:7
**drafted (1)**
47:11
**drawing (2)**
28:19 38:15
**drinking (1)**
64:15
**drive (1)**
40:15
**driven (1)**
59:9
**driver (1)**
64:18
**driver's (1)**
64:15
**driving (1)**
64:11
**drops (1)**
19:15
**due (3)**
58:7,12 66:6
**duly (1)**
5:15
**duties (1)**
9:5
**duty (9)**
26:19,20 27:8,21
  27:22 29:5 37:15
  63:5 65:14

---

**E**

**E (4)**
3:1,1 69:1,1
**earlier (5)**
38:25 39:25 40:17

48:7 51:1
**early (2)**
55:12 57:13
**easier (1)**
55:21
**education (3)**
6:20 7:2,21
**effect (2)**
2:10 54:21
**eight (1)**
28:21
**either (7)**
18:21 20:3 21:12
  25:24 29:8 41:18
  57:2
**elaborate (2)**
44:15 52:13
**elaborations (1)**
45:3
**elected (2)**
15:16 23:5
**element (4)**
35:17,19,20 58:18
**elements (1)**
35:13
**eligibility (1)**
20:13
**else's (1)**
38:21
**embezzlement (1)**
61:18
**embrace (1)**
46:21
**emerge (1)**
39:7
**emerged (1)**
11:2
**emergence (1)**
11:7
**emergent (1)**
12:8
**employed (4)**
7:9 8:9 34:17 40:18
**employee (4)**

8:15 61:20 62:5
  64:10
**employee's (1)**
62:19
**employer (1)**
11:20
**Employers (1)**
51:8
**enforcement (1)**
24:10
**engaged (1)**
8:1
**enlighten (1)**
17:19
**enter (3)**
29:9,12,20
**entered (3)**
30:6 46:7 62:12
**entering (1)**
29:17
**entertain (1)**
34:3
**entire (2)**
16:16,18
**entree (1)**
14:14
**EPA (2)**
37:13 46:23
**equal (1)**
11:20
**equally (1)**
32:16
**Eslami (2)**
58:22 59:1
**essentially (4)**
29:11 30:21 63:8
  63:18
**established (1)**
14:16
**et (1)**
1:10
**ethical (1)**
23:8
**ethics (2)**

21:21 23:3
**EUO (1)**
59:11
**evaluate (4)**
31:4 32:8,15,19
**evaluation (1)**
32:11
**everybody (3)**
6:4 12:13 40:13
**evidence (8)**
2:20 23:20,23
  33:25 34:7,12
  38:14 59:8
**evolution (1)**
39:8
**evolved (1)**
8:3
**exact (2)**
37:9 59:18
**exaggerating (1)**
15:1
**examination (6)**
4:1,5 5:11,18 59:12
  59:13
**examined (1)**
5:15
**example (2)**
9:10 16:8
**examples (2)**
7:14 50:21
**excellent (1)**
8:12
**exception (1)**
24:20
**excess (2)**
64:8 66:12
**exciting (1)**
24:11
**exclude (2)**
42:18 44:10
**exclusive (1)**
10:20
**exclusively (1)**
8:4

Alabama Gas Corporation v. Travelers Casualty and Surety Company, et al.  2:10-CV-1840 IPJ
Hon. Bernard Harwood
October 26, 2011
Page 75

**excuse (1)**
27:11
**exhausted (3)**
65:13,22,23
**exhaustion (2)**
65:12 66:6
**exhibit (6)**
4:11 34:20,24 35:9
40:20 54:5
**EXHIBITS (1)**
4:8
**exist (2)**
9:12 25:24
**existed (2)**
9:25 66:2
**existence (1)**
27:8
**existing (2)**
50:7 51:11
**expected (1)**
48:22
**expenses (1)**
58:7
**experience (3)**
39:16,20 56:24
**expert (22)**
21:1,10,12,19,20
21:23 22:11,21,24
22:25 23:4,9
34:24 38:19,21
43:20 56:24 61:22
61:22 62:22 67:8
67:9
**expertise (1)**
39:3
**explain (2)**
29:2 31:24
**explanation (1)**
44:5
**explicit (1)**
63:2
**expressed (2)**
37:11 43:4
**expressly (1)**

33:8
**extent (6)**
14:4 16:19 31:20
36:3 41:10 52:17
**extrinsic (1)**
34:7
**e-mail (3)**
3:11,20 67:5
**E-S-L-A-M-I (1)**
58:23

**F**

**F (1)**
69:1
**fact (13)**
28:11,13 30:5 36:7
38:16,17 40:9
47:6 51:14,16
52:8 55:3 59:16
**facts (6)**
20:4 27:12 28:9,15
45:10 51:5
**factual (1)**
26:24 27:19 36:4,6
**failed (1)**
66:22
**failure (3)**
60:1 63:10,11
**fair (6)**
17:18 42:19 43:7
43:17 45:4 56:4
**fairly (3)**
6:15 48:10 67:5
**faith (56)**
11:8,14 12:2,15,21
13:10 14:19 15:6
15:13 16:3,5 17:1
17:9,14 18:23
19:6,9,18 21:14
21:18 35:14,18,20
35:21 36:8 39:2,7
41:2 49:9 52:22
53:3,19 54:3 55:6
55:16,17 56:3

59:3 60:1,2,3
61:16,23 62:1,18
62:23 63:1,10,12
63:13,15,16,21
65:25 66:3 67:12
**fall (2)**
63:8,20
**falls (1)**
37:13
**familiar (6)**
5:25 17:16 19:9
27:25 28:20,23
**familiarity (1)**
51:19
**far (6)**
12:25 32:14 49:11
51:5 60:23 66:25
**fashion (3)**
16:14 18:11 43:25
**favor (6)**
26:9,11,15,20 27:9
27:20
**favorably (1)**
27:17
**federal (3)**
23:24 37:19 38:14
**fee (1)**
58:11
**feel (3)**
15:1 39:11 40:24
**fees (2)**
58:8 67:10
**fell (1)**
58:5
**felt (1)**
59:16
**fidelity (1)**
61:21
**fiduciary (1)**
63:5
**fifth (1)**
16:10
**filed (1)**
55:9

**finally (1)**
42:11
**finance (3)**
54:12,14,18
**financed (1)**
54:12
**financial (2)**
59:10,19
**find (4)**
37:12 50:13 57:10
65:4
**finder (1)**
38:17
**finding (3)**
26:9,12 27:21
**fine (3)**
6:7 10:22 64:14
**Fire (2)**
61:5,9
**fired (1)**
62:5
**firm (2)**
20:6,9
**first (15)**
5:15 8:2 25:9,12
49:1 50:15 51:23
52:25 56:24 57:11
62:18 66:4 67:10
67:13,15
**first-most (1)**
18:7
**five (2)**
19:16 54:6
**five-member (1)**
16:12
**focusing (1)**
63:1
**follow (1)**
43:22
**followed (2)**
37:11 39:7
**following (1)**
5:12
**follows (1)**

5:16
**force (1)**
2:10
**foregoing (3)**
5:6 69:7,10
**foreign (1)**
24:10
**foreshadowed (2)**
44:19,20
**forget (1)**
59:17
**form (3)**
2:16 31:18,25
**formal (1)**
7:2
**formally (1)**
55:22
**former (5)**
20:20,21,24 21:22
23:9
**formerly (2)**
22:1 40:16
**forms (1)**
52:16
**formulating (1)**
31:3
**forward (4)**
23:6 29:7 49:8
60:11
**Foster (4)**
30:19,20 32:25
33:9
**found (2)**
59:10,25
**four (9)**
16:9 19:16 28:1,4
34:5 49:6 52:3,6
56:5
**fourth (2)**
61:5,8
**Frank (1)**
3:14
**frankly (1)**
53:10

**free (1)**
40:24
**freewheeling (1)**
62:9
**friends (1)**
14:13
**full (2)**
2:11 5:20
**function (2)**
19:8 27:23
**further (3)**
34:16 68:14 69:13
**fwinston@stepto...**
3:20

———— **G** ————
**gain (1)**
34:16
**gained (2)**
32:12 62:21
**garnered (1)**
48:15
**Gary (3)**
54:7 56:23 61:1
**Gas (2)**
1:7 5:23
**gears (1)**
45:4
**GEIGER (1)**
3:6
**general (2)**
25:10 30:17
**generally (6)**
5:25 10:15 21:18
    25:19 39:19 46:17
**geographical (1)**
9:11
**Georgia (1)**
3:9
**give (16)**
9:9,13 12:1,16 13:9
    14:22 22:25 26:3
    33:16 43:20 52:24
    54:25 56:2,19

59:1 68:8
**given (19)**
10:18 14:11 21:10
    21:12 25:16 35:22
    42:4 48:8 52:8,10
    52:11 53:10 54:14
    57:4,11 59:21
    66:2,20 69:12
**gives (1)**
39:11
**giving (8)**
7:14 12:25 20:6,25
    44:6 52:11 63:3,4
**gloss (1)**
47:13
**go (14)**
15:3 16:18 21:17
    23:5,16 27:2 29:7
    29:12 35:7 40:1,3
    49:4,11 52:16
**goes (2)**
16:13,16
**going (19)**
6:22 20:9 22:11
    23:24 32:13 36:4
    36:6 40:22 48:6
    49:8,11 50:10
    55:20 56:4 58:1
    60:9 61:24 63:15
    64:13
**good (6)**
5:19 14:18 17:4
    19:19 33:6 39:12
**gotten (1)**
67:5
**govern (1)**
25:11
**Governor (2)**
13:22 14:9
**graduated (1)**
6:23
**grounded (1)**
39:15
**grounds (2)**

2:18 26:5
**group (3)**
54:12,14 64:2
**gubernatorial (1)**
14:12
**guess (5)**
19:16 36:7 38:13
    39:9 52:7
**guesstimate (1)**
13:13
**guidance (1)**
33:16
**guilty (1)**
49:9
**Guy (2)**
13:22,24

———— **H** ————
**Hand (1)**
5:7
**handle (1)**
11:14
**handled (3)**
12:2,23 13:11
**handouts (1)**
52:14
**happened (4)**
19:10,11 60:5 61:3
**happens (1)**
30:2
**hard (3)**
11:1 12:17 17:14
**Hardwood (1)**
34:19
**Hartford (8)**
8:25 61:4,8,18 62:2
    62:10,18 66:23
**Harwood (10)**
1:17 2:5 5:10,14,19
    5:21 6:3,11,15
    34:20
**heads (2)**
18:8,9
**hear (3)**

14:18 16:3 17:22
**hearing (1)**
69:12
**held (2)**
44:25 53:13
**help (2)**
38:1,11
**helpful (3)**
29:7 38:16,22
**helps (3)**
37:7 40:24 42:15
**hierarchy (1)**
43:6
**hinted (1)**
44:24
**hire (2)**
11:23 56:19
**hired (1)**
66:14
**hiring (1)**
40:2
**hit (1)**
64:17
**home (1)**
59:7
**homeowners (1)**
59:5
**Hon (4)**
1:17 2:4 5:10,14
**honor (2)**
54:23 66:3
**Honorable (1)**
6:10
**honored (2)**
41:19 66:7
**honorific (1)**
6:13
**horizon (1)**
12:14
**Horris (1)**
10:16
**Houston (4)**
18:6,21 20:19 21:5
**Hunt (3)**

13:22,24 14:9
**hurricane (1)**
65:6

———— **I** ————
**idea (4)**
14:22 34:3 46:21
    46:25
**identification (1)**
35:10
**identified (1)**
11:6
**Illinois (1)**
31:5
**implicit (1)**
63:22
**important (1)**
43:9
**impression (2)**
32:12 51:23
**improper (1)**
55:4
**INA (1)**
10:3
**incidental (1)**
22:8
**incite (1)**
34:16
**included (1)**
7:9
**including (1)**
7:5
**indemnifying (1)**
29:17
**indemnity (1)**
25:20
**INDEX (2)**
4:1,8
**indicated (2)**
11:4 47:13
**industry (2)**
39:17,21
**inform (1)**
21:22

Alabama Gas Corporation v. Travelers Casualty and Surety Company, et al.   2:10-CV-1840 IPJ
Hon. Bernard Harwood

October 26, 2011
Page 77

information (7)
36:14 62:4,13,16
62:21,25 63:6
informed (1)
25:10
informing (1)
30:25
inherent (1)
38:24
inherited (1)
10:8
initially (5)
12:16 15:17 16:13
16:19 18:5
inner-workings (1)
17:19
inquired (1)
59:13
insight (1)
40:15
Institute (1)
24:6
Instruction (1)
24:4
insurance (75)
7:3,10,11,19,19,22
7:25 8:2,5,9,10,14
8:21 9:4,8,19,22
9:25 10:7,19 11:8
11:24 24:18,20
28:24 29:4,19
30:10 31:6 32:10
33:19 35:14,23
36:9,12 39:16,18
39:21,25 40:18
45:8,11,14 48:21
48:22 50:7,23,25
51:20,22 54:11,20
54:22 55:24 56:1
56:10 58:18,21
59:3,4 61:5,17
62:1 63:14,23
64:21 65:9,11,17

66:13,15
insured (13)
11:25 26:11,16,20
27:9,17 29:9,10
54:18 64:22,24
65:15,20
insureds (2)
65:24 66:4
insurer (3)
35:12 47:11 53:18
insurers (3)
11:17,19 29:2
intend (1)
44:21
intentional (1)
31:11
interested (1)
69:15
interfered (1)
58:4
interjecting (1)
44:18
interpretation (5)
27:12 30:22 33:24
47:10,14
interpreted (2)
47:7,8
interviewed (1)
62:2
interviews (1)
62:22
intimately (3)
17:15 19:9 39:10
introduce (2)
6:14,14
investigate (1)
60:2
investigated (1)
59:24
involve (2)
7:19 57:16
involved (18)
9:15 13:3 21:13,19
29:7 30:3,5,5 36:6

54:13 55:7,15
57:8,23 58:19
64:11 65:6,8
involvement (2)
58:21 65:5
involving (1)
50:24
IPJ (1)
1:5
issue (10)
38:8,18 39:2 42:4
44:17 45:22 46:4
48:9 50:25 51:13
issued (3)
47:11 60:12,14
issues (6)
7:4 30:4 46:18 47:3
50:23 55:7
issuing (2)
37:18,21

J

Janie (1)
20:22
January (2)
15:21 55:11
JEFFERSON (1)
69:4
job (1)
19:19
Johnson (8)
3:16 36:24 37:4,17
37:21,23 38:1,7
Johnson's (2)
38:20 60:7
Jones (2)
12:10,10
Jr (2)
3:14 5:21
judge (25)
5:19 6:2,5 14:20,24
15:12 18:16,18
19:23 22:14 34:19
36:2,24 37:4,17

37:19,21,23 38:1
38:7,19 39:10
56:12 60:7 67:14
judges (6)
6:18 20:15 21:22
23:9 53:2,11
judgment (6)
15:4 29:22 30:8
37:7 57:7 67:6
judgments (1)
24:10
judicial (2)
14:6 47:13
juris (1)
41:24
jurisdiction (2)
32:16 45:23
jurisdictions (9)
31:13 32:9,20
33:23 34:11 46:13
47:22 48:8 50:8
jurisprudence (2)
50:8,22
jury (6)
24:3 35:24 37:21
38:2,11,22
justice (19)
12:10 16:10 18:8
18:11,15,24 20:1
20:3,19,19,20,21
20:23 21:5,5,5,7
39:11 54:1
justices (6)
15:22 16:10 18:2,7
20:18,25

K

KAZMAREK (1)
3:6
keep (1)
62:13
killed (2)
58:6 64:18
kin (1)
62:13

69:14
knew (2)
12:13 62:7
know (30)
6:21 8:5 10:21 11:2
12:17 15:3 18:12
18:25 21:4,16
25:3 30:1 34:22
46:4,24 47:21
53:7,9,20,21
56:21 57:4 60:11
60:14,23 61:2
65:3,10,18 67:1
knowledge (3)
38:15 39:3 53:6
known (2)
47:12 57:23

L

L (1)
2:1
laid (1)
43:4
language (1)
41:14
Large (1)
5:3
Laseter (17)
3:4,6 4:5 5:18,22
17:3 18:14 27:4
30:11 31:23 32:4
44:3 56:11 61:10
67:21 68:2,4
lastly (1)
64:1
late (1)
45:13
law (30)
3:5,15 6:23 7:5,15
8:18,18 24:6,23
25:12,13,14 27:11
30:18,23 32:10,21
32:21 36:7 37:6
42:13 48:10 49:18

**Alabama Gas Corporation v. Travelers Casualty and Surety Company, et al.  2:10-CV-1840 IPJ**
**Hon. Bernard Harwood**

October 26, 2011
Page 78

50:7,25 51:13,20
52:18,25 55:6
**laws (1)**
2:11
**lawsuit (1)**
5:25
**lawyer (18)**
6:24 8:1,13 10:3,7
10:20 12:3 22:15
39:10,17 40:3,9
60:7 62:4,19
64:24 65:1,17
**lawyers (3)**
6:16 57:6 65:18
**lawyer-like (1)**
9:9
**lead (1)**
32:4
**leadership (3)**
24:22,25 25:4
**leading (2)**
2:16 32:2
**leases (1)**
58:1
**Lee (1)**
12:7
**left (1)**
44:11
**legal (3)**
22:6 26:6 39:3
**legislation (1)**
24:8
**legitimate (1)**
11:22
**legitimately (1)**
49:7
**legs (1)**
15:7
**length (1)**
45:1
**lengthy (1)**
57:5
**letter (5)**
29:9,12 36:25 37:2

37:5
**letters (2)**
37:12 49:14
**Let's (1)**
27:2
**levels (1)**
32:2
**liability (3)**
25:20 64:9,20
**liberty (1)**
62:15
**license (2)**
64:15 69:20
**light (1)**
64:16
**likewise (3)**
26:18 32:15,19
**limitation (1)**
53:25
**limits (4)**
64:25 65:22,23
66:5
**line (6)**
51:11,15,15 55:3
55:17 67:4
**list (3)**
10:24 42:25 64:1
**listed (5)**
52:4 54:6 60:15
61:5 66:19
**listen (1)**
27:3
**listing (1)**
52:2
**litigation (2)**
22:10 62:14
**little (6)**
10:4,10,16 14:24
17:12 33:16
**lived (1)**
39:10
**LLC (1)**
64:2
**LLP (2)**

3:6,16
**local (1)**
25:5
**logic (1)**
48:16
**long (5)**
6:4,15 9:12 20:21
57:5
**longer (3)**
6:5 9:12 57:8
**look (13)**
17:25 18:20 28:7
28:14 34:21 37:9
40:21 42:7,16
48:22 49:1,24
56:2
**looked (2)**
18:11 59:24
**looking (9)**
24:7 34:7,10 40:24
42:2 46:13 50:14
51:12 54:5
**looks (1)**
49:23
**loosely (1)**
58:3
**lot (24)**
6:21 7:7 9:18 10:1
10:8 15:3,4 17:11
17:14,16 30:24
39:20,24 40:6
44:15 49:25 50:2
53:13,14 56:19
57:25 61:19 62:7
65:7
**lt (1)**
12:14
**lurking (1)**
44:24
**Lyons (1)**
20:19

———————
**M**
———————
**Maddox (1)**

21:5
**maintain (2)**
8:6 20:13
**major (5)**
42:17,20,24 43:3
44:9
**majority (10)**
37:11 42:3 45:6
47:19,22,25,25
48:4,8,23
**making (1)**
53:25
**Management (1)**
64:2
**Mann (1)**
10:17
**mark (2)**
35:7 44:4
**marked (2)**
34:20 35:9
**marks (1)**
41:7
**materials (4)**
52:21 53:17 54:3
56:2
**matter (4)**
22:8,16 23:4 53:18
**matters (4)**
7:10,20 26:24
58:10
**mean (16)**
6:13 7:5 10:11 12:7
22:4 30:10,20
38:20 39:23 41:25
42:18 44:15,23
52:7 56:18 67:10
**meandering (1)**
60:24
**meaning (5)**
12:20 15:8 25:16
44:10 49:17
**meanings (1)**
26:1
**means (1)**

37:2
**meant (2)**
8:12 33:7
**measured (1)**
36:8
**meeting (2)**
40:12 52:9
**meetings (1)**
40:11
**member (2)**
16:11 24:19
**mentioned (2)**
9:21 34:5
**method (2)**
7:8,14
**Midwest (1)**
51:8
**million (2)**
64:9 66:12
**mind (4)**
6:2 19:3 21:17
51:25
**mine (4)**
14:13 38:21 57:24
58:1
**minor (1)**
43:4
**minority (7)**
42:3 45:7 50:8,22
51:2,17,24
**mirrored (1)**
31:6
**mirrors (1)**
30:21
**misdoing (1)**
61:20
**misplaced (1)**
51:5
**Mitchell (2)**
8:25 62:11
**mix (2)**
36:4 49:24
**mixed (1)**
36:7

**moment (3)**
34:21 35:7 42:15
**money (2)**
14:11 62:7
**monthly (1)**
40:11
**months (1)**
14:4
**morning (1)**
5:19
**mortgage (1)**
59:17
**mother (1)**
64:17
**motive (1)**
59:20
**Moving (1)**
61:4
**multiple (1)**
32:2
**multi-judge (1)**
22:15
**mumbling (1)**
31:24
**Mutual (2)**
10:3,17

**N**

**N (2)**
2:1 3:1
**Nabers (2)**
20:21 21:6
**name (11)**
5:20,22 13:1,1
  16:23 17:8 18:10
  20:22 28:22 30:14
  33:15
**named (2)**
18:6 64:22
**names (2)**
14:8 17:7
**narrow (3)**
24:14 47:19,22
**National (1)**

64:6
**naturally (2)**
9:15 17:13
**NE (1)**
3:8
**necessary (1)**
2:14
**need (4)**
20:2 51:3 56:21
  59:19
**needs (1)**
66:4
**negligent (1)**
55:4
**negotiations (1)**
66:3
**neither (1)**
69:13
**never (8)**
6:13 10:22 40:16
  40:18 59:13 65:23
  66:12 67:11
**nonwaiver (1)**
29:10
**normal (3)**
35:18,19 55:17
**normally (1)**
55:16
**NORTHERN (1)**
1:2
**noses (1)**
42:6
**Notary (3)**
1:22 2:7 5:2
**note (2)**
33:5 67:25
**noted (2)**
31:10,19
**notice (3)**
45:14 54:16,20
**noticed (1)**
6:8
**November (1)**
52:12

**number (7)**
12:16 13:10 19:14
  20:18 24:5 34:20
  55:8
**numerical (3)**
34:15 48:13,19
**NW (1)**
3:17
**N-A-B-E-R-S (1)**
21:6

**O**

**O (1)**
2:1
**oath (1)**
59:12
**object (5)**
26:4,4 31:18 44:12
  61:7
**objection (18)**
13:6 14:1 16:25
  17:4 23:15 27:14
  30:9 31:8,25
  33:10 38:5 42:21
  43:2,11 44:2
  45:18,24 46:15
**objectionable (1)**
55:21
**objections (2)**
2:15,18
**objective (1)**
23:1
**obligation (3)**
25:19,20 28:7
**observed (1)**
33:21
**obviously (2)**
48:14 60:15
**occurrence (1)**
12:11
**October (2)**
1:18 5:9
**offer (9)**
39:1,15 41:1,5,13

41:23 42:12 61:25
  65:10
**offered (1)**
2:20
**offers (1)**
65:19
**office (1)**
15:20
**offices (1)**
5:7
**Off-the-record (3)**
24:13 34:18 47:16
**Oh (3)**
11:13 13:5 23:12
**okay (4)**
18:20 31:21 35:8
  61:12
**omitted (1)**
42:25
**Once (1)**
65:12
**ones (6)**
17:15,16 31:1 33:4
  57:14 63:3
**one-sided (1)**
48:9
**open (2)**
14:5 49:19
**opined (1)**
61:23
**opinion (40)**
9:20 22:7 23:1
  31:20 32:24 37:18
  37:22 38:15,19,20
  38:21 39:15 40:23
  41:1,5,14,23
  42:12,25 43:16
  44:16 45:19 49:16
  54:25 56:2,19,22
  57:5,11 58:10
  59:2,21 61:25
  62:25 63:2,3,4,8
  63:18 66:1
**opinions (19)**

9:2,14,18 18:23
  21:10 23:8 25:11
  31:4 34:11,14
  39:1 43:4,21,25
  45:7 48:14 49:11
  57:4,15
**opponent (1)**
14:11
**opportunity (2)**
11:20 58:4
**opposing (1)**
21:20
**oral (4)**
5:11 17:22,23 53:4
**order (3)**
37:8 68:1,8
**ordered (1)**
46:22
**outcome (1)**
48:10
**outline (2)**
19:20 25:11
**overflow (1)**
10:23
**overwhelming (1)**
48:23
**owed (1)**
62:6

**P**

**P (3)**
2:1 3:1,1
**page (6)**
4:3,9 50:14,16 52:1
  54:5
**paid (4)**
54:15,16 56:15
  59:15
**pains (1)**
49:4
**panel (1)**
16:4
**panels (1)**
16:7

Alabama Gas Corporation v. Travelers Casualty and Surety Company, et al.  2:10-CV-1840 IPJ
Hon. Bernard Harwood

October 26, 2011

Page 80

| | | | | |
|---|---|---|---|---|
| **paper (2)** | **payments (1)** | 46:9 47:18 | 11:11,15 52:25 | **principles (2)** |
| 53:3,5 | 59:17 | **pleadings (1)** | **pragmatic (1)** | 25:10 62:2 |
| **papers (2)** | **peculiar (1)** | 36:22 | 29:6 | **prior (4)** |
| 52:5,20 | 45:16 | **please (1)** | **preceding (1)** | 2:20 6:9 12:9 43:20 |
| **paperwork (1)** | **people (5)** | 40:24 | 27:6 | **private (1)** |
| 54:13 | 6:6 11:23 12:15 | **plus (1)** | **precluded (1)** | 21:1 |
| **paragraph (1)** | 56:19 63:6 | 48:23 | 23:2 | **probably (10)** |
| 50:15 | **percent (1)** | **point (11)** | **predict (1)** | 10:6,18 11:18 15:7 |
| **parameters (1)** | 11:18 | 14:17 15:5 36:11 | 49:12 | 15:9 19:16 31:10 |
| 63:9 | **period (2)** | 49:17 54:19 55:2 | **prejudice (3)** | 36:5 41:7 55:12 |
| **paraphrase (1)** | 13:12 16:5 | 57:1 60:6 62:19 | 29:14 45:13 51:3 | **problems (1)** |
| 28:9 | **permissible (1)** | 65:1,16 | **premature (1)** | 31:6 |
| **Park (1)** | 38:18 | **points (8)** | 65:2 | **Procedure (1)** |
| 5:8 | **person (1)** | 30:17 42:17,20,24 | **premiums (2)** | 5:5 |
| **part (7)** | 63:7 | 43:9 44:9 45:5 | 54:15,16 | **proceedings (1)** |
| 40:16,21 43:15 | **personal (1)** | 46:12 | **preparation (1)** | 5:12 |
| 54:12 57:6 58:11 | 64:12 | **policies (4)** | 51:19 | **process (2)** |
| 62:8 | **persuade (1)** | 9:5 25:21 47:5 | **prepared (1)** | 19:22 31:3 |
| **participate (1)** | 48:18 | 65:11 | 68:6 | **professional (2)** |
| 21:25 | **phone (1)** | **policy (24)** | **preparing (1)** | 22:13 23:3 |
| **participated (3)** | 22:22 | 25:15 27:12 30:22 | 32:23 | **proffered (1)** |
| 17:17 22:2,18 | **phrase (2)** | 32:10 41:8,9,14 | **present (1)** | 65:20 |
| **participating (1)** | 47:8 48:1 | 41:18 45:16 46:21 | 39:5 | **project (1)** |
| 18:12 | **pick (1)** | 47:1,11 49:4 | **presentation (2)** | 58:2 |
| **participation (2)** | 31:5 | 54:11,15,17,21 | 53:4 54:2 | **projected (1)** |
| 20:10 40:16 | **picture (1)** | 55:5 59:5,6 64:25 | **presentations (2)** | 12:12 |
| **particular (4)** | 59:18 | 66:5,5,9 | 52:10 53:16 | **proposed (1)** |
| 32:14 35:5 40:21 | **Piedmont (1)** | **policyholder (1)** | **preserved (2)** | 24:7 |
| 42:19 | 3:8 | 56:9 | 53:5,22 | **prospective (1)** |
| **particularly (2)** | **Place (1)** | **Porterfield (2)** | **pressed (1)** | 39:12 |
| 45:15 50:1 | 5:8 | 33:13,18 | 12:17 | **protective (2)** |
| **parties (6)** | **plain (1)** | **posed (1)** | **presumably (1)** | 68:1,8 |
| 2:3,17 20:5 21:1 | 25:16 | 52:2 | 47:12 | **provide (1)** |
| 58:3 69:14 | **plaintiff (7)** | **position (5)** | **pretty (6)** | 63:11 |
| **party (1)** | 1:8 3:3 5:23 37:13 | 22:23 23:2 51:2,8 | 8:4 24:11 33:2 | **providing (1)** |
| 22:20 | 58:15,17 62:5 | 54:22 | 39:12 48:17 63:13 | 29:16 |
| **pattern (2)** | **plaintiffs (3)** | **possible (3)** | **previously (1)** | **provision (1)** |
| 24:3 30:5 | 59:22 61:22 62:17 | 26:1 29:19 48:8 | 22:16 | 66:6 |
| **Paul (1)** | **plaintiff's (4)** | **potentially (2)** | **primary (4)** | **PRP (5)** |
| 10:3 | 62:4 64:24 65:1,17 | 59:2 60:1 | 64:7 66:4,9,12 | 36:25 37:1,5,12 |
| **pay (4)** | **plan (2)** | **practice (8)** | **principally (1)** | 49:14 |
| 61:18 63:10 64:14 | 37:16,20 | 6:20 8:3,18,20,22 | 59:9 | **prudence (1)** |
| 66:5 | **Plating (2)** | 9:8 28:23 53:1 | **principle (1)** | 41:24 |
| **payment (2)** | | **practicing (3)** | 25:13 | **Public (4)** |

Alabama Gas Corporation v. Travelers Casualty and Surety Company, et al.   2:10-CV-1840 IPJ
Hon. Bernard Harwood

October 26, 2011
Page 81

1:22 2:7 5:2
69:20
**publications (1)**
52:3
**published (5)**
23:7 52:5,8,15,18
**purposes (1)**
37:6
**pursuant (1)**
5:4
**put (5)**
41:24 42:1 44:3
58:1 66:11
**putting (1)**
58:9

**Q**

**quadriplegic (1)**
64:19
**qualification (1)**
56:13
**qualified (3)**
14:16 38:1,11
**qualify (2)**
64:23 65:15
**question (35)**
8:11 12:20,24 16:4
16:14 17:5 24:14
26:4 27:1,6,7,11
31:25 33:7 35:5
35:24 36:7 38:10
41:21 42:18,24
44:1,2,3,5 45:6,19
48:6 49:13,19
50:11 51:23 56:5
57:2,9
**questions (11)**
2:16,17 6:19,21
36:6 40:23 43:18
52:2 67:22,23
69:8
**quite (2)**
10:5 67:18
**quotations (1)**

41:7
**quote (1)**
39:20

**R**

**R (2)**
3:1 69:1
**race (1)**
14:12
**ran (1)**
64:16
**rate (1)**
64:8
**rationale (2)**
48:17,24
**rationales (2)**
34:17 42:8
**reach (1)**
20:17
**reached (5)**
33:23 34:11 38:8
57:1 64:24
**reaching (1)**
36:12
**read (15)**
6:9 17:13,16 19:11
26:25 31:9,19
33:2 34:14 36:21
43:8 46:8 57:20
67:24 68:9
**reading (3)**
2:8 33:8 48:14
**ready (2)**
65:18,19
**reaffirmed (1)**
51:16
**reality (1)**
56:14
**really (8)**
8:11 15:6 43:3,5
46:24 59:13 61:24
67:11
**reason (12)**
17:12 18:17 35:12

35:22 36:17 38:3
43:17 44:7 48:21
48:25 49:8,22
**reasonable (1)**
44:9
**reasoned (1)**
42:2
**reasoning (1)**
34:15
**reasons (3)**
29:16 37:10 42:7
**recall (42)**
7:10 9:22 13:1,17
15:10 16:23 17:7
17:11 18:22 19:5
19:17 21:6,7,16
21:20 30:12,14
33:4,7,13 45:8,10
45:25 46:2,8,11
46:17,18 47:3,17
47:23,24 48:1,3,5
50:9 53:17 54:10
58:20 61:15 64:9
64:14
**recalled (1)**
51:2
**recalls (1)**
23:16
**recite (1)**
12:20
**recognize (3)**
6:5 56:14 63:15
**recognized (1)**
28:6
**recommendation...**
23:25
**recommissioned ...**
19:15
**record (2)**
5:20 68:5
**recover (1)**
58:7
**recused (1)**
18:17

**red (2)**
12:10 64:16
**reduced (1)**
69:9
**refer (5)**
10:5,15 40:24
50:12 60:9
**reference (1)**
49:21
**referred (4)**
6:10 16:13 18:10
30:25
**referring (6)**
17:1 37:7 48:4 51:1
51:4 67:14
**refusal (1)**
61:17
**refusing (1)**
35:12
**regard (13)**
23:8 26:18 27:7,18
27:19 32:10 33:24
33:25 39:1 48:20
49:14 51:8 52:20
**regards (2)**
26:23 66:22
**regular (2)**
10:2 16:21
**reinstitute (1)**
54:21
**related (1)**
45:12
**relates (1)**
38:17
**relating (2)**
2:12 47:5
**relationship (6)**
8:8 13:23 14:3,17
41:5 54:13
**Relevance (1)**
23:16
**relevant (1)**
7:3
**relied (1)**

55:3
**reluctant (1)**
50:16
**remember (9)**
11:1 17:10,15
33:15 47:6 52:24
55:9 57:12,14
**render (1)**
48:9
**rendered (1)**
64:19
**repeat (1)**
50:11
**report (22)**
8:24 11:6 21:12
30:17,21 34:24
40:25 41:11,13
42:16 43:8,14
44:17,19,21 45:3
50:6,14 51:10
52:1 60:12,14
**reported (6)**
1:20 12:21 13:15
15:10 17:25 18:2
**reporter (5)**
1:21 2:6 5:2 18:15
27:2
**reports (2)**
25:3 43:20
**represent (5)**
5:23 8:7,8 22:16,24
**representatives (1)**
40:12
**represented (3)**
9:19 51:17 56:9
**representing (6)**
8:5 11:24 22:20
39:18 56:16 59:1
**represents (1)**
69:10
**request (1)**
68:6
**required (1)**
16:17

Alabama Gas Corporation v. Travelers Casualty and Surety Company, et al.   2:10-CV-1840 IPJ
Hon. Bernard Harwood

October 26, 2011

Page 82

17:13 19:12
**research (1)**
51:18
**reservation (5)**
28:25 29:8,11,21
30:7
**resolved (3)**
26:20 27:9,20
**Resources (3)**
57:21 58:17 60:21
**respect (2)**
40:9 61:21
**respective (1)**
2:4
**response (1)**
68:8
**result (3)**
13:15 59:11 69:16
**results (1)**
26:12
**retain (2)**
31:20 32:14
**retained (11)**
9:16 21:11 53:11
55:24,25 56:7
58:14 60:7 61:22
63:23 66:8
**retired (2)**
6:18 20:18
**review (2)**
32:24 52:19
**reviewed (2)**
31:14 36:21
**right (20)**
7:17 9:3 11:9,10
13:19 27:13 28:2
34:23 35:6 38:9
39:4 40:5 41:17
49:18 50:18 51:13
51:14 60:4 63:25
67:15
**rights (6)**
28:25 29:9,11,14
29:21 30:7

**riveting (1)**
24:12
**Road (1)**
3:8
**Robert (1)**
5:21
**role (2)**
24:25 57:24
**roles (3)**
23:13 24:22 25:4
**rotate (1)**
16:22
**roughly (1)**
13:11
**rubrics (1)**
30:25
**rule (8)**
5:4 16:18 22:2,4,12
38:13 50:22 52:2
**ruled (2)**
36:25 37:5
**rules (10)**
2:12 5:5 21:21
22:13 23:3,20,23
23:24 24:3 38:14
**run (1)**
20:5

---
**S**

**S (2)**
2:1 3:1
**Safeco (1)**
12:7
**sag (1)**
44:17
**SAITH (1)**
68:14
**Sargent (4)**
1:20 2:6 5:1 69:19
**sat (5)**
16:24 20:19,20,21
22:9
**satisfy (1)**
37:12

**save (1)**
27:4
**savings (1)**
59:15
**saw (2)**
8:24 18:11
**saying (12)**
8:6 27:10 28:18
34:17 39:9 40:5
43:14 61:13 62:6
63:13 65:22 67:5
**says (6)**
16:15 22:14,17
29:12 37:10 50:16
**school (4)**
6:23 7:5,16 8:18
**Scott (2)**
3:4 5:22
**sea (1)**
15:7
**second (1)**
26:12
**secondarily (1)**
8:8
**secondary (1)**
26:13
**second-most (1)**
18:9
**Securities (1)**
3:7
**see (15)**
18:5,12,12,15,21
21:7 31:15 32:5
34:14,16 50:13,17
52:4 54:6 61:12
**seeing (1)**
31:2
**seek (1)**
29:21
**seeking (1)**
58:6
**seen (6)**
20:18,22 21:4 39:8
43:19 49:25

**selection (1)**
14:6
**send (1)**
29:8
**senior (2)**
18:7,8
**sense (1)**
52:18
**sent (3)**
14:10 54:16,19
**sentence (3)**
42:19 50:15,17
**separate (1)**
55:6
**separately (2)**
17:22 68:3
**separation (1)**
39:22
**serious (2)**
64:19,20
**serve (3)**
15:22 22:11,21
**served (2)**
15:25 24:4
**serving (1)**
23:3
**settle (2)**
65:2,18
**settled (2)**
15:6 65:19
**shape (1)**
39:9
**share (1)**
62:12
**shared (3)**
62:3,21,24
**sharing (1)**
63:5
**Shearin (4)**
54:8 55:8 56:23
61:1
**she'll (1)**
38:20
**shift (1)**

45:4
**Shores (1)**
20:22
**short (1)**
67:17
**shorthand (1)**
56:7
**should've (1)**
60:20
**show (4)**
28:11 45:13 51:3
59:19
**showing (1)**
34:19
**shows (2)**
9:11 55:8
**side (2)**
55:23 56:6
**sides (1)**
11:21
**sign (2)**
67:24 68:10
**signature (1)**
2:8
**significance (1)**
50:19
**similar (4)**
31:16 32:9,17,21
**simply (3)**
39:13,21 44:4
**sit (5)**
16:20 17:22 18:17
19:13 20:3
**sits (1)**
16:10
**sitting (7)**
13:9 14:19 19:2,5
43:7 57:12 67:18
**situation (10)**
21:4 22:5,19 27:20
51:10,12 54:11
58:13 61:15 62:20
**situations (3)**
30:12 51:21 63:16

Alabama Gas Corporation v. Travelers Casualty and Surety Company, et al.   2:10-CV-1840 IPJ
Hon. Bernard Harwood

October 26, 2011

Page 83

| | | | | |
|---|---|---|---|---|
| **six (2)** | **special (4)** | **step (1)** | **suing (2)** | **sworn (1)** |
| 14:4 52:11 | 12:11 20:3,12,23 | 19:20 | 63:6,7 | 5:15 |
| **six-year (3)** | **specialized (1)** | **STEPTOE (1)** | **suit (9)** | **system (1)** |
| 15:22,25 19:10 | 38:15 | 3:16 | 37:5,14 41:6,7,8,15 | 64:16 |
| **slang (2)** | **specially (1)** | **STIPULATED (1)** | 49:3,13,17 | **S-E-E (1)** |
| 17:8 55:20 | 7:22 | 2:2 | **Suite (1)** | 18:15 |
| **slaseter@kglatto...** | **specific (2)** | **stipulation (1)** | 3:8 | **S-H-E-A-R-I-N (1)** |
| 3:11 | 31:14 40:22 | 5:6 | **suits (1)** | 54:8 |
| **slightly (1)** | **specifically (2)** | **straight (1)** | 12:15 | |
| 45:5 | 19:7 33:4 | 8:17 | **summarized (1)** | **T** |
| **slow (1)** | **speculation (1)** | **street (1)** | 42:17 | **T (4)** |
| 12:18 | 14:2 | 11:22 | **summary (8)** | 2:1,1 69:1,1 |
| **small (1)** | **spelled (2)** | **strict (1)** | 15:3 37:7 42:20 | **take (7)** |
| 10:13 | 10:13,14 | 63:13 | 43:21,24 44:9 | 34:21 36:11 40:1 |
| **snapshot (1)** | **split (1)** | **strike (1)** | 57:7 67:6 | 42:15 65:10,19 |
| 36:11 | 47:9 | 36:25 | **superintendent (1)** | 67:16 |
| **somebody (2)** | **St (2)** | **study (1)** | 40:7 | **taken (2)** |
| 16:15 56:15 | 10:3 12:11 | 23:22 | **supervision (1)** | 2:5 69:7 |
| **somewhat (1)** | **staff (1)** | **studying (1)** | 69:10 | **takes (1)** |
| 53:12 | 20:1 | 7:16 | **support (2)** | 37:23 |
| **son (1)** | **stage (1)** | **sub (2)** | 48:15,16 | **talk (1)** |
| 60:7 | 15:4 | 45:5 65:6 | **supposed (1)** | 25:9 |
| **sorry (1)** | **stand (1)** | **subcommittee (1)** | 22:25 | **talking (3)** |
| 50:10 | 45:1 | 24:18 | **supposedly (1)** | 55:18 62:19,23 |
| **sort (19)** | **standards (2)** | **subcommittees (1)** | 64:12 | **tasks (1)** |
| 6:6,17 11:19 12:12 | 30:22 31:7 | 24:7 | **Supreme (22)** | 40:6 |
| 21:17 23:13 30:24 | **start (2)** | **subject (3)** | 15:16 16:2 17:6,20 | **Tel (2)** |
| 31:11 36:10 40:15 | 28:13 34:6 | 38:19 53:18 54:24 | 18:1,23 20:25 | 3:10,19 |
| 43:20,24 44:24 | **started (2)** | **submits (1)** | 23:19,21 24:2 | **tell (9)** |
| 47:1 53:23 57:24 | 12:17 52:17 | 14:8 | 30:4 36:19 39:11 | 18:1 19:21 37:17 |
| 58:12 61:14 67:11 | **starting (1)** | **submitted (1)** | 41:25 42:6 46:5 | 37:20 54:9 55:22 |
| **sorts (1)** | 54:7 | 14:9 | 47:18 48:18 49:12 | 58:23 61:15 64:4 |
| 62:8 | **state (10)** | **subsequent (1)** | 51:21 54:1 55:11 | **tend (1)** |
| **sought (1)** | 5:2,20 12:8 22:7 | 50:3 | **sure (12)** | 6:16 |
| 30:7 | 31:5,21,22 32:14 | **substantially (1)** | 7:13 12:19 13:7 | **tender (1)** |
| **SOUTHERN (1)** | 46:24 69:3 | 22:18 | 20:8 28:17,18 | 64:25 |
| 1:3 | **statements (1)** | **sub-group (1)** | 38:25 39:13 43:24 | **tenure (2)** |
| **space (1)** | 40:1 | 24:18 | 53:24 55:1 60:6 | 17:6 19:10 |
| 61:11 | **states (2)** | **sued (3)** | **SURETY (1)** | **term (23)** |
| **speak (1)** | 1:1 37:12 | 58:5 62:6,17 | 1:10 | 6:17 15:22,25 16:2 |
| 11:20 | **statute (2)** | **sufficient (1)** | **surfaced (1)** | 25:25 26:1 27:25 |
| **speaks (5)** | 16:18 25:14 | 59:8 | 65:14 | 28:20 33:24 34:1 |
| 42:22 43:12 44:14 | **stenotypy (1)** | **suggesting (1)** | **surprised (1)** | 37:1 41:6,15,15 |
| 45:19 46:16 | 69:8 | 39:14 | 18:25 | 42:9 45:16 46:25 |

47:12,19 49:3
55:20 57:24 58:3
**terms (1)**
41:18
**test (4)**
28:1,4,21 34:5
**testified (4)**
5:16 62:22 66:23
67:7
**testify (4)**
44:21 60:17,21,25
**testifying (2)**
56:24 66:18
**testimony (6)**
21:1 23:9 38:25
57:18 66:20 67:3
**tests (1)**
30:24
**th (1)**
6:21
**thank (2)**
19:21 57:20
**thanks (1)**
56:20
**that'd (2)**
6:7 22:2
**theft (1)**
61:18
**theory (1)**
62:18
**thereto (2)**
2:20 69:8
**they'd (1)**
20:4
**thing (4)**
19:8 31:12 34:2
59:11
**things (7)**
16:22 44:16 45:3
47:4 49:25 58:8
62:8
**think (38)**
6:17 9:8 10:10 12:4
12:6,10 14:16
19:8 20:20 21:17
22:17 24:9 25:10
28:19 32:4,7
36:10 37:23 38:7
38:10,13 40:8
42:5 45:12 46:7
48:18 49:1 52:12
53:13,20 55:19
56:12,25 63:22
64:6 65:15 66:11
67:17
**thinking (1)**
21:18
**third (2)**
65:14,21
**thoroughly (1)**
43:8
**thought (3)**
50:25 59:8,9
**three (4)**
14:8,8 21:7 52:9
**time (32)**
2:18,19 9:13,13,18
9:18 10:1,1,18
11:12 15:7 16:5
19:13,13 20:22
26:3 27:5 36:4,8
36:15,17 45:1
49:24,24 50:3
53:21,25 54:19
55:12 57:11 67:10
67:13
**times (3)**
19:16 22:23 43:18
**title (2)**
6:6,13
**today (7)**
5:24 13:9 19:2,5
43:8 57:12 66:18
**told (2)**
60:8 67:3
**topic (2)**
54:3,24
**tort (6)**
7:22 11:8 12:7
35:13 39:6 63:15
**torts (1)**
7:18
**total (1)**
64:8
**touch (1)**
58:21
**Tower (1)**
5:8
**traditional (1)**
6:18
**transcript (4)**
6:9 67:24 68:6
69:11
**transcripts (1)**
6:9
**transition (1)**
25:8
**Travelers (5)**
1:10 10:24 38:3
41:1 42:12
**treated (1)**
35:25
**Treatise (1)**
52:18
**trend (3)**
49:20 50:1,4
**trial (18)**
2:19 13:18 14:19
14:24 15:11 30:4
39:10 44:22 57:2
60:17,19,22,25
66:20,24,25 67:3
67:7
**trier (1)**
38:16
**triggers (1)**
37:14
**tri-parte (1)**
8:7
**truck (1)**
64:12
**trucking (2)**
64:10,11
**true (3)**
31:12 53:13 69:11
**try (8)**
8:6 17:4 24:14
42:18,23 51:7
52:13 58:1
**trying (8)**
24:16 31:21 43:23
44:7 57:10 62:20
65:9 67:4
**turn (1)**
50:2
**turned (1)**
56:18
**Turning (2)**
40:20 52:1
**Tuscaloosa (3)**
10:6 14:6 25:5
**two (10)**
15:2 16:9 17:21,21
18:6 25:25 46:12
65:20 66:4,13
**two-year (1)**
23:22
**type (1)**
60:2
**types (1)**
24:8
**typewriting (1)**
69:9

**U**

**U (1)**
2:1
**Uh-huh (2)**
45:9 64:3
**ultimate (1)**
38:18
**unanimous (1)**
16:11
**uncertain (1)**
29:5
**uncertainty (2)**
27:19 29:22
**unclear (1)**
49:17
**undecided (1)**
51:13
**underlying (3)**
42:7 44:10 48:24
**underpinnings (1)**
48:16
**understand (19)**
7:13 12:23 17:20
24:16 28:17,18
30:17 37:1 38:2
40:25 41:4,12,22
43:24 49:10 53:24
57:17,19 68:5
**understanding (3)**
45:21 50:20 55:14
**understands (1)**
6:4
**understood (2)**
25:19,24
**uniform (3)**
24:9 47:10 48:15
**uniformly (1)**
47:8
**United (4)**
1:1 57:21 58:17
60:21
**updates (1)**
24:1
**use (4)**
6:7,17 58:3 62:16
**USF&G (2)**
9:11,21
**usually (2)**
18:10 19:24
**Utica (1)**
10:3

**V**

**V (1)**
1:9
**vacancy (3)**

Alabama Gas Corporation v. Travelers Casualty and Surety Company, et al.  2:10-CV-1840 IPJ
Hon. Bernard Harwood
October 26, 2011
Page 85

14:5,9,13
**vague (6)**
14:2 29:25 30:9
31:8 32:3 45:20
**various (1)**
25:4
**variously (1)**
33:3
**verbally (1)**
22:22
**versus (3)**
12:7 42:3 45:6
**view (5)**
23:1 36:1 37:24
51:17,24
**views (2)**
33:23 42:1
**Vincent's (1)**
12:11
**volunteer (1)**
20:4
**vote (1)**
16:12

**W**

**W (1)**
3:4
**WAIVED (1)**
2:9
**waiving (1)**
29:15
**walk (1)**
54:7
**want (13)**
6:19 11:23 13:7
14:15 20:8 34:13
35:3 37:9 38:25
54:20 63:11,20
65:2
**wanted (2)**
7:1 15:8
**Washington (1)**
3:18
**wasn't (4)**

12:20 47:9 51:4
59:23
**watched (1)**
39:8
**water (1)**
53:14
**way (11)**
10:23 12:24 16:6
31:21,22 37:9
39:16 41:12 46:2
47:9 66:2
**weight (3)**
42:1,3 45:6
**went (11)**
6:22,23 7:15 8:17
13:2 14:14 18:5
40:10,11 53:3
66:3
**weren't (2)**
13:3 54:15
**we'll (6)**
29:12 56:20 58:3
62:12,13 64:25
**we're (8)**
5:24 23:22 24:8
29:13 55:18 62:15
63:1,14
**we've (10)**
20:2,17 22:22 40:1
55:3 65:11,12,22
67:5,17
**winnows (1)**
14:7
**Winston (30)**
3:14 14:1 16:25
23:15 26:3,25
27:14 29:25 30:9
31:8,18,23 32:1
33:10 38:5 42:21
43:2,11 44:1,12
45:18,24 46:15
48:7 56:8 61:7,12
67:16,23 68:9
**withdrawal (1)**

29:14
**witness (5)**
2:9 5:10 22:12
23:16 69:12
**witnesses (2)**
43:20 48:7
**word (2)**
14:10 41:8
**words (4)**
10:2 25:15 29:15
36:14
**work (14)**
8:13 9:10 10:1,2,16
10:17,23 11:21
15:5,11 39:24
58:11 65:7,10
**worked (3)**
7:24 8:14 16:7
**working (2)**
24:8 66:10
**works (1)**
19:22
**worry (1)**
11:23
**worthy (1)**
43:15
**wouldn't (2)**
15:1 18:25
**would've (5)**
12:2 31:19 32:12
47:13 59:25
**wrapping (1)**
23:22
**wreck (2)**
40:1 64:11
**wrestling (1)**
12:9
**written (7)**
8:25 12:11 22:4
52:21 54:3 57:5
57:15
**wrong (2)**
37:17,21
**wrongful (2)**

55:5 63:19
**wrote (1)**
18:22

**Y**

**yeah (18)**
11:13 14:21 20:17
22:5 24:12 30:12
30:24 34:2 36:10
37:8 39:5 42:5
44:23 48:2 50:13
50:24 55:19 61:10
**year (4)**
14:25 15:2,9 52:11
**years (9)**
8:3 14:25 17:13
52:3,6,9,23 53:1
67:15

**0**

**05 (1)**
55:9
**07 (1)**
55:11

**1**

**1 (5)**
4:11 34:20,24 35:9
40:20
**10 (2)**
14:25 15:9
**10-year (1)**
13:12
**10:21 (1)**
67:20
**10:31 (1)**
67:20
**10:33 (1)**
68:12
**11th (1)**
16:8
**1200 (1)**
5:7
**1330 (1)**
3:17

**1981 (2)**
11:7 12:4
**1982 (1)**
12:5
**1983 (1)**
12:7

**2**

**2nd (1)**
52:12
**2:10-CV-1840 (1)**
1:5
**20 (3)**
10:19 13:14 52:25
**200 (1)**
52:10
**2000 (1)**
15:20
**2001 (2)**
15:19,21
**20036-1795 (1)**
3:18
**2011 (2)**
1:18 5:9
**202 (1)**
3:19
**26 (3)**
1:18 5:9 52:2
**28 (2)**
8:2 67:15

**3**

**3-year-old (1)**
64:18
**30 (2)**
5:4 10:19
**30305 (1)**
3:9
**3490 (1)**
3:8
**35 (1)**
4:11
**350 (1)**
3:8

**4**

**4 (3)**
 50:14 64:9 66:11
**404)812-0844 (1)**
 3:10
**429-6482 (1)**
 3:19

**5**

**5 (3)**
 4:5 64:2 67:2
**579 (1)**
 69:20

**6**

**6 (2)**
 52:1 54:5

**7**

**702 (1)**
 38:14

**9**

**9:01 (1)**
 5:9
**90 (1)**
 11:18
**91 (2)**
 13:2,19