# APPENDIX OF UNPUBLISHED CASES CITED IN

## ALAGASCO'S BRIEF IN SUPPORT OF MOTION

### <u>TO EXCLUDE THE TESTIMONY OF JUDGE BERNARD HARWOOD</u>

**Cases:**                                                                                                          **Page(s)**

*Kraeger v. Nationwide Mut. Ins. Co.*
    1997 U.S. Dist. LEXIS 2726
    (E.D. Penn. Feb. 28, 1997)...............................................................................................2

*Kubrick v. Allstate Ins. Co.*
    2004 U.S. Dist. LEXIS 358
    (E.D. Penn. Jan. 7, 2004) ................................................................................................4

*Travelers Indem. Co. of Illinois v. Royal Oak Enterprises, Inc.*
    2004 U.S. Dist. LEXIS 29575
    (M.D. Fla. Aug. 20, 2004) ...........................................................................................19



1 of 1 DOCUMENT

**JUDITH KRAEGER AND PHILIP KRAEGER, Plaintiffs v. NATIONWIDE MUTUAL INSURANCE COMPANY, Defendant**

**CIVIL ACTION No. 95-7550**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*1997 U.S. Dist. LEXIS 2726*

**February 28, 1997, Decided
March 7, 1997, FILED**

**DISPOSITION:** [*1] Defendant's Motion in Limine Regarding the Testimony of Plaintiffs' Expert DENIED.

**COUNSEL:** For JUDITH M. KRAEGER, PLAINTIFF: RONALD C. MESSMANN, JOSEPH F. RODA, P.C., LANCASTER, PA USA. JOSEPH F. RODA, RODA & NAST, P.C., LANCASTER, PA USA. ERIC L. KEEPERS, RODA AND NAST, LANCASTER, PA USA. For PHILIP H. KRAEGER, PLAINTIFF: RONALD C. MESSMANN, (See above). JOSEPH F. RODA, (See above). ERIC L. KEEPERS, (See above).

**JUDGES:** HUYETT, J.

**OPINION BY:** HUYETT

**OPINION**

***MEMORANDUM & ORDER***

HUYETT, J.

**FEBRUARY 28, 1997**

Plaintiffs Judith and Philip Kraeger ("Plaintiffs") have offered an expert witness, Michael S. Barranco, in this insurance bad faith case.

Plaintiffs originally suggested four topics about which this expert might testify: (1) that Defendant Nationwide Mutual Insurance Company ("Defendant") acted in bad faith in the instant case; (2) that Defendant acts in bad faith as a general business practice; (3) how in-

surance claims are managed and evaluated; and (4) the statutory and regulatory standards to which insurance companies must adhere. At oral argument, counsel for Plaintiffs stated that instead of asking (1) and (2) above, Plaintiffs would ask the expert "whether there was any reasonable [*2] basis, in his experience within the insurance industry, for the actions of Nationwide that are at issue in this case." Defendant has moved in limine to preclude this expert, making several arguments.

First, Defendant claims that Mr. Barranco's testimony should be completely precluded because there is no recognized body of experts in the area of bad faith insurance claims handling. There is no requirement that an expert's field of expertise be one in which a recognized body of experts exists. *See F.R.E. 702.* Thus, this contention is without merit.

Second, Defendant claims that Mr. Barranco's testimony should be precluded because there has been no showing that expert testimony is proper. In general, whether expert testimony is permitted depends on whether the expert's knowledge is likely to assist the trier of fact to arrive at the truth. *F.R.E. 702; Hines v. Consolidated Rail Corp., 926 F.2d 262, 272-73 (3d Cir. 1991).* Testimony about how insurance claims are managed and evaluated and the statutory and regulatory standards to which insurance companies must adhere could be helpful to the jury in evaluating whether the claim in the instant case was handled in bad faith. [1] Whether [*3] this testimony is admissible will depend on the context in which it is offered at trial. Mr. Barranco cannot testify that Defendant "violated *42 Pa. C.S.A. § 8371*" or that Defendant acted in "bad faith." These are legal conclusions. However, Mr. Barranco's opinion,

1997 U.S. Dist. LEXIS 2726, *

based upon his expertise and experience, that Defendant had no reasonable basis for its actions could be helpful to the jury.

> 1    However, Mr. Barranco's opinion that Nationwide in fact violated certain statutes, such as the Unfair Insurance Practices Act, would not appear to be relevant or helpful to the jury.

Third, Defendant claims that Mr. Barranco is not qualified to testify as an expert in the area of bad faith insurance claim handling practices. The Court of Appeals for the Third Circuit has held "a broad range of knowledge, skills, and training qualify an expert as such" and has "eschewed imposing overly rigorous requirements of expertise." *United States v. Velasquez, 33 V.I. 265, 64 F.3d 844 (3d Cir. 1995).* Mr. Barranco's resume shows **[*4]** that he qualifies as an expert on the issue of bad faith insurance claims handling. [2]

> 2    Mr. Barranco's resume reveals that he has attended the College of Insurance and the Royal-Globe Insurance Companies' Claim and Loss Adjusters' Training Program; practiced as an attorney in the field of insurance litigation; worked at insurance companies holding various positions including claims supervisor, manager of corporate affairs and corporate security, adjuster, member of claims and underwriting committee, general counsel; and authored various publications including "Good Faith and Bad Faith in Substance," presented at "Bad Faith Litigation in Florida" seminars. Currently, Mr. Barranco is an insurance and reinsurance consultant.

Defendant argues that *Daubert* restricts Mr. Barranco's testimony. Mr. Barranco's testimony is not "scientific" or "technical" pursuant to *F.R.E. 702*, but consists of "specialized knowledge." The factors listed in *Daubert* do not apply to this type of testimony. However, the rationale **[*5]** behind *Daubert*, that a foundation and relevance must be demonstrated for testimony to be admissible, remains true.

Fourth, Defendant claims that Mr. Barranco should not be permitted to base his testimony on other bad faith cases in which Nationwide was a party. Counsel for Plaintiffs stated at oral argument that he will not elicit this testimony. Thus, this argument is moot.

Fifth, Defendant claims that Mr. Barranco should not be permitted to base his opinions and testimony on the statutes cited by Mr. Barranco as they are not of the type upon which experts in bad faith would rely and they are not cited accurately. Plaintiffs only need to show that the statutes are "of a type reasonably relied upon by experts" in the field if they are otherwise inadmissible. *F.R.E. 703.* It would be reasonable for experts in bad faith insurance practices to look to the relevant statutory and regulatory requirements in examining the reasonableness of an insurer's actions. Thus, this contention is without merit.

Sixth, Defendant claims that Mr. Barranco's conclusion that "Nationwide handles its policy holders' claims improperly and in bad faith as a general business practice" should be precluded **[*6]** because it is not relevant to any claim made by Plaintiffs and because it is more prejudicial than probative. Counsel for Plaintiffs stated at oral argument that he will not elicit this testimony. Thus, this argument is moot.

For the foregoing reasons, Defendant's Motion in Limine Regarding the Testimony of Plaintiffs' Expert will be **DENIED**. Defendant may make appropriate objections at trial concerning the testimony of this expert.

**An appropriate order follows.**

**HUYETT, J.**

> ***ORDER*** - ENTERED: *3/10/97*

**HUYETT, J.**

**FEBRUARY 28, 1997**

For the reasons stated in the foregoing memorandum, Defendant's Motion in Limine Regarding the Testimony of Plaintiffs' Expert is **DENIED.**

**IT IS SO ORDERED.**

> **HUYETT, J.**



1 of 1 DOCUMENT

**JOAN KUBRICK, Administratrix of the Estate of Timothy Kubrick, Deceased, and WILLIAM A. KUBRICK, Plaintiffs v. ALLSTATE INSURANCE COMPANY, Defendant**

CIVIL ACTION NO. 01-6541

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

*2004 U.S. Dist. LEXIS 358*

January 7, 2004, Decided

**SUBSEQUENT HISTORY:** Affirmed by *Kubrick v. Allstate Ins. Co., 2005 U.S. App. LEXIS 1440 (3d Cir. Pa., Jan. 28, 2005)*

**DISPOSITION:**    Defendant's Motion for Summary Judgment was denied. Judgment was entered.

**COUNSEL:** [*1]  For Joan Kubrick, Administratrix of the Estate of Timothy Kubrick, Deceased, and William A. Kubrick, PLAINTIFFS: Anthony J Mazullo, Jr, Mazullo & Murphy, PC, Doylestown, PA USA. Carol A Shelly, Mellon Webster & Shelly, Doylestown, PA USA. Robert M Stengel, Robert M Stengel, PC Doylestown, PA USA. Thomas P Donnelly, Mellon, Webster & Shelly, Doylestown, PA USA.

For Allstate Insurance Company, DEFENDANT: Elissa J Taub, Marshall Walthew, Dechert Price & Rhoads, Philadelphia, PA USA. Jason E Murtagh, Dechert LLP, Philadelphia, PA USA.

**JUDGES:** CYNTHIA M. RUFE, J.

**OPINION BY:** CYNTHIA M. RUFE

**OPINION**

**MEMORANDUM OPINION**

**RUFE, J.**

This case concerns whether Defendant Allstate Insurance Company acted in bad faith in handling an un-derinsured motorist benefits claim by the Estate of Timothy Kubrick, deceased. Presently before the Court is Defendant's Motion for Summary Judgment. For the reasons below, Defendant's Motion is granted.

**I. BACKGROUND** [1]

> 1    The following factual recitation is taken in the light most favorable to Plaintiffs, the non-moving parties, and gleaned from the evidence of record. Unless otherwise noted, all exhibits are attached to Defendant's Reply Memorandum of Law in Support of Allstate Insurance Company's Motion for Summary Judgment.

[*2]  On October 5, 1985, Timothy Kubrick died in an automobile accident in Lake Township, Wayne County, Pennsylvania. Timothy and his friend, Bernard Michini, were occupying Timothy's 1971 Dodge Demon when, traveling at an excessive speed, it crossed over into oncoming traffic and collided with a vehicle driven by Scott Nagle. Michini was thrown from the Dodge Demon and survived, but Timothy was found dead inside the vehicle. See Police Accident Report (Ex. 2); 3/22/00 Report of Bieber & Assocs., Inc. at 14, 19 ("Bieber Report") (Ex. 28). From the outset, there was considerable debate as to whether Timothy or Michini was driving at the time of the accident.

Plaintiff Joan Kubrick is Timothy's mother and administratrix of his estate. Plaintiff William A. Kubrick is Timothy's father. Plaintiffs contend that Michini was driving the Dodge Demon. Although the truth concerning this question has no bearing on the instant lawsuit, the existence of this factual dispute is significant.

Case 2:10-cv-01840-IPJ     Document 120-3     Filed 11/03/11     Page 5 of 22

Page 2
2004 U.S. Dist. LEXIS 358, *

At the time of the accident both Timothy and Michini held primary policies of insurance with State Farm Insurance ("State Farm"), and Michini held an excess policy with Transamerica Insurance Company ("Transamerica"). **[*3]** William A. Kubrick held a policy of insurance with Defendant Allstate Insurance Company ("Allstate") that provided underinsured motorists ("UIM") coverage (the "Allstate Policy").

On April 18, 1986, Mrs. Kubrick, on behalf of Timothy's Estate, and Mr. Kubrick initiated a wrongful death and survival action against Michini in the Court of Common Pleas of Lackawana County, alleging Michini was the driver of the Dodge Demon. See Summons and Complaint (Exs. 8-9). Soon thereafter Michini filed a countersuit, alleging Timothy was the driver. On November 27, 1991, Plaintiffs agreed to settle the litigation with Michini, splitting State Farm and Transamerica's available settlement funds of $ 350,000 (out of $ 400,000 in coverage) between them: $ 185,000 for the Estate and $ 165,000 for Michini. On January 30, 1992, the court entered an order approving the settlement. See Court Order of 1/30/92 (Ex. 12).

Acting on behalf of the Estate, Mrs. Kubrick challenged the settlement, arguing that her daughter, Kimberly, had entered into the settlement on behalf of the Estate without authority. On October 4, 1993, Michini and Transamerica filed a Petition to Enforce the Settlement Agreement. **[*4]** Plaintiffs' attorney representing them in the contested settlement, Thomas B. Helbig, intervened as a party in order to recover his costs and fees. See Court Order of 2/11/94 at P 1 (Ex. 3). After an evidentiary hearing, the court granted the Petition on February 11, 1994. See id.

During the pendency of the lawsuit with Michini, Plaintiffs also sought UIM coverage under Mr. Kubrick's Allstate Policy. On July 27, 1989, on behalf of Plaintiffs, attorney Helbig notified Allstate of the accident and pending lawsuit and that they had received an offer of the policy limits from Michini's insurer. Helbig asked Allstate for their consent to settle and a waiver of any subrogation rights. Finally, Helbig notified Allstate of Plaintiffs' claim for UIM benefits under the Allstate Policy and demanded arbitration. See Letter of 7/27/89 from Helbig to Allstate (Ex. 17).

When Helbig received no reply to this letter, he followed up with another letter on September 6, 1989, enclosing a copy of his previous correspondence and asking for a response. See Letter of 9/6/89 from Helbig to Allstate (attached to Plff.'s Resp. at Ex. F). Helbig wrote again on October 9, 1989, enclosing his **[*5]** two previous letters and repeating his request for a response. Helbig explained that Plaintiffs were making the UIM claim because Timothy resided in Mr. Kubrick's home at the time of the accident, and therefore was eligible for UIM benefits under the Allstate Policy. Finally, Helbig addressed the Allstate Policy coverage limits by noting that the Allstate Policy declaration sheet listed the bodily injury liability limits as $ 300,000 per person/$ 500,000 per occurrence, while the UIM coverage limits were $ 15,000 per person/$ 30,000 per occurrence. See Allstate Policy Declaration (Ex. 31). Citing the *Pennsylvania Motor Vehicle Financial Responsibility Law, 75 Pa. Cons. Stat. Ann. § 1731*, which requires that bodily injury liability limits and UIM limits of a policy be equal unless the named insured submits a written request for lower UIM limits, Helbig asked for verification that Mr. Kubrick had executed the written request, also known as a "sign-down waiver." Letter of 10/9/89 from Helbig to Allstate (attached to Plff.'s Resp. at Ex. F). On October 13, 1989, Helbig wrote Allstate and designated his arbitrator. See Letter of 10/13/89 from Helbig to **[*6]** Allstate (attached to Plff.'s Resp. at Ex. F).

Allstate began searching its records for the sign-down waiver on October 30, 1989. See Letter of 10/30/89 from Whelan to Morrison (Ex. 36). On December 5, 1989, its Operations Territory Manager sent a letter to the claims department stating that after "an extensive search" of both on-and off-site storage by "our most experienced document retrieval personnel," the sign-down waiver could not be located. Letter of 12/5/89 from Morrison to Whelan (attached to Plff.'s Resp. at Ex. B). An unidentified Allstate representative noted in the claim file that the missing sign-down waiver presented "another issue" regarding the Estate's UIM claim. Claim Diary Entry of 12/12/89 (attached to Plff.'s Resp. at Ex. B). Allstate did not inform Helbig that the sign-down waiver was missing.

On November 13, 1989, Helbig wrote to Allstate again, referencing his previous correspondence, asking that the matter of the Estate's UIM claim be assigned to a claims representative, and threatening to file a Petition to Compel Arbitration unless Allstate contacted him within ten days. See Letter of 11/13/89 from Helbig to Pettus (attached to Plff.'s Resp. at **[*7]** Ex. F).

Allstate representative S. James Everett responded to Helbig's letter on November 20, 1989. Everett noted that because the Estate was planning to accept only $ 125,000 in settlement of its claim against Michini, and thus was not exhausting the applicable $ 400,000 limits in other triggered policies, the Estate would not be entitled to any UIM benefits under the Allstate Policy. See Letters of 11/20/89 and 1/24/90 from Everett to Helbig (Exs. 18-19). In addition to addressing the exhaustion issue, Everett identified two other Allstate concerns as to its liability: (1) whether Timothy was driving the Dodge Demon and therefore caused the accident; and (2) whether Timothy was residing in Mr. Kubrick's home at

2004 U.S. Dist. LEXIS 358, *

the time of the accident. Letter of 11/20/89. If the accident had been Timothy's fault, or if he was not living with his father at the time, the Estate would not be entitled to UIM benefits under the Allstate Policy. See Complaint P 28; Helbig Dep. at 132-33 (Ex. 4).

Helbig believed that Allstate's position on the exhaustion requirement was reasonable and in accordance with Pennsylvania law. Helbig Dep. at 150-53 (Ex. 4). [2] Helbig had no further contact with Allstate **[8]** after that because "it was our opinion at that time that in order to have a valid UIM claim, there had to be exhaustion of all available liability coverage, which we did not have, and it did not appear were going to have in terms of subsequent discussions with Transamerica [Michini's excess insurer]." Id. at 153-54.

> 2   Plaintiffs executed a written waiver of the attorney-client privilege for purposes of Helbig's deposition. See Affs. of William A. Kubrick and Joan Kubrick, filed on the case docket at document no. 26.

On April 4, 1995, an intervening change in Pennsylvania insurance law affected the Estate's claim for UIM benefits under the Allstate Policy. In *Boyle v. Erie Insurance Co., 441 Pa. Super. 103, 656 A.2d 941 (Pa. Super. Ct. 1995)*, the Pennsylvania Superior Court declared that an exhaustion clause that requires that the limits of bodily injury insurance coverage must be exhausted prior to any claim for UIM coverage is against public policy and does not preclude recovery by **[9]** the insured for UIM coverage. See also *Chambers v. Aetna Cas. & Sur. Co., 442 Pa. Super. 155, 658 A.2d 1346 (Pa. Super. Ct. 1995)*. Thus, after April 4, 1995, Pennsylvania law no longer barred the Estate from seeking UIM coverage under the Allstate Policy due to its failure to exhaust the limits of available bodily injury coverage.

On November 6, 1997, Mr. and Mrs. Kubrick retained attorney Bruce Neff to determine whether the Estate might have any additional insurance claims. Neff Dep. at 15-16 (Ex. 20). [3] On Mr. Neff's advice, the Estate pursued a UIM claim against Timothy's insurer, State Farm, and laid plans to pursue a UIM claim under the Allstate Policy thereafter. Id. at 20-23.

> 3   Plaintiffs also executed a written waiver of the attorney-client privilege for purposes of the Neff deposition. See Neff Dep. at 7.

Over a period of approximately fifteen months, Neff negotiated a settlement of the Estate's UIM claim against State Farm. In February 1999, State Farm offered to settle **[10]** for the full policy limits of $ 50,000. Neff advised Mrs. Kubrick to sign the settlement agreement and

release, but Mrs. Kubrick hesitated for various reasons. Joan Kubrick Dep. at 200-01 (Ex. 7); Petition to Withdraw as Counsel and Enforce Settlement at P 3-19 (Ex. 22). After making numerous requests for additional information and revisions to the release, Mrs. Kubrick signed the release and consummated the settlement on December 15, 1999. Id. at P 19.

Even as he pursued a UIM claim against State Farm, Neff continued the process of making a UIM claim under the Allstate Policy. On November 10, 1997, Neff notified Allstate that he now represented the Estate, demanded arbitration of the Estate's UIM claim, and named the Estate's chosen arbitrator. Letter of 11/10/97 from Neff to Allstate (Ex. 23).

Allstate employee John Russell analyzed the Estate's UIM claim on November 14, 1997. Russell identified several issues that needed to be addressed before paying UIM benefits. He noted that "even before we deal" with the sign-down waiver, counsel for the Estate should address tort exhaustion, Timothy's residency at the time of the accident, and whether the Estate accepted a tort settlement **[11]** without Allstate's consent. 11/14/97 Claim Diary Entry (Ex. 27). Russell also identified the statute of limitations as a potential issue. See id.

On November 25, 1997, Neff spoke with Allstate representative Ronald Neil Feher. Feher's subsequent letter to Neff summarizes their conversation:

> As we both know, there is a great deal of investigation to be completed on this case on both sides. The main issue on my end is to try to determine who actually was the driver of the Kubrick vehicle. . . . As we had agreed, we will not proceed with the arbitration until we both have completed our investigations into the many issues involved in this case. At this point, I will wait to refer this case to our defense counsel to appoint an arbitrator if necessary.

Letter of 11/26/97 from Feher to Neff (Ex. 24). Consistent with a recommendation from Russell, see Claim Diary Entry of 11/14/97, Feher also requested information related to Allstate's liability on the Estate's claim, such as court orders, copies of depositions, and State Farm and Transamerica insurance documents. Neff requested the sign-down waiver purportedly executed by Mr. Kubrick, and Feher agreed to send it to **[12]** him if it was available. See 11/26/97 Claim Diary Entry (Ex. 25).

2004 U.S. Dist. LEXIS 358, *

On December 3, 1997, Neff requested the sign-down waiver yet again. Feher responded in a December 15, 1997 letter, stating, "before I begin to investigate the availability of sign-down waivers, we must first determine if there is a valid UIM claim. . . ." Letter of 12/15/97 from Feher to Neff (Ex. 26). In order to determine liability, Feher explained, Allstate wanted verification that Timothy was a resident in his father's home at the time of the accident, a copy of the court order concerning the settlement of Michini's Transamerica policy, and the Transamerica and State Farm policy and claim numbers for the accident. Feher also stated that Allstate needed to determine whether all available policies were exhausted, whether the Estate entered settlements without Allstate's consent, and whether the UIM claim was precluded by the four year statute of limitations. See id. He concluded, "I feel that before we can discuss the details of the UIM claim, we need to resolve these issues to determine if there is in fact a legitimate UIM claim to be pursued." Id.

Neff knew that in order to successfully pursue a UIM [*13] claim, he needed to prove that Timothy was not the driver and that he was residing at his father's home. Neff investigated these issues and was confident that he could prove them in the Estate's favor. Neff Dep. at 102-05.

Meanwhile, Allstate began its own investigation of the accident and its liability for the Estate's UIM claim. Several weeks later, on January 23, 1998, counsel for Allstate contacted Neff and asked him to identify a person to give a statement under oath concerning the claim. Letter of 1/23/98 from Herman to Neff (Ex. 29). Neff responded a few days later and restated his request for the sign-down waiver. He also opined that there was "no purpose to be gained from" an oral examination of a representative of the Estate because that person would have no personal knowledge of the accident. Letter of 1/28/98 from Neff to Herman (Ex. 51). The record reflects almost no activity on the UIM claim for the next seventeen months.

At some point during this lull, Allstate obtained new counsel. On June 28, 1999, Allstate's new counsel wrote to Neff and requested that he arrange for Mrs. Kubrick to provide a statement under oath. He also named Allstate's arbitrator and requested [*14] the underlying claim file. Finally, he notified Neff that Allstate had "been unable to locate the sign-down waivers. It should be noted, however, that the search is continuing and in the event such sign-down waivers are located, I will supply you with copies of same." [4] Letter of 6/28/99 from Riemenschneider to Neff (Ex. 39). Mrs. Kubrick provided a statement on December 7, 1999. See Statement Under Oath of Joan Kubrick ("Kubrick Statement") (Ex. 41).

4    Plaintiffs allege that on October 19, 1999 Allstate finally admitted to Plaintiffs that it could not locate the sign-down waiver. Complaint PP 11, 15. There is no documentary support in the record for this statement, but Allstate does not contest it in its responsive memoranda. Accordingly, the Court will accept it as true. Allstate acknowledges that because it could not locate the sign-down waiver, the law demands that the Allstate Policy bodily injury and UIM limits be equal. Nonetheless, it steadfastly maintains that Mr. Kubrick paid for only $ 45,000 in UIM coverage ($ 15,000 per person, stacked by three vehicles on the policy) and that Allstate's record-keeping error provided him with an "enormous windfall" of $ 900,000 in UIM coverage ($ 300,000 per person, stacked). Def's Reply Mem. at 12-14. Allstate's evidence tends to support this contention.

[*15] The next day, December 8, 1999, Allstate retained a private investigator, Bieber & Associates, Inc. ("Bieber"), to determine whether Timothy was driving the Dodge Demon and whether Timothy was residing at his father's home at the time of the accident. See Bieber Report at 3. Bieber actively investigated these issues from December 8, 1999 through December 23, 1999; from January 3, 2000 through January 27, 2000, and from March 15, 2000 through March 22, 2000, when it issued its report.

Allstate and the Estate agreed to settle the UIM claim in September 2000 for $ 600,000. See Letter of 9/29/00 from Neff to Riemenschneider (Ex. 48). Mrs. Kubrick hesitated to finalize the agreement, however, because she wanted to ensure that the settlement and release would not preclude her from pursuing a subsequent bad faith claim against Allstate. Attorney Neff wrote to counsel for Allstate on September 29, 2000, asking Allstate to "clarify" that the settlement "includes no monies for any alleged bad faith claims handling on the part of Allstate. Since you and I have discussed these issues, it is my understanding that there is no disagreement in this matter." Id. Neff wrote to Mrs. Kubrick [*16] that same day to confirm that the settlement did not include a release of any bad faith claim and enclosed a copy of his letter to Allstate. See Letter of 9/29/00 from Neff to Kubrick (Ex. A to Ex. 30).

On October 10, 2000, Neff sent Mrs. Kubrick the settlement release. See Letter of 10/10/00 from Neff to Kubrick (Ex. B to Ex. 30). Mrs. Kubrick refused to sign, however, because she was still concerned that she would be waiving future bad faith claims against Allstate. See Allstate's Second Set of Requests for Admission ("RFA") nos. 7-9 (Ex. 30). [5] Mrs. Kubrick drafted her own release,

believing that it would preserve her bad faith claim against Allstate. RFA nos. 14-15; Letter of 10/18/00 from Kubrick to Neff (Ex. 33). She sent her version of the release to Neff on October 18, 2000 and told Neff that she would sign it. See id.

> 5  Plaintiffs failed to respond to Allstate's Second Set of Requests for Admission. Accordingly, pursuant to *Federal Rule of Civil Procedure 36(a)*, any matter addressed therein is admitted for purposes of the case at bar. See *Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976).* Admissions may be considered in ruling on a motion for summary judgment. See id.; *Fed. R. Civ. P. 56(c).*

[*17]  On October 19, 2000, Neff and Mrs. Kubrick had a fifty-five minute phone conversation about the releases. Neff assured Mrs. Kubrick that the Allstate release did not embrace any claims for bad faith against Allstate and informed her that he would accept responsibility if the Allstate release was ever interpreted as a release of a future bad faith claim. See RFA nos. 17-18; Letter of 10/19/00 from Neff to Kubrick (Ex. D to Ex. 30). Mrs. Kubrick informed Neff that she would sign the letter. See id.; RFA no. 21.

On October 22, 2000, Mrs. Kubrick changed her mind. Id. no. 22. She questioned whether she could trust Allstate, and asked Neff to obtain clarification "to make it perfectly clear" that the release pertains only to the UIM coverage and does not preclude a future bad faith claim against Allstate. Letter of 10/22/00 from Kubrick to Neff (Ex. E to Ex. 30). She asked Neff to negotiate a revised release with Allstate that explicitly preserved her bad faith claim and indicated that she would sign such a release. See RFA nos. 25-26.

On October 30, 2000, counsel for Allstate sent a letter to Neff confirming that the $ 600,000 settlement between Allstate and the Estate [*18]  did not include any consideration for a release of future bad faith claims against Allstate. RFA no. 27; Letter of 10/30/00 from Riemenschneider to Neff (Ex. F to Ex. 30). Neff forwarded this letter to Mrs. Kubrick that same day and asked her to sign the Allstate release. RFA nos. 29-31; Letter of 10/30/00 from Neff to Kubrick (Ex. G to Ex. 30). Mrs. Kubrick was aware of Allstate's confirmation that the $ 600,000 settlement did not include any consideration for a release of bad faith claims against Allstate. RFA no. 32.

On November 2, 2000, Mrs. Kubrick informed Neff that she and her husband were still unwilling to sign the release because Mrs. Kubrick believed that the release, as drafted, waived a future bad faith claim by the Estate. RFA nos. 33-34. Neff responded that same day by in-forming the Kubricks that he intended to file a Petition to Enforce the Settlement with Allstate unless they signed Allstate's release. RFA no. 35; Letter of 11/2/00 from Neff to Kubrick (Ex. H to Ex. 30). Mr. Kubrick responded by repeating Mrs. Kubrick's request that Neff obtain a revised release specifically preserving the Estate's bad faith claim. RFA no. 37; Letter of 11/2/00 from W. Kubrick to [*19]  Neff (Ex. I to Ex. 30).

On November 10, 2000, Neff filed a Petition to Enforce Settlement in the Court of Common Pleas of Philadelphia County. RFA no. 40. On November 13, 2000, Mr. Kubrick informed Neff that he would sign the release drafted by Mrs. Kubrick. RFA no. 41. On January 13, 2001, Allstate agreed to accept the Kubricks' version of the release. On January 15, 2001, Neff so informed the Kubricks and asked them to sign the release. RFA nos. 43-45; Letter of 1/15/01 from Neff to Kubrick (Ex. J to Ex. 30).

The Kubricks, however, then refused to sign the release that they had drafted. RFA no. 47. On February 28, 2001, Mr. Kubrick filed a motion in the Court of Common Pleas alleging that Neff had entered into the settlement with Allstate without the Kubricks' knowledge or consent, rejecting the $ 600,000 settlement, and stating that he wanted to take his UIM claim to arbitration. RFA nos. 48-53. Mr. Kubrick included similar allegations in his March 14, 2001 motion for summary judgment, and asked the court to award $ 900,000 for the Estate's UIM claim against Allstate. RFA nos. 54-57.

On April 11, 2001, Allstate responded to Mr. Kubrick's February 28, 2001 motion and his motion [*20]  for summary judgment. On June 7, 2001, the court granted the Kubricks's request for a stay until they could obtain new counsel, and permitted Neff to withdraw as counsel for the Estate. RFA. nos. 61-62.

In July 2001, Mrs. Kubrick requested that Allstate send her a revised release of the UIM claim that explicitly preserved the Estate's right to file a bad faith claim. RFA. no. 63. On July 17, 2001, counsel for Allstate agreed to provide Mrs. Kubrick with a release that contained the language she had requested. RFA no. 64; Letter of 7/17/01 from Riemenschneider to Kubrick (Ex. K to Ex. 30) ("I enclose herewith a copy of the release which incorporates your suggested provision."). Allstate executed the release on July 23, 2001 and forwarded it to Mrs. Kubrick for her signature. That release was in all relevant respects identical to the release that Allstate agreed to execute six months before, on January 13, 2001. RFA nos. 66-68, 76. The Kubricks executed the release on August 21, 2001. RFA no. 74; Underinsured Release (Ex. M to Ex. 30).

The Court of Common Pleas approved the settlement on November 21, 2001, but prohibited Allstate

from issuing any funds to the Estate until Mrs. Kubrick [*21] filed a copy of the court's order with the Register of Wills in Lackawanna County. RFA nos. 78-79.

On December 18, 2001, Plaintiffs initiated the instant action against Allstate. The Complaint alleges bad faith (Counts 1-5), failure to pay the settlement funds (Count 6), and breach of contract (Count 7). [6]

> 6  Plaintiffs are Pennsylvania citizens and Allstate is an Illinois citizen. Jurisdiction is premised on diversity of citizenship. See *28 U.S.C. § 1332*. The parties agree that Pennsylvania law governs.

Mrs. Kubrick complied with the state court order and Allstate issued a settlement check to the Estate on December 28, 2001. On January 3, 2002, Mrs. Kubrick questioned Allstate about the statement on the check that the money was a "final settlement of any and all claims." RFA no. 82. Allstate agreed that the language on the executed release superseded the language on the settlement check. RFA no. 83. New counsel for the Estate, Robert Stengel, notified counsel for Allstate that [*22] Mrs. Kubrick would accept the settlement check as issued, but on January 9, 2002, Mrs. Kubrick informed counsel for Allstate that Stengel was not her attorney and that she could not accept the check without any qualifying language. RFA nos. 84-86.

At Mrs. Kubrick's request, Allstate issued a second check on January 9, 2002 that did not include the words "final settlement of any and all claims." RFA nos. 87-88. Mrs. Kubrick cashed the check. After attorneys' fees and costs, the Estate received approximately $ 350,000. Kubrick Dep. at 121-22.

## II. SUMMARY JUDGMENT STANDARD

The Court will render summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any show that there is no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. A factual dispute is "material" [*23] only if it might affect the outcome of the suit under governing law. *Id. at 248*. All inferences must be drawn, and all doubts resolved, in favor of the non-moving party. *United States v. Diebold, Inc., 369 U.S. 654, 655, 8 L. Ed. 2d 176, 82 S. Ct. 993 (1962).* [7]

> 7  Plaintiffs take some issue with the undersigned's required procedure on summary judg-

ment, which directs the moving party to first file a very brief statement, generally not to exceed three pages, identifying the issues to which the motion is directed. The nonmoving party is then directed to respond with supporting evidence demonstrating that summary judgment is not appropriate. See Judge Rufe's Required Procedure on Summary Judgment for Those Moving under *Rule 56(b)* ("Required Procedure") (Ex. 35).

Plaintiffs argue that Allstate's initial moving paper, which conforms exactly to the Required Procedure, fails to meet Allstate's burden to establish the absence of a material fact under *Federal Rule of Civil Procedure 56*. See *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)* ("Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."). Plaintiffs contend, therefore, that the burden has not shifted to them, the nonmoving party, and that summary judgment is precluded. See Plff.'s Resp. at 7-8.

Plaintiffs misunderstand the burden-shifting machinations of *Rule 56*. In the case at bar, Plaintiffs bear the burden at trial of demonstrating by "clear and convincing evidence" that Allstate acted in bad faith. See *Polselli v. Nationwide Mut. Fire Ins. Co., 23 F.3d 747, 750 (3d Cir. 1994)*. Defendant's Motion for Summary Judgment asserts (and specifically certifies under *Rule 11*) that there is no evidentiary basis upon which Plaintiffs can meet their burden. This initiates the motions practice, and the Court will only award summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex, 477 U.S. at 322*. Just as plaintiffs must do in order to defeat a defendant's motion for a judgment as a matter of law under *Rule 50(a)*, a plaintiff responding to a defendant's motion for summary judgment under the Required Procedure must marshal its evidence and demonstrate that a reasonable jury could find in its favor. Cf. *Anderson, 477 U.S. at 250* (the "standard [for granting summary judgment] mirrors the standard for a directed verdict under *Federal Rule of Civil Procedure 50(a)* . . . ."). Adherence to the Required Procedure is con-

sistent with the purpose of *Rule 56*, which is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense. See *Goodman, 534 F.2d at 573*.

The Required Procedure directs the moving party to file a Reply to the nonmoving party's Response; if after doing so it fails to identify those portions of the record demonstrating an absence of a genuine issue for trial and that it is entitled to judgment as a matter of law, the motion will be denied. There is nothing about this process that is unfair or inconsistent with *Rule 56* or Supreme Court precedent.

## [*24] III. BAD FAITH INSURANCE PRACTICES UNDER PENNSYLVANIA LAW

Pennsylvania's bad faith statute provides:

In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:

(1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.

(2) Award punitive damages against the insurer.

(3) Assess court costs and attorney fees against the insurer.

*42 Pa. Cons. Stat. Ann. § 8371 (West 1998).* The statute does not define "bad faith," but Pennsylvania courts utilize the following definition:

Any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (i.e. good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith.

*Terletsky v. Prudential Prop. & Cas. Ins. Co., 437 Pa. Super. 108, 649 A.2d 680, 688 (Pa. Super. Ct. 1994)* **[*25]** (quoting Black's Law Dictionary 139 (6th ed. 1990)). A recovery for bad faith requires "clear and convincing evidence of bad faith, rather than mere insinuation, and a showing by the insured that the insurer did not have a reasonable basis for denying benefits under the policy and that the insurer knew of or recklessly disregarded its lack of a reasonable basis in denying the claim." *Zimmerman v. Harleysville Mut. Ins. Co., A.2d , 2003 PA Super 227, 2003 Pa. Super. LEXIS 1754, 2003 WL 21356757, at *6 (Pa. Super. Ct. June 12, 2003)* (quoting *Williams v. Nationwide Mut. Ins. Co., 2000 PA Super 110, 750 A.2d 881 (Pa. Super. Ct. 2000))*; see also *W.V. Realty, Inc. v. Northern Ins. Co., 334 F.3d 306, 311-12 (3d Cir. 2003)*. Conversely, a defendant may prevail at the summary judgment stage by "affirmatively demonstrating a reasonable basis for its actions." *Quaciari v. Allstate Ins. Co., 998 F. Supp. 578, 581 n.3 (E.D. Pa.),* aff'd, *172 F.3d 860 (3d Cir. 1998)* (Table).

Bad faith claims are highly fact-specific and depend on the conduct of the insurer vis-a-vis its insured. *Zimmerman, 2003 Pa. Super. LEXIS 1754, 2003 WL 21356757, at *7.* The **[*26]** clear and convincing evidence standard requires evidence "so clear, direct, weighty and convincing as to enable the court to make its decision with a clear conviction." *Polselli, 23 F.3d at 752* (internal quotations and citations omitted). The plaintiff's burden in opposing summary judgment is "commensurately high because the court must view the evidence presented in the light of the substantive evidentiary burden at trial." *Kosierowski v. Allstate Ins. Co., 51 F. Supp. 2d 583, 588 (E.D. Pa. 1999),* aff'd, *234 F.3d 1265 (3d Cir. 2000)* (Table).

## IV. DISCUSSION

Allstate seeks summary judgment as to all of Plaintiffs' claims. Specifically, it argues that: (1) Mr. Kubrick has no standing to pursue a bad faith claim; (2) Plaintiffs' bad faith claims are time-barred and/or fail as a matter of law; (3) Plaintiffs' claim that Allstate failed to pay the settlement of $ 600,000 is moot because Allstate did, in fact, issue a check for $ 600,000, which Mrs. Kubrick cashed; and (4) Plaintiffs' breach of contract claim alleging failure to pay up to the limits of the Allstate Policy's UIM coverage is barred by the settlement release.

Plaintiffs **[*27]** offer little or no argument in opposition to three of these four arguments. First, Plaintiffs concede that Allstate's payment of the $ 600,000 settlement amount moots any breach of contract claim. Plff.'s

Resp. at 11. Accordingly, summary judgment as to Count Six of the Complaint is appropriate.

Second, Plaintiffs fail to address adequately whether Allstate may be liable for failure to pay the full $ 900,000 available under the Allstate Policy's UIM coverage. In any event, that claim is clearly barred by the release. It states that the $ 600,000 payment to the Estate is "in settlement of the underinsured motorist protection coverage on [the Allstate Policy] because of bodily injuries sustained by Timothy Kubrick by reason of the October 5, 1985 accident. See Underinsured Release (Ex. 34). By signing the release, Plaintiffs waived any right to seek further money from Allstate under the UIM provisions of the Allstate Policy. Accordingly, summary judgment is appropriate as to Count Seven.

Third, Plaintiffs offer no rebuttal to Allstate's contention that Mr. Kubrick has no standing to pursue a bad faith claim, perhaps because this is clearly correct. Pennsylvania's bad faith statute [*28] provides that "if the court finds that the insurer has acted in bad faith toward the *insured*," the court may award the plaintiff interest on the amount of the claim, punitive damages, and costs and attorneys' fees. *42 Pa. Cons. Stat. Ann. § 8371* (emphasis added). Therefore, only an "insured" may bring a bad faith action against an insurer. Although Mr. Kubrick owned the Allstate Policy, he was not the insured for purposes of the Estate's UIM claim; rather, the insured was Timothy Kubrick, and after his death, the Estate. Accordingly, only the Estate was entitled to pursue a UIM claim. It follows that only the Estate, through the Administratrix, may bring a bad faith claim arising from Allstate's handling of the UIM claim. As such, summary judgment is appropriate as to any claims asserted by Mr. Kubrick.

The heart of Defendant's Motion addresses whether Mrs. Kubrick, as the Administratrix of the Estate, can adduce clear and convincing evidence to demonstrate that Allstate acted in bad faith. Plaintiffs advance their bad faith claims on essentially two aspects of Allstate's administration of the Estate's UIM claim: (1) Allstate's unwarranted delay in bringing [*29] the Estate's UIM claim to arbitration, occasioned by Allstate's concealment of the sign-down waiver and its lengthy investigation of the Estate's claim; and (2) Allstate's conduct in negotiating the form of the settlement release. Each of these issues is discussed below.

**A. Whether Allstate Acted in Bad Faith by Unreasonably Delaying Arbitration of the Estate's UIM Claim**

Plaintiffs allege that Allstate concealed the "nonexistence" of the sign-down waiver when Plaintiffs made their initial requests for it in 1989, and then again after Plaintiffs renewed their requests in 1997 and thereafter. Plff.'s Resp. at 3. They contend that Allstate's deceitful and obstreperous insistence that the sign-down waiver could and would be located unreasonably delayed the arbitration of the UIM claim.

In addition, Plaintiffs fault Allstate for undertaking an investigation of certain issues relating to Allstate's liability for the Estate's UIM claim. As outlined above, Allstate investigated whether Timothy was driving the Dodge Demon at the time of the accident. Under the Allstate Policy, if Timothy had been driving the Dodge Demon, and thereby caused the accident, UIM benefits would [*30] not lie. In addition, Allstate investigated whether Timothy was living with his father at the time of the accident. If he was not living in his father's household, he would not have qualified as an insured under the Allstate Policy. In other words, Plaintiffs complain that Allstate unreasonably delayed administration of the Estate's UIM claim by investigating potential defenses against liability.

**1. The Missing Sign-Down Waiver**

As noted supra at page 3, Plaintiffs' attorney, Mr. Helbig, asked for the sign-down waiver on October 9, 1989. By December 5, 1989, after an "extensive search" of company storage facilities, Allstate concluded that the sign-down waiver could not be located. It is undisputed that Allstate did not reveal the results of its internal search to Plaintiffs at this time.

Contrary to Plaintiffs' contention, Allstate's failure to disclose that the sign-down waiver was missing had no material effect on the administration of the Estate's UIM claim. [8] Contemporaneous with Allstate's internal attempts to retrieve the sign-down waiver, Allstate and Helbig corresponded regarding the issue of Allstate's liability. Allstate took the position that it was not liable [*31] for the Estate's UIM claim unless and until the Estate had exhausted the applicable bodily injury limits in the State Farm and Transamerica policies. The Estate's attorney, Neff, agreed at that time that Allstate's position was correct and ceased pursuit of the Estate's UIM claim against Allstate. [9] Therefore, the undisputed facts show that Allstate refused to arbitrate the Estate's UIM claim in 1989 not because of the missing sign-down waiver, but because Plaintiffs had not yet exhausted other coverage. This was an eminently reasonable position to take, and thus it cannot be the basis for a bad faith claim. See *Quaciari, 998 F. Supp. at 581 n.3* (noting that defendant may prevail at summary judgment stage by "affirmatively demonstrating a reasonable basis for its actions"); *Jung v. Nationwide Mut. Fire Ins. Co., 949 F. Supp. 353,*

2004 U.S. Dist. LEXIS 358, *

*361 (E.D. Pa. 1997)* ("Nationwide had a reasonable basis to investigate and deny the claim; therefore, their subsequent and related conduct is not bad faith."). Moreover, Plaintiffs have failed to demonstrate any harm to the Estate arising from these 1989 events, and harm is an essential element of a bad faith claim. *Quaciari, 998 F. Supp. at 584 n.9.* [*32]

> 8    It is worth noting at the outset that Allstate never disputed that Mr. Kubrick had paid for some UIM coverage. The only dispute arising from the missing sign-down waiver was the level of coverage.
>
> 9    The undisputed evidence shows that Allstate also identified other deficiencies in the Estate's UIM claim in 1989, including whether Timothy was driving and whether Timothy was a resident of his father's home. It appears from the record, however, that Allstate relied primarily upon the exhaustion issue in denying the claim in 1989. See Letter of 1/24/90 from Everett to Helbig ("It is our position that there is no UIM claim on this file until your clients collects **all** liability protection in effect which you indicated was $ 400,000."); Letter of 11/20/89 from Everett to Helbig ("If and when it is determined we have a UIM exposure we will need to investigate the liability and residency issue.").

The issue of the sign-down waiver arose again when Plaintiffs renewed their request for arbitration [*33] on November 10, 1997. At that time, Allstate began a second search for the sign-down waiver. Allstate contends that its 1989 search was limited in scope insofar as it did not extend to other possible document repositories, such as the files of its insurance agents. See Claim Diary Entry of 5/27/99 (Ex. 50) (noting that Allstate contacted Mr. Kubrick's former insurance agent and learned that agent had developed Alzheimer's disease). Plaintiffs offer no evidence to contradict this contention. Given that locating the sign-down waiver could have meant a difference in coverage of $ 45,000 versus $ 900,000, Allstate was certainly entitled to search for the document. In any event, it is undisputed that Allstate did not inform Plaintiffs until October 1999 that it definitely could not locate the sign-down waiver.

As noted supra at pages 5-6, prior to the Superior Court's decision in *Boyle, 441 Pa. Super. 103, 656 A.2d 941,* Plaintiffs did not have a viable UIM claim against Allstate because they had not exhausted other available coverage. Nonetheless, the Estate still needed to seek UIM benefits from Timothy's insurer, State Farm, before it could seek UIM benefits from Allstate. [10] The [*34] Estate's attorney, Neff, knew this to be true, and thus pursued a claim against State Farm before pursuing a claim against Allstate. Neff. Dep. at 22-23. The Estate eventually settled with State Farm on December 15, 1999, but not until after many months of delay attributable to Mrs. Kubrick. Accordingly, the Estate did not have a ripe UIM claim against Allstate until two years after it initially requested the sign-down waiver. It is difficult to see how this course of events could give rise to a claim of bad faith unless the Court were to demand that insurers put the cart (the coverage limits) before the horse (the ultimate question of liability). [11]

> 10    As Allstate correctly notes, Boyle allowed an insured to bring a claim against a secondary carrier when the insured had settled with the primary carrier for less than full policy limits, but it does not necessarily permit an insured to assert a claim against a secondary carrier before settlement of the claim by the primary carrier.
>
> 11    Allstate cites one cogent example of why it would have been imprudent for Allstate to conduct a full investigation of the Estate's claim until after the Estate had settled with State Farm. It notes that had the Estate's claim against State Farm gone to arbitration, and had it been established at arbitration that Timothy was at fault for the accident, the doctrine of issue preclusion would have estopped the Estate from asserting a subsequent claim for UIM benefits against Allstate.

[*35]    In addition to the exhaustion issue with respect to the State Farm policy, the same liability issues that existed in 1989 remained unresolved in 1997. The evidence shows that both sides knew there was "a great deal of investigation to be completed on both sides." Letter of 11/26/97 from Feher to Neff. Accordingly, Allstate undertook an extensive investigation of the issues of Timothy's residency (the "residency issue") and the identity of the driver of the Dodge Demon (the "driver issue") at the time of the accident. Furthermore, by this time, the statute of limitations was a concern, as well as the issue of whether Plaintiffs had accepted a tort settlement without Allstate's consent. Although the issues were somewhat different, the Estate and Allstate appeared to be in much the same position they were in 1989; both sides acknowledged that there was a question as to Allstate's liability.

As a result, in Allstate's view, the issue of the sign-down was again secondary to the issue of liability. See, e.g., Letter of 12/15/97 from Feher to Neff ("Before I begin to investigate the availability of sign-down waivers, we must first determine if there is a valid UIM claim. . . ."). Plaintiffs' [*36] attorney did not object. Rather, he responded by asserting that "all of the [liability] issues you raised are appropriate issues for an arbitration pan-

el." Letter of 12/16/97 from Neff to Feher (attached to Plff.'s Resp. at Ex. F). Soon thereafter, Allstate initiated its investigation by, among other things, requesting a sworn statement from a representative of the Estate. As Plaintiffs concede, Allstate had every right to investigate the Estate's claim. See Plff.'s Sur-Reply at 9-10; see also *Jung, 949 F. Supp. at 361* (law of bad faith does not "interfere with an insurance company's right to investigate and litigate" legitimate defenses).

There is almost no documentation regarding events between January 1998 and June 1999, when Allstate renewed its request for a sworn statement from a representative of the Estate. For reasons not apparent from the record, Mrs. Kubrick did not appear for such a statement until six months later, in December 1999. While it appears that the investigation of the Estate's UIM claim was lengthy, the evidence of record suggests that Allstate -- not the Estate -- took the initiative in reviving an apparently dormant file when it contacted **[*37]** Mr. Kubrick's former insurance agent in May 1999 and renewed its request for a sworn statement in June 1999. Only a few months later, in October 1999, Allstate informed Plaintiffs that the sign-down waiver was missing.

While it appears that there was a lengthy delay between the Estate's November 1997 request for the sign-down waiver and Allstate's October 1999 admission that the document was missing, there is simply no evidence that Allstate's ill will, dishonest or frivolous conduct, or unfounded obstruction caused the delay. Rather, it appears that this time was consumed by a period of inactivity by both parties, and/or by investigation of Allstate's liability on the UIM claim. In fact, Allstate was still investigating its liability on the UIM claim when it admitted that the sign-down waiver was lost. Accordingly, the record does not support Plaintiffs' contention that Allstate's fruitless but justified search for the sign-down waiver caused any unreasonable delay in the administration of the UIM claim. [12]

> 12 This case is distinguishable from the case on which Plaintiffs principally rely, *Leab v. Cincinnati Ins. Co., No. Civ.A.95-5690, 1997 U.S. Dist. LEXIS 8868, 1997 WL 360903 (E.D. Pa. June 26, 1997).* There, the court concluded that an insurer's two-year delay in producing a requested sign-down waiver could support a jury verdict of bad faith. *Id. at *8-9.* However, unlike the case at bar, the insurer's liability was never at issue in Leab. Rather, the only question was whether the insured had executed a sign-down waiver. Moreover, the jury's verdict rested not only on evidence of unwarranted delay, but also on the fact that the insurer in Leab eventually produced three different sign-down waivers --

two with different dates and one completely blank -- and provided only "feeble explanations" for such an error.*Id. at * 8.* Finally, the court in Leab concluded that the insurer's delay in locating the sign-down waiver "contributed in part to the lengthy period of time between the date of the first demand and the final payment of $ 35,000." *Id. at * 9.* As explained supra, Plaintiffs have failed to produce any evidence that the Allstate's inability to locate the sign-down waiver had a material effect on its administration of the Estate's UIM claim.

**[*38]**　The "clear and convincing" evidence standard places a demanding burden on Plaintiffs. They have failed to come forward with the requisite evidence that is "so clear, direct, weighty and convincing" that one could reasonably find against the defendant insurer "without hesitancy" and "with a clear conviction." *Polselli, 23 F.3d at 752; U.S. Fire Ins. Co. v. Royal Ins. Co., 759 F.2d 306, 309 (3d Cir. 1985).* Accordingly, Plaintiffs cannot base a claim for bad faith on the events surrounding the missing sign-down waiver.

**2. Allstate's Investigation of the Driver and Residency Issues**

Plaintiffs argue that Allstate's investigation of the various issues relating to its liability on the Estate's UIM claim substantially delayed administration of the claim. They characterize Allstate's investigation as cumulative, inefficient and untimely such that Allstate ultimately prevented resolution of the UIM claim until September 2000. Such conduct, Plaintiffs contend, gives rise to a claim of bad faith. See *O'Donnell v. Allstate Ins. Co., 1999 PA Super 161, 734 A.2d 901, 906 (Pa. Super. Ct. 1999)* ("An action for bad faith may also extend to **[*39]** the insurer's investigative practices."). Some of these arguments overlap with those discussed above with respect to Allstate's search for the missing sign-down waiver.

There is no bad faith unless the Estate can show, through clear and convincing evidence, that Allstate did not have a reasonable basis for its investigatory actions and that Allstate knew of or recklessly disregarded its lack of a reasonable basis for its actions. See *Polselli, 23 F.3d at 751; Kosierowski, 51 F. Supp. 2d at 589* (in determining whether there was bad faith conduct, "courts have looked to the degree to which a defendant *knew* that it had no basis to deny the claimant.");*Zimmerman, 2003 Pa. Super. LEXIS 1754, 2003 WL 21356757, at *6.* Allstate contends that it had a reasonable basis for undertaking the investigation and that its manner of execution, given the scope of issues, was appropriate. As Plaintiffs concede, it is beyond reproach that an insurer is entitled to investigate legitimate defenses against claims by its

insureds. See, e.g., *Jung, 949 F. Supp. at 361* ("The law [of bad faith] is meant to dissuade an insurance company from using its economic power [*40] to coerce and mislead insureds; it does not purport to interfere with an insurance company's right to investigate and litigate [a] legitimate [defense]."). Plaintiffs base their bad faith claim on the manner in which Allstate conducted its investigation and argue that it resulted in unreasonable delay.

The evidence of record belies Plaintiffs' contention that the investigation was untimely and should have been conducted in 1989. As the discussion supra at Part III.A.1 demonstrates, the Estate's 1989 UIM claim against the Allstate Policy was premature because the Estate had not yet exhausted other available coverage. The Estate's attorney at the time, Mr. Helbig, acknowledged this fact and tabled the claim. Allstate acted reasonably by closing the case file. Therefore, there is no support in the record for the notion that Allstate should have conducted a thorough investigation of the many unresolved factual issues relating to its liability on the Estate's UIM claim in 1989.

The evidence of record also belies Plaintiffs' contention that the *scope* of the investigation unreasonably delayed resolution of the claim. As noted supra at Part III.A.1, all parties involved knew [*41] that the residency and driver issues were potential complete defenses to Allstate's liability. There is a good deal of conflicting evidence as to each of these questions. [13] Upon consideration of the entire record, no reasonable juror could conclude that Allstate lacked good grounds to investigate these questions. Cf. *Kosierowski, 51 F. Supp. 2d at 590-91* (given "persistent disputes" as to the value of a claim, "it cannot be said that Allstate acted unreasonably in asking for clarification from the plaintiff in the form of a statement under oath").

> 13    There was considerable evidence suggesting that Timothy did not live with his father in Dickson City, Lackawanna County, Pennsylvania at the time of the accident, but rather that he lived in a cottage in Lake Ariel, Wayne County, Pennsylvania. Timothy's Certificate of Death lists his mailing address as Dickson City, but it states that Timothy "actually lived" in Wayne County, where the accident occurred. Certificate of Death (Ex. 40). Timothy garaged the Dodge Demon at the cottage in Wayne County. Kubrick Statement at 51-52 (Ex. 41). An attendant at a gas station located near the Lake Ariel cottage told an Allstate investigator that Timothy lived in a house in Wayne County and that he had seen the Dodge Demon parked there "many, many times." Bieber Report at 20 (Ex. 28). Timothy slept at the cottage in Wayne County the night before the accident, which occurred a "couple" of miles away. Kubrick Dep. at 34; Kubrick Statement at 57. Allstate's investigator spoke with at least 3 people who either stated that Timothy did not live with his parents in Lackawanna County or that he actually lived in Wayne County. Bieber Report at 6-9; 24-25. Timothy also owned property in Wayne County, and a former girlfriend told investigators that Timothy told her about purchasing a house in the same area where the cottage is located. Deed (Ex. 42); Bieber report at 11.

> Similarly, there was considerable evidence suggesting that Timothy was driving the Dodge Demon at the time of the accident. Timothy owned the Dodge Demon, and the initial accident investigation report lists Timothy as the driver. Helbig Dep. at 94-95; Police Accident Report. Michini maintained that he was a passenger and Timothy was driving the vehicle. Michini's hospital discharge summary states that he was a passenger in the vehicle. Discharge Summary (Ex. 43). The autopsy report also identifies Timothy as the driver. Wayne County Coroner Report at 2 (Ex. 44). In addition, Michini stated that "Tim was not the kind of guy that would allow" him to drive the Dodge Demon. Bieber Report at 9; Letter of 10/25/91 from Rutter to Kubrick at 1 (Ex. 46) ("Mr. Michini has . . . said that your son would not have permitted him to [drive the Dodge Demon.]"). There has never been any judicial determination on this issue.

> There exists contrary evidence that Timothy did, in fact, reside in his father's house in Lackawanna County, see, e.g., Kubrick Statement at 20-28, and that Timothy was not driving the Dodge Demon at the time of the accident. See, e.g., Bieber Report at 20. Nonetheless, given the substantial contradictory evidence concerning these important questions, the Court cannot conclude that Allstate acted unreasonably when it undertook a formal investigation of these issues.

[*42]    Furthermore, the evidence of record also belies Plaintiffs' contention that the *duration* of the investigation unreasonably delayed resolution of the claim. Allstate began its external investigation of the Estate's UIM claim on January 23, 1998 by asking for a statement from a representative of the Estate. On January 28, 1998, the Estate's attorney objected because the Estate representative, Mrs. Kubrick, had no personal knowledge of the accident, [14] and because he believed such a statement was "premature."

14    Counsel's objection is puzzling considering that Mrs. Kubrick clearly had personal knowledge of several other questions related to liability, such as the residency issue. The Court notes that it is common practice for insurers to require sworn statements in support of insurance claims. See, e.g., *O'Donnell, 734 A.2d at 903 n.4* ("An Examination under Oath, customary in the insurance industry, is akin to a deposition only to the extent that the insured is questioned by the insurer, under threat of perjury, regarding the circumstances of the loss. . . .").

**[\*43]**  The parties have failed to identify any correspondence between them for the next seventeen months, or until June 28, 1999, when Allstate contacted the Estate to renew its request for a statement from a representative of the Estate. Mrs. Kubrick did not appear for a statement under oath until December 7, 1999, or nearly two years after Allstate's initial request. [15]

15    Plaintiffs provide no explanation for this delay of nearly two years. The Court can only speculate that Plaintiffs may have been focusing their energies on their UIM claim against State Farm, which was a precondition to a successful UIM claim against Allstate.

Shortly after the Estate renewed its UIM claim on November 10, 1997, Allstate began analyzing the extensive paper trail left in the wake of years of litigating the Estate's other insurance claims. After identifying numerous issues for consideration, it began the process of collecting "several thousand pages of documents" to determine the course of events since 1985, including pleadings **[\*44]**  and deposition transcripts from the underlying lawsuits, as well as correspondence among the various attorneys, litigants and parties. Def.'s Reply at 10-11; see Claim Diary Entry of 5/27/99 (documenting record request to Allstate insurance agent); Letter of 6/28/99 from Riemenschneider to Neff (requesting underlying claim files from counsel for the Estate).

The Bieber investigation followed immediately after Mrs. Kubrick gave her December 7, 1999 statement, and Bieber issued its report on March 22, 2000. The parties have identified no further activity until September 29, 2000, when they agreed to settle the Estate's UIM claim for $ 600,000. Negotiations concerning the settlement and release followed. See discussion infra at Part IV.B.

The Court cannot quibble with Plaintiffs' contention that Allstate's investigation of the UIM claim was lengthy. However, Plaintiffs have come forward with no evidence that the delay was occasioned by Allstate's ill will, frivolous conduct, dishonest purpose or unreasonable self-interest. Conspicuously absent is any evidence

that, during the January 1998 to March 2000 investigation period, Plaintiffs were prodding Allstate to conclude its **[\*45]**  investigation or otherwise resolve the UIM claim. Nor is there any evidence that Allstate needlessly retread old ground or pursued irrelevant material. Rather, as noted supra, the evidence suggests that this period of time was consumed by a period of inactivity by both parties, and/or by Allstate's investigation. "If delay is attributable to the need to investigate further[,] . . . no bad faith has occurred." *Kosierowski, 51 F. Supp. 2d at 589.* Moreover, Mrs. Kubrick's delay in appearing for a statement under oath suggests that she played some role in delaying administration of the Estate's UIM claim. Cf. *Quaciari, 998 F. Supp. at 582-83* ("The time delay in resolving the claim seems equally attributable to both plaintiff and defendant; even if all delay were attributable to Allstate, it would not, without more, be sufficient to establish bad faith."). Accordingly, Plaintiffs cannot make out a claim of bad faith based on the notion that Allstate's lengthy investigation unreasonably delayed resolution of the Estate's UIM claim. [16]

**B. Whether Allstate Acted in Bad Faith When Negotiating the Settlement and Release**

16    In light of the Court's conclusion as to the merits of Plaintiffs' bad faith claims premised on pre-1999 conduct, the Court need not address Allstate's argument that some of Plaintiffs' claims are barred by the statute of limitations.

**[\*46]**  Because Allstate could not locate the sign-down waiver, it conceded that the Allstate Policy provided $ 900,000 in UIM coverage. Plaintiffs allege that Allstate acted in bad faith when it made an offer of settlement for $ 600,000, which is $ 300,000 less than the coverage limit. This argument is totally without merit. Where, as here, there are substantial unresolved questions as to the insurer's liability, making an offer for less than the policy limits cannot constitute bad faith. See *Kosierowski, 51 F. Supp. 2d at 592* ("Given the uncertain value of her injuries as well as the difficulty in determining what her recoverable damages would have been, it was not improper for Allstate to negotiate, and no reasonable jury could so find."); *Terletsky, 649 A.2d at 689* (finding no bad faith where insurer evaluated liability of each driver at "fifty-fifty" and therefore made settlement offers fifty percent lower than the value of the cases). As the discussion supra at Part IV.A demonstrates, the residency and driver issues were certainly open to debate. Both parties had the option of risking an arbitrator's decision as to these issues. It is a common and **[\*47]**  pru-

2004 U.S. Dist. LEXIS 358, *

dent practice for litigants to seek the comfort of a certain settlement in favor of the costs and uncertainty attendant to the adversary process. Settlements often involve compromise, and Plaintiffs have offered no evidence that Allstate's offer was unreasonable or that it was made for an improper or frivolous purpose. See *Leo v. State Farm Mut. Auto. Ins. Co., 939 F. Supp. 1186, 1192-93 (E.D. Pa. 1996)* (finding no bad faith based on allegedly low settlement offer when plaintiff failed to come forward with clear and convincing evidence that offer was unreasonable or that insurer knew offer was unreasonable) (Pollak, J.), aff'd, *116 F.3d 468 (3d Cir. 1997)* (Table). As a consequence, no reasonable juror could conclude that Allstate's offer was made in bad faith.

Finally, Plaintiffs contend that Allstate acted in bad faith when it "persisted in requiring Plaintiffs to execute a release not in conformity with the terms of the settlement." Complaint P 39. Plaintiffs contend that the release offered by Allstate was a "general release," and that Allstate unreasonably refused to modify the release to expressly preserve Plaintiffs' right to bring a future **[*48]** bad faith claim against Allstate. Because Plaintiffs have failed to come forward with clear and convincing evidence to that effect, this argument fails.

As an initial matter, it is not bad faith for an insurer to seek a release when settling a disputed claim. See *Leab, 1997 U.S. Dist. LEXIS 8868, 1997 WL 360903, at *6* ("When there is a dispute as to the money owed, it is reasonable, customary, and prudent for an insurer of anyone to get a release as part of the settlement of the disputed claim."). The heart of Plaintiffs' claim goes to the *form* of release proposed by Allstate, purportedly because it sought to sweep within its purview any future bad faith claims. There is simply no evidence to support this contention, let alone "clear and convincing" evidence. To the contrary, as is plainly evident from the factual recitation supra at Part I, Allstate's conduct was reasonable. Even taking the evidence in a light most favorable to Plaintiffs, it appears that the Kubricks, not Allstate, were responsible for delaying final resolution of the settlement. The Kubricks harbored a mistaken belief as to the legal effect of the Allstate release. Both Allstate and the Estate's own attorney repeatedly **[*49]** reassured Mr. and Mrs. Kubrick orally and in writing that the release did not embrace any bad faith claims. [17] The Estate's counsel, in an apparent effort to conclude the settlement, offered to accept responsibility "if through some possible interpretation it was determined that a bad faith claim could not be pursued against Allstate." Letter of 10/19/00 from Neff to Kubrick. Later, Mrs. Kubrick even refused to execute a release that she had drafted. Thereafter, the dispute descended into a litigation posture, with the Kubricks denouncing their attorney and taking positions that are, on this record, inexplicable.

[17]    Allstate's proposed release stated that Allstate would accept $ 600,000 "in full settlement and final discharge of all claims under the underinsured motorist protection coverage under the above numbered policy because of bodily injuries sustained by Timothy Kubrick by reason of" the 1985 accident. (Ex. B to Ex. 30)

The Kubrick's proposed release stated that Allstate would accept $ 600,000 "in settlement of the underinsured motorist protection coverage claim on the above numbered policy because of the bodily injuries sustained by Timothy Kubrick by reason of" the 1985 accident. (Ex. C to Ex. 30).

**[*50]**    Legal agreements can be intimidating and confusing, and responsible parties should always approach the process with some caution. However, in these circumstances, Allstate cannot be held accountable if it was unwilling to accede to the Kubrick's overabundance of caution and undue insistence on a certain form of the release. To be sure, no reasonable jury could conclude that Allstate's conduct was unfounded, frivolous, dishonest or otherwise in bad faith. [18]

[18]    Without the Court's permission, Plaintiffs filed a Supplemental Sur-Reply in Further Opposition to Defendant's Motion, to which Defendant filed a Reply thereto. Plaintiffs' Supplemental Sur-Reply directs the Court to a recent decision by the Superior Court of Pennsylvania, *Hayes v. Harleysville Mut. Ins. Co., 841 A.2d 121, 2003 Pa. Super. 460, 2003 WL 22839277 (2003)*. Hayes concerned an insurer's delay in producing a sign-down form upon a request from its insured, but it is distinguishable from the case at bar. In contrast to the lost sign-down waiver in this case, the insurer in Hayes had the form in its possession throughout its handling of the claim, failed to make a reasonable effort to search its files, and only produced the form to its own attorney on the day of the arbitration. See *id. 841 A.2d 121 at *4*. In contrast, the case at bar is devoid of any evidence that Allstate actively concealed the sign-down form from anyone. Moreover, unlike the case at bar, there is no indication that liability was ever an issue in Hayes. As such, Hayes is inapposite on its facts and has no impact on today's decision.

**[*51] V. THE EXPERT REPORT OF GEORGE C. CULBRETH**

In opposition to Allstate's Motion for Summary Judgment, Plaintiffs submitted the expert report of

George C. Culbreth, and proposed to offer Mr. Culbreth's testimony in support of their bad faith claims. Plaintiffs proffer Mr. Culbreth's testimony on two issues: (1) whether Allstate's investigation was reasonable and timely, and (2) whether Allstate's "concealment of the sign-down waiver" was reasonable. Plaintiff's Resp. in Opp. to Def.'s Motion in Limine at 5.

In his report, Mr. Culbreth reviews the facts and chronology of this case from the 1985 accident through the Estate's UIM claim against Allstate. See 7/11/03 Report of George C. Culbreth ("Culbreth Report") (Ex. 38). Mr. Culbreth's comments appear in bold and interspersed among his factual recitation. For example, after noting that Allstate had informed Neff on December 15, 1997 that it would not investigate the sign-down waiver until certain basic investigation was completed, Mr. Culbreth writes, "Note: Allstate had knowledge since 12-05-89 there was no signed sign down waiver." Id. at 6. The Culbreth Report concludes with a summary that makes a number of general **[\*52]** observations [19] and concludes, "looking back on this scenario, I believe all parties would and should have acted differently. Based on the file information we reviewed, we believe Allstate Insurance Company certainly acted in bad faith until the time they finally referred to counsel. This case should have been resolved many years ago." Id. at 7.

> 19    E.g., "This unfortunate accident, which caused the death of one young man and serious injury to two other young men, has certainly created a trail of events that still continues today. . . . Certainly the courts were tested as well as other individuals and agencies." Id.

Allstate moves to exclude Mr. Culbreth's testimony and report for various reasons under *Federal Rule of Evidence 702, Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993)* and *Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 151, 143 L. Ed. 2d 238, 119 S. Ct. 1167 (1999)*. The Court need not determine **[\*53]** whether his testimony is admissible, however, because it has no effect on the Court's decision.

Plaintiffs concede that Mr. Culbreth cannot testify as to the ultimate issue of whether Allstate acted in bad faith. See Plff.'s Resp. in Opp. to Def.'s Motion in Limine at 7. His opinion on this purely legal question is not relevant or helpful to a jury. See *Weston v. Washington Metro. Area Transit Auth., 316 U.S. App. D.C. 321, 78 F.3d 682, 684 n.4 (D.C. Cir.)* ("An expert witness may not deliver legal conclusions on domestic law, for legal principles are outside the witness' area of expertise under *Federal Rule of Evidence 702*."), amended on other grounds after reh'g, *86 F.3d 216 (D.C. Cir. 1996)*; *United States v. Leo, 941 F.2d 181, 196 (3d Cir. 1991)*

(district court properly "took care to limit Moran's testimony so that he was not giving his opinion as to what the law required");*Kraeger v. Nationwide Mut. Ins. Co., No. Civ.A.95-7550, 1997 U.S. Dist. LEXIS 2726, 1997 WL 109582, at \*1 & n.1 (E.D. Pa. Mar. 7, 1997)*.

The Court will assume, without deciding, that Mr. Culbreth's testimony is admissible, [20] and **[\*54]** that he would testify that Allstate acted unreasonably in administering the Estate's UIM claim. Even so, his opinion is not clear and convincing evidence that Allstate acted in bad faith because, as demonstrated above, the facts of this case cannot support such a conclusion. "When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict." *Advo, Inc. v. Philadelphia Newspapers, Inc., 51 F.3d 1191, 1198-99 (3d Cir. 1995)* (quoting *Brooke Group, Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 242, 125 L. Ed. 2d 168, 113 S. Ct. 2578 (1993)*). Courts in this district have applied this principle to proffered expert testimony when deciding motions for summary judgment in bad faith cases. See *Kosierowski, 51 F. Supp. 2d at 595* ("The mere presence of an expert opinion supporting the non-moving party's position does not necessarily defeat a summary judgment motion: rather, there must be sufficient facts in the record to validate that opinion."); *Dattilo v. State Farm Ins. Co., No. Civ.A.97-1842, 1997 U.S. Dist. LEXIS 16188, 1997 WL 644076, at \*4 (E.D. Pa. Oct. 17, 1997)* **[\*55]** (expert's opinion is not clear and convincing evidence of bad faith because "his conclusion is simply not supported by the facts of this case")

> 20    At least one court in this circuit has questioned the usefulness of such testimony. See *Dattilo v. State Farm Ins. Co., No. Civ.A.97-1842, 1997 U.S. Dist. LEXIS 16188, 1997 WL 644076, at \*4-5 (E.D. Pa. Oct. 17, 1997)* ("[A bad faith case] is not a malpractice case in which the insurer's conduct should be judged by standards of the insurance industry."), aff'd, *168 F.3d 478 (3d Cir. 1998)* (Table).

Accordingly, the Court concludes on the basis of the undisputed material facts of record that Allstate it entitled to summary judgment on all claims. The motion is granted. An appropriate Order follows.

## ORDER

**AND NOW**, this 7th day of January, 2004, upon consideration of Defendant's Motion for Summary Judgment [Doc. # 35], Plaintiffs' Response in Opposition thereto [Doc. # 37], Defendant's Reply [Doc. # 39], Plaintiffs' Sur-Reply [Doc. # 41], **[\*56]** Plaintiffs'

2004 U.S. Dist. LEXIS 358, *

Supplemental Sur-Reply [Doc. # 44], Defendant's Reply to Plaintiffs' Supplemental Sur-Reply [Doc. # 45], and for the reasons set forth in the attached Memorandum Opinion, it is hereby **ORDERED** that Defendant's Motion is **GRANTED**.

Judgement is hereby **ENTERED** in favor of Defendant Allstate Insurance Company and against Plaintiffs on all counts of the Complaint.

Plaintiffs' Motion in Limine for the Admission of Expert Testimony [Doc. # 33] is **DENIED AS MOOT**.

Defendant's Motion in Limine to Exclude the Testimony of George C. Culbreth [Doc. # 40] is **DENIED AS MOOT**.

The Clerk of Court shall mark this case closed for statistical purposes.

It is so **ORDERED**.

**BY THE COURT:**

   **CYNTHIA M. RUFE, J.**



1 of 1 DOCUMENT

**TRAVELERS INDEMNITY COMPANY OF ILLINOIS, Plaintiff, v. ROYAL OAK ENTERPRISES, INC., a foreign corporation; DAN SWEARINGEN, an individual; and JOHN V. TILTON, SR., as Personal Representative of the Estate of JOHN V. TILTON JR., deceased, Defendants.**

**Case No. 5:02-cv-58-Oc-10GRJ**

**UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA, OCALA DIVISION**

*2004 U.S. Dist. LEXIS 29575*

**August 20, 2004, Decided**

**SUBSEQUENT HISTORY:** Motion to strike granted by, Motion to strike denied by *Travelers Indem. Co. v. Royal Oak Enters., Inc., 2004 U.S. Dist. LEXIS 29573 (M.D. Fla., Sept. 2, 2004)*

**PRIOR HISTORY:** *Travelers Indem. Co. of Ill. v. Royal Oak Enters., 2004 U.S. Dist. LEXIS 29574 (M.D. Fla., Aug. 16, 2004)*

**COUNSEL:** **[\*1]** For Travelers Indemnity Company of Illinois, Plaintiff: Andrew Edward Grigsby, Sina Bahadoran, Hinshaw & Culbertson, Miami, FL.

For Royal Oak Enterprises, Inc., a foreign corporation, Defendant: Barry Goheen, King & Spalding LLP, Atlanta, GA; Daniel James King, King & Spalding, Atlanta, GA; Jona J. Miller, King & Spaulding, LLP, Sarasota, FL US; William Harper Phelan, Jr., Bond, Arnett, Phelan, Smith & Craggs, P.A., Ocala, FL.

For Dan Swearingen, an individual, Defendant: William Harper Phelan, Jr., Bond, Arnett, Phelan, Smith & Craggs, P.A., Ocala, FL.

For Royal Oak Enterprises, Inc., Counter Claimant: Barry Goheen, King & Spalding LLP, Atlanta, GA; Daniel James King, King & Spalding, Atlanta, GA; Jona J. Miller, King & Spaulding, LLP, Sarasota, FL US; William Harper Phelan, Jr., Bond, Arnett, Smith & Craggs, P.A., Ocala, FL.

For Travelers Indemnity Company of Illinois, Counter Defendant: Andrew Edward Grigsby, Hinshaw & Culbertson, Miami, FL.

For Dan Swearingen, Counter Claimant: William Harper Phelan, Jr., Bond, Arnett, Phelan, Smith & Craggs, P.A., Ocala, FL.

**JUDGES:** GARY R. JONES, United States Magistrate Judge.

**OPINION BY:** GARY R. JONES

**OPINION**

**ORDER**

**[\*2]** Pending before the Court is Travelers' Motion to Strike or Limit the Expert Witness Report of Jeffrey M. Posner. (Doc. 177.) Royal Oak has submitted a memorandum in opposition (Doc. 189), and the matter is now ripe for the Court's review. For the reasons set forth below, Travelers' Motion (Doc. 177) is due to be **DENIED.**

**BACKGROUND & FACTS**

This is an action for declaratory relief regarding Royal Oak's claims under certain insurance policies issued by Travelers. The claims arise from a wrongful death action filed against Royal Oak in July of 2000, by the estate of John V. Tilton, Jr, who allegedly died while in the course and scope of his employment with Royal Oak. The Tilton estate amended its original complaint in

2004 U.S. Dist. LEXIS 29575, *

August of 2001, to include counts against Royal Oak for its intentional conduct. [1] According to Travelers, the estate added these counts to avoid the exclusivity provisions of the Florida Workers' Compensation Statute. [2]

> 1  Under Count II of its Amended Complaint ("Intentional Tortious Conduct"), the estate alleged that Royal Oak and one of its officers created an unsafe work environment that was substantially certain to result in death.

[*3]

> 2  *See* Travelers' Amended Complaint, Doc. 32, P9.

During the Tilton litigation, Travelers assumed the defense of Royal Oak and hired the law firm of Weiner & Argo to defend Royal Oak, but specifically reserved for itself the right to recoup the cost of defense, including attorney fees, should the Court ultimately determine that there was no duty to defend. The parties to the Tilton suit reached a settlement agreement in July, 2002, whereby Royal Oak and its officer were released from further liability and the estate received $ 750,000.00 from Travelers. As part of the settlement agreement, Travelers and Royal Oak reserved their rights to continue to litigate the declaratory action.

Due to Travelers' and Weiner & Argo's alleged "failure to properly communicate with Royal Oak on basic litigation strategies in the Tilton litigation ... and due to Travelers' reservation of rights," Royal Oak retained separate independent counsel to protect its interests.[3]

> 3  *see* Royal Oak's Amended Counterclaim, Doc. 120 at P177.

[*4] In Count Two of its Amended Complaint, [4] Travelers seeks to recoup the cost of attorney's fees paid to Weiner & Argo for the defense of Royal Oak in the underlying Tilton litigation. Comparably, in Count Eleven of its Amended Counterclaim, [5] Royal Oak seeks to recover all reasonable costs and attorney's fees [6] paid to outside counsel in the underlying Tilton litigation. [7]

> 4  *See* Travelers' Amended Complaint at p. 9.
> 5  Royal Oak's Amended Counterclaim, Doc. 120 at PP167-184.
> 6  *Id.* at P184. Royal Oak hired King & Spaulding and Fisher & Phillips as "independent counsel," and seeks to recover $ 654,832.00 in attorney's fees.
> 7  In the introductory section of its Amended Counterclaim, Royal Oak states that it "seeks damages and other available relief, including attorney's fees for litigating this action, arising from, among other things, (1) Travelers' refusal to

inform Royal Oak concerning certain matters in the action brought by Mr. Tilton's estate; (2) its refusal to consider a settlement offer within policy limits made by Mr. Tilton's estate; (3) its breach of duty to defend by failing to retain mutually agreeable counsel to defend Royal Oak in the Tilton law suit. Travelers' acts caused Royal Oak unnecessarily to incur costly litigation expenses, among other damages, in litigating the tort action brought by Mr. Tilton." *See* Royal Oak's Amended Counterclaim, Doc. 120 at P3.

[*5] In the instant motion, Travelers seeks to strike or limit the expert report submitted by Jeffrey M. Posner on behalf of Royal Oak because it exceeds the scope of this case, "and strays from the purpose of expert witness testimony by purporting to offer legal conclusions..." Specifically, Travelers argues that Posner's legal opinions as to Travelers' duties to defend and indemnify, and his opinions as to the existence of a conflict of interest should be stricken because these are legal conclusions that are left to the Court's determination. Further, Travelers argues that Posner's opinions on bad faith and breach of duty should be stricken because, as the Court has previously dismissed Royal Oak's claims against Travelers for bad faith and breach of duty, such issues are no longer in dispute. Finally, Travelers argues that Posner should be prohibited from offering any testimony about the reasonableness of attorney's fees Royal Oak seeks to recover because he gave no such opinion in his Rule 26 expert report, never reviewed any billing records, and is not an attorney qualified to render such an opinion.

In response, Royal Oak argues that Travelers' motion is due to be denied because [*6] it is "procedurally erroneous." According to Royal Oak, "there is nothing to strike" because Royal Oak has not offered Posner's report in evidence. Further, Royal Oak argues that Travelers' motion is due to be denied because Posner's opinions are proper, and any so-called "legal conclusions" expressed in the report are properly included as the basis and reasons for his opinions. Third, Royal Oak contends that Posner's opinions on bad faith remain relevant to its breach of contract counterclaim still pending before the Court. Finally, Royal Oak maintains that Posner's opinions as to the reasonableness of attorney's fees is proper because it was disclosed in his Rule 26 report and because there is no requirement in the law for an expert on fees to be an attorney.

## DISCUSSION

Determinations on the admissibility of evidence are left to the broad discretion of the district court. [8] However, that discretion is dramatically narrowed where a party seeks to admit expert testimony purporting to offer legal

conclusions, and where a party seeks to admit expert testimony which effectively tells the jury what result to reach. The first type of testimony would impermissibly invade the **[\*7]** province of the Court, and the second type of testimony would impermissibly invade the province of the jury.

> 8    *Montgomery v. Aetna Casualty & Surety Company, 898 F. 2d 1537, 1541 (11th Cir. 1990).*

Here, Travelers argues that Posner's legal opinions as to Travelers' duties to defend and indemnify, and his opinions as to the existence of a conflict of interest should be stricken because these are legal conclusions that are left to the Court's determination. Initially, it is well settled that a determination of the extent of coverage under an insurance policy is a question of law to be decided by the Court. [9] It is further noted that the legal obligations of the parties under a contract [10] and the legal implications of the parties' conduct [11] are likewise left to the Court's determination.

> 9    *Fireman's Fund Insurance Company v. Tropical Shipping and Construction Company, LTD., 254 F. 3d 987, 1003 (11th Cir. 2001) See Also Brooks v. J.C. Penney Life Insurance Co., 231 F. Supp. 2d 1136, 1142 (N.D. Ala. 2002)*(Interpretation of insurance policy and its provisions is a question of law.)

**[\*8]**

> 10    *Marx & Co. v. Diners' Club, Inc., 550 F. 2d 505, 508 (2nd Cir. 1977) cert. denied. 434 U.S. 861, 98 S. Ct. 188, 54 L. Ed. 2d 134 (1977).* ("The basis of expert capacity may be summed up in the term 'experience.' But experience is hardly a qualification for construing a document for its legal effect when there is a knowledgeable gentleman in a robe whose exclusive province it is to instruct the jury on the law. The danger is that the jury may think that the 'expert' in the particular branch of law knows more than the judge - surely an inadmissible inference.") *Quoting* Wigmore on Evidence (s 555).

> 11    *K.W. Plastics, et al. v. United States Can Co., 199 F.R.D. 687, 695 (M.D. Ala. 2000) Citing Montgomery at 1541. See Also Konikov v. Orange County, 290 F. Supp 2d 1315, 1317 (M.D. Fla. 2003)*("It would be inappropriate for a lawyer, as an expert witness, to testify before a jury about matters of domestic law. In contrast to foreign law, domestic law is properly considered and determined by the Court.")

In light of these principles, **[\*9]** and after careful consideration of the parties' arguments and the record as a whole, the Court finds that Posner's report does not

offer legal opinions or conclusions of law. Rather, it discloses a series of opinions as to the customs and practices of the insurance industry concerning the issues in dispute. As those customs and practices throughout Posner's twenty-five (25) years in the field have undoubtedly been shaped by insurance law, it is understandable that some of the statements made in his report reflect this reality. [12]

> 12    For example, at page 21 of his report, Posner states that an insurer owes its insured "a duty to provide an adequate defense free of conflicts." While such a statement may be characterized as a legal conclusion, it merely serves as a backdrop or introduction to Posner's opinions on whether Travelers' interests were in conflict with those of Royal Oak during the Tilton settlement negotiations.

As the Eleventh Circuit has noted, "the law in this circuit pertaining to the admissibility **[\*10]** of an expert's opinion couched in legal terms is not crystal clear." [13] However, where, as here, the substance of the expert's testimony concerns ordinary practices and trade customs which are helpful to the fact-finder's evaluation of the parties' conduct against the standards of ordinary practice in the insurance industry, his passing reference to a legal principle or assumption in an effort to place his opinions in some sort of context will not justify the outright exclusion of the expert's report in its entirety. [14]

> 13    *Hanson v. Waller, LVL, Inc., 888 F. 2d 806, 811 (11th Cir. 1990) Quoting Haney v. Mizell Memorial Hospital, 744 F. 2d 1467, 1474, n. 7 (11th Cir. 1984).*
> 14    *See Maiz v. Virani, 253 F. 3d 641, 667 (11th Cir. 2001)* (Plaintiffs' liability expert, an accounting partner and forensic accounting expert, was qualified to opine on forensic accounting issues, and as part of that process he was entitled to state reasonable assumptions regarding the requirements of the applicable contracts in order to put his opinions in context.); *Aetna Casualty and Surety Company et al., 1995 Del. Super. LEXIS 340, 1995 WL 628447* (Prohibition against legal opinion testimony did not warrant exclusion of expert testimony approximating a legal opinion, but rather "served as a guide to admissible testimony.")

**[\*11]** Turning to Travelers' argument that Posner's opinions on Travelers' alleged bad faith and breach of duty should be stricken because the claims have been dismissed, the Court notes that although the bad faith and breach of fiduciary duty claims against Travelers were indeed dismissed, [15] Royal Oak's breach of contract counterclaim [16] is still pending before the Court. Because

2004 U.S. Dist. LEXIS 29575, *

bad faith cannot be completely divorced from a breach of contract claim under Florida law, [17] such opinions are still relevant to an existing claim, and Royal Oak's continued pursuit of such claims is therefore appropriate at this juncture. [18]

15    *See* Doc. 140.

16    *See* Doc. 120, p. 44.

17    *See Nationwide Mutual Insurance Co. v. McNulty, 229 So. 2d 585, 586 (Fla. 1969)*("The contractual duty of the insured to defend justifies an implication that the insurer will exercise ordinary care and good faith in so proceeding."); *See Also North American Van Lines, Inc. v. Lexington Ins. Co., 678 So. 2d 1325, 1334 (Fla. 4th DCA, 1996)*("bad faith is a sub-category of a breach of contract case.")

**[*12]**

18    For this reason, Travelers' request for sanctions against Royal Oak for "continuing to pursue the stricken claim" is due to be denied.

Travelers' argument that Posner should be prohibited from offering testimony regarding the reasonableness of fees because he did not provide such opinions in his expert report is also without merit. Assuming *arguendo* that Posner did not offer any opinions on the reasonableness of attorney's fees in his expert report, Royal Oak cannot maintain that it has been prejudiced because Posner *did* give an opinion on the reasonableness of fees during the course of his April 27, 2004 deposition. [19] Such testimony was elicited some five (5) months prior to the scheduled trial of this matter. Further, Travelers' expert, Mr. Bryce Ackerman, provided opinions on the reasonableness of fees in his rebuttal report in March 2004. As "failure to make the required expert witness disclosures is harmless when there is no prejudice to the party entitled to the disclosure," [20] Travelers' request to prohibit Posner from offering testimony on the reasonableness of fees is **[*13]** due to be denied.

19    *See* Doc. 177, Ex. B at p. 88.

20    *Id.* Quoting *Nguyen* at 680.

Finally, the Court rejects Travelers' argument that Posner is not qualified to opine on the reasonableness of attorney's fees. Attorney's fees are reasonable if they are consistent with "the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." [21] Proof of the market rate "*may* be comprised of testimony ... from other legal practitioners in the relevant legal community who are familiar with the type of legal ser-

vice provided and the prevailing market rate for such work." [22]

21    *American Civil Liberties Union v. Barnes, 168 F.3d 423, 427 (11th Cir. 1999).*

22    *Schafler v. Fairway Park Condominium Association et al., 324 F. Supp. 2d 1302 (S.D. Fla. 2004).*

**[*14]**    As Royal Oak correctly points out, there is no requirement in the law for an expert witness on attorney's fees to be an attorney. [23] Rather, an attorney's fees expert must simply meet the requirements of *Rule 702 of the Federal Rules of Evidence.* That is, he must have the "skill, experience, training, or education" to qualify as an expert on the testimony offered. Here, Posner reports that he has twenty-five (25) years of experience in the insurance, brokerage, and risk management areas. [24] Throughout the course of this 25 years, Posner negotiated settlements, provided litigation support for insurance coverage litigation, and negotiated and supervised fees paid by insurance companies to outside counsel. [25] Based upon Posner's substantial experience, there is little merit to Travelers' argument that he is not qualified to render an opinion on the reasonableness of attorney's fees in this case.

23    *See Lindley v. Lindley, 1 F.3d 1249 (10th Cir. 1993)*(unpublished opinion)(certified public accountant's expert testimony on reasonableness of attorney's fees was admitted into evidence).

**[*15]**

24    *See* Doc. 177, Ex. A, Posner's Expert Report at p. 30.

25    *Id.* at p. 31.

Based on the foregoing, the Court concludes that Travelers' Motion to Strike or Limit the Expert Witness Report of Jeffrey M. Posner (Doc. 177) is due to be **DENIED.** Furthermore, Travelers' request for sanctions against Royal Oak for continuing to pursue its bad faith and breach of fiduciary duty claims against Travelers (Doc. 177) is likewise due to be **DENIED.**

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on this 20th day of August, 2004

**GARY R. JONES**

**United States Magistrate Judge**