FILED
2011 Nov-09  PM 03:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit B

Page 1

```
 1              IN  THE  UNITED  STATES  DISTRICT  COURT

 2          FOR  THE  NORTHERN  DISTRICT  OF  ALABAMA

 3                    SOUTHERN  DIVISION

 4     - - - - - - - - - - - - - - - - - - x

 5   ALABAMA GAS CORPORATION,              :

 6              Plaintiff,                 :

 7   v.                                    : 2:10-CV-1840-IPS

 8   TRAVELERS CASUALTY AND SURETY         :

 9   COMPANY, et al.,                      :

10              Defendants.                :

11     - - - - - - - - - - - - - - - - - - x

12

13

14            Deposition of KATHLEEN ROBISON

15                  Washington, D.C.

16             Wednesday, November 2, 2011

17                    9:00 a.m.

18

19   Job No.:  80833

20   Pages 1 through 122

21   Reported by:  Cassandra E. Ellis, RPR

22

23

24

25
```

Page 2

1           Deposition of KATHLEEN ROBISON, held at the

2     offices of:

3

4        STEPTOE & JOHNSON

5        1330 Connecticut Avenue, Northwest

6        Washington, D.C.  20036

7        (202) 429-3000

8

9

10

11        Pursuant to agreement, before Cassandra E. Ellis,

12     Registered Professional Reporter and Notary Public of

13     The District of Columbia.

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

```
 1                    A P P E A R A N C E S

 2        ON BEHALF OF PLAINTIFF ALABAMA GAS:

 3             W. SCOTT LASETER, ESQUIRE

 4             KAZMAREK, GEIGER & LASETER, LLP

 5             One Securities Center

 6             Suite 350

 7             3490 Piedmont Road, Northeast

 8             Atlanta, Georgia  30305

 9             (404) 812-0844

10             Slaseter@kglattorneys.com

11

12

13

14

15        ON BEHALF OF DEFENDANT TRAVELERS:

16             FRANK WINSTON, JR., ESQUIRE

17             STEPTOE & JOHNSON, LLP

18             1330 Connecticut Avenue, Northwest

19             Washington, D.C.  20036

20             (202) 429-6482

21             Fwinston@steptoe.com

22

23

24

25
```

Alabama Gas Corporation v. Travelers Casualty, et al.                2:10-CV-1840-IPS
Kathleen Robison                                                     November 2, 2011

Page 4

```
 1                    C O N T E N T S

 2    EXAMINATION OF KATHLEEN ROBISON              PAGE

 3        By Mr. Laseter                           5

 4

 5

 6

 7                    E X H I B I T S

 8            (Attached to the Transcript)

 9    KATHLEEN ROBISON Deposition Exhibit          PAGE

10    Robison 1  Report/Opinion Letter of Kathleen  8

11        Robison

12    Robison 2  August 16, 2011 e-mail chain      12

13    Robison 3  Declarations, Agreements, and     79

14        Conditions Bates Stamped T000296 - T000335

15    Robison 4  May 28, 2009 e-mail chain         93

16    Robison 5  D&B business information report   96

17        Bates Stamped T000271 - T000295

18    Robison 6  November 10, 2008 Letter Bates    111

19        Stamped T000022 - T000025

20

21

22

23

24

25
```

Alabama Gas Corporation v. Travelers Casualty, et al.              2:10-CV-1840-IPS
Kathleen Robison                                November 2, 2011

Page 5

```
 1                  P R O C E E D I N G S
 2                    KATHLEEN ROBISON
 3    having been first duly sworn, testified as follows:
 4      EXAMINATION BY COUNSEL FOR PLAINTIFF ALABAMA GAS
 5  BY MR. LASETER:
 6          Q    Good morning, is it Ms. Robison or Robison?
 7          A    Robison.
 8          Q    Robison?  Thank you.  My name's Scott
 9  Laseter.  We met a moment ago, I'm an attorney for
10  Atlanta -- excuse me -- Alabama Gas Corporation.  We
11  refer to Alabama Gas Corporation as Alagasco, would
12  that be okay with you?
13          A    That would be okay with me.
14          Q    Also in this matter we have referred to the
15  defendants, together, as Travelers, if I refer to the
16  insurance carrier all as a single entity, as
17  Travelers, would that be okay with you?
18          A    That's okay.
19          Q    Are you aware that this deposition is in a
20  lawsuit in which Alagasco is seeking coverage from
21  Travelers for environmental costs in Huntsville,
22  Alabama, MVP Street?
23          A    Yes.
24          Q    When were you engaged in this matter?
25          A    I believe I was engaged in August of, let's
```

Alabama Gas Corporation v. Travelers Casualty, et al.
Kathleen Robison

2:10-CV-1840-IPS
November 2, 2011

Page 6

1    see, August of this year.

2        Q   Would you have -- a -- an engagement

3    agreement?

4        A   Yes.

5            MR. LASETER:  Frank, we've been exchanging

6    those, can I get one at -- a copy of that at the

7    break?

8            MR. WINSTON:  I'll see if I can do that,

9    yeah.

10   BY MR. LASETER:

11       Q   When did you start work on the matter?

12       A   The end of August, I believe.

13       Q   That's August 2011?

14       A   Yes, sir.

15           (Discussion held off the record.)

16   BY MR. LASETER:

17       Q   How many hours, total, would you say you've

18   spent on this matter?

19           MR. WINSTON:  Objection, relevance.

20       A   Let me mentally calculate that a minute.

21       Q   Mm-hmm.

22       A   It would be in excess of 50.

23       Q   Would it be less than a hundred?

24       A   Yes, it would be less than a hundred.

25       Q   Did anybody else at your firm assist you in

Alabama Gas Corporation v. Travelers Casualty, et al.          2:10-CV-1840-IPS
Kathleen Robison                                               November 2, 2011

Page 7

1    this matter?

2         A    No one else.

3         Q    And aside from counsel for Travelers did

4    anybody outside of your firm help you in this matter?

5         A    No one else.

6         Q    Within that 50 to a hundred hours you've

7    spent on the matters so far what are the tasks that

8    you've accomplished?

9         A    I've read the documents, which there were

10   many, I've completed an opinion letter, and I've done

11   some review and now some travel time.

12        Q    Now --

13             MR. WINSTON:  Off the record for a minute,

14   please.

15             (Discussion held off the record.)

16             MR. WINSTON:   Okay.

17   BY MR. LASETER:

18        Q    And I assume you will admonish us if we

19   don't speak loud enough?  I sometimes get quiet, too.

20             When you said you did some review do you

21   mean simply going back over -- your -- your materials?

22        A    Yes, I did some review.

23        Q    Anything else?

24        A    That would be it.

25        Q    Did you have any meetings with counsel for

Page 8

1    Travelers?

2         A    We met yesterday.

3         Q    Had you met at any other time?

4         A    I hadn't met him.

5         Q    Did you have any phone conferences?

6         A    We had a couple of phone conversations.

7         Q    Anything else that you can recall, sitting

8    here today?

9         A    No.

10        Q    Within that universe of roughly fifty to a

11   hundred hours how much of that did you spend, as best

12   you know, on the review of documents?

13        A    The vast majority was on the review of

14   documents.

15        Q    Eighty percent?

16        A    That would be a good estimate.

17             (Robison Exhibit No. 1 was marked for

18   identification.)

19   BY MR. WINSTON:

20        Q    Ms. Robison, I've put before you a document

21   marked as Exhibit 1, if you can take a moment and look

22   that over and let me know when you've had a chance?

23        A    Yes.

24        Q    You mentioned a moment ago that you

25   prepared an opinion letter, is Exhibit 1 that letter?

Alabama Gas Corporation v. Travelers Casualty, et al.
Kathleen Robison

2:10-CV-1840-IPS
November 2, 2011

Page 9

1       A    Yes, it is.

2       Q    If I slip into calling Exhibit 1 your

3   report would that be okay?

4       A    I think that's a better term for it.

5       Q    On page one of Exhibit 1 of your report,

6   down at the bottom, it identifies Exhibit B within the

7   report as documents that you reviewed and relied on,

8   can I get you to turn to Exhibit B with me?

9            And it appears that Exhibit B is a listing

10  of pleadings from the litigation, and then at the very

11  end, on page six, and over onto page seven, documents

12  and deposition transcripts; is that right?

13      A    That is correct.

14      Q    Do you know if this is all the pleadings in

15  the lawsuit?

16      A    No, I do not.

17      Q    How was this list compiled?

18      A    This list was compiled from the pleadings

19  that were sent to me.

20      Q    Were these sent to you in hard copy?

21      A    They were sent to me both in hard copy and

22  electronically.

23      Q    But you compiled the list on Exhibit B?

24      A    Yes.  Yes, I did.  I -- I took -- I cut and

25  paste, but I verified that each one was.

Alabama Gas Corporation v. Travelers Casualty, et al.                    2:10-CV-1840-IPS
Kathleen Robison                                      November 2, 2011

Page 10

```
1           Q    And then at the bottom of page six there's
2    a series of letters and numbers, are those Bates
3    labels?
4           A    That is correct.
5           Q    Or Bates numbers?
6           A    That is correct.
7           Q    And did you get these documents in hard
8    copy?
9           A    The vast majority of these documents I got
10   in hard copy.  No, I'm sorry, let me -- these
11   documents I got in electronic.  I'm not sure if I got
12   the documents that are starting with ALA, I'm not sure
13   if I got those electronic -- or -- or in the hard
14   copy.
15          Q    And how about the document identified as
16   Munich Re Book?
17          A    I -- I got that electronically.
18          Q    And the four deposition transcripts that
19   are on page seven?
20          A    Those were electronic.
21          Q    The documents that you received in
22   electronic form, did you print them up?
23          A    No, I did not.
24          Q    The documents that you got in hard copy,
25   did you also get those as an electronic version?
```

Page 11

1          A    The ALA documents -- I -- I'm not sure.

2          Q    With regard to the T documents, do you

3    understand that the T designates that that was a

4    document that came from Travelers' files?

5          A    Yes.

6          Q    Do you understand that the ALA documents

7    indicate that it came from Alagasco's files?

8          A    That was my assumption.

9          Q    Did you know where the Munich Re Book came

10   from?

11         A    It was my understanding that the Munich Re

12   Book came from Travelers.

13         Q    And I apologize if I've already asked this,

14   but with regard to the T documents, the ones that came

15   from Travelers, did you print those out?

16         A    I might have printed out one or -- I -- a

17   -- a few here and there, but I did not print them all

18   out.

19         Q    Okay.  I'm -- I'm doing the math, the --

20   the total number of pages reflected in T documents is

21   on the order of 8500 pages; is that right?  If you

22   need --

23         A    There were a lot of them.  I did not do the

24   math.

25         Q    Did you review every page?

Page 12

1          A    I -- I looked at each page.  I don't -- I
2     didn't review each page.
3          Q    But you at least looked at every page; is
4     that right?
5          A    Yes, I did.
6          Q    Did you look at all the pleadings listed?
7          A    I believe I did.
8          Q    As -- as with the documents -- did you --
9     did you look at every page?
10         A    Yes, sir.
11         Q    Did you read every page?
12         A    I didn't read the ones that were
13    repetitious.
14         Q    With regard to the Bates labeled documents,
15    do you feel like you've made a sufficiently careful
16    examination of those to understand the contents?
17         A    I -- I feel that I made a significant -- a
18    sufficient examination to understand the contents for
19    the area that I was -- asked to -- asked to opine on.
20              (Robison Exhibit No. 2 was marked for
21    identification.)
22    BY MR. LASETER:
23         Q    Ms. Robison, I'm showing you a document
24    marked Exhibit 2, and I'll ask you a question about it
25    in a moment, but maybe to ask a precedent question,

Alabama Gas Corporation v. Travelers Casualty, et al.
Kathleen Robison

2:10-CV-1840-IPS
November 2, 2011

Page 13

1    turning back to page six of Exhibit B do you have an

2    understanding of where the various different ranges of

3    T label documents came from within Travelers?

4          A    I think I do.

5          Q    Can you tell me where that is?

6          A    The ones that I first looked at, towards

7    the beginning of the T range, were from the Travelers,

8    what I term the 2008 file, and toward the -- toward

9    the middle, at one point, then it began to incorporate

10   the 1998 Travelers St. Paul file.

11         Q    And do you know where that demarcation was?

12         A    I -- I can't tell you the exact T number,

13   where that demarcation was, but -- it -- it was

14   evident that certain documents were older than the

15   others.

16         Q    But -- as -- as you did your review you

17   were not aware of a particular page at which that

18   demarcation sat; is that right?

19         A    As I sit here now I cannot remember if

20   there was a demarcation page or not.

21         Q    Exhibit 2 is an e-mail that Travelers'

22   counsel sent to Alagasco's counsel providing a

23   demarcation, to the extent that you -- you know, does

24   the demarcation that they provided in Exhibit 2 match

25   your understanding?

Page 14

1        A    Well, the -- the first part of the doc, the

2    e-mail to you, what I call the first part, where it

3    says "pursuant to," and then it has three lines, those

4    are the documents that I received and reviewed, so

5    that's my understanding.

6        Q    And -- and is it also consistent with your

7    understanding that the 1998 file, as you described it,

8    is also described in this letter, started at T003535

9    and went on through T008153?

10            MR. WINSTON:  Objection, document speaks

11   for itself.

12       A    I believe it does except that I think there

13   were a couple of documents right at the end that may

14   not have been with the 1998 file.

15       Q    Do you recall what those documents were?

16       A    No, I don't.

17       Q    Was it evident from their date that they

18   couldn't have been from the 1998 file?

19       A    I can't recall, at this point, but there

20   was something about them that led me to believe that.

21       Q    And I think I understand this now, but if

22   you can turn to page five of your report, quickly,

23   you'll see that in the bottom paragraph there are a

24   couple of references to 4600 documents from the 1998

25   file, by the word document, there, do you mean pages?

Page 15

```
 1          A    Pages, yes, sir.
 2          Q    Some of those pages may have all been part
 3   of a single document and others were individual
 4   documents?
 5          A    (Nodding.)
 6          Q    Is that right?
 7          A    Correct.
 8          Q    And do you understand that the 1998 file
 9   was retrieved by Ms. Tarczanin -- that's T-a-r-c --
10          MR. WINSTON:    -- z-a-n-i-n.
11          MR. LASETER:    Thank you, Frank.
12   BY MR. LASETER:
13          Q    -- Ms. Tarczanin in around early December
14   of 2008?
15          A    Yes, I understand that it was somewhere in
16   the first third or I would say toward the end of the
17   first third of December.
18          Q    Of 2008?
19          A    Of 2008.
20          Q    If I'm tracking that right, that would be
21   somewhere around the early part of the second week of
22   December?
23          A    Yes.  I'm thinking -- I'm thinking that it
24   would have arrived there about, for some reason, about
25   the seventh, eighth of December.
```

Alabama Gas Corporation v. Travelers Casualty, et al.              2:10-CV-1840-IPS
Kathleen Robison                                                  November 2, 2011

Page 16

1        Q    Do you have an understanding about the
2   origin of the other documents, that weren't part of
3   that 1998 file, that were listed on your report?
4             MR. WINSTON:   Objection to form.
5             THE WITNESS:   Could you repeat that?
6   BY MR. LASETER:
7        Q    Yeah, I was trying to understand, I think
8   we've identified -- that -- that 4600 some odd pages
9   of the documents, that are identified with Bates
10  numbers on your report, were what we'll call the 1998
11  claims file, and I'm simply trying to find out if you
12  have an understanding of where the other documents
13  came from, the ones that aren't included with that
14  4600?
15       A    Oh, okay.
16            MR. WINSTON:   Objection, vague.  Go ahead.
17       A    Thank you, now I understand better.  It is
18  my understanding that those came from the -- majority
19  of those came from the Travelers' 2008 claim file.
20       Q    Going back to your review of these 85 or
21  8600 pages of documents, how did you physically do
22  that?
23       A    I -- I received them electronically, on a
24  disc, put them into my computer, and I have a very big
25  monitor screen, now, and I sat there and I went --

Page 17

1    reviewed each -- reviewed them as they came up.

2          Q    So you just paged through them on the

3    computer?

4          A    I paged through them on the computer.

5          Q    Did you have to get that big monitor for

6    this case?

7          A    No.  But at the age that I'm getting I

8    thought it was a wise idea when my old monitor failed.

9          Q    I have great sympathy for that, I now have

10   a magnifying glass on my desk.

11               MR. WINSTON:  Off the record for a minute.

12               (Discussion held off the record.)

13               MR. WINSTON:  We can go back on the record.

14               MR. LASETER:  Yeah, that's right.

15   BY MR. LASETER:

16         Q    How did you keep up with what you were

17   learning as you were going through the documents on

18   the computer screen?

19         A    The documents that I thought -- were --

20   were relevant to what I had been asked to review, the

21   area that I had been asked to review, I did print off.

22         Q    Mm-hmm.  And you put those in files?

23         A    I put those in files.  Basically what I did

24   was I attempted to reconstruct the correspondence, the

25   claims, the claims type of file --

Alabama Gas Corporation v. Travelers Casualty, et al.                    2:10-CV-1840-IPS
Kathleen Robison                                                         November 2, 2011

Page 18

1        Q    Mm-hmm.

2        A    -- for the 2008 file.

3        Q    And with regard to the 1998 materials, what

4   did you do with that?

5        A    The 1998 materials, a lot of that was

6   underwriting, audits, et cetera.  What I did with that

7   material, there were some documents, some of the

8   policy documents, policy forms, endorsements, those,

9   some of those I printed off.

10        Q    Other than printing out documents did you

11   keep any other record of what you found to be

12   important?

13        A    I had documents that I put together as the

14   claim file, policy information, and some documents --

15   that -- that indicated policy search.

16        Q    Did you take notes?

17        A    No, I did not take notes.  Excuse me, I did

18   compile, I compiled a sheet that basically identifies

19   the people and who reports to whom, and key -- key

20   terminology, like SLCU.

21        Q    Mm-hmm?

22        A    And SLG, that type of thing.

23        Q    But in terms of recording your impressions

24   of documents, as you went by, you weren't keeping

25   notes or any other record of that?

Page 19

```
 1        A    No.
 2        Q    Is this methodology you employed to review
 3   this file similar to methodologies you've used in
 4   other matters?
 5        A    Yes.
 6        Q    Is this the same methodology that a claims
 7   handler would use?
 8             MR. WINSTON:  Objection, vague.
 9        A    That, I don't know, because this -- I'm
10   looking at a lot of documents, and then I have a
11   different reason for looking at the documents, and so
12   sometimes the documents come in order and sometimes
13   the documents don't come in order.  I prefer having
14   them electronic.  And this is the methodology that I
15   developed that best suits me.
16        Q    Do you know if this is a methodology that
17   other people in your line of work use?
18             MR. WINSTON:  Objection, relevance.
19        A    No, I don't.
20        Q    I want you to turn to Exhibit A of document
21   number one; is this your CV?
22        A    Yes, it is.
23        Q    And I should have asked earlier, with
24   regard to Exhibit 1, are there any changes or
25   additions that you want to make to your report?
```

Page 20

```
 1          A    Well, there are some typograph- -- typos

 2    that I saw.   There is one that I thought that I had

 3    really reviewed this, and that is on page nine, second

 4    paragraph from the top, the first line, that should be

 5    0203, not 30, because February does not have 28 -- 30

 6    days.

 7               There are a couple of pages in here where

 8    there should have been an apostrophe after Travelers.

 9    And I think I missed one paragraph.

10          Q    Other than typographical corrections any

11    additions or changes to the substance that you want to

12    make?

13          A    No.

14          Q    Turning back to Exhibit A, then, of

15    document one, it looks like that you've started in the

16    insurance business right out of college; is that

17    right?

18          A    Yes, I did.

19          Q    And you were a claims adjuster?

20          A    Yes, sir.

21          Q    What's a claims adjuster do?

22          A    Companies have different terms for them.

23          Q    Mm-hmm?

24          A    Claims handling, claims adjuster, basically

25    assigned claims and review the claims, decide on
```

Alabama Gas Corporation v. Travelers Casualty, et al.
Kathleen Robison

2:10-CV-1840-IPS
November 2, 2011

Page 21

1    coverage, decide on the payment, settle the claim,

2    move onto the next one.

3         Q    So as you use claims adjuster, on Exhibit

4    A, it has the same connotation to you as a claims

5    handler?

6         A    Yes, it does, because back 40 years ago we

7    did not use the term claims handler.  The word was

8    claims adjuster.

9         Q    At State Automobile Mutual Insurance

10   Company, which is the first, the earliest employer

11   listed on your CV, what type of claims did you handle

12   there?

13        A    Well, that was back in the early days, when

14   we were just getting into this business, so I was

15   allowed to take loss notices over the phone, schedule

16   appointments for the drive-in, and handle broken

17   windshield and stolen hubcap claims.

18        Q    Anything else at State Automobile?

19        A    Well, because the 11 outside adjusters were

20   male, and by the middle of the afternoon they were all

21   gone, yes, if other claims came up then we would go

22   into their files -- and -- and retrieve them and help

23   the customer, help the client.

24        Q    Were all of the claims you handled for

25   State Automobile related to automobiles?

Alabama Gas Corporation v. Travelers Casualty, et al.          2:10-CV-1840-IPS
Kathleen Robison                                              November 2, 2011

Page 22

```
 1          A    No, they were basically personal lines and

 2    main street business, so that would have been

 3    automobile, homeowners, and small business owner

 4    policies.

 5          Q    Any environmental claims that you handled

 6    then?

 7          A    Not that I remember.

 8          Q    And I do recognize that was awhile ago,

 9    so --

10          A    Yes, it was.

11          Q    The next one on your CV is INA; what is

12    INA?

13          A    INA, at that time, was one of the oldest

14    insurance companies in the United States.  It was the

15    Insurance Company of North America.  They have about,

16    oh, I'd say 15 or 20 years ago merged with Connecticut

17    General, so it's now known as CIGNA.

18          Q    And you identified yourself on your CV as a

19    claims adjuster for INA, as well?

20          A    Yes.

21          Q    What sort of claims did you handle there?

22          A    Well, INA had -- the -- the ESIS accounts,

23    which is E-S-I-S, which was several insured or

24    accounts with high retentions, very, very high

25    deductibles.  So at INA I was responsible for four of
```

Alabama Gas Corporation v. Travelers Casualty, et al.
Kathleen Robison

2:10-CV-1840-IPS
November 2, 2011

Page 23

```
 1   those, those accounts, besides the other types of
 2   claims that came in, and I remember three distinctly,
 3   Kroger's, Borden's and Ashland Oil.
 4             I would handle -- with them, I would handle
 5   their product liability, vehicle accidents, property
 6   damage, first-party property damage, third-party
 7   property damage.
 8        Q    And while at INA did you handle any
 9   environmental claims?
10        A    I know with Ashland Oil we had some oil
11   spills.
12        Q    Were those sudden event occurrences?
13        A    If I remember correctly, most of them were
14   caused by an auto accident.
15        Q    Do you recall any that involved historical
16   spills?
17        A    No, I don't.
18        Q    Do you recall any claims that you handled,
19   in that time period, that involved a search for
20   historical coverage?
21        A    Not that I can recall.
22        Q    The next company on your list is Dairyland
23   Insurance Company, where you were from 1976 to 1978;
24   what was Dairyland?
25        A    Dairyland was and still is a non-standard
```

Alabama Gas Corporation v. Travelers Casualty, et al.
Kathleen Robison

2:10-CV-1840-IPS
November 2, 2011

Page 24

1  auto company.

2       Q   What's a non-standard auto company?

3       A   A non-standard auto company is a company

4  that sells insurance through people who cannot

5  normally get it through the normal channels, such as

6  Allstate, State Farm, Geico.

7       Q   Are those normally high-risk accounts?

8       A   They're high-risk accounts.

9       Q   And am I correct to assume that the claims

10 that you would have handled at Dairyland would all

11 have been automobile related?

12      A   Automobile, bodily injury, yes.

13      Q   In 1978 you moved to Sentry Insurance

14 Company; is that correct?

15      A   That's correct.

16      Q   What did do you at Sentry?

17      A   At Sentry I was an outside adjuster, so I

18 had a territory, thirteen counties, basically the

19 lower peninsula of Northeast Michigan, and I handled

20 personal auto, personal homeowners, business, worker's

21 comp, business property, product liability, completed

22 operations, liability.

23      Q   If there's an outside adjuster does that

24 also mean there's an inside adjuster?

25      A   Yes.

Alabama Gas Corporation v. Travelers Casualty, et al.
Kathleen Robison

2:10-CV-1840-IPS
November 2, 2011

Page 25

1    Q    What is the distinction between an outside
2  adjuster and inside adjuster?
3    A    Inside adjuster works at a desk, in an
4  office, and generally does not go outside to meet the
5  clients face-to-face or do -- they may occasionally go
6  out to a scene investigation, but an outside adjuster
7  is one that does their work at the scene, in other
8  words, climbs up on the roofs, goes into the burned
9  out buildings, visits the morgue, et cetera.
10    Q    Now, is there a reason a claim would be
11  assigned to an outside adjuster versus an inside
12  adjuster?
13    A    Claims such as a broken windshield can be
14  handled without going to the scene.  So the more --
15  the more involved claims were, such as a fire or a
16  claim for a lot of damage to a roof would -- might be
17  assigned to an outside adjuster.
18    Q    And while at Sentry Insurance Company do
19  you recall any environmental claims?
20    A    I believe -- I believe I was -- I -- I --
21  my mind keeps going back to a site investigation I did
22  that I believe involved that at a -- at a waste dump
23  site, gathering information.
24    Q    Can you recall where that was?
25    A    I think it was outside of the Bay City

Page 26

1    area.   Although there were dump sites up around Mio,

2    Michigan, also.

3          Q    Do you recall if that claim was presented

4    to you as an environmental claim?

5                MR. WINSTON:   Objection, vague.

6          A    I -- this was awhile ago.

7          Q    Mm-hmm?

8          A    And I handled a lot of claims then.  I

9    can't recall.

10          Q    Fair enough.   Do you recall whether there

11    was an aspect of that claim that involved a search for

12    historical insurance coverage?

13          A    I cannot recall that.

14          Q    Can you recall any other Sentry Insurance

15    Company era claims, and by that I mean the 1978 and

16    `79 period reflected on your CV, that involved a

17    search for historical coverage?

18          A    Not that I recall.

19          Q    After 1979 you then moved to Citizen

20    Insurance Company; is that correct?

21          A    That's correct.

22          Q    Did you move to Citizens Insurance Company

23    as a claims manager?

24          A    No.   I initially went to Citizens as a

25    claims supervisor.

Alabama Gas Corporation v. Travelers Casualty, et al.                    2:10-CV-1840-IPS
Kathleen Robison                                                         November 2, 2011

Page 27

1        Q    What's a claims supervisor do?

2        A    As the claims supervisor I had four or five

3    adjusters reporting to me and that I reviewed and I

4    assisted them with their claims while I also handled

5    -- had assigned claims, myself.

6        Q    What sort of insurance company, Citizens

7    Insurance Company, in other words, line of business is

8    it in?

9        A    At that time Citizens only wrote in the

10   State of Michigan, so it was a one-state company, it

11   wrote 60 percent personal lines, meaning automobile

12   and homeowners, and 40 percent commercial lines.

13       Q    Were there any particular types of claims

14   that you would have been responsible for while -- at

15   -- at Citizens Insurance Company?

16       A    Basically, the claims that -- I -- I was

17   responsible for, either directly or indirectly, would

18   have been over that -- would have been the types of

19   claims -- all the types of claims that Citizens

20   received.

21       Q    So in other words you didn't have some

22   specialty at Citizens?

23       A    No, I did not have a specialty at Citizens.

24       Q    And during that eight or so years that you

25   were at Citizens Insurance Company do you recall

Alabama Gas Corporation v. Travelers Casualty, et al.                2:10-CV-1840-IPS
Kathleen Robison                                                    November 2, 2011

Page 28

1    environmental claims you handled?

2          A    Yes.

3          Q    Can you tell me about those?

4          A    Because we insured commercial

5    establishments, particularly at this -- at this time,

6    historically, we were receiving claims.  There were

7    such that -- there were environmental damage to land

8    being claimed to water, waterways, and also leaching,

9    leaching -- leaching from dumpsites.

10         Q    Can you give me an idea of how many

11   environmental claims you might have handled?

12         A    They -- they weren't the majority -- of --

13   of the claims.  They were -- and in the scope of

14   everything it was a smaller percentage.

15         Q    Would it have been, this is in order of

16   magnitude, less than ten or more than ten?

17         A    I would say that it was -- I'm trying to

18   think -- and again, as I progressed at Citizens I had

19   -- I was overseeing more and more people, so that's

20   why I -- so more than ten, yes.

21         Q    More than 50?

22         A    No.

23         Q    And of that somewhere between ten and fifty

24   claims how many of those claims have you been the

25   direct handler on as opposed to being in a supervisor

Alabama Gas Corporation v. Travelers Casualty, et al.                    2:10-CV-1840-IPS
Kathleen Robison                                          November 2, 2011

Page 29

1    or management role?

2                    MR. WINSTON:  Objection to form.

3    BY MR. LASETER:

4         Q    Do you understand what I'm asking?

5         A    I lost my train of thought.

6         Q    Let me try again.  You identified, I think,

7    that the number of environmental claims was somewhere,

8    roughly speaking, between about 10 and 50, and I think

9    you also testified earlier -- that -- that you

10   progressed, while at Citizens, from being initially a

11   supervisor with a few direct adjusters under you, and

12   some personal responsibility for direct claims, went

13   up to being a manager where you had additional people

14   under you; is that right?

15        A    That's correct.

16        Q    And I'm trying to get an understanding of

17   this roughly 10 to 50 environmental claims that you

18   may have had involvement in, how many of those were

19   claims that you were directly responsible for as

20   opposed to ones where you were supervising others?

21        A    They would have been where I was

22   supervising others.

23        Q    So none of them were your direct

24   responsible claims, claims for which you had direct

25   responsibility?

Alabama Gas Corporation v. Travelers Casualty, et al.                          2:10-CV-1840-IPS
                    Kathleen Robison                                            November 2, 2011

                                                                                    Page 30

 1              MR. WINSTON:  Object to the form, to the

 2     extent that she's the supervisor I think she has

 3     responsibility for the claim.  You understand what --

 4              MR. LASETER:  And -- and I don't --

 5              MR. WINSTON:  If you understand what he's

 6     asking you can answer the question.

 7          A   You're asking me -- if -- if my -- how many

 8     claims I had day-to-day responsibility for with my

 9     adjuster number on the claim file?

10              MR. WINSTON:  Yes.

11          A   And the answer would be, I believe, none.

12          Q   And then I understand that you were a

13     supervisor, initially, and then became a claims

14     manager; do I have that right?

15          A   That is correct.

16          Q   When you were a claims manager how many

17     people were reporting to you?  Let me ask a better

18     question.  How -- how many adjusters were reporting to

19     you?

20          A   First one was easier, the first one was

21     between 40 and 50, depending on timeframe.  And I

22     would say that of that about 20 percent of the staff

23     was clerical functioning.

24          Q   Mm-hmm?

25          A   Then there were supervisors.  There were

Page 31

1  also appraisers.

2           MR. LASETER:  Mm-hmm, I see.  And as a --

3  as an aside, we can take a break whenever you like, my

4  watch is acting up this morning, but I tend to break

5  about every hour, but if I go on it may be because

6  this thing has stopped.

7           MR. WINSTON:  You don't need a break now,

8  do you?

9           THE WITNESS:  No.

10          MR. WINSTON:  Okay.

11          THE WITNESS:  I will let you know.

12          MR. WINSTON:  As Mr. Laseter said, we'll

13  try to break about every hour just to stretch our

14  legs.

15  BY MR. LASETER:

16      Q   Again, trying to understand your role in

17  the somewhere between 10 -- and -- and 50

18  environmental claims, can you give me a distinction as

19  between how many of those would have been while you

20  were a supervisor as opposed to how many of them would

21  have been when you were a manager?

22      A   I would say the vast majority was when I

23  was a manager.

24      Q   And do I also understand right that when

25  you were a manager there would have also been both a

Page 32

1  supervisor and then an adjuster underneath you in

2  regard to those claims?

3          A    In most cases, yes.

4          Q    Did you have any direct claims handling

5  responsibility when you were a manager?

6          A    When I was a manager in the Detroit area

7  office there were a couple claims that I was directly

8  responsible for, they were not environmental, they

9  were large, catastrophic injury type claims.

10         Q    And then, in 1987, you moved to Luverne,

11 Minnesota?

12         A    Yes, sir.

13         Q    Is that right?  Where is Luverne?

14         A    Luverne, Minnesota is 18 miles due east of

15 Sioux Falls, South Dakota.  So it is in the very

16 southwest corner of Minnesota, in Rock County.  The

17 only county in Minnesota that does not have a natural

18 lake.

19              MR. LASETER:  Off the record.

20              (Discussion held off the record.)

21 BY MR. LASETER:

22         Q    And you were at Tri-State Insurance Company

23 then?

24         A    Yes, sir.

25         Q    And that's a W.R. Berkley company?

Alabama Gas Corporation v. Travelers Casualty, et al.                    2:10-CV-1840-IPS
Kathleen Robison                                    November 2, 2011

Page 33

```
 1        A    Yes, sir.

 2        Q    And Berkley's a specialty loans company?

 3        A    No.

 4        Q    How would you describe them?

 5        A    Bill Berkley has built his companies with

 6   three types of companies, they are one -- one -- one

 7   part is what we would call standard insurance

 8   companies, one is specialty type insurance companies,

 9   and then the other part are service companies, service

10   insurance companies, third-party administrators,

11   specialize in work comp, that type of thing.

12        Q    And which of those three categories did

13   Tri-State fit in?

14        A    A normal insurance company.

15        Q    What was its product mix?

16        A    Tri-State Insurance Company's niche market

17   was agri business, schools, apartment buildings, and

18   some personal lines, it was hea- -- more heavily into

19   the commercial lines area, it wrote in North Dakota,

20   South Dakota, Nebraska, Minnesota, Iowa, and

21   Wisconsin.

22        Q    Did you go to Tri-State as the vice

23   president of claims?

24        A    Yes, I did.

25        Q    And in that role what was your
```

Page 34

1   responsibility?

2          A    My responsibility was for the claims

3   operation.  And as being a vice president I was on the

4   executive committee for the company.

5          Q    How many people were reporting to you as

6   the vice president of claims, rough number?

7          A    Indirectly, that -- that was a smaller

8   company.  I believe it was approximately 50 people,

9   give or take a few.

10          Q    And did you have any direct responsibility

11   for claims?

12          A    I -- I had direct responsibility for the

13   claims because I was the vice president of the claims.

14          Q    And I may have asked a bad question.  I

15   understood that -- I -- I would -- am I correct to

16   understand that you were the officer ultimately in

17   charge -- of -- of all claims that came to the company

18   while you were there?

19          A    Correct.

20          Q    And what I meant to ask is whether you were

21   the sort of -- the -- the frontline person handling a

22   claim at Tri-State?

23          A    So did I ever have any file -- claim files

24   that were specifically assigned to me?

25          Q    Correct.

Alabama Gas Corporation v. Travelers Casualty, et al.                2:10-CV-1840-IPS
Kathleen Robison                                        November 2, 2011

Page 35

1          A    Not that I recall.

2          Q    Do you recall working on any environmental

3     claims at Tri-State?

4          A    Yes.

5          Q    Can you tell me about those?

6          A    Tri-State, as I said, insured agri

7     business, so there were grain elevators, and also

8     insured oil dealers, petroleum dealers, et cetera,

9     yes, we had -- we had claims where -- the -- the

10    chemical -- the chemicals from the products being sold

11    used at the agri business got into the ground, into

12    the water supply, misapplied places, same with the

13    oil, oil delivery -- with -- with the normal spillage

14    that occurs when they -- they load at their site,

15    wrong delivery to places.

16         Q    Any of those environmental claims involve

17    the reconstruction of historical coverage?

18         A    Some of the -- I -- I believe one or two of

19    them did, Tri-State had been -- had been around,

20    started in 1910, 1920s.

21         Q    Can you remember anything more about those

22    one or two that may have involved historical coverage

23    questions?

24         A    Could you repeat that?

25         Q    Yeah, if I understood correctly -- you --

Alabama Gas Corporation v. Travelers Casualty, et al.                    2:10-CV-1840-IPS
Kathleen Robison                                                        November 2, 2011

Page 36

1   you testified that one or two of those environmental

2   claims that you had handled at Tri-State would have

3   involved historical insurance coverage, and I was

4   asking for more explanation of those two claims to the

5   extent that you can recall?

6       A    When we would get -- when we get a -- when

7   we would get a claim in that -- was -- would have been

8   over a period of time we would have to go into our

9   archival records and retrieve any and all policies

10  that applied during that period of time.

11          So that getting -- and the purpose was to

12  get the complete policy, with the terms the conditions

13  and all the endorsements, to evaluate, to know what

14  coverages were available to the insured and when and

15  how much.

16      Q    And I may not have asked a good question.

17  I'm trying to get an understanding of the particular

18  claims that involved that historical search that were

19  environmental, what you can recall?

20          MR. WINSTON:   Objection, no foundation.

21      A    What I can recall, for example, if it was a

22  -- a -- if it was an elevator operator it would be

23  what were the locations, and how long had they been

24  insured with us, and going back into our records to

25  make that determination.

Page 37

```
1          Q   Do you recall doing that with regard to a
2     particular environmental claim?
3          A   I remember doing that a number of times in
4     my career.  And generally they would -- I mean,
5     environmental is one of them, asbestos is another.
6          Q   I'm asking you, while you were at Tri-State
7     do you remember an instance when you did that on a
8     claim that you would call environmental?
9          A   I believe so.
10         Q   And can you tell me about that claim that
11    you can remember?
12         A   I -- I believe it involved -- a -- a grain
13    elevator.
14         Q   Do you recall where that grain elevator
15    would have been?
16         A   It would have been in one of the six
17    states.
18         Q   Do you recall what -- the -- the loss was
19    or what -- the -- the incident was?
20         A   I believe it was leaching into the water,
21    also the ground.
22         Q   Do you know what was leaching?
23         A   Chemicals.
24         Q   Can't remember what chemicals?
25         A   No.
```

Page 38

1        Q    Any other claims, of an environmental
2   nature, that you can recall while at Tri-State where
3   you were called -- or one of the people you were --
4   who were working for you were called on to do
5   historical analysis of the insurance policy?
6        A    Please repeat that.
7        Q    Yeah, I'm simply trying -- to -- to get an
8   understanding of what you can recall, right now, of
9   those environmental claims, while you were at
10  Tri-State, that involved looking back at historical
11  insurance coverage.  And you identified one of them
12  was this grain elevator case?
13       A    Mm-hmm.
14       Q    And I'm simply asking you if there were any
15  others that you can recall?
16       A    As I said, they would have been grain
17  elevators, they would have been petroleum dealers,
18  distributors, that type of thing.
19       Q    Right.  I understand the nature of them,
20  generally.  I'm asking you if you can recall one?
21       A    I cannot recall the specifics of one.
22       Q    And then in 1991 you went to Bankers and
23  Shippers Insurance Company?
24       A    Yes, sir.
25       Q    I see that's a Travelers' subsidiary; is

Alabama Gas Corporation v. Travelers Casualty, et al.
Kathleen Robison

2:10-CV-1840-IPS
November 2, 2011

Page 39

1   that right?

2          A    It was at that time.

3          Q    What was their line of business?

4          A    Non-standard auto and forced place

5   homeowners.

6          Q    Am I correct -- to -- to assume that there

7   was no environmental claims involved in your work at

8   Bankers and Shippers?

9          A    The only environmental claims that we had

10  would have arisen from an auto accident.

11         Q    And then in `94 you went do DaimlerChrysler

12  Insurance Company?

13         A    Technically, when I went there it was

14  Chrysler, it wasn't until 1998 that it became

15  DaimlerChrysler.

16         Q    And what line of business was the Chrysler

17  and then, later, DaimlerChrysler Insurance Company in?

18         A    Their book of business could be divided

19  into thirds, one-third was floor plan insurance for

20  the dealers that financed through Chrysler financial,

21  one-third was what I termed specialty type of

22  insurance, basically for the corporation, such as if

23  Chrysler Corporation could convince the Oscars that

24  all the starlets would arrive in Chrysler vehicles,

25  then we would write a special policy for those

Alabama Gas Corporation v. Travelers Casualty, et al.
Kathleen Robison

2:10-CV-1840-IPS
November 2, 2011

Page 40

1   vehicles for that time period.

2           We also had a -- did the first layer of

3   coverage for the Chrysler product liability.  We did

4   contingent liability coverage for the finance company.

5   And then -- the -- the other third of the business --

6   and this isn't -- is not premium-wise, is not divided

7   equally, 33 --

8           Q    Mm-hmm.

9           A    -- 33, 33 percent, but the other third was

10  insuring, doing all the property and casualty,

11  providing all the property and casualty insurance that

12  a dealership needed to be in business, and that

13  included the work comp, it -- and it was -- we

14  competed on the open market, so it was not just for

15  Chrysler or Mercedes dealers, it was for any

16  dealership that wanted to insure with us and that we

17  thought was a good risk.

18          Q    Now, is floor plan coverage a first-party?

19          A    Yeah, floor plan coverage is first-party,

20  it's basically the comp and collision on the vehicles

21  on the dealer's lot.

22          Q    Now, while at Chrysler or DaimlerChrysler

23  Insurance Company do you recall any environmental

24  claims?

25          A    Because Chry- -- we -- we had some

Alabama Gas Corporation v. Travelers Casualty, et al.
Kathleen Robison

2:10-CV-1840-IPS
November 2, 2011

Page 41

1  environmental claims, but they were more accidental in

2  nature, and because Chrysler, DaimlerChrysler, did not

3  start writing that book of business until, I believe,

4  `87, `88.

5        Q   Is that in the dealer business that you're

6  referring to?

7        A   That was in the, yeah, the dealer property

8  and casualty business, they did start writing the

9  floor plan business, I believe, in the late `60s,

10  early `70s.

11       Q   And when you refer to accidentals, you --

12  you mean like spill of a tank at a -- at a dealership

13  or something like that?

14            MR. WINSTON:  Object to the form.

15       A   What I mean is basically a rise in -- yes,

16  rising out of automobile accidents or, you know,

17  someone backing into a gasoline tank, that type of

18  thing.

19       Q   And then in 2004 you moved to, is it

20  Malecki, Deimling, and Nielander?

21       A   Nielander.

22       Q   Nielander, and Associates; is that right?

23       A   Really, what I did was I first, in 2004,

24  after I left DaimlerChrysler, I was downsized to early

25  retirement package, I started K.Robi and Associates,

Alabama Gas Corporation v. Travelers Casualty, et al.                    2:10-CV-1840-IPS
Kathleen Robison                                         November 2, 2011

Page 42

1    and then two to three years later I affiliated with

2    Malecki, Deimling, and Nielander.

3         Q    And can you tell me what sort of work

4    you've done in that period of time?

5         A    What I do is in consulting work, I do

6    expert witness work, I do train -- training, insurance

7    training, policy language trai- -- ba- -- a lot of

8    it's policy language training, and some of it is

9    claims, claims training.

10           I do technical writing for various

11   companies, and then I also, from time to time, will do

12   perform reviews audits, specialty reviews audits.

13        Q    What's a specialty review audit?

14        A    It will depend on what the client is

15   looking for, for example, one client came and said,

16   you know, our home offices are always reviewing our

17   claims, our home office is always reviewing our claims

18   office, but we've never reviewed our home office

19   claims department.

20           I had another client who said -- our -- our

21   claims office and our home office are at war over how

22   to handle a certain type of matter.  So I did a review

23   on each and then I brought them together for -- a -- a

24   meeting to work out the differences.  It's because

25   I've been in the business so long there are a lot of

Alabama Gas Corporation v. Travelers Casualty, et al.
Kathleen Robison

2:10-CV-1840-IPS
November 2, 2011

Page 43

```
1    people who know me and if they have a special issue
2    they will, from time to time, contact me.
3         Q    What is policy language training?
4         A    It's -- it is taking the -- a -- a specific
5    insurance policy and walking the students through the
6    policy and explain the policy to them.
7         Q    Are there particular policy types that
8    you've done that for?
9         A    Generally we are using the plain,
10   unmodified, ISO insurance service office forms.  There
11   are times that a company will hire me to do that type
12   of specific training on their specific files.
13        Q    Have you ever done policy training on an
14   ISO policy that's an older ISO form, meaning older
15   than your period of times you've been working at
16   Malecki?
17             MR. WINSTON:  Object to the form.
18   BY MR. LASETER:
19        Q    I mean, I try to ask you a better question
20   and maybe is a -- I understand that there have been a
21   series of ISO general liability forms, for example,
22   and they have date ranges, what's the oldest, let me
23   ask the preceding question -- although -- thank you,
24   Frank.
25             Have you done -- a -- a policy language
```

Page 44

1    training on an ISO liability policy?

2          A    Yes.

3          Q    What's the oldest ISO liability policy that

4    you've done a training for?

5          A    If I go back, historically, it would be the

6    1973 CGL.

7          Q    And when was that?

8          A    That would have been when I was at

9    Citizens.

10         Q    Is that an in-house training?

11         A    That's in-house training.

12         Q    But while at Malecki what's the oldest one

13   that you've done?

14         A    Generally I am working on the most current

15   forms unless the client is using an older form.

16         Q    And in your -- the period from 2004 to now

17   have you been involved in environmental claims,

18   excluding the one that you're here about today?  Take

19   your time.

20         A    Allied Williams Company --

21         Q    You're reading --

22         A    -- versus American Casualty Company.

23         Q    Sorry, you're reading from --

24         A    I'm really reading from my CV, page five.

25         Q    And that's the second one down on the page?

Page 45

1        A    Yes, sir.

2        Q    Any others?

3        A    That's it.

4        Q    Can you tell me about Allied Williams

5   Company, is -- meaning about this particular -- strike

6   that -- this entry you're reading is identified under

7   expert witness files, what does that mean?

8        A    That means that the company that I was

9   hired to be an expert and opine on certain facets

10  involved in that matter.

11       Q    Did that engagement result in testimony?

12       A    That one did not.

13       Q    And if I understand then the -- you've

14  identified on your report all the matters where you've

15  been engaged as an expert, and then the subset of

16  those matters that resulted in testimony at

17  deposition, then the further subset of those that

18  resulted in trial testimony; is that right?

19       A    That is correct.

20       Q    Okay.  With regard to the Allied Williams

21  Company matter, what was that claim?

22       A    That was, if I remember correctly, and I'm

23  doing this from memory, I believe that was a pest

24  control entity concerning one of their former

25  properties that had environmental issues.  And I

Alabama Gas Corporation v. Travelers Casualty, et al.
Kathleen Robison

2:10-CV-1840-IPS
November 2, 2011

Page 46

1    cannot -- and I cannot say for sure but I believe the

2    EPA was involved in that.

3          Q    Were those environmental issues pesticide

4    related?

5          A    They were the chemicals from the pesti- --

6    from the -- from the business, yes.

7          Q    Do you know where that facility was

8    located?  And if it helps, I notice that this was

9    filed in the Southern District of Alabama.

10         A    I'm trying to remember.  I don't know why

11   Texas comes to my mind but I can't -- I can't say for

12   sure.

13         Q    You said that you thought that EPA may have

14   been involved, did I hear that right?

15         A    That's what I said.

16         Q    Do you recall if there was a state agency

17   involved?

18         A    I cannot recall.

19         Q    Do you recall whether or not there was a

20   PRP letter issued in that case?

21         A    I cannot recall.

22         Q    I should have asked you a precedent

23   question.  Do you understand what I mean by PRP

24   letter?

25         A    I believe it means potential responsible

Page 47

 1   party.

 2           Q    Yeah, yeah, the phrase PRP means potential

 3   responsible party.  Have you ever heard of a general

 4   notice letter from EPA?

 5           A    General notice letter?  I'm --

 6           Q    Are you familiar with the term of art, a

 7   PRP letter?

 8           A    Please repeat that.

 9           Q    All right.  Are you familiar with the term

10   of art, in environmental claims, referred to as a PRP

11   letter?

12           A    Yes.

13           Q    Okay.  What does that mean to you?

14           A    That means to me that the EPA has notified

15   an entity that they are looking into an environmental

16   matter of which they believe the entity might be a

17   responsible party.

18           Q    Are you familiar with the term of art, a

19   104E letter?

20              MR. WINSTON:  Object to the form.

21              THE WITNESS:  10- --

22              MR. WINSTON:  Actually, I object on

23   vagueness grounds.  Go ahead, you can answer.

24           A    104E letter?

25           Q    Mm-hmm?

Page 48

1        A    Not C, E?

2        Q    E, correct.

3        A    I believe that's an information request

4    letter.

5        Q    And do you understand how, if at all, that

6    relates to a PRP letter?

7        A    Generally, it is my understanding that

8    generally the request for information comes prior to

9    the PRP.

10        Q    And sitting here today can you recall

11    whether or not the Allied Williams Company involved a

12    request for information letter?

13        A    I cannot remember.

14        Q    And sitting here today can you remember

15    whether the Allied Williams Company involved a PRP

16    letter?

17        A    I cannot remember.

18        Q    Sitting here today can you recall any other

19    matter, besides the one we're here testifying about

20    today, that you worked on that involved a 104E

21    information request letter?

22        A    During my -- after 2004?

23        Q    We'll start there, yes.  After that point,

24    yes?

25        A    No.

Page 49

1          Q    All right.  And after 2004 can you recall
2     any matter that you've worked on, other than the one
3     we're here about today, that involved a PRP letter?
4          A    I thought I just answered that one.
5          Q    I was asking you first about a 104E
6     information request and then I was going to ask you
7     about a PRP letter.  You can put them both together if
8     the answer is the same?
9          A    I've lost my train of thought.
10         Q    Let's start all over again.
11              MR. WINSTON:  I don't even think there's a
12    question pending, anyway.  Go ahead.
13    BY MR. LASETER:
14         Q    The first question is, after 2004, and
15    working for the current firm that you're working for,
16    or at K.Robi Associates, do you recall working on any
17    matters where the EPA had issued a 104E information
18    request letter?
19         A    No.
20         Q    And sitting here today, in the period after
21    2004, working at your current employer or at K.Robi,
22    do you recall any matters where EPA issued a PRP
23    letter?
24         A    No.
25         Q    Prior to 2004, can you recall a matter that

Page 50

1    you were involved in that involved a 104E information

2    letter, information request letter?

3          A    I'm sure we had some of those at Citizens

4    and I'm sure we had some of those at Tri-State.

5          Q    Can you remember any of them, sitting here

6    today?

7          A    Can I remember, specifically?  I cannot

8    recall that, specifically.

9          Q    And the same question with regard to PRP

10   letters.  Sitting here today can you recall any

11   particular instances, prior to 2004, where you were

12   responsible for a matter that involved a PRP letter?

13         A    I know there were PRP letters involved.  I

14   cannot recall the specific claim.

15              MR. WINSTON:  We've been going over an

16   hour, so whenever it's a good time to break, if we can

17   take one?

18              MR. LASETER:  This is actually a good time.

19              MR. WINSTON:  Okay.  Five minutes?

20              MR. LASETER:  Yeah.

21              (Recess.)

22              MR. LASETER:  Let's go back on the record.

23   BY MR. LASETER:

24         Q    Ms. Robison, I think this is inherent in

25   your prior testimony, but I want to go ahead and ask

Alabama Gas Corporation v. Travelers Casualty, et al.                    2:10-CV-1840-IPS
Kathleen Robison                                                         November 2, 2011

Page 51

1    it just to be sure.

2              Am I correct to assume that you, other than

3    the case that we're here to talk about today, you've

4    never been involved in a situation where an insurance

5    company had to consider whether or not a PRP letter

6    would be considered a suit under a general liability

7    policy for purposes of the defense?

8         A    I can't say that in my history some- --

9    someplace in time that didn't occur, but I can't say

10   for sure.

11        Q    And -- and sitting here today you don't

12   recall any such instance?

13        A    I -- I -- and sitting here today I don't

14   recall such instances.

15        Q    And -- and for purposes of your opinions in

16   this case you're not relying on your personal

17   experience in doing that at some point in your career?

18        A    That would be correct, I'm not relying on

19   person- -- personal experiences.

20        Q    And again, I think this is inherent in your

21   -- in your answer before, but I'll ask the same

22   question with regard to 104E letters, have you ever,

23   in your career, been involved in a situation where an

24   insurance company had to consider whether or not a

25   104E letter constituted a suit, for purposes of a CGL,

Alabama Gas Corporation v. Travelers Casualty, et al.
Kathleen Robison

2:10-CV-1840-IPS
November 2, 2011

Page 52

1    a duty to defend under a CGL policy?

2         A    I'm hesitating here because I'm going back

3    to my experiences at Citizens, because of the

4    timeframe that I was at Citizens, particularly in home

5    office, when historically this was -- these type of

6    claims are really bubbling up, so to speak, I -- I

7    know that we were confronted with these various

8    issues, okay?  I cannot specifically recall -- the --

9    the claims nor the specifics of them.

10        Q    All right.  So sitting here today, you

11   don't recall any instance where you were involved in

12   the decision that an insurance company, with regard to

13   whether or not a 104E information request would be

14   considered a suit for purposes of triggering the duty

15   to defend in a liability policy; is that right?

16        A    I cannot recall a specific case.

17        Q    Do you know for certain that you were ever

18   involved in such a case?

19        A    I believe I was but I can't say with

20   concrete certainty.

21        Q    Do you recall the decision that Citizens

22   would have reached, with regard to any such case, in

23   terms of whether they would have defended that claim?

24        A    I can recall the process that we went

25   through.

Page 53

1      Q    What was that process?

2      A    The process was to gather all the -- all

3  the policy data, the conditions, the terms, the

4  exclusions, all the endorsements, the process then

5  would have been to have evaluated against that, and

6  then the process would have been to determine what the

7  current -- what the case law, what -- the -- the legal

8  requirements were in that venue.  And in those cases

9  we generally consulted with an attorney, legal

10  counsel.

11      Q    In those cases, what -- what do you -- what

12  do you mean by "in those cases"; what do you mean by

13  "those cases"?

14      A    When I say in those cases I would say where

15  we are going to make a determination.  I believe your

16  question was what I mean by in those cases was when we

17  were making a determination if the 104E or the PRP

18  letter constituted duties on our part.

19      Q    Do you recall the decision reached by any

20  of the insurance companies you've worked for with

21  regard to -- any -- any matter where a 104E letter was

22  at issue?

23          MR. WINSTON:  Objection.  I think that's

24  been asked and answered.

25      A    I -- I, again, I would refer to the process

Alabama Gas Corporation v. Travelers Casualty, et al.
Kathleen Robison

2:10-CV-1840-IPS
November 2, 2011

Page 54

1    that we went through, and I would say we would do a

2    follow-through process, and depending upon that venue,

3    at that time, we would have responded accordingly.

4         Q    Okay, sure, and fair enough.  But I'm

5    asking you if you recall any specific instances, right

6    now?

7         A    The specific instances with the claim

8    number and the name and the date do not come to mind.

9         Q    How about the general description of the

10   matter?

11        A    The general descriptions of the matter, as

12   I said, would have been from a -- from a -- an

13   entity's production having chemicals, et cetera,

14   created an environmental concern, either on the land

15   or on the water or from leaching of waste disposal

16   places, that would be the best I could do.

17        Q    But you can't remember a specific instance,

18   sitting here today?

19        A    I can't remember -- I can't recall a

20   specific instance.

21        Q    I want to follow up on the procedure you

22   just described for how a -- such a claim would have

23   been evaluated, and I want to step away from

24   particularly asking about environmental claims, just

25   ask about claim, complex claims, in general, when

Page 55

 1    confronted with situations where there may be legal

 2    issues with regard to whether or not coverage -- was

 3    -- was afforded under a given policy.

 4            Can you recall -- any -- any such issues

 5    where the legal question involved had differing

 6    outcomes and differing jurisdictions?

 7            MR. WINSTON:  Objection, vague.

 8        A    Yes.

 9        Q    Can you give me an example?

10        A    Again, I'll go to my most recent example,

11    which would be at DaimlerChrysler.

12        Q    Mm-hmm.

13        A    Okay, when we're talking about sometimes

14    prior dam- -- prior damage, disclosure of prior damage

15    by a dealer, that will vary from venue to venue.  Do

16    we have coverage, don't we, how much do we have, et

17    cetera, that's one of the -- that's -- that's one

18    issue.

19            Sometimes one is confronted with that, with

20    underinsured and uninsured motorist types of claims,

21    because that's -- it's so state specific and venue

22    specific.

23            We have an, under the CGL policy currently,

24    we have the issue of faulty workmanship, that

25    depending upon the venue depends on how it's

Alabama Gas Corporation v. Travelers Casualty, et al.
Kathleen Robison

2:10-CV-1840-IPS
November 2, 2011

Page 56

1    addressed.

2         Q    Can you explain that faulty workmanship

3    issue?

4         A    The faulty workmanship issue -- is -- is

5    the -- is faulty workmanship in and of itself an

6    occurrence.

7         Q    And some jurisdictions say it is and some

8    say it's not?

9         A    Correct.

10        Q    Do you know whether there is a majority

11   rule one way or the other?

12             MR. WINSTON:  Objection, vague, calls for a

13   legal conclusion.

14        A    I have not looked at it as to tallying up

15   how many states go one way or the other because we

16   have states that will go one way and then they'll go

17   the other.

18        Q    Are there any states in which there is no

19   decision on that, at this time, to your knowledge?

20        A    I believe there are some.

21        Q    And if you were presented with a claim

22   involving one of those states, where there is no

23   current rule on it, how would you proceed as a claims

24   handler?

25        A    In the state that there is no rule on it,

Alabama Gas Corporation v. Travelers Casualty, et al.
Kathleen Robison

2:10-CV-1840-IPS
November 2, 2011

Page 57

```
 1   how would I proceed as a claims handler?  I would

 2   consult -- I would consult with my supervisor.

 3         Q    Mm-hmm.

 4         A    I would consult with various resources, and

 5   I may even consult with a -- with legal counsel.  And

 6   then, through their collaborative process, would act

 7   accordingly.

 8         Q    What resources do you have in mind?

 9         A    It -- it could be various resources.  I --

10   you know, this is a hypothetical.  I couldn't really

11   --

12         Q    Sure.

13         A    I can't say this book or this book or that,

14   there would be various resources.

15         Q    By -- by -- by resources you mean -- you

16   mean books?

17         A    They -- it could be books, it could be, you

18   know, information.  I mean, and today, and in today's

19   world we have a lot of things -- on the -- on the

20   system, the computer, the inter- -- you know, there's

21   a lot of things that one can access that are not

22   actually in books.

23         Q    I may have misheard you.  I -- I think you

24   said that you might possibly consult legal counsel, is

25   that right or would you always consult legal counsel
```

Page 58

1    if you were dealing with a situation where, for -- to

2    stick with our example, the faulty workmanship

3    question had not been addressed in the jurisdiction at

4    issue?

5                MR. WINSTON:  Object to the form.  Go ahead

6    and answer if you understand.

7        A    I -- I don't think that I could say I would

8    always or would always not.

9        Q    Mm-hmm.

10       A    It would depend on the circumstances and

11   how recently that issue has been looked into prior, et

12   cetera.  So --

13       Q    Meaning how recently that issue had been

14   looked in with regard to whether coverage provided in

15   a given jurisdiction?

16       A    Correct.

17       Q    If it had never been looked at by the

18   company, in the jurisdiction at hand, would you --

19   would you, as a claims handler or a claims supervisor,

20   at least recommend consulting counsel?

21       A    That might be.

22       Q    And why might you not?

23       A    Again, it's -- it's claim specific, it also

24   could be depending upon the wording in the policy or

25   the endorsements that have been added to it.

Alabama Gas Corporation v. Travelers Casualty, et al.
Kathleen Robison

2:10-CV-1840-IPS
November 2, 2011

Page 59

1        Q    While you were at DaimlerChrysler Insurance
2   Company did the claims adjusters working for you have
3   a system for recording of daily activity?
4        A    We had a system for recording.  I don't
5   know if you would call it daily activity.
6        Q    Can you explain your system for recording
7   that you had there?
8        A    We had a -- we had a computerized claims
9   system where there was a section for an adjuster to
10  put in notes concerning the factual activities that
11  took place that were not otherwise documented within
12  the claim file.
13       Q    Mm-hmm.  Was there a similar system in use
14  at Bankers and Shippers?
15       A    Halfway through we went to computer,
16  computerized, the first half it was mo- -- it was more
17  a hardcopy in the file.
18       Q    What would -- what would go into a hardcopy
19  put in the file?  Do you mean, like, notes?
20       A    It would be the adjuster's notes recording
21  the facts of information that was not otherwise
22  recorded in the claim file.
23       Q    Have you ever worked at an insurance
24  company where adjusters or claims handlers didn't use
25  either a computerized system or a system of notes to

Page 60

1    record their activity?

2           A    Yes, I have.  And on the more -- and what

3    we're saying is I don't -- the more complex claims I

4    have seen filed where it's a complex legal matter, say

5    in litigation, and the documentation within the file

6    is sufficient, that the adjuster is not putting in

7    notes.

8           Q    I may not have asked -- a -- a good

9    question.  I meant to ask, while you were working at

10   an insurance company was -- was there ever an

11   insurance company that you worked for that didn't have

12   a system for either computerized or handwritten

13   recording of activity?

14          A    I'm -- I'm not --

15               MR. WINSTON:  Object to the form.

16          A    I'm going back in my memory, because I --

17   I'm not quite sure what we did at State Auto in the

18   early `70s or at INA in the early `70s.

19          Q    Yeah?

20          A    I can't recall how we did it.

21          Q    And -- and how about at Dairyland?

22          A    Dairyland we did have -- we did -- we did

23   put notes in the files.

24          Q    How about at Sentry?

25          A    Yes.

Alabama Gas Corporation v. Travelers Casualty, et al.                    2:10-CV-1840-IPS
Kathleen Robison                                            November 2, 2011

Page 61

 1        Q    Yes, you put notes in the file?

 2        A    Yes.

 3        Q    And excluding the current case, have you

 4   ever worked for any insurance company where, as a

 5   matter of routine practice, they did not have some

 6   system of either putting notes in the file or using a

 7   computer system for that same purpose?

 8        A    I have worked at companies that have those

 9   systems.  Again, there is no requirement that the --

10   there has -- the frequency of the notes or the length

11   of the notes or how many of the notes.  So I have had

12   case -- claims where, because of the correspondence

13   going back and forth there are, to all extents,

14   extensive purposes, there are no notes.

15        Q    Sure.  And I don't mean to say that every

16   -- every single claim has notes, but rather I merely

17   mean to ask you whether you've ever worked with an

18   insurance company where there wasn't a system

19   generally in place for the recording of activity by

20   claims handlers, either computer or in handwritten

21   notes?

22        A    With the companies that I've worked for

23   that I can -- and again, I -- I'm sorry I can't go

24   back to what I did at State Auto and INA, because

25   those were so long ago, they -- they each had a

Page 62

1    system.

2         Q    And after 2004 and your consulting work,

3    excluding the current matter, have you consulted with

4    any company that you know had no such system for

5    recording claims activities, claims adjusters

6    activities?

7         A    Some of the companies that I've consulted

8    with have been -- haven't been in their claims area,

9    so I can't -- I can't answer that across the board.

10         Q    But where the ones where you've had

11    exposure to their claims function are you aware of

12    anywhere they didn't have a system for recording

13    adjuster's activities?

14         A    The ones where I've been exposed to their

15    claims function they had a system for recording

16    activities.

17         Q    You described a moment ago a process that

18    you would have gone through in the event you were

19    considering a -- whether or not a 104E letter

20    triggered an obligation in your policy; is that a

21    standardized process throughout the insurance

22    industry?

23              MR. WINSTON:  Let me object to the extent

24    that calls for a legal conclusion.  Go ahead and

25    answer the question.

Page 63

1    BY MR. LASETER:

2          Q    And yeah, let me -- let me -- before you

3    answer, let me be sure I framed the question right.  I

4    merely mean to ask you as a -- as an experienced

5    claims executive and an expert -- on -- on claims

6    matters, not as a lawyer.

7               I'm just asking you, in your experience as

8    a claims expert, whether you understand the process of

9    handling claims to be standardized?

10         A    I can say that that process that a -- I --

11   I explained to you was -- is a common process.  I

12   can't say that it's a standardized process in each and

13   every claims organization.

14         Q    What does the designation CPCU stand for?

15         A    It is chartered property casualty

16   underwriter.

17         Q    And AIC?

18         A    Associate in claims.

19         Q    And are they both given by the same

20   organization?

21         A    Yes, they are.

22         Q    And what's that organization?

23         A    Today it's known as the Institutes.

24         Q    And what did it used to be known as?

25         A    AII, American Insurance Institute, maybe.

Page 64

1    I'm not quite sure.

2            Q    Okay.  The AIC is a designation given by

3    the Institute; is that right?

4            A    That's correct.

5            Q    And it focuses on claims?

6            A    It focuses on claims.

7            Q    Does the CPCU designation also have a

8    claims component?

9            A    The CPCU is a -- more of a general

10   insurance series of courses.  CPCU does not -- not --

11   does not say how claims are handled or does not go --

12   let me try -- it's the -- the one -- the one I took

13   was a ten-part series.

14           Q    The -- that -- the CPCU is a ten-part

15   series?

16           A    Was a ten-part series.

17           Q    Mm-hmm.

18           A    And it was -- it went through -- the -- the

19   overall insurance organization, explaining it,

20   departments, I'm not quite sure it goes into claims,

21   specific claims handling practices.

22           Q    You described the one that you got as

23   having ten components, has that evolved over time, the

24   number of components required?

25           A    Originally, in 1941 or `42 it started out

Page 65

1    with five parts, and then in the mid to late `70s it

2    -- they split each part and made it ten parts, and in

3    the last ten years it has evolved to eight parts with

4    the ability to go either on with a personalized

5    emphasis or a commercialized emphasis.

6             Q    And how many -- strike that -- does the AIC

7    designation come as a result of completing a number of

8    courses?

9             A    Yes, it does.

10            Q    How many courses are involved?

11            A    At the time that I did that it was four

12   courses.

13            Q    What were the topics for those four

14   courses?

15            A    One was property casualty and work comp, it

16   was a general property casualty and work comp.

17            Q    With the focus on claims?

18            A    With the focus on claims.

19            Q    Others?  I'm sorry, was that one of them or

20   was that -- was that the -- I think you said that

21   there were four courses?

22            A    There were four courses, one was general.

23            Q    Okay?

24            A    One was liability, one was property, and

25   one was work comp.

Page 66

1        Q    I -- thank you.  Do you teach CPUC (sic)
2   courses now?
3        A    No, I do not teach CPCU courses.
4        Q    Do you teach IAC (sic) courses?
5        A    No, I don't teach AIC courses.
6        Q    Do you teach any courses in claims
7   handling?
8        A    I do, for various clients, give some
9   courses that relate to claims handling that are also
10  continuing education.
11       Q    In what states?
12       A    Depends.  North -- North Carolina, Texas,
13  Oklahoma, Florida, Wyoming, sometimes for
14  Independence, Mississippi, Delaware are the ones.
15       Q    Are those courses common in all those
16  jurisdictions?
17       A    Those courses have been approved for
18  continuing education credits in those jurisdictions.
19       Q    Is it the same course that's been approved
20  in each of those jurisdictions?
21       A    Yes, sir.
22       Q    Did those courses involve general
23  materials, text materials, or are they insurance
24  company specific?
25       A    They're general text materials.

Page 67

1        Q    Who publishes those materials?

2        A    The vast majority -- I -- I do -- I do for

3   a firm called Claims Training Services out of, I

4   believe, Jackson, New Jersey, Jacksonville, New

5   Jersey, maybe.

6        Q    Have you used their materials?

7        A    I -- Claims Training Services is owned by

8   Bil Stewart, who I've known for a long time, and so

9   when he has more work than he can handle he hires me

10  to do that.

11       Q    I'm just trying to understand where -- the

12  -- the text for those courses comes from?

13       A    They're his texts.  They are not published.

14  They -- they are not on the market for sale.

15       Q    Do I understand right that those texts have

16  been approved by the insurance commissioners or

17  whoever approves continuing education in those states?

18       A    The insurance departments, yes.

19       Q    Are there texts that the AIC courses use

20  for claims handling?

21       A    Yes, there are texts.

22       Q    Do you still have those texts?

23       A    I don't know if I do or not.  I always

24  wanted to keep my CPCU textbooks but over the many

25  moons they've sort of disappeared.

Alabama Gas Corporation v. Travelers Casualty, et al.                    2:10-CV-1840-IPS
Kathleen Robison                                        November 2, 2011

Page 68

1        Q    Are there textbooks that you consider
2    especially important or reliable in the area of claims
3    handling?
4        A    Currently, today, I have not been
5    acquainted with any.
6        Q    If you -- if you go back in your prior
7    experience?
8        A    If I go back in my prior experience there's
9    a really old one, that was put out by John something,
10   but it's very outdated today.
11       Q    Are you familiar with an American Institute
12   of CPUC (sic) publication called Property Loss
13   Adjusting?
14       A    No, I'm not.
15       Q    On page one of your report, Exhibit 1, in
16   the paragraph immediately under qualifications, the
17   third line down, the phrase "best practices"; do you
18   see that?
19       A    Yes.
20       Q    What does best practices mean in that
21   paragraph?
22       A    Best practices has come to mean the
23   practices, the processes, procedures that are
24   effective and efficient and meet the goals of the
25   company and fulfill -- the -- the duties of the claims

Alabama Gas Corporation v. Travelers Casualty, et al.                    2:10-CV-1840-IPS
Kathleen Robison                                                November 2, 2011

Page 69

```
 1   person and the underwriter.

 2        Q   Are those best practices company specific?

 3        A   A lot of times they are -- are -- when one

 4   talks about best practices they're more generic, but

 5   then they need to be applied, modified, adapted to the

 6   individual company, for that individual company's

 7   uniqueness.

 8        Q   And if a person wanted to go and learn

 9   about what are the generic best practices in claims

10   handling where would they go?

11        A    If I was going to look for what -- the --

12   the best practices were, are generically, I would be

13   looking to maybe some of the publications that the

14   Institute puts out.

15            You have -- you have various large

16   consulting firms that will -- they don't publish them

17   but -- you can -- you can contract with them and they

18   will give those to you, such as IBM has an insurance

19   consulting arm, McKenzie and Company, those places.

20        Q   Does Mercer have any?

21        A   Does?

22        Q   Mercer, any affiliates of Marsh?

23        A   I'm not familiar with that, but could be.

24        Q   Any other sources for the generic best

25   practices that come to mind?
```

Page 70

1           A    Oh, from time to time Claims Magazine,

2    Insurance, Or Claims Advisor, they could publish

3    something that someone wrote.

4           Q    We were talking earlier about the process

5    for evaluating a claim, and I believe you had -- you

6    identified gathering the policies -- is -- is one

7    step, evaluating the policies against the facts is

8    another step, and ascertaining the law in any

9    unanswered questions is another step.  Are there

10   additional steps that are -- that are standard

11   processes you go through in evaluating a claim?

12          A    It could depend on the claim but I think

13   those are the basic ones.

14          Q    Is -- is that the order that you would

15   ordinarily proceed in evaluating a claim?

16          A    That would be the order.

17          Q    Is that mandatory?

18               MR. WINSTON:  Objection to the extent

19   you're calling for a legal conclusion.

20   BY MR. LASETER:

21          Q    And -- and let me ask a better question,

22   that's a fair objection.

23               I don't mean to ask whether that's required

24   by any law.  I'm asking whether it would be in

25   accordance with best practices to always do it in that

Page 71

1  order, meaning the order of find the policies,

2  evaluate the policy against the facts, followed by a

3  legal evaluation of any unanswered questions?

4          A    I believe that would be advisable.

5          MR. LASETER:  We're a little bit ahead of

6  schedule for a break, but we're close to a break, and

7  this is a good stopping point for me so why don't we

8  take a break?

9          MR. WINSTON:  Okay.

10          THE WITNESS:  Okay.

11          (Recess.)

12  BY MR. LASETER:

13          Q    If I can get you to turn to page three of

14  your report, okay, that's Exhibit -- deposition

15  Exhibit 1, and down in the last full paragraph on the

16  page it starts with, "To perform a coverage analysis

17  one must review all the complete policies"; do you see

18  that?

19          A    Yes.

20          Q    What does the term "complete policies" mean

21  to you?

22          A    Complete policies means to me having the

23  declaration page, the insuring agreement, the

24  conditions, the exclusions, all the endorsements and

25  the definitions.

Alabama Gas Corporation v. Travelers Casualty, et al.                    2:10-CV-1840-IPS
Kathleen Robison                                    November 2, 2011

Page 72

1          Q    Is it possible to proceed with an analysis
2     of coverage without all those things?
3          A    It would be very difficult because all
4     those things are necessary to understand the complete
5     policy.
6          Q    Have you ever been involved in a situation
7     where you've made a coverage analysis with less than a
8     complete policy?
9          A    Not that I recall.
10         Q    Are you familiar with the -- with whether
11    or not an insurance company or the insured have the
12    obligation of establishing exclusions to the policy?
13         A    Please repeat that question.
14         Q    Do -- do you know whether or not, as a
15    matter either of -- strike that -- do you know, as a
16    matter of custom in the insurance industry, whether a
17    policy holder is required to establish its exclusions
18    in an insurance policy when seeking coverage -- under
19    a -- for a claim?
20              MR. WINSTON:  And I'll object, calls for a
21    legal conclusion.
22         A    You're saying the policy holder, not the
23    insurer?
24         Q    Best -- that's my question, yes.
25              MR. WINSTON:  I'm going to object, now,

Page 73

```
 1   that the question is somewhat vague, as well as calls
 2   for a legal conclusion.
 3               THE WITNESS:  Can you repeat that question
 4   back?
 5               MR. LASETER:  Sure.
 6               THE WITNESS:  To make sure I answer --
 7               MR. LASETER:  Yeah, let me ask a -- maybe a
 8   better question, that'll be -- be easier.
 9   BY MR. LASETER:
10        Q    Do you understand that the insurance
11   company has the burden of establishing exclusions to
12   policies, as a general matter?
13               MR. WINSTON:  Let me object, calls for a
14   legal conclusion.
15        A    I understand that the insurance company
16   will present a policy to an insured that normally does
17   contain exclusions, and that the insured can -- and
18   there are times, depending upon the type of insured
19   and the availability, that there are endorsements the
20   insured can elect that will modify or eliminate
21   exclusions.
22        Q    I may have asked a -- I'm sure I asked a
23   bad question.
24               With regard to a -- the determination of a
25   specific claim, and whether or not there's coverage
```

Alabama Gas Corporation v. Travelers Casualty, et al.                    2:10-CV-1840-IPS
Kathleen Robison                                                          November 2, 2011

Page 74

1   for a particular claim, do you understand whether or

2   not the insurance company has the obligation of

3   establishing the existence of any exclusions it wants

4   to use to bar coverage?

5            MR. WINSTON:  Same objection, calls for a

6   legal conclusion.

7        A    The -- the insurance company -- and -- and

8   the insured presenting a claim, the insurer will

9   advise the insured of the applicable exclusions.

10       Q    But as between the insurance company and

11  the policy holder do you have any understanding, one

12  way or the other, as to who has the burden of

13  establishing exclusions?

14           MR. WINSTON:  Objection, calls for a legal

15  conclusion.

16       A    By establishing -- con- -- exclusions are

17  you saying writing the -- creating the exclusions?

18       Q    No.  I mean to say proving that they

19  existed on a given policy?

20           MR. WINSTON:  Yeah, objection, calls for a

21  legal conclusion.

22       A    Generally, when a claim comes in, if there

23  are any applicable exclusions then it is the insurance

24  company who advises the insured of those -- and -- and

25  establishes that, and shows that the exclusion's

Page 75

1    applicable to the situation.

2            Q    In a coverage dispute, meaning a

3    disagreement as between the insured and the policy

4    holder, do you have an understanding whether the

5    insurance company's obligated to demonstrate the

6    existence of those exclusions if it wants to rely on

7    them?

8            MR. WINSTON:    Same objection, calls for a

9    legal conclusion.

10           A    It is my understanding that when the

11   insurance company is relying on certain exclusions --

12   that would -- that would bar coverage that the

13   insurance company advises of those exclusions.

14           Q    And if it's unclear whether or not they

15   exist with a given policy, because the policy document

16   may not be complete, who has the obligation of

17   establishing that, to the extent you know?

18           MR. WINSTON:    Objection, calls for a legal

19   conclusion.

20           A    The l- -- the legal conclusion in -- in the

21   jurisdiction I do not know.

22           Q    Is it your view that you can't do an

23   evaluation of coverage without a complete policy?

24           A    Well, one never says never, and with the

25   word can, obviously one can do an evaluation.  Should

Alabama Gas Corporation v. Travelers Casualty, et al.
Kathleen Robison

2:10-CV-1840-IPS
November 2, 2011

Page 76

1   one do an evaluation and is the evaluation proper are

2   different issues.

3       Q    Can an evaluation of a claim ever be

4   proper, in your judgment, if the policy before the

5   claims handler's not complete?

6       A    Depends --

7            MR. WINSTON:   Objection, vague, go ahead

8   and answer.

9       A    Depending upon the given claims situation I

10  would say in most instances it would not be proper to

11  make that evaluation without a complete policy.

12      Q    If a claims handler has less than a

13  complete policy with regard to a particular claim is

14  it proper for that claims handler to do nothing

15  further until the complete policy's located?

16           MR. WINSTON:   Objection, vague.

17      A    I -- it is my opinion that -- the -- the

18  claims handler should continue their activities and

19  accumulated in trying to locate the complete policy.

20      Q    And if they reach a conclusion that they

21  can't find a complete policy what should they do?

22      A    The claims adjuster should then go in

23  consultation with their supervisor and the company

24  proc- -- procedures in that.

25      Q    And do those procedures vary from company

Alabama Gas Corporation v. Travelers Casualty, et al.
Kathleen Robison

2:10-CV-1840-IPS
November 2, 2011

Page 77

1  to company?

2      A    Those procedures could vary from company to

3  company depending upon the company's historical

4  perspective, how long the company's been in business,

5  the types of policies they have, et cetera.

6      Q    Are you aware of any procedure that the

7  Travelers has with regard to how a claims handler

8  should proceed in the event the policy appears to be

9  incomplete?

10      A    From my understanding of the documents

11  reviewed, and the depositions reviewed, that when a

12  claims handler has an issue they go into consultation

13  with their supervisor on that issue and then act

14  accordingly.

15      Q    Act according to what their supervisor

16  tells them?

17      A    The supervisor could then go into

18  consultation with their supervisor, go into

19  consultation with other people in the department, and

20  even with counsel.

21      Q    What's your source for Travelers'

22  procedures that you guys described?

23      A    Those procedures that I just described were

24  in Robert Harris' deposition.

25      Q    Have you seen any other source for

Alabama Gas Corporation v. Travelers Casualty, et al.                    2:10-CV-1840-IPS
Kathleen Robison                                                         November 2, 2011

Page 78

 1    Travelers' procedures besides Mr. Harris' deposition?
 2          A    I did not see any other written -- I did
 3    not see a document on Travelers' written procedures.
 4          Q    Do you have any other source, besides
 5    Mr. Harris' deposition, written or otherwise, for
 6    Travelers' procedures?
 7          A    Basically -- in the -- in the documents I
 8    reviewed I would be mainly Mr. Harris'.
 9          Q    I want to be clear, though, is there
10    anything besides Mr. Harris' deposition that you're
11    relying on for Travelers' procedures?
12          A    I'm -- there may have been something in
13    Gail Dalton's deposition.
14          Q    Can you recall what it was?
15          A    I can't recall, at this point, that's why I
16    was hesitating.
17          Q    Besides Mr. Harris' deposition testimony
18    and Ms. Dalton's deposition testimony is there
19    anything else that you're relying upon for Travelers'
20    procedures in this case?
21          A    Those would be the two.
22          Q    And as a former claims executive and an
23    expert in claims, assuming that a company is
24    confronted with a situation where policy's incomplete,
25    and the matter percolates up, as you describe, from

Page 79

1    the initial adjuster to supervisor after supervisor

2    after supervisor, how should the company evaluate

3    that?

4              MR. WINSTON:  Objection, vague.

5         A    How should the company evaluate that?  It

6    would be looking at what documents they do have,

7    decide -- making the decision that, okay, we are going

8    to move forward with -- what -- what we do have, or

9    have we exhausted all avenues, and having exhausted

10   all avenues then making a decision, do we have enough

11   information here to move forward to make a decision.

12        Q    And in your judgment that'll be made -- at

13   a -- at a supervisor level?

14        A    That would be made at a -- it would be

15   made -- generally, it's not made by a -- an individual

16   person, it would be made in consultation with others.

17             (Robison Exhibit No. 3 was marked for

18   identification.)

19   BY MR. LASETER:

20        Q    Let me show you a document that's marked as

21   Exhibit 3, if you'd take a moment and look that over

22   and let me know when you've had a chance.  And I'll go

23   ahead and tell you that my first question is going to

24   be is -- on -- on page eight of your report, you

25   reference --

Page 80

```
 1        A    Okay.

 2        Q    -- a document, and my first question is

 3   going to be, is this the same policy?

 4             MR. WINSTON:  Hold on.

 5   BY MR. LASETER:

 6        Q    But I'm just giving you that as a guide.

 7   My first question is simply let me know when you're

 8   done reviewing Exhibit 1.  Did you have a chance to

 9   look at Exhibit 3?

10        A    Excuse me?

11        Q    Have you had a chance to look over Exhibit

12   3?

13        A    Yes.

14        Q    Okay.  If you can turn to page eight of

15   your report, in the first paragraph that is not a

16   quote, it has a citation and Bates numbered and those

17   citations are T00296 to 000304?

18             MR. WINSTON:  Let me object because I think

19   you left out, just for clarity, I think you left out a

20   zero in the 296 designation.

21             MR. LASETER:  Thank you.  Let me strike

22   that question -- and -- and go back and say that, for

23   identification purposes, Exhibit 3 bears a Bates label

24   T000296 through T000335, and I believe it is

25   consecutive.
```

Alabama Gas Corporation v. Travelers Casualty, et al.
Kathleen Robison

2:10-CV-1840-IPS
November 2, 2011

Page 81

1  BY MR. LASETER:

2          Q    And then turning to my question, you

3  identify pages T000296 to 000304 on page eight; did I

4  read that right?

5          A    Yes.

6          Q    And that appears to be a part of Exhibit 3,

7  does it not?

8          A    Yes.

9          Q    Do you know what I mean by a PDF file?

10         A    Yes.

11         Q    Yeah?  I believe that Exhibit 3 is a

12  complete single PDF file running through to page T35;

13  is that your understanding?  Or do you have an

14  understanding one way or the other?

15         A    I don't have -- I --

16         Q    You don't know one way or the other?

17         A    I don't know one way or the other if you're

18  correct or not.

19         Q    Per- -- perfectly fair.  And then -- my --

20  my question is, why, if you can -- if you know, did

21  you cut off -- the -- the numbering for your reference

22  at number -- last number 304?

23         A    I -- I took -- I took -- the -- the base

24  policy form, the endorsements that followed I was not

25  sure, because there were no effective dates listed on

Alabama Gas Corporation v. Travelers Casualty, et al.                    2:10-CV-1840-IPS
                        Kathleen Robison                                  November 2, 2011

Page 82

1    -- the -- the endorsements, and then we got into the

2    endorsements such as on T000309, we got -- there was

3    one effective date but then you get to T00310 and your

4    effective date is 9/71.  I was doing that just for

5    clarity.

6            Q   Is T000296 to 304 a sufficiently complete

7    policy, in your judgment, to make a coverage

8    evaluation in this case?

9            A   There -- the endorsements there are -- it

10   -- there are certain things still missing, here, such

11   as knowing what all the endorsements were on this

12   policy.  Another issue here was the not having a

13   listing somewhere on this with all the endorsements

14   that were attached.

15           Q   Do you have an understanding, one way or

16   the other, as to whether that listing ever existed?

17           A   I don't have any -- I can't -- I can't tell

18   you if it ever existed or it didn't exist.  I can tell

19   you that in the normal course of business for an

20   insurance company there would have been a listing.

21           Q   If the document that you quote is the only

22   document available in this situation is that

23   sufficient to make a coverage determination?

24           A   Again, it depends on what we're making a

25   coverage determination on.

Alabama Gas Corporation v. Travelers Casualty, et al.          2:10-CV-1840-IPS
Kathleen Robison                                               November 2, 2011

Page 83

1        Q    How about the duty to defend?

2        A    On the duty to defend, here we are looking

3   at the base policy, and again, this was -- and this --

4   and in this case that we're talking about it spanned

5   -- a -- a number of years.  I believe it went back

6   into the `40s, the policies into the `40s, and this

7   policy, if in looking at the effective dates, this is

8   the `67 policy.

9             So if we are talking about issues between

10  `67 and `70 this might be sufficient depending upon

11  the issues.

12       Q    And do you have an understanding -- of the

13  -- of the -- the facts in this case sufficient to

14  render an opinion as to whether or not it's sufficient

15  with regard to the duty to defend?

16            MR. WINSTON:  Objection.  Object to the

17  form, vagueness.

18       A    In this case it is my understanding that

19  Travelers based their -- their decision on duty to

20  defend a lot -- not a lot -- but used this policy

21  series for that.

22       Q    This policy series or this policy form?

23       A    By this policy what I meant by this series

24  of policies, from `67 to `70, and then the renewal

25  from `70 to `73.

Page 84

1      Q    And in your judgment was that appropriate
2  for them to do?
3      A    They had, after 15 months, this is -- this
4  is what they came up with, this is what they were able
5  to locate, and I believed it was appropriate because
6  they moved on what they had, the best at that point in
7  time.
8      Q    Did you see any evidence of a determination
9  being made by Travelers that they were going to
10 proceed with the evaluation even though they had less
11 than a complete policy?
12         MR. WINSTON:  Object to the form.  Object
13 to vagueness.
14     A    Are you asking me in any of the documents I
15 reviewed I actually saw a statement from Travelers to
16 that effect?
17     Q    Correct.
18     A    No, I did not.
19     Q    Did you see any testimony to that effect?
20         MR. WINSTON:  Objection.  Object to the
21 form.  Objection, vagueness.
22         MR. LASETER:  Let me be sure we're talking
23 about the same thing because that's maybe a fair
24 objection.
25 BY MR. LASETER:

Alabama Gas Corporation v. Travelers Casualty, et al.                    2:10-CV-1840-IPS
Kathleen Robison                                         November 2, 2011

Page 85

1          Q    You had testified earlier, I believe, that

2     the determination of whether or not a policy was

3     sufficiently complete to allow a company to make

4     coverage determination would be made by supervisors in

5     a process of collaboration --

6          A    Mm-hmm.

7          Q    -- is that right?

8          A    That's correct.

9          Q    And I'm asking you with regard to this

10    particular claim if you ever saw any evidence that

11    that process of collaboration was made prior to the

12    time they decided to proceed with the evaluation based

13    on the policy that you reference in your report?

14               MR. WINSTON:    Same objections.

15         A    If I can understand your question, you're

16    asking me if, prior to making the coverage decision

17    that they -- they -- you're not talking about the

18    coverage decision, itself.

19         Q    I'm talking about the duty to defend

20    decision?

21         A    The duty to defend decision?

22         Q    Mm-hmm.

23         A    Yes, in Gail Dalton's deposition she said

24    that she had consulted -- with -- with counsel.

25         Q    And do you think she said she consulted

Page 86

1    with counsel with regard to whether or not the policy

2    was sufficient or complete?

3              A    No.  Okay --

4              MR. WINSTON:  Let me object to the

5    vagueness.

6              A    I think that's where I was confused --

7              Q    Okay.

8              A    -- with your question.

9              Q    Yeah, let me ask it again, just to -- be --

10   be sure.  And we can wait for the ambulance coming to

11   cart me away.

12             I'm simply focused on the question of

13   whether or not the policy information that the

14   Ms. Dalton and the claims department at Travelers had

15   before them when they made the duty to defend in this

16   case, and I'm asking you whether you saw any evidence

17   that the claims department at Travelers made this sort

18   of collaborative decision that you've described with

19   regard to whether or not this policy information was

20   sufficient and complete to allow them to make a

21   decision about the duty to defend?

22             A    I did not see any documentation

23   specifically addressing that issue.

24             Q    And did you see any testimony specifically

25   addressing that issue?

Page 87

```
 1              MR. WINSTON:  Objection, asked and
 2    answered.
 3         A   I did not see any testimony, either.
 4         Q   On page three of your report you refer to
 5    the policies at issue in this case as being
 6    manuscript, and I'm looking now at the bottom
 7    paragraph, partial paragraph on page three; what does
 8    that mean to you?
 9         A   Manuscript, to me, means that -- the -- the
10    entire policy is not completely a form policy.  In
11    other words, where the forms are pre- -- all the forms
12    that are attached to the policy are pre-printed.
13         Q   And did you see any evidence in your review
14    that the fact that these policies may have been
15    manuscript have affected how the claims department
16    handled this claim?
17         A   Please repeat that question?
18         Q   Yeah, I'm going to ask -- you say on --
19    well, strike that -- I'm simply asking you whether you
20    saw any evidence, in your review of the materials
21    listed in your report, that indicated that the fact
22    that these may have been manuscript policies, meaning
23    the policies issued at Alagasco, made of manuscripted
24    policies --
25         A   Mm-hmm.
```

Page 88

1          Q    -- whether that -- that fact affected the

2     way in which the claims department handled this claim?

3          A    The methodology of handling the claim does

4     not differ between manuscript -- and -- and

5     non-manuscript forms, but with manuscript forms,

6     particularly policies that are this old over this long

7     period of time, it does -- it's more -- it takes

8     longer, it could take longer to locate it, and it can

9     be -- it can enhance the importance of locating all of

10    the policies and endorsements.

11         Q    And did you see any specific evidence in

12    the document or in the testimony you reviewed that, in

13    fact, the -- the -- the manuscript and nature of these

14    policies did affect Travelers' review of this claim?

15         A    What I saw was their continual looking for

16    policies, their pol- -- a continual policy search in

17    trying to gather all the appropriate policies and to

18    try to assemble as many of the pieces together.

19         Q    You understand that Ms. Dalton was using at

20    least the form of the policy that's now Exhibit 3 when

21    she did her analysis that resulted in the February 3,

22    2010 letter denying a duty to defend; is that right?

23         A    That is my understanding.

24         Q    Did you see any evidence in the file, in

25    anything that you reviewed, that indicated that she

Alabama Gas Corporation v. Travelers Casualty, et al.
Kathleen Robison

2:10-CV-1840-IPS
November 2, 2011

Page 89

1    was hampered in any way in making that decision based

2    upon the incompleteness of this policy?

3         A    In -- that she -- in looking through the

4    file I didn't see any indication.  I didn't see any

5    notation from her that indic- -- that said that.

6         Q    Did you see any testimony that suggested

7    that?

8         A    Not that I recall.

9         Q    And you note on page three that "Alagasco

10   did not send policies to Travelers in response to

11   request," and I believe you say that again on page

12   six; is that right?

13             MR. WINSTON:  Can you perhaps direct her to

14   where you're referring?

15   BY MR. LASETER:

16        Q    Yeah, I think on page three, it's in the

17   very middle paragraph --

18        A    Mm-hmm.

19        Q    -- that starts with Ms. Goldman?

20        A    Yes.

21        Q    And then on page six it's the end of the

22   very, very last sentence on page six?

23        A    Yes.

24        Q    And in your understanding, is that Alagasco

25   didn't send policies to Travelers?

Page 90

 1         A    On the 2008 claim.

 2         Q    Do you think that they sent them policies

 3    before then?

 4         A    I'm not quite sure because in the 1998

 5    claim, the claim file, I could not determine if the

 6    policy forms if any of those came from Alagasco or if

 7    they all came from Travelers.

 8              The one thing that did strike me was in

 9    Gail Dalton's February 3rd, 2010 letter there was, I

10    believe on the second page, toward the bottom, where

11    she exp- -- where she stated they had been trying to

12    internally verify and that --

13         Q    I believe you testified a moment ago that

14    your source for Travelers' procedures in this case is

15    primarily Mr. Harris' deposition and perhaps

16    Ms. Dalton's deposition; did I remember that right?

17         A    That's correct.

18         Q    Have you compared Travelers' procedures to

19    other best practices or other procedures in the

20    industry?

21         A    I have not done a deliberate comparison,

22    no.

23         Q    Sitting here today are you aware of any way

24    in which they deviate from industry standard or best

25    practices, I should say?

Page 91

1            MR. WINSTON:  Object to "they."  When you

2    say they are you referring to Travelers?

3    BY MR. LASETER:

4        Q    Travelers' procedures, how they deviate

5    from what you described earlier as best practices?

6            MR. WINSTON:  Object to the form.

7        A    The -- the procedures that I am familiar

8    with of Travelers, from the review of these documents,

9    no, I am not aware.

10       Q    Meaning not aware of any deviation from

11   best practices?

12       A    That is correct.

13       Q    Have you evaluated the degree to which

14   Travelers' claims handling activities, with regard to

15   the Alagasco matter, matched their own procedures, I

16   mean, the Travelers' procedures?

17       A    The Travelers' procedures as described by

18   Robert Harris?

19       Q    No, the Travelers' procedures as you

20   understand them to be?

21       A    The Travelers' procedures that I understand

22   them to be, through the documents and testimony I

23   reviewed, have -- did they apply them to Al- -- the

24   Alagasco case, is that what you're asking?

25       Q    I was actually asking it from the other

Page 92

```
 1    direction, although that's the right idea, my -- my

 2    question is -- is -- is, are you aware of any

 3    instances in which they deviated from those procedures

 4    in the handling of Alagasco's claim?

 5              MR. WINSTON:  Object to the form.

 6         A    I am not aware of any deviation where they

 7    -- where they deviated from those procedures, no.

 8         Q    And is it your opinion they followed their

 9    procedures?

10         A    I believe that they followed their

11    procedures.

12         Q    And is that an opinion you intend to give

13    in this case?

14         A    Yes.

15         Q    You testified earlier, I believe, that

16    Ms. Tarczanin received the 4600 some odd page 1998

17    claims file in December of 2008; did I remember that

18    right?

19         A    Yes.

20         Q    What additional activities, after receiving

21    that file, did you see evidence of in terms of what

22    Travelers' claims department did to locate policies?

23         A    I saw -- I saw evidence of lo- -- locating

24    policies in December of 2009 and May -- I'm sorry --

25    2008 and May of 2009 and September of 2009.
```

Page 93

```
 1        Q    What was the evidence that you saw in May
 2   of 2009?
 3        A    Those were, I believe, e-mails between the
 4   Houston SLG operation and the S -- SLCU.
 5             MR. LASETER:  Mark, that please, as the
 6   next exhibit.
 7             (Robison Exhibit No. 4 was marked for
 8   identification.)
 9   BY MR. LASETER:
10        Q    Showing you a document marked Exhibit 4,
11   take a moment and look that over, and my question will
12   be, once you've had a chance, if whether that's the
13   document you were recalling?
14        A    Yes, it is.
15        Q    And what activity do you think is recorded
16   related to searching for policies in Exhibit 4?
17             MR. WINSTON:  Objection.  The document
18   speaks for itself.
19        A    It is an e-mail from James, James A.
20   Johnson, I believe.  They go through a whole chain,
21   here, so -- but it is basically the Allan Johnson
22   requesting copies of policies from Nicole, and finding
23   and asking how she's coming with her search, so that
24   he can establish administratively what he needs to do.
25        Q    And -- what -- what evidence of actual
```

Page 94

1  activities on the part of Ms. Tarczanin do you see in

2  terms of her continued search for policies?

3       A    I do not -- well, in here there is not --

4  let's see, she says on the bottom of T001358, going

5  onto T001359, that she has, "To date, I have not

6  received any confirmed Aetna policies."

7       Q    And so other than the writing of the e-mail

8  reflected there, that you think the document, Exhibit

9  4, reflects any other activity searching for policy by

10 Ms. Tarczanin?

11      A    I think what it reflects is that she's --

12 she hasn't received these and she still knows that she

13 needs -- that she is in the process, she still knows

14 that it's necessary to find all the policies.

15      Q    Right.  And so between December of 2008,

16 and this e-mail in 2009, did you see any activity, any

17 evidence of any specific activity by anyone at

18 Travelers searching for policies?

19      A    I did not see any documentation of the

20 continued search.

21      Q    Did you see any testimony that reflected

22 activity searching for policies between December 2008

23 and May 2009?

24      A    I cannot say for certain.

25      Q    Sitting here today can you recall any?

Alabama Gas Corporation v. Travelers Casualty, et al.                    2:10-CV-1840-IPS
Kathleen Robison                                      November 2, 2011

Page 95

1          A    Sitting here today I cannot recall any.

2          Q    And aside from document number four are you

3  aware of any other evidence related to Travelers'

4  search for policy information during the month of May

5  2009?

6          A    Not that I recall.

7          Q    You mentioned a moment ago something in

8  September 2009, what was that?

9          A    There were, if I remember, there were some

10 e-mails.

11         Q    What do those e-mails reflect?

12         A    As I reviewed those I believe they

13 reflected the ongoing search.

14              MR. WINSTON:  You can refer to your report,

15 if you would like.

16              MR. LASETER:  Yes, absolutely.

17              THE WITNESS:  I don't know that --

18 BY MR. LASETER:

19         Q    And perhaps to help, on page seven, at the

20 top of the page, you have a sentence that says, "It

21 continues, efforts to create coverage"; do you see

22 that?

23         A    Yes, I do.

24         Q    And you cite two documents, one of them is

25 T001357 through T001360, which is document number

Alabama Gas Corporation v. Travelers Casualty, et al.          2:10-CV-1840-IPS
Kathleen Robison                                November 2, 2011

Page 96

1  four; is that right?

2          A    That's correct.

3               MR. LASETER:  If you would go ahead and

4  mark this as Exhibit 5.

5               (Robison Exhibit No. 5 was marked for

6  identification.)

7  BY MR. LASETER:

8          Q    I'm showing you a document marked Exhibit

9  5, which bears Bates label T000271 through T000295,

10 and take a moment to look that over and then let me

11 know whether that's the document, the second document,

12 referenced on page seven of your report?

13         A    Yes, it is.

14         Q    Okay.  And that appears to be a request for

15 a Dunn and Bradstreet business information report; is

16 that correct?

17         A    That is correct.

18         Q    Does that document reflect any activity on

19 the part of anyone at Travelers in the reconstruction

20 of the insurance policy information?

21         A    No, it doe- -- it reflects that they

22 ordered a D and B report.

23         Q    And any other evidence, that you're aware

24 of, that shows activities on the part of Travelers'

25 claims function, during September of 2009, that they

Alabama Gas Corporation v. Travelers Casualty, et al.
Kathleen Robison

2:10-CV-1840-IPS
November 2, 2011

Page 97

1    were trying to recreate the policy information?

2          A    There was, in those e-mails, and I believe

3    it was about the same time as this, where they were

4    looking at a listing of different names that were

5    related to Alagasco or that were similar.

6          Q    Is that identified anywhere in your report?

7          A    No, it is not.

8          Q    Any other evidence, during September of

9    2009, that you believe indicates that Travelers'

10   claims department was trying to locate policies for

11   Alagasco?

12         A    Besides what I mentioned, that would be it.

13         Q    Which was an e-mail identifying some

14   company names?

15         A    Yes.

16         Q    Between December 2008 and September 2009,

17   besides the things that you just testified to, do you

18   recall any other evidence that indicated that

19   Travelers was working on trying to secure policies on

20   behalf of Alagasco?

21         A    Not that I recall.

22         Q    Do you recall seeing any testimony of

23   activities during that period?

24         A    Not that I recall.

25         Q    Between September 2009 and February 2010,

Page 98

1    do you recall seeing any evidence of Travelers'

2    efforts to locate insurance policies on behalf of

3    Alagasco?

4            A    Not that I recall.

5            Q    Just to be sure I'm -- I'm right, now,

6    between December 2008 and February 2010 there's the

7    e-mail marked as Exhibit 4, there's a Dunn and

8    Bradstreet request marked as Exhibit 5, and there was

9    an e-mail which you recall but you didn't cite in your

10   report that appeared to identify some company names;

11   is that right?

12           A    That's what I stated.

13           Q    And is that a complete list of all the

14   evidence of activities that you saw of Travelers'

15   efforts to reconstruct the insurance policies on

16   behalf of Alagasco in this matter, between 2008,

17   December 2008 and February of 2010?

18           A    And the documents that I reviewed, those

19   are the ones that I recall.

20           Q    And in the testimony you reviewed, did you

21   see anything in addition to that?

22           A    Not that I recall.

23           Q    And has anybody outside of the testimony

24   that you reviewed or the documents told you about any

25   activities?

Page 99

```
 1        A    No.

 2        Q    Have you ever seen the Munich Re Book

 3   before this case?

 4        A    No, I have not.

 5        Q    Have you ever seen anything like the Munich

 6   Re Book with regard to environmental coverage issues

 7   before this case?

 8        A    As the reinsurers that I -- in the

 9   companies that I have worked for, the reinsurers was

10   Gen Re, and Gen Re had published a number of similar

11   books.

12        Q    And do you recall seeing any Gen Re Book

13   that analyzed environmental coverage issues?

14        A    I do not recall, specifically.

15        Q    Do you recall ever using any such book in

16   the course of handling a claim?

17        A    I'm sure I did, I can't recall the specific

18   claim.

19        Q    Which company was Gen Re the reinsurer for?

20             MR. WINSTON:  Objection, vague.

21   BY MR. LASETER:

22        Q    Let me ask a better question.  You

23   identified General Re as the reinsurer from one of the

24   companies that previously worked for; is that right?

25        A    That is correct.
```

Alabama Gas Corporation v. Travelers Casualty, et al.                2:10-CV-1840-IPS
Kathleen Robison                                                     November 2, 2011

Page 100

1        Q    Which company was that?

2        A    DaimlerChrysler.

3        Q    So if you resorted to a Gen Re compendium

4   of environmental coverage cases it would have been

5   while you were working at Chrysler or DaimlerChrysler

6   Insurance Company?

7        A    That's the one I recall.

8        Q    Do you recall any others?

9        A    From any other companies?

10       Q    Any other compendiums of insurance coverage

11  cases that you might have reviewed in connection with

12  a claim?

13       A    From time to time -- from time to time we

14  get -- attorney's firms will put out compe- --

15  compendiums of various things, I know I have looked at

16  that for UM/UIM issues.

17       Q    That's uninsured motorists?

18       A    Uninsured -- und- -- underinsured and

19  uninsured motorists.

20       Q    Do you recall one for environmental

21  matters?

22       A    I do not recall a specific one for

23  environmental matters.

24       Q    I'm on page nine of the next to last

25  paragraph, this is referring to whether or not a PRP

Alabama Gas Corporation v. Travelers Casualty, et al.
Kathleen Robison

2:10-CV-1840-IPS
November 2, 2011

Page 101

1    letter or notice from EPA is considered a suit under

2    policies in Alabama, do you understand that, that

3    would be the topic of this?

4           A    Oh, yes.

5           Q    Uh-huh, and the second sentence there, you

6    say this was a fairly debatable issue; do you see

7    that?

8           A    Yes, I do.

9           Q    That's your opinion?

10          A    That's my opinion.

11          Q    What's the basis for that?

12          A    The basis for that is that Travelers had --

13   that Travelers had looked at its resources, they had

14   consulted -- with -- with counsel, the state of

15   Alabama had -- the Supreme Court had not ruled one way

16   or the other on this, on this issue, and so that it --

17   there wasn't direction from that, and that meant --

18   meant that -- that it was a debatable issue and could,

19   now that we look back at it, that Travelers looked at

20   all the issues involved and made their decision

21   accordingly.

22          Q    How do you know that Alabama had not ruled

23   on that issue?

24          A    How -- how do I know that?

25          Q    How do you, Ms. Robison, know that

Alabama Gas Corporation v. Travelers Casualty, et al.
Kathleen Robison

2:10-CV-1840-IPS
November 2, 2011

Page 102

1    Travelers -- that Alabama law had not -- there's not a

2    case in Alabama on that issue?

3         A    I -- in -- in reviewing the Munich Re and

4    doing -- and being advised, and being advised.

5         Q    Being advised by counsel for Travelers?

6         A    By counsel, yes.

7         Q    Did you personally review the Munich Re

8    Book to determine whether or not Alabama had rules on

9    the issue of whether a PRP letter is a suit?

10        A    I did review the PRP -- I'm sorry -- I did

11   review the Munich Re Book.

12        Q    And you reviewed it for purposes of

13   determining whether or not it says that Alabama has

14   ruled on the issue of whether or not the PRP letter is

15   a suit?

16        A    I -- I reviewed the Munich Re Book to see

17   what the Munich Re Book said.

18        Q    And I'm asking you if reviewed it for

19   purposes of determining whether or not a PRP letter is

20   a suit in Alabama.

21             I'm not asking you whether or not

22   Travelers' counsel told you that, I'm asking whether

23   you personally reviewed the Munich Re Book to

24   determine that, yourself?

25        A    I looked at the Munich Re Book to see what

Page 103

1  the Munich Re Book said on that, yes.

2          Q   And -- you -- you reviewed on the issue of

3  whether a PRP letter is a suit, you reviewed the

4  Munich Re Book?

5              MR. WINSTON:  Objection, asked and

6  answered.  It's becoming argumentative.

7          A   I reviewed what was in the Munich Re Book

8  and looked at the notations and the symbols, yes.

9          Q   And besides your review of the Munich Re

10 Book, that you just testified to, and having counsel

11 for Travelers discuss with you that issue, any other

12 source that you have for your understanding as to

13 whether or not that was a debatable issue?

14             MR. WINSTON:  Object to the extent you

15 mischaracterize her testimony.  You can go ahead and

16 answer.

17         A   I did not do -- a -- a legal research on

18 that, no, I did not do a legal research.

19         Q   I'm just trying to be sure I understand --

20 the -- the -- the source for your sentence, it says in

21 your report, on page nine, this was a fairly debatable

22 issue.

23             One source you said is your review of the

24 Munich Re Book; is that right?

25         A   That's correct.

Alabama Gas Corporation v. Travelers Casualty, et al.          2:10-CV-1840-IPS
                    Kathleen Robison                            November 2, 2011

Page 104

1          Q    And the second source is discussions with

2    counsel for Travelers; is that right?

3          A    That's correct.

4          Q    Any others?

5          A    That would be -- besides any of the

6    testimony that the depositions I reviewed, that would

7    be it.

8          Q    So a third possibility would be -- the --

9    the views of Travelers' claims department?

10         A    Correct.

11         Q    Okay.  So the three things in there that

12   you reviewed, the Munich Re Book, your discussion with

13   counsel for Travelers, and the opinions of Travelers'

14   claims department; is that right?

15         A    Correct.

16         Q    Is there anything else?

17              MR. WINSTON:  Objection, asked and

18   answered.

19         A    Not that I recall.

20         Q    We talked a minute ago about the activities

21   that Travelers' claims department undertook with

22   regard to the reconstruction of policies between

23   December of 2008 and February of 2010, and I want to

24   move away from the question of efforts to reconstruct

25   the insurance policies and ask if you saw any evidence

Page 105

1   that they were doing anything else between December

2   2008 and February 2010, besides what was reflected in

3   the Exhibit No. 5 that you already have in front of

4   you?

5          A    Yes.

6          Q    What were those things?

7          A    They -- they promptly -- they communicated

8   with Alagasco.

9          Q    So they -- they wrote letters, you mean?

10         A    They -- they -- they wrote letters to

11  Alagasco, they talked to Alagasco's attornies, they

12  received information from Alagasco.

13         Q    Anything else?

14         A    As far as documents, that's -- that -- and

15  I did see evidence of initiating -- assigning an

16  investigator.

17         Q    When was that?

18         A    And that was after the February 3rd, 2008,

19  2010 letter.

20         Q    So that would not be between December 2008

21  and February 2010?

22         A    I believe you're -- that's correct, if

23  we're looking at the February, I'm not quite sure, but

24  it was after the 2003/2010 letter.

25         Q    And to be clear, I think you meant February

Alabama Gas Corporation v. Travelers Casualty, et al.
Kathleen Robison

2:10-CV-1840-IPS
November 2, 2011

Page 106

1   3rd, 2010?

2          A    Oh, February 3rd, I'm sorry.

3          Q    That's fine.  All right.  So the things

4   we've identified so far is that Travelers wrote

5   letters to Alagasco, they had phone calls, and they

6   received information from Alagasco.  Anything else

7   that Travelers' claims department did between December

8   2008 and February 2010?

9               MR. WINSTON:  Let me just object that the

10  claim file and documents there speak for themselves.

11  I assume what you're asking her, as she sits here

12  today, is can she think of anything else.

13         A    And you're -- you're ask -- if we're

14  talking about what I reviewed in the documents?

15         Q    I'm -- to be clear, I'm -- I'm asking you

16  for the basis for your opinion that Ala- -- that

17  Travelers was conducting a review of this claim

18  between December 2008 and February 2010.

19              And so far you've identified that they

20  wrote letters, they had phone calls, and they received

21  information, and in addition to the activities that we

22  discussed a moment ago, related to the reconstruction

23  of policies, and I'm trying to find out if there's

24  anything that stands behind your view that they were

25  reviewing this matter between December 2008 and

Page 107

1    February 2010?

2         A    And in December 2010 they -- they received

3    --

4         Q    You mean 2008?

5         A    I'm sorry, thank you, in December of 2008

6    Nicole Tarczanin received docu- -- 4 -- 4600 -- over

7    4600 pages in documents.  She testified that she --

8    she reviewed, she read each and every page, so that,

9    yes, there's evidence of that.

10              There is evidence, as I stated, of an

11   ongoing policy search in the file.

12        Q    And that's the one we just testified to?

13        A    That's the one we just talked about.  There

14   -- there is evidence of -- with Alagasco sending in

15   information that would -- that takes time to read,

16   absorb, decipher, decide, of communicating, responding

17   based on that information sent back, throughout this

18   time period, and -- and continuing the policy, as I

19   said, continuing -- reading all the information,

20   continuing the policy search, getting the information

21   from Alagasco during this time period.

22              During this time period there was a period

23   where Alagasco, there was nothing from Alagasco for

24   five months, so they -- they promptly responded to all

25   the communication that Alagasco sent.  They promptly

Alabama Gas Corporation v. Travelers Casualty, et al.                    2:10-CV-1840-IPS
Kathleen Robison                                                         November 2, 2011

Page 108

1    addressed it.

2            Q    Anything else?

3            MR. WINSTON:  Objection, asked and

4    answered.

5            A    That would be what I saw.

6            Q    You reviewed Ms. Tarczanin's deposition?

7            A    Yes, I did.

8            Q    Do you believe that she testified that she

9    could remember reading those 4600 pages?

10           A    My recollection is she testified that she

11   would have read all the pages.  She could not remember

12   reading each and every page.

13           Q    Do you think that she could remember

14   reading any of those pages, based on her testimony?

15           A    I would have to review that testimony again

16   to answer that question.

17           Q    Mm-hmm.  Is it possible that she just

18   testified that she merely believes that she would have

19   reviewed every page?

20           MR. WINSTON:  Well, objection, anything's

21   possible.  You can answer that.

22           A    I believe she said that it was her practice

23   and procedure to review all the documents.

24           Q    And not that she knows for certain that she

25   did; is that right?

Page 109

```
 1              MR. WINSTON:  Object to the form.
 2        A    I believe she testified something that she
 3   could not recall if -- she -- she could not recall
 4   that particular one.
 5        Q    That -- so you don't know how much time
 6   Ms. Tarczanin might have spent, in December 2008,
 7   reviewing those 4600 pages?
 8              MR. WINSTON:  Object to the form.
 9              MR. LASETER:  Help me with that objection,
10   Frank?
11              MR. WINSTON:  You just made a statement.
12   You didn't even ask her a question.
13              MR. LASETER:  Oh, I suppose that's fair.
14   BY MR. LASETER:
15        Q    Sitting here today, Ms. Robison, do you
16   have any understanding as to the amount of time
17   Ms. Tarczanin would have spent in December 2008
18   reviewing the 4600 pages of the 1998 claims file?
19        A    I have an understanding of how much time it
20   would take a person to go through that, yes.
21        Q    Which is about how much time it took you?
22        A    No.  I would expect the person to go
23   through it much, much, much more thoroughly than it
24   took me.
25        Q    Why would that be?
```

Page 110

1       A    Because they would be -- I was looking at

2  documents relating to the handling of the 2008 -- `8

3  matter, and these were -- and there were a lot of

4  documents in there relating to the 2000 -- or, I'm

5  sorry -- the 1999 case, and I was not in the process

6  of trying to recreate a file from all the

7  underwriting, writing information that was in there.

8            So I would expect it would -- take -- take

9  a person who was doing that initial go-through a lot,

10 lot, lot longer time than it would take me.

11      Q    And -- and sitting here today, do you have

12 any actual information with regard to the amount of

13 time Ms. Tarczanin spent in December 2008 on that

14 matter?

15      A    I do not have any specific information on

16 the exact number of hours or minutes she spent looking

17 at it.

18      Q    And the same thing would be true with

19 regard to January 2009?

20      A    The same thing would be true there.

21           MR. WINSTON:  I don't want to interrupt

22 your flow, but we're getting close to another break

23 time, plus I don't know how much longer you have,

24 whether you would consider lunch or not?

25           MR. LASETER:  Well, let's take a break.  We

Alabama Gas Corporation v. Travelers Casualty, et al.
Kathleen Robison

2:10-CV-1840-IPS
November 2, 2011

Page 111

1  can go off the record.

2          (Recess.)

3          MR. LASETER:  Back on the record.

4          (Robison Exhibit No. 6 was marked for

5  identification.)

6  BY MR. LASETER:

7      Q   I'm going to show you what's now marked

8  Exhibit 6, ask you to take a moment and look at that,

9  and I'm going to make reference to page four of your

10 report.

11         And once you've had a moment to look that

12 over, my question would be whether this letter is the

13 letter you referred to on page four of your report?

14     A   Yes.

15     Q   And you quoted a sentence on your page four

16 of your report that comes from page two of the letter

17 that reads, "Therefore, we cannot determine our

18 potential coverage obligations to Alagasco unless or

19 until such a claim or lawsuit's received"; do you see

20 that?

21     A   Yes.

22     Q   And that is a sentence that follows on an

23 observation by Ms. Tarczanin that they -- request for

24 information is not a formal claim; is that correct?

25     A   Yes.

Page 112

1          Q    And then in your report you say, "In my
2    opinion, this was a reasonable statement"; do you see
3    that?
4          A    Yes.
5          Q    And is that your opinion?
6          A    Yes.
7          Q    What's the basis for that opinion?
8          A    The basis for that opinion is that the --
9    at this point in time the US EPA is asking for
10   information and had not presented a claim for damages,
11   it was -- it was simply looking for information,
12   stating that there would be a claim.
13         Q    Did you resort to any reference materials
14   to make that evaluation, meaning the evaluation this
15   was a reasonable statement?
16         A    No.
17         Q    Okay.  Did you review the information
18   requested?
19         A    Yes.
20         Q    So to be sure I'm understanding, the basis
21   for your opinion is that in your review of the
22   information request it didn't make a demand for
23   damages, is that -- did I understand that right?
24         A    It didn't present a claim, it was asking
25   for information.

Alabama Gas Corporation v. Travelers Casualty, et al.
Kathleen Robison

2:10-CV-1840-IPS
November 2, 2011

Page 113

1    Q    And -- and other than your review of the
2  information request do you have any other basis for
3  your review that this was a reasonable position on the
4  part of Ms. Tarczanin?
5    A    It would be the -- it would be my -- based
6  on my past experiences in claims handling and on the
7  documents that I reviewed.
8    Q    In regard to your past experience, I
9  believe you testified earlier that you couldn't recall
10  a particular instance where you had to consider a
11  request for information; did I get that right?
12    A    That's correct.
13    Q    Can you recall any similar situation where
14  you reached a determination that something wasn't a
15  formal claim?
16        MR. WINSTON:  Objection, vague.
17    A    Yes, throughout claims handling, my claims
18  experience, we will have times where an insured says,
19  particularly, like, dealerships, I am being, you know,
20  this department is asking me these questions and, you
21  know, and I think, you know, this may be a claim.  And
22  we'll say, you know, you need to respond.  And then
23  when a claim is presented you'll notify us.
24    Q    Any others come to mind?
25    A    That's -- that -- those are the ones that

Page 114

1    stick out in my mind right now.

2         Q    On page nine of your report, you state that

3    Ms. Dalton had consulted with counsel, this is in the

4    next to last full paragraph on page nine, when do you

5    understand that she consulted with counsel?

6         A    It is my recall, from reading her

7    deposition, that she consulted with counsel prior to

8    the February 3rd, 2010 letter.

9         Q    And is your understanding that she

10   consulted with counsel entirely from her deposition?

11        A    Yes.  Excuse me.  That's what she states in

12   her deposition but then I -- and Robert Harris'

13   deposition, he also talks about their procedure and

14   how they go about it.

15        Q    And do you think anything in Mr. Harris'

16   deposition confirmed or denied that Ms. Dalton

17   actually did see counsel?

18        A    Mr. Harris' deposition described their

19   process.

20        Q    So he was just describing the process, he

21   was not testifying one way or the other with regard to

22   whether or not Ms. Dalton actually followed that

23   process; is that right?

24        A    He was describing the process, correct.

25        Q    And -- and was not saying, one way or the

Alabama Gas Corporation v. Travelers Casualty, et al.
Kathleen Robison

2:10-CV-1840-IPS
November 2, 2011

Page 115

 1    other, whether or not Ms. Dalton followed it?

 2        A    From what I recall, correct.

 3        Q    I'll ask you to turn to Exhibit C of your

 4    deposition, which is your list of testimony, and

 5    initial question, are the matters that are reflected

 6    on Exhibit C also included in the matters listed on

 7    Exhibit A under the category of expert witness files?

 8        A    They should be, let me double check.

 9        Q    And it looks like I'm now -- I see that it

10    looks like that's correct.  Turning to Exhibit C, what

11    was the matter, the Kenneth John Nardelli matter

12    about?

13        A    That was a claims practices issue

14    concerning a recovered stolen vehicle.

15        Q    Who retained you in that matter?

16        A    The Metropolitan.

17        Q    Was there a question of bad faith in that

18    case?

19        A    Yes.

20        Q    What happened to that case?

21        A    That case went to trial with an adverse

22    verdict that was later significantly reduced.

23        Q    You did not testify at trial?

24        A    I testified at trial, yes.

25        Q    Oh, I'm sorry, it's down below?

Alabama Gas Corporation v. Travelers Casualty, et al.
Kathleen Robison

2:10-CV-1840-IPS
November 2, 2011

Page 116

1          A    Yes.

2          Q    I see.

3          A    Yes.

4          Q    Okay.  What is the -- was the David V.

5    Oakes case about?

6          A    The David V. Oakes case was an underinsured

7    motorists case.  I was retained by Allstate.

8          Q    Was that a claims handling case?

9          A    That involved claims handling.

10         Q    Allegation of bad faith?

11         A    Yes, sir.

12         Q    And how was that case resolved?

13         A    That case was resolved through settlement.

14         Q    Do you recall who counsel was in that case?

15         A    They're out of Lexington, Kentucky.

16              MR. WINSTON:  Are we talking for policy

17    holders or for insurance?

18    BY MR. LASETER:

19         Q    Either side?

20         A    Oh, oh, either side, counsel is out of --

21    out of -- and I cannot -- I'm sorry, I cannot remember

22    their name, David V. Oakes was an attorney but he did

23    not represent himself.

24         Q    And you can't remember who represented

25    Allstate?

Page 117

1          A     I should but I don't.

2          Q     That's all right.  How about the Michael

3    and let's call it --

4          A     Scheidecker.

5          Q     -- Scheidecker, which is

6    S-c-h-e-i-d-e-c-k-e-r, case, what was that about?

7          A     That was a negligent infliction of an

8    emotional distress case in Alaska, it involved claims

9    handling and faith allegations, but more so to the

10   applicability of the negligent infliction of emotional

11   distress.  Allstate Insurance Company retained -- I

12   was retained by them, that case was resolved through

13   settlement.

14         Q     Cecil Nevels?

15         A     Cecil Nevels is a bodily injury, Cecil

16   Nevels is a bodily injury case, it's in the state of

17   Kentucky and with the same firm as the David V. Oakes,

18   and I was retained by Deerbrook Insurance Company.

19         Q     Is Deerbrook related to Allstate in any

20   way?

21         A     Deerbrook is a subsidiary of Allstate.

22         Q     Was there -- is there a bad faith issue

23   there?

24         A     There's a bad faith issue there.  That one

25   is not yet resolved.

Alabama Gas Corporation v. Travelers Casualty, et al.                    2:10-CV-1840-IPS
Kathleen Robison                                November 2, 2011

Page 118

1          Q    Jannell Williams?

2          A    Jannell Williams -- is a -- is a case

3    involving a single vehicle truck, tractor-trailer

4    accident, where the two drivers were, after -- the --

5    the rig had the accident, it caught fire and the two

6    drivers were burned to death.

7               I am re- -- I was retained by Jannell

8    Williams.

9          Q    What's the issue there?

10         A    The issue on that is concerning -- the --

11   the -- the claims handling of the evidence, spoliation

12   of evidence.

13         Q    Is that evidence of the underlying

14   accident?

15         A    Of the underlying accident, that one is not

16   resolved, either.

17         Q    I may have already asked you this, who was

18   counsel for Metropolitan Group in the Nardelli case?

19         A    Tim Strong, Steptoe and Johnson, out of

20   Phoenix, Arizona.

21         Q    Do you recall who represented Mr. Nardelli?

22         A    No, I do not.

23         Q    Have you been retained by either the firm

24   Steptoe and Johnson or about Steptoe's clients in

25   other matters?

Alabama Gas Corporation v. Travelers Casualty, et al.                    2:10-CV-1840-IPS
Kathleen Robison                                                          November 2, 2011

Page 119

1          A    In other matters?  Let me take a look.

2          Q    Yeah.

3          A    If you don't mind.

4          Q    Absolutely.

5          A    No.

6               MR. LASETER:  No further questions.

7               MR. WINSTON:  Okay, we'll read and sign.

8    Can we get an expedited transcript?

9               (Signature having not been waived, the

10   deposition of Kathleen Robison was concluded at 12:51

11   p.m.)

12               ACKNOWLEDGMENT OF DEPONENT

13        I, Kathleen Robison, do hereby acknowledge that I

14   have read and examined the foregoing testimony, and

15   the same is a true, correct and complete transcription

16   of the testimony given by me and any corrections

17   appear on the attached Errata sheet signed by me.

18

19   _____      _____

20        (DATE)                        (SIGNATURE)

21

22

23

24

25

Alabama Gas Corporation v. Travelers Casualty, et al.
Kathleen Robison

2:10-CV-1840-IPS
November 2, 2011

Page 120

1        CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2        I, Cassandra E. Ellis, Registered Professional

3    Reporter, the officer before whom the foregoing

4    proceedings were taken, do hereby certify that the

5    foregoing transcript is a true and correct record of

6    the proceedings; that said proceedings were taken by

7    me stenographically and thereafter reduced to

8    typewriting under my supervision; and that I am

9    neither counsel for, related to, nor employed by any

10   of the parties to this case and have no interest,

11   financial or otherwise, in its outcome.

12       IN WITNESS WHEREOF, I have hereunto set my hand

13   and affixed my notarial seal this 3rd day of November

14   2011.

15   My commission expires:

16   November 30, 2012

17

18

19   _____

20   NOTARY PUBLIC IN AND FOR

21   THE DISTRICT OF COLUMBIA

22

23

24

25

Alabama Gas Corporation v. Travelers Casualty, et al.                    2:10-CV-1840-IPS
                    Kathleen Robison                                      November 2, 2011

Page 121

```
 1                 E R R A T A    S H E E T

 2        IN RE:  Alabama Gas v. Travelers Casualty

 3     RETURN BY:  _____

 4     PAGE      LINE       CORRECTION AND REASON

 5     _____     _____      _____

 6     _____     _____      _____

 7     _____     _____      _____

 8     _____     _____      _____

 9     _____     _____      _____

10     _____     _____      _____

11     _____     _____      _____

12     _____     _____      _____

13     _____     _____      _____

14     _____     _____      _____

15     _____     _____      _____

16     _____     _____      _____

17     _____     _____      _____

18     _____     _____      _____

19     _____     _____      _____

20     _____     _____      _____

21     _____      _____

22        (DATE)                   (SIGNATURE)

23

24

25
```

Page 122

1        E R R A T A   S H E E T   C O N T I N U E D

2          IN RE:  Alabama Gas v. Travelers Casualty

3     RETURN BY:  _____

4     PAGE      LINE        CORRECTION AND REASON

5     _____     _____       _____

6     _____     _____       _____

7     _____     _____       _____

8     _____     _____       _____

9     _____     _____       _____

10    _____     _____       _____

11    _____     _____       _____

12    _____     _____       _____

13    _____     _____       _____

14    _____     _____       _____

15    _____     _____       _____

16    _____     _____       _____

17    _____     _____       _____

18    _____     _____       _____

19    _____     _____       _____

20    _____     _____       _____

21    _____     _____

22       (DATE)                    (SIGNATURE)

23

24

25