FILED
2011 Nov-23  AM 10:59
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

ALABAMA GAS CORPORATION,

PLAINTIFF,

v.                                    CASE NO. 2:10 CV 01840 IPJ

TRAVELERS CASUALTY AND SURETY
COMPANY, ST. PAUL FIRE AND MARINE
INSURANCE COMPANY, ST. PAUL
SURPLUS LINES INSURANCE COMPANY,
& ST. PAUL MERCURY INSURANCE
COMPANY,

DEFENDANTS

## EXPERT REPORT OF PETER J. HILDEBRAND, JD & CPCU

TO THE HONORABLE COURT:

I, Peter J. Hildebrand, offer the following report containing a statement of my opinions and the bases and reasons there for, the data or other information considered in forming the opinions, my qualifications, including a list of any publications or papers authored by me within the preceding ten years and the compensation I am to be paid. I have also attached as Exhibit "A", a current curriculum vitae, and as Exhibit "B" a list of documents I reviewed and considered in my preparation for this report.

## QUALIFICATIONS

My full name is Peter Jerome Hildebrand. I received a Bachelor of Arts degree in Economics (Honors Program) from the University of Wisconsin - Madison, summa cum laude, and was awarded membership in Phi Beta Kappa and various other honor fraternities. I continued my studies at University of Wisconsin Law School, where I received a Juris Doctor degree three years later. My studies included the available Environmental Law courses in the law school curriculum. I was admitted to the State Bar Association of Wisconsin where I remain licensed and in good standing.

2

I have worked in the insurance industry full time since 1976. For twenty-five years, I was a member of senior claims management in four different insurance companies. After completing several years as a trial lawyer in private practice, I took an attorney position with the Milwaukee Insurance Company (MIC), where my responsibilities included supervising outside counsel, providing coverage opinions on insurance issues, filing and litigating lawsuits and resolving high exposure claims. While at MIC, I handled several commercial insurance claims involving environmental matters for our insureds. Midway through my tenure at MIC, I was promoted to Vice President and General Counsel and head of the Claims - Legal Department.

After leaving MIC, I joined the home office claims department for Great American Insurance Company (GAI), where I served as the claim officer in charge of liability claims. My staff was responsible for providing the field claim offices with direction on all serious liability cases and for the audit of those offices for compliance with claims standards and practices. Our book of business included nearly all types of commercial policies, including a variety of primary, excess and umbrella policies.

Among my early accomplishments at GAI was to complete my CPCU studies and to receive my designation as a Certified Property & Casualty Underwriter. Attainment of this certification at that time required successful completion of a 10 course curriculum with exams covering courses such as commercial liability coverage, commercial property coverage, the legal environment of insurance and others. The curriculum is very much focused on commercial coverages and claim handling. The CPCU is the equivalent of an undergraduate degree in property and casualty insurance.

During my home office tenure, I was responsible among other things for implementation of the Claims & Litigation Management Program and for completion of the consolidation of all environmental and toxic tort claims into a centralized unit.

The GAI Environmental Claim Unit (ECU) handled all the claims involving toxic torts and environmental issues within the company related to the following categories:

> A. Claims asserted against policyholders as PRP's by the EPA under CERCLA & other related federal legislation.
> B. Claims asserted for personal injury, property damage and clean-up expenses at environmental sites.
> C. Claims asserted by various states through their Departments of Environmental Protection for violation of state environmental statutes and regulations.
> D. LUST (Leaky Underground Storage Tank) claims nationwide.
> E. All asbestos related claims.
> F. All claims involving exposure to other toxic substances including but not limited to lead, silica, beryllium, welding rods, and others.

As part of my duties, I managed the ECU for most of my tenure at the GAI home office. I was personally involved in the largest and most complicated cases within ECU including EPA Superfund matters nationwide. My duties relative to the ECU included the following:

3

1. To implement a coverage protocol within the unit and to insure consistent application of coverage positions on issues such as (a) Late Notice; (b) Trigger of Coverage; (c) Number of Occurrences; (d) Property Damage; (e) Personal Injury; (f) Pollution Exclusion; (g) Owned Property Exclusion; (h) Treatment of PRP Letters as Suits; (i) Duty to Defend; and (j) Punitive Damages.
2. To work with environmental coordinating counsel to identify and establish our coverage positions on issues like those outlined in section (1) and to keep the staff informed on GAI's positions in that regard.
3. To provide claims or legal advice and direction to unit members on specific issues of coverage and liability on individual claims within the ECU.
4. To provide claims or legal advice and direction to unit members on investigation of ECU claims including the establishment of multiple claim handlers on files containing a conflict between the interests of the policyholder and the company.
5. To negotiate defense sharing agreements with other insurers and the policyholder to provide a unified effort in the defense of the ECU litigation.
6. To negotiate settlement agreements with other insurers and policyholder's counsel to resolve ECU claims to the benefit of the policyholder.
7. To establish procedures for the handling of claims in the ECU.
8. To provide authority to establish loss and expense reserves within the ECU and to approve such reserves in excess of claim handler authority.
9. To provide authority to establish payment authority on settlements and expenses for each unit member and to authorize any payments in excess of that authority.
10. To review and approve coverage letters drafted by unit members.
11. To evaluate claims either personally or through a claims committee process to assist and guide unit members on claims handling decisions.
12. To meet with and discuss complex ECU cases with defense counsel who specialize in handling such matters and assessing their knowledge, experience and effectiveness.
13. To provide unit members with regular training on coverage and legal issues related to the types of claims in ECU.
14. To provide reports to executive management and to our reinsurers on the major environmental and toxic tort cases being pursued against GAI, and to resolve any reinsurance disputes related thereto.

In addition to the largest environmental claims, I also personally handled some of the highest exposure mass tort claims including a major piece of litigation from a hotel fire in Puerto Rico, a toxic environment case in East Texas, and various claims presented against a number of Fortune 500 Companies. As part of my duties as head of home office liability claims, I was responsible for managing the home office liability claims staff. Our staff regularly reviewed and revised the methods and procedures to be followed by the field claim offices on commercial claims and performed quality control audits. I was involved in the establishment and implementation of claims procedures and protocols throughout GAI commercial lines offices. In order to

4

accomplish these duties, I regularly contacted and discussed standards with my counterparts in GAI, with claims executives in other major commercial claims departments and with reinsurance claims executives.

We implemented standards and procedures consistent with our understanding of the custom and practice in the industry, fair claim practice act regulations and our duties under the insurance contract and the law. I personally traveled regularly to our field claim offices nationwide and audited their claim files with my staff to insure compliance with those standards and procedures and to develop plans to help offices improve in their compliance. I also performed claim audits on other insurance companies as part of the due diligence performed by GAI when it was proposing to purchase another insurer and personally was able to see how other companies interpreted the custom and practice within the industry as to their claim handling.

Half way through my career at GAI, I took a position as Regional VP of Claims for the Mid-Atlantic, Southern and Texas regions of the company. During my management of these offices, my offices received numerous awards for excellence in claims handling and superior financial results. My offices handled a wide variety of commercial claims and I was personally accountable for each office and its compliance with the aforementioned standards and procedures. My combined region received the President's Award as the best performing region in the company on multiple occasions and I personally received the Claims MVP Award as the outstanding claims executive in the division.

For the last ten years of my corporate employment, I was the senior claims officer at two different insurance companies. After leaving GAI, I managed the Vesta/Shelby Insurance Group (Vesta) Claims and Regulatory Departments for three years. I subsequently left to build the Claims Department for the American Safety Insurance Group (ASI), where I remained for seven years. In both positions, I implemented practices and procedures consistent with my understanding of the custom and practice within the industry. ASI wrote specialty or niche business focused on environmental contractors and consultants. ASI later expanded its business to other contractors and to fixed site environmental risks. ASI wrote program business including a dry cleaning program which generated a volume of environmental claims. It also outsourced business to Managing General Agents (MGA's) and contracted with TPA's to handle those outsourced claims.

As part of my duties at ASI, I initially handled all the complex environmental claims personally, including coverage investigation and evaluation, drafting of coverage letters, obtaining non-waiver agreements, assessment of defense duties, reassignment of conflict files, and the settlement of those cases. As the company grew, I managed a staff that was specially trained in environmental coverage and claims handling procedures. At one point in time, I worked with underwriting to review hundreds of our environmental coverage forms and to revise those coverage forms. We performed a product comparison with other environmental insurers to better assess the types of coverages and endorsements available in the marketplace. In addition to drafting coverage forms, I also worked with the Regulatory Manager to get approval for some of those forms nationwide and once approved, I presented education and training to company employees on those coverages.

5

In each of the senior management positions held for the above four carriers, I was personally involved in the development, implementation, revision and enforcement of the company claim policies and claim handling procedures or guidelines and either implemented or administered a claims training program in that regard. I have personally made numerous training presentations to claims personnel on my staff and for other offices or claim handling entities, including training on the handling and evaluation of coverage on environmental claims and good faith claims handing. I have also taught The Legal Environment of Insurance for the CPCU Society and been a guest lecturer at Crawford University and Marquette Law School. I was recently active on the Education Committee for the Atlanta Claims Association.

Presently, I am operating Peter Hildebrand, LLC, an insurance and reinsurance consulting business that I started in January, 2006. I am currently a licensed Insurance Counselor in the State of Georgia for property and casualty insurance. I am a member of the Defense Research Institute (DRI), the Wisconsin State Bar Association, and the American Association of Justice (AAJ). I am also a member of the American Bar Association (ABA) and its Torts, Trial & Insurance Practice Section and its Mediation and Arbitration Section. In addition to my CPCU membership, I am a member of the Society of Risk Management Consultants and of ARIAS, a leading arbitration group for complex insurance/reinsurance disputes. Earlier this year, I made the annual ethics presentation to the Central Indiana Chapter of the CPCU on Insurance Company Business Ethics and Bad Faith. Please refer to Exhibit "A" for more detail on my background and experience.

The U.S. District Court for the Northern District of Georgia has determined that I am a qualified expert witness on claim handling practices and procedures on a case involving an auto liability BI claim with issues relative to time limited demands and a failure to promptly settle. I have written and presented a paper entitled "*Reinsurance Basics for the Claims Professional Relative to Bad Faith Claims.*" Since starting my consulting business in 2006, I have regularly consulted and/or testified on issues involving claim handling practices and procedures, personal auto and non-standard auto liability coverage and claim handling, failure to settle issues, time limited and policy limits demands, claims compliance with the duty of good faith and fair dealing, fair claim settlement practice statutes and regulations, researching policies on continuing occurrence claims and umbrella/excess claim handling.

## TESTIMONY & COMPENSATION

As mentioned above, I have been approved as an expert on claim handling practices in the United States District Court for the Northern District of Georgia – Atlanta Division. I have been deposed or testified in Court approximately 30-35 times in the past six years. I have consulted and/or testified on a wide variety of matter including cases involving issues related to environmental coverage and claims handling. A listing of cases in which I have testified is attached as exhibit C. Peter Hildebrand, LLC will bill for the time I expend in this case at the rate

6

of $325 per hour plus expenses for file review, consultation, report preparation and travel. The rate for testimony at depositions, hearings or trials is $450 per hour plus expenses.

## BACKGROUND

I have been asked by counsel for the Plaintiff to review this matter and render opinions related to the claims handling of the Special Liability Coverage Unit (SLCU) at Travelers[1] relative to the claims submitted by the Plaintiff, Alabama Gas Company (Alagasco), in connection with environmental conditions at a manufactured gas plant in Huntsville, Alabama (Huntsville MGP).

I have been asked generally to consider whether Travelers had any legitimate or reasonable basis upon which to refuse and/or fail to defend and/or negotiate a settlement of the claims asserted by the U.S. Environmental Protection Agency (EPA) against Alagasco. In particular, I will address the following issues:

1. Whether a reasonably competent claims professional would conclude that Travelers' position that it had no duty to defend Alagasco against claims by the EPA because they did not constitute a "suit" had a reasonable or fairly debatable legal and/or factual justification under Alabama law?

2. Whether a reasonably competent claims professional would consider Travelers' failures to follow its own procedures and/or business practices by not advising Alagasco of its coverage position in a reasonable time and by not securing legal advice before de facto denying coverage as evidencing an intentional or reckless failure to investigate Alagasco's right to coverage or a failure to subject the results of its investigation to cognitive evaluation in a timely fashion?

3. Whether a reasonably competent claims professional would conclude that Travelers unreasonably failed to undertake an independent factual investigation of the EPA's claims and/or allegations on an ongoing basis throughout its handling of the tender by Alagasco of the claims from the EPA, especially in light of having been notified of a potential claim for over ten years, or failed to properly subject the results of its investigation to a cognitive evaluation and/or review?

4. Whether a reasonably competent claims professional would conclude that Travelers' failure to diligently review materials within its own possession, including the substantial evidence of many years of policies definitively providing general liability and excess liability coverage is indicative of Travelers' conscious and/or reckless disregard of the Insured's rights under the policy or a failure to subject the results of its investigation to cognitive evaluation?

---

[1] I have been informed that the defendants, which are all part of The Travelers Companies, Inc., group of insurers, have responded collectively in this litigation. Therefore, they will be referred to together as "Travelers".

5. Whether a reasonably competent claims professional would conclude that Travelers' misrepresentation as to the extent to which it was investigating the claims between 1998 and 2010 is indicative of an intent not to perform a reasonable investigation or a failure to subject the results of its investigation to cognitive evaluation?

Whether specifically referenced or not, all opinions which follow are based upon the custom and practice and/or standards and practices within the insurance industry for handling claims to a reasonable degree of claims handling certainty, assuming good faith and reasonable diligence. Of course, these standards and practices within the industry are a reflection of the industry's understanding of statutes, case law, policy interpretation and any other legal requirements which impact claims handling and include contractual duties that arise from the insurance policy. These standards and practices generally will comply with any applicable fair claim practice acts and regulations, as well as any consumer legislation and regulations.

## STATEMENT OF FACTS

### *(1)    Background on Alagasco and the Huntsville MGP site*

Energen is a diversified energy holding company headquartered in Alabama including a natural gas distribution subsidiary unit, Alabama Gas Corporation (Alagasco), and an oil/gas exploration unit (Taurus). Alagasco traces the origins of its charter to the Birmingham Gas Corporation (BGC). Alagasco's connection to the Huntsville MGP site stems from the Huntsville Gas Company (HGC) incorporated in 1918. In the 1930s and 1940s, BGC, HGS and the Alabama Gas Company (AGC) were all direct or indirect subsidiaries of the Southern Natural Gas Corporation (SNG).  As part of a plan of simplification, SNG's subsidiaries were merged in a series of transactions in which HGC was merged into AGC in 1946 and AGC was merged into BGC in 1948, after which BGC changed its name to Alagasco. Alagasco was subsequently spun off and became a publicly traded company in 1953.

In its Pollution Report, the EPA alleged that the Huntsville MGP operated from approximately 1856 to 1946, when the plant was converted to a propane air operation.  The agency asserted that the buildings and fixtures were dismantled between 1946 and 1971 when the Searcy Homes project opened for occupancy by residents. The EPA alleged that various hazardous substances associated with the Huntsville MGP posed an unacceptable risk to humans in and around the housing project, such that a time *critical removal was necessary*.  The EPA sought to require Alagasco to perform that environmental cleanup because it is a successor company to HGC.

8

*(2)   Overview of the Insurance Policies Issued to Alagasco & its related Companies*

Alagasco and its corporate predecessors purchased general liability (GL) insurance policies providing primary liability coverage dating back to the mid-1940's including an alleged policy with Aetna Casualty and Surety Company (Aetna) from 02/01/44 to 11//10/45, successive policies issued by various St. Paul companies from 07/10/47 to 07/10/84, as well as excess policies. Aetna Casualty and Surety Company was renamed Travelers Casualty and Surety Company effective 07/01/97 and St. Paul merged with Travelers in 2004. For purposes of this Expert Report, the coverage and claims handling obligations of Travelers will encompass the policies issued by both Aetna and St. Paul and also the claims handling by St. Paul's special claims handling unit prior to the merger.

Among other policies, St. Paul issued policy number 5010JB1000 and renewed same numerous times with a resultant policy period from 07/10/67 to 07/10/83. The Insuring Agreement for that policy provides property damage liability coverage as follows:

> Coverage D: PROPERTY DAMAGE LIABILITY OTHER THAN AUTO
>
> To pay any loss by reason of the liability imposed by law or contract upon the Insured for damages because of injury to or destruction of property, including the loss of use thereof. (See Exhibit A at p.2 – Complaint for Declaratory Relief and Damages)

The Insuring Agreement also provides St. Paul with the right to investigate and requires the insurer to provide the Insured with a defense as provided in subsection IV – DEFENSE, SETTLEMENT SUPPLEMENTARY PAYMENTS as follows:

> It is further agrees that the Company shall:
>
> (a)   Defend in the name of and on behalf of the Insured *any suit* against the insured alleging such injury, death, damage or destruction and seeking damages on account thereof, *even if such suit is groundless, false or fraudulent*; but the Company shall have the right to make such *investigation, negotiation, and settlement of any claim or suit* as may be deemed expedient by the Company.
>
> (b)   .....
>
> The Company agrees to *pay the expenses* incurred under Subdivision (a) and (b) of this section *in addition to the applicable limit if liability* of this policy. (See Exhibit A at p.3 – Emphasis added)

The policy applies to "occurrences" that occur during the policy period and broadly defines "occurrence" to include "a continuous or repeated exposure during the policy period to

conditions which unexpectedly and unintentionally causes ... injury to or destruction of tangible property, including the loss of use thereof." (Exhibit A – p.3) The EPA's claims alleged continuous and repeated exposure to harmful conditions throughout the 1970s as a result of hazardous substances from the Huntsville MGP. Those allegations constitute an "occurrence" as defined in the St. Paul policies during the 1967 to 1983 policy period.

This policy had PD limits of Liability of $50,000 per occurrence, which was typical for the primary GL policies issued by St. Paul with several exceptions. The Insureds did also purchase excess liability insurance policies from St. Paul providing $1,000,000 in coverage for most years between 07/10/47 to 07/10/83. (T4480) The latter would apply to any of the indemnity obligations of the Insurer in excess of the primary GL policy limits.

### (3)    Initial Notice of a Potential Claim

By letter dated 06/02/98, Alagasco (Reynolds) provided both St. Paul (T3623) and Travelers (T0142) with notice of certain circumstances which may give rise to a claim relative to eight manufactured gas plants and five manufactured gas holder sites in Alabama. The Huntsville MGP site was included in the letter with notation that the site was now owned by a third party and that no sampling had been conducted at the site. An Attachment provided to St. Paul listed by policy number the policies issued by various St. Paul entities from 07/10/47 to 07/10/86.(T00002) An Attachment to the Travelers letter listed policies issued by Aetna from 02/01/44 to 10/10/45 and from 07/10/85 to 07/10/86 (T000004).

### (4)    Travelers Handling of the Initial Notice of a Potential Claim.

Travelers (Petersen) acknowledged receipt of the notice by letter dated 07/20/98. (T0148) Peterson indicated that the SLCU would perform a policy search and requested policy documentation from the Insured. Petersen "fully" reserved the insurer's rights under the policies including the right to deny coverage in the event of breach of any conditions under the insurance contract. Alagasco submitted copies of Aetna policies by letter dated 08/18/98 and requested that Travelers forward "any policy evidence." (T0151) Travelers (Petersen n/k/a Dalton) sent Alagasco (Reynolds) a letter dated 09/22/99 advising as follows:

> (A) We assume there are no pending claims or lawsuits at this time;
> (B) Absent any pending claims presented, Travelers is unable to determine whether it may have a defense or indemnity obligation;
> (C) We are unable to locate any policies effective from 02/01/44 to 10/10/45.
> (D) Travelers did confirm  the existence of excess policies from 07/10/85 to 07/10/86, however, they incorporate a pollution exclusion; and
> (E) Travelers fully reserves its rights and specifically reserves the right to decline coverage in the event of a policy breach. (T1337)

10

Alagasco (Reynolds) responded by letter dated 11/11/99 in which he enclosed a copy of the Insured's evidence of the Aetna policy effective from 02/01/44 to 10/10/45. (T1340) He further confirmed that there were no claims or lawsuits presently associated with any of the sites.

### (5)   *St. Paul's Handling of the Initial Notice of a Potential Claim*

St. Paul (Kleppinger) acknowledged receipt of the notice by letter dated 06/30/98. (T3618) Kleppinger sought verification that the notice was informational only and that there were no claims. She indicated that St. Paul would perform a policy search and requested all policy materials in the Insured's possession and historical information relative to the corporate relationships of the various Alagasco insureds, while investigating the matter without waiver of any policy rights. St. Paul already had the benefit of policy information from a previous loss at the Insured's Pinson site as per correspondence on or after 05/24/94. (T5943 – 5960) In fact, certain St. Paul (Seline) inter-office emails dated 11/01/96 were sent to the claims hander (Colvin) which verified coverage as follows:

> After an exhaustive search, I've found policies (albeit file is in poor shape) that documents our primary limits from 1962 to 1984 and excess limits from 1967 to 1983. In short, the gl limits for policy periods 1967 thru 1983 were 50k/100k BI and 50k PD. From 7/10/83 – 8/10/84, the gl limits were a combined 250 csl. Excess limits from 7/10/67 – 7/10/83 (we didn't write the umbrella from 83/84) were always 1MM. The only policy with known fac reinsurance was the last (redacted) the 1mm umbrella was written 82/83. (Redacted) retained the 1st 100k umbrella (Redacted)...

> P.S. I see your exhaustive list of affected policies goes back to 1952. FYI – I found correspondence in the file that suggested we first wrote back in 1947 (vs 52) and then continuously thereafter until 84. Have fun! (T6559)

By letter dated 08/18/98, Alagasco responded to St. Paul by providing corporate information from Moody's together with copies of policies from 1967 to 1986 and requested that St. Paul provide any policy evidence in its files. (T7848) There is no documentation that St. Paul (Colvin) ever provided Alagasco with the results of its exhaustive coverage searching included verification of coverage and limits developed through its previous coverage investigation despite Alagasco's request and cooperation.

Alagasco and St. Paul proceeded to enter into a Standstill and Confidentiality Agreement as per correspondence between 02/12/99 and 03/25/99. (T3579 & T 3653 et seq.) The parties appeared to have held brief negotiations regarding a possible settlement of all MGP-related claims but no such resolution ensued. St. Paul (Kleppinger) prepared a Claim Report on 08/31/99 summarizing the information presented by Alagasco, but it contained no future plan of action or recommendations. (T7618 – 7652) I saw no documentation that St. Paul attempted to perform its

own factual investigation after receipt of the 06/30/98 notice. I saw no documentation that the Insurer ever sent Alagasco a follow-up letter expressing St. Paul's acceptance of coverage for the potential claims and/or its interpretation of coverage as it applied to the potential claims.

### (6)    Alagasco's Notice of Occurrence or Claim and Demand for Defense

By letter dated 10/29/08, Alagasco (Goldman) provided a formal notice of an occurrence or claim and demand for defense to both St. Paul (T0001) and Travelers (T0003). Alagasco timely submitted to its insurers a copy of the Information Request from the EPA dated 10/03/08 relative to the Huntsville MGP. (T005) Alagasco also provided the EPA's Pollution Report dated 09/22/08 containing a site description, current activities and planned removal actions. The Pollution Report clearly stated as follows:

> **Next Steps**
> *EPA's Enforcement Section* is preparing an assessment of liability and ability to pay on Potentially Responsible Parties (PRP's) related to the site. If it is determined that one or more PRP's are able to complete a removal action, ERRB *may* pursue an Administrative Order of Consent (AOC) with them to carry out the time-critical removal action and provide reimbursement for past costs. (T 0020)

Alagasco provided each insurer with a listing of that insurer's policies as an Attachment to each letter. Alagasco clearly advised the insurers of the following:

(A)    Alagasco provided previous notice of the environmental concerns with Huntsville MGP on 06/02/98;

(B)    Alagasco believes the EPA's Information Request constitutes a claim under the policies;

(C)    Please consider this letter a supplemental notice of the facts and allegations and *as a tender of the defense and demand for coverage*; and

(D)    Alagasco has hired Kazmarek, Geiger & Laseter to represent its interests, obtain an extension from the EPA and assist in preparing a response to the EPA. (T001)

Alagasco requested that each insurer state its coverage position and indicate whether it wished to defend. The Insured requested that the Insurer immediately let them know as to any recommendations relative to Alagasco refraining from any specific action. The two letters received by the Travelers were date stamped on 11/04/08 and 11/05/08 respectively by the Special Liability Group.

### (7)    Travelers Initial Handling of the Defense Tenders by Alagasco

By letter dated 11/10/08, The Travelers SLCU (Tarczanin) acknowledged receipt of the tender and advised of its handling. (T0022) There was no reference in this letter that Travelers was

12

handling the tender to St. Paul. The letter does confirm that the SLCU had responsibility for verifying the existence and terms of the insurance policies and *investigating the facts and circumstances* surrounding the claim at the Huntsville MGP site to determine coverage. Tarczanin advised Alagasco as follows:

- (A) The Insurer is researching its records for copies of the policies and requests the Insured to forward any copies of policies or other information;
- (B) General Liability policies are subject to their terms, conditions, limits and endorsements and generally respond to damages suffered by a 3rd party;
- (C) Travelers' interpretation of *the Request for Information (RFI) is that it is not a formal claim* and the Insurer cannot determine its potential coverage until receipt of such a claim or lawsuit;
- (D) Travelers will monitor the matter in order to be in a *better position to make a coverage determination* should it develop into a formal claim, so please keep Travelers advised as to status;
- (E) Initial review of our records does not indicate receipt of the 06/02/98 notice, so please forward for consideration; (T0022 - T0023 - Emphasis Added)

Travelers proceeded to advise Alagasco that "pending further review of any potentially applicable policies and of the facts and allegations of this matter, we fully reserve our rights," and that the insurer was not waiving any such rights by future communication or investigation. (T0023) "We specifically reserve our right to decline coverage in the event that any additional conditions of our insurance policies (including, but not limited to, those pertaining to notice, cooperation, voluntary payments, assumption of obligations, mitigation, impairment of subrogation, etc.) have been breached." Although Travelers goes to great lengths to explain that it is preserving its coverage positions, it fails to seek additional factual information such as verification of ownership dates, site usage, hazardous substance disposal practices, and environmental reports or studies related to the site. Travelers also does not specifically advise that it will not defend unless a suit is filed, although it does mention that it requires timely notice of claim or suit in the future.

Of some significance is that the concept of a "formal claim" does not appear in any Travelers policy (Harris Depo. p. 102). At least some jurisdictions have expressly held that CERCLA 104(e) RFI letters like the one sent by EPA to Alagasco constitute "suits" triggering the defense obligation, a fact apparently available to Travelers' SLCU in the so-called Munich Re Book that summarizes environmental coverage for cases across the country (Dalton Depo. p. 26). Despite the fact that Ms. Tarczanin's letter rejected Alagasco's demand for a defense and despite Travelers' internal policy of seeking review and legal advice prior to taking such position (Harris Depo. pp. 34-37) there is no evidence that Ms. Tarczanin followed those procedures before sending the letter of 11/10/08, a letter which constituted a refusal to provide the defense demanded by Alagasco.

13

*(8)   Alagasco's request that Travelers and St. Paul provide Concurrence with the Insured's Entry into an AOC with the EPA given the EPA's View that the Huntsville Site Required a Removal Action*

By letter dated 11/18/08, Alagasco (Goldman) responded to Tarczanin explaining that it is clear that the insured is a PRP and corporate successor to Huntsville Gas Company and likely will be held jointly and severally liable for a "time critical removal action." (T0026-27) Given the clear and present need to marshal defenses, Alagasco expressed its belief that Travelers was obligated to acknowledge coverage and assume defense completely or reserve it rights and participate by paying for a defense using counsel acceptable to Alagasco.

The Insured also provided Travelers with information about its meeting on 11/05/08 in which the EPA invited Alagasco to enter into an Administrative Order on Consent (AOC) and the government's view that this was not a remedial action but a removal action. Alagasco explained that the alternative was for the EPA to go forward with a more expensive clean-up at Alagasco's expense. Alagasco provided a copy of the Revised Model Administrative Settlement Agreement and Order of Consent as an enclosure and sought an immediate response from Travelers as to its concurrence with entering into the AOC because the question was time critical. (T0027-63) Alagasco also sent a letter dated 11/18/08 to St. Paul (Kleppinger) providing similar information in the form of a status report. (T0064)

*(9)   Travelers' Ongoing Failure to Accept the Tender of Defense or Provide a Coverage Position to Alagasco*

By letter dated 11/25/08, Travelers (Dalton) responded to Alagasco's letter of 11/18/08 by acknowledging receipt and advising as follows:

> (A)  We have received the enclosures including the AOC;
> (B)  We have the RFI and Pollution Report previously received;
> (C)  We are in the process of researching our records for copies of any potentially applicable policies;
> (D)  Once we have had an opportunity to review the captioned matter in conjunction with the policies, we will be in further contact regarding our coverage position;
> (E)  We can only advise Alagasco to act in a manner that it believes will best protect its interests with respect to the AOC; and
> (F)  We fully reserve our rights and specifically reserve the right to deny coverage. (T0066-67)

Basically this letter appears to have been written by Tarczanin's supervisor in her absence to "buy time" to allow the claims handler to complete a review of the materials and provide a coverage position. Alagasco (Goldman) responded by letter dated 12/12/08 advising that the *insured looked forward to receiving Travelers' coverage position.* Goldman also inquired about Travelers acquisition of St. Paul and whether Travelers would now be the point of contact with

14

regard to old St. Paul policies given the lack of response by St. Paul to recent communications. (T0071-72)

Travelers (Tarczanin) acknowledged by letter dated 12/19/08 that Travelers was in fact handling the St. Paul position and referred back to her 11/10/08 letter which as previously noted made no reference to St. Paul's coverage. (T0078) The letter of 12/19/08 failed to mention that Tarczanin apparently already knew or should have known by 12/18/08 that she had some *confirmed* St. Paul policies. (T1161) It should be noted that *Travelers' SLCU had physically received approximately 4500 pages of materials from the St. Paul claims files by December, 2008* including materials referenced above relative to the St. Paul policies. (Harris Depo. p.12) There was no indication that these materials were thoroughly reviewed by anyone in SLCU upon receipt or thereafter. Had those materials been subjected to even passing cognitive evaluation, the fact that St. Paul had insured Alagasco from at least 1947 to 1984, and the express terms of that coverage from the early 1960s through 1984, would have been beyond reasonable debate.

Alagasco (Goldman) sent all the excess insurers including Travelers a letter dated 01/07/09 providing an analysis of the excess insurer's duties and alternative paths for handling. Given that Alagasco believed that none of the underlying policies were exhausted and their duties may not yet have ripened, the Insured advised that it would report further when it knew more about the potential for exhaustion of the underlying coverage. I saw no acknowledgement from Travelers to this letter.

Alagasco (Goldman) sent Travelers (Dalton) a letter dated 01/29/09 advising of an upcoming meeting with the EPA and inquiring about Travelers acquisition of St. Paul. (T1328) Travelers (Tarczanin) responded with another "buy time" reservation of rights letter dated 02/03/09 and advised that the Insurer was also handling the St. Paul portion of the claim. (T1329) *Between 02/03/09 and 06/22/09, there is no indication of any material claims activity by Travelers and the Insurer had not provided the Insured with its coverage position or even an updated reservation of rights letter narrowing its potential coverage defenses.*

Alagasco's counsel (Laseter) advised Travelers by letter dated 06/22/09 that the EPA indicated on 06/15/09 that it wanted to move forward on the Huntsville MGB site and the proposed AOC. (T0085-86) Alagasco advised of the status of the matter and activities that it had undertaken in the interim at its own expense to mitigate the exposure:

(A) Alagasco had retained and paid an environmental consultant (GEI, Inc.) that prepared a preliminary estimate of $3.3 Million to $7.1 Million as the range of the cost for remediation;

*(B)* Alagasco's counsel had discussions with the Huntsville Housing Authority relative to participating in a joint response to the EPA;

*(C)* They also discussed allocations, clean-up responsibilities and related issues.

*(D)* Alagasco expressed a willingness to cooperate with the EPA if it ultimately was required to participate in a clean-up; and

*(E)* Alagasco clearly advised Travelers that *its failure to provide a definitive coverage position was jeopardizing the Insured's efforts* to contain the exposure. (T0085-86 – Emphasis added)

15

Consistent with the previous requests made by Alagasco, its counsel renewed the demand that Travelers provide a defense to the EPA's claims and sought advice on any particular action which Travelers would recommend Alagasco take or refrain from taking. By letter dated 06/24/09, Travelers (Tarczanin) responded with what can only be described as another "buy time" letter as follows:

      (A) We are in the process of researching our records for copies of any potentially applicable policies;

      (B) Once we have had an opportunity to review the captioned matter in conjunction with the policies, we will be in further contact regarding our coverage position;

      (C) We can only advise Alagasco to act in a manner that it believes will best protect its interests with respect to the AOC; and

      (D) We fully reserve our rights and specifically reserve the right to deny coverage. (T0066-67)

Between 11/10/08 and 06/24/09, there is no documentation in the Travelers' claims file suggesting that Travelers was performing a fact investigation or attempting to analyze coverage or otherwise develop a coverage position to provide to Alagasco, even though Travelers was now handling the additional 35 years in additional primary coverage provided in the St. Paul policies and its Insured had a documented $7.1 Million in potential exposure from the Huntsville MGB site based upon its own consultant's estimates. There is nothing in the claims file to indicate that Travelers had yet reviewed the St. Paul claims materials referenced earlier.

*(10) The EPA sends the PRP letter with a 14 Day Deadline for Alagasco to Further Negotiate an Administrative Settlement Agreement and Order of Consent (AOC)*

By letter dated 06/25/09, Alagasco's counsel (Laseter) forwarded to Travelers the EPA's Notice and Offer to Negotiate dated 06/24/09 (the PRP letter), by which the EPA established a 14 day deadline for Alagasco to continue negotiations regarding execution of the AOC. (T 0095-0134) Now faced with a fixed deadline set by the EPA, Alagasco again requested the assistance of its insurer by demanding a defense. More particularly, Alagasco's counsel wrote as follows:

      (A)    Given past correspondence provided to Travelers dating back to 2008, the Notice and Offer to Negotiate has been anticipated for some time;

      (B)    The EPA's demands plainly constitute a claim under the insurance policies;

      (C)    Alagasco renews its demand for defense;

      (D)    Alagasco insists and demands that *Travelers either assume the defense or expressly consent to Alagasco's entry into the AOC*;

      (E)    ***Alagasco will interpret Travelers failure to either defend or consent as a denial of coverage, freeing its Insured to negotiate with the EPA and***

16

> ***other parties and pursue all claims against Travelers*** (including the claim
> for its failure to state a coverage position); and
>
> (F)     Attached is an updated Opinion of Costs from GEI. (T0135)

Alagasco's counsel (Laseter) also emailed Travelers (Dalton) copies of correspondence dating back to 1998 (T0141-0168) and confirmed a telephone discussion on 06/26/09 in which he expressed frustration to her as to Travelers suggestion that it lacked sufficient time to investigate the terms of the policies. (T0136) Of course, substantially all of this correspondence was contained in the St. Paul claims materials received in the SLCU in December, 2008. There is no documentation in the Travelers claims file to suggest that anyone in the SLCU had reviewed and analyzed coverage based upon the St. Paul materials or sought the assistance of coverage counsel relative to its denial of coverage by not defending or consenting to entry into the AOC. Travelers (Dalton) again sent a "buy time" letter certified mail dated 06/26/09 which again stated as follows:

> (A) We are in the process of reviewing the file in conjunction with any
> potentially applicable policies;
> (B) Once we have had an opportunity to complete our review, we will be in
> further contact regarding our coverage position;
> (C) We can only advise Alagasco to act in a manner that it believes will best
> protect its interests with respect to the captioned matter; and
> (D) We fully reserve our rights and specifically reserve the right to deny
> coverage. (T0169-0170)

During the first eleven months after receiving the 11/10/08 notice of claim and demand for defense, Travelers had done nothing to assist its Insured with defending this claim or mitigating the damage exposure, and the Insurer had failed to make any commitment to help with the ongoing expense in this matter. Alagasco's counsel (Laseter) advised Travelers (Tarczanin) by letter dated 10/13/09 that an agreement in principle had been reached with the Huntsville Housing Authority for its participation by paying Alagasco $300,000 towards the response costs. (See exhibit H to the Evidentiary Materials in Support of Alagasco's Motion for Partial Summary Judgment) *Alagasco also advised it would undertake the actual environmental work per the Participation Agreement attached to the letter.* Despite being advised of this significant commitment by its Insured, Travelers had no immediate reply to this letter in its claims file. I saw no acknowledgment by Travelers of this key development towards a reasonable resolution of the matter nor an analysis of coverage relative to Travelers assisting Alagasco in the expense required to fulfill a commitment to complete the environmental work.

There is no documentation in the file that Travelers did anything further after sending its letter of 06/26/09 until 02/03/10. There is no documented investigation or even an attempted investigation into either coverage or the factual basis for the claim and/or damages related to the EPA's claim. There is no coverage analysis of the policies provided to and verified by St. Paul referenced earlier in this report. There is no indication that the matter was referred to or reviewed by coverage counsel in order to complete the coverage analysis. There is no request for

17

additional factual investigation of the loss or the parties' positions on liability, damages and clean-up. Even internally, the handler (Tarczanin) was questioned on 12/17/09 as to whether there had been a coverage decision yet and she responded that it was still being reviewed. (T1172-73) There is no explanation provided in the file as to the reasons why Travelers was not assisting its Insured on the claim or accepting coverage and defense under the known policies.

> *(11) Travelers Waits until 02/03/10 to Provide its Coverage Position on the PRP Letter Denying Alagasco a Defense under Any of the Policies Issued by St. Paul and Aetna*

Travelers (Dalton) sent a letter dated 02/03/10 advising of its determination that it had no obligation to defend (T1368) Travelers waited to deny a defense for more than three months after Alagasco had advised that it was undertaking the environmental work and some fifteen months from Alagasco's initial request for a defense of 10/29/08. The sole basis for the refusal to defend was Travelers view that it only owed a defense to a suit, and there was no suit filed against Alagasco in this matter. Dalton sought advice of counsel *contemporaneously* with the issuance of this letter. (Dalton Depo. p.24) There is no formal coverage opinion letter in the file or documentation to confirm receipt of such a letter. Prior to that time, Travelers had not consulted with counsel with regard to any of the positions it was taking in the Alagasco matter. (Dalton Depo. p.25)

Dalton did access a legal resource called the Munich Re Book on Environmental Coverage Case Law at the time of her issuance of the defense denial. (Depo. p. 26) A review of that resource confirmed that there is no case law in Alabama to support the position that a PRP letter is or is not a suit, but the clear majority view as reflected in that publication is that the Courts interpret the term "suit" to include a PRP letter. (See pp. 3-10 – Munich Re Book) *Dalton apparently ignored the majority rule and selected the position most favorable to Travelers.* Travelers had unsuccessfully asserted this position in previous court cases in other jurisdictions as well. In fact, Travelers was aware that no lawsuit was filed throughout its handling of the Alagasco matter and at no time advised its Insured that it was the Insurer's position that a PRP letter did not qualify for defense as a suit until well after the Insured negotiated a settlement intended to minimize the exposure and avoid a suit.

When Alagasco's counsel challenged that position by letter dated 03/03/10, Travelers (Dalton) responded by letter dated 03/11/10 by merely restating that the PRP letter issued by the EPA to Alagasco did not constitute a lawsuit within the meaning of the 1967 to 1984 primary level policies. (T1131) She further advised that Travelers was "currently investigating the facts and circumstances of the captioned matter under the primary level policies pursuant to a complete reservation of rights in order to determine the extent of our indemnity obligation, if any.... Inasmuch as our indemnity investigation is presently ongoing, at this time, we can only advise that Alagasco act in a manner that it believes will best protect its interests..." (T1132)

This separate fact investigation was commenced only after discussion and consultation with counsel and at the counsel's request in February 2010. (Harris Depo. p.73) Dalton admitted that to her knowledge Travelers had not previously done any of the following:

18

(1) Contacted the EPA directly;

(2) Submitted a Freedom of Information Act request to the EPA;

(3) Hired an outside investigator;

(4) Engaged an environmental consultant;

(5) Sent a company claims employee to Huntsville in connection with the matter;

(6) Performed independent research beyond running a Dunn & Bradstreet report'

(7) Accessed EPA information on-line; or

(8) Performed an assessment of the human health or environmental risk at the site.

(See Dalton Depo. pp. 16-18)

In fact, Dalton confirmed that Travelers had not commenced any independent factual investigation prior to February, 2010, aside from ordering a so-called Dunn & Bradstreet report by computer. (Dalton Depo. p.14) In other words, Gail Dalton, the previous claims handler when she was known as Gail Petersen, was aware of a potential claim as a result of the initial notice dated 06/02/98 and of the notice of occurrence and demand for defense dated 10/28/08, yet Travelers did not commence any independent factual investigation until February, 2010. (Harris Depo. p.42)

## OPINIONS

*(1) A reasonably competent claims professional would conclude that Travelers' position that it had no duty to defend Alagasco against claims by the EPA because they did not constitute a "suit" had no reasonable or fairly debatable legal and/or factual justification under Alabama law.*

Claims professionals are well aware of the basic principle that the duty to defend is broader than the duty to indemnify. In Alabama, the duty to defend is determined primarily by the allegations contained in the Complaint. (See General Liability Insurance Coverage – Maniloff at p.74) Within the context of handling environmental claims, primary enforcement comes from either the EPA or its state counterpart. The government has administrative procedures in place to obtain resolution of environmental disputes with PRP's prior to the actual filing of suit in order to expedite the remediation process and to reduce the expense related to litigation. Targeted PRP's have a very minimal chance of avoiding some participation because of the application of joint and several liability.

An experienced environmental claims professional would be able to recognize upon receipt and review of a PRP letter such as the one received by Alagasco that absent some agreement with the EPA, Alagasco had a high likelihood of being sued and ultimately may pay more for both loss and expense than through the negotiation of an amicable settlement. The information contained in the PRP letter plus extrinsic reports like the EPA's Pollution Report allow an insurer to compare the allegations with the policy terms to assess coverage equally as well as the review of

a complaint in a lawsuit. It was in the mutual best interests of Travelers and Alagasco to negotiate a favorable compromise prior to forcing the EPA to file an actual suit.

In recognition of the "enforcement" powers of the EPA and state environmental agencies, the courts have recognized the need for a defense of PRP's even in the absence of a lawsuit. The majority rule is that a PRP letter constitutes a "suit" within the meaning of a general liability policy. (Munich Re Book – 2009 at p.3) The Courts have broadly construed the term "suit" to allow a layman's understanding to apply as opposed to the narrower definition asserted by Travelers in this matter. Travelers was on notice as early as 10/29/08 that the EPA Enforcement Division was involved in prosecuting its claim against Alagasco, which is a clear indication that absent cooperation by Alagasco in the clean-up, an EPA suit was imminent.

Although Alabama has no law directly on point, Travelers (Dalton) had access to legal resources which confirmed that the majority rule was contrary to the position that she ultimately took in her defense denial letter. It should be noted that the insurance company had the opportunity to include a definition of "suit" in the insurance policy and failed to do so in any of the St. Paul policies. Courts have concluded that the term is capable of multiple interpretations in the context of a PRP letter from EPA and administrative proceedings, such that a claims professional would be well aware that any ambiguity is construed against the insurance company as the drafter of the insurance policy. This basic principle is well known to experienced claims handlers. In my opinion, an environmental claims professional would conclude that Travelers' position that it had no duty to defend Alagasco against claims by the EPA because they did not constitute a "suit" had no reasonable or fairly debatable legal and/or factual justification under Alabama law. It is well established that on environmental issues without clear precedent in Alabama, the Courts will follow the majority rule which would require Travelers to defend against the allegations in a PRP letter when there is a duty to defend a suit in the policy.

It is undisputed the St. Paul policies provided the insurer with a duty to defend as cited earlier in the coverage section of this report. The allegations necessary to trigger this duty to defend need only include the *possibility of coverage*. The St. Paul GL policies provide a broad grant in coverage as reflected in the definitions of "occurrence" and "property damage" cited earlier in this report. In my opinion, an environmental claims professional would conclude that any environmental claims handler in a specialized claims unit would know that the allegations made by the EPA clearly reflected the *possibility of coverage* necessary to trigger the defense duty which applies under the St. Paul policies regardless if they are "groundless, false, or fraudulent." This is especially true given that the duty to defend is broader than the duty to indemnify and can be accepted in a reservation of rights letter preserving coverage issues to the extent the insurer deemed necessary. Travelers' claims handling was contrary to insurance industry custom and practice by failing to offer a defense subject to reservation of its rights. Travelers failed to assist its insured during time critical decisions and forced the Insured to pay substantial expense for environmental consultants and attorneys to protect itself for damages potentially covered under the St. Paul policies.

Even very basic research confirms that the current trend of decisions favors the majority rule. In a specialized coverage unit such as the SLCU at Travelers, claims specialists are supposed to possess a higher level of knowledge and expertise such as to be aware of the majority rule and

trends on key coverage issues. It is my opinion, an environmental claims professional would agree that it is industry custom and practice to apply the majority rule in jurisdictions which have no definitive decision on the issue and that an insurer with a dedicated environmental unit would follow that rule. The SLCU personnel should be there to assist the Insured on environmental issues, to help the Insured by providing qualified legal advice, and to provide the Insured with the benefit of SLCU's experience in dealing with the EPA's Enforcement Section on technical issues routinely handled within the unit.

An Insured buys an insurance policy to obtain the assistance of the insurance company when claims are presented and to secure some piece of mind about unknown liabilities and exposures. Applying the majority rule under the circumstances of this case would be consistent with giving the Insured the policy benefits the Insured paid for with its premiums and the Insurer should give the Insured's interests consideration at least equal to its own interests. In my opinion, a claims professional would conclude that failing to accept the defense tender at least under a reservation of rights reflected an attempt by Travelers to favor its own interests to the detriment of Alagasco's interests. Common sense would dictate that the Insurer would actually reduce its own exposure by accepting and controlling the defense. For example, most environmental claims departments train their adjusters to control litigation expense, use panel defense counsel with preferred rates, and aggressively pursue defense sharing agreements to the mutual benefit of the Insurer and the Insured. Instead Travelers (Dalton) chose the position most favorable to the Insurer and to its financial benefit to the detriment of its Insured's interests.

> **(2)   A reasonably competent claims professional would consider Travelers' failures to follow its own procedures and/or business practices by not advising Alagasco of its coverage position in a reasonable time and by not securing legal advice before de facto denying coverage as evidence of an intentional or reckless failure to investigate Alagasco's right to coverage or a failure to subject the results of its investigation to cognitive evaluation in a timely fashion.**

The communications between Travelers and Alagasco are comprehensively described in the Statement of Facts. Between receipt of the 10/29/08 Notice of Occurrence and Demand for Defense and Travelers letter of 02/13/10 denying the defense because the PRP letter was not a suit, Travelers issued at least six blanket reservation of rights letters. Travelers' response based upon those letter can be summarized as follows:

- (A) 11/10/08      In response to Alagasco's submission of the claim and demand for defense, Travelers states that the EPA Request for Information is not a "formal" claim and that when the Insured receives a formal claim or suit, it needs to timely give notice;
- (B) 11/25/08      In response to Alagasco's explanation that as a PRP it was faced with a claim involving a time critical removal action and its submission of the AOC, Travelers issued its first "buy time" letter generally reserving rights with no mention of its position that a PRP letter is not a suit;

(C) 12/19/08        In response to Alagasco's letter expressing that it was looking forward to Travelers' coverage position and inquiring about the handling of the St. Paul coverage, Travelers acknowledged it was handling the St. Paul coverage and restated its handling was subject to reservation of rights without reference to its position that a PRP letter is not a suit.

(D) 02/03/09        In response to Alagasco's advisement as to the upcoming meeting with the EPA and further reference to the St. Paul coverage, Travelers issued another "buy time" letter confirming it was handling the St. Paul coverage and reserving its rights with no mention of its position that it would not consider even a PRP letter as a suit;

(E) Between 02/03/09 and 06/22/09, there is no indication of any material claims activity by Travelers and the Insurer had not provided the Insured with its coverage position or even an updated reservation of rights letter narrowing its potential coverage defenses including no reference to its position that a PRP letter is not a suit.

(F) 06/24/09        In response to Alagasco's letter as to a $7.1 Million potential remediation cost and advisement that Travelers' failure to provide a definitive coverage position was jeopardizing the Insured's effort to contain the exposure, Travelers issued another "buy time" letter confirming it was reserving its rights with no mention of its position that a PRP letter is not a suit;

(G) 06/26/09        In response to Alagasco's letter confirming the 14 day deadline set by the EPA to negotiate the AOC and the *Insured's clearly stated request that Travelers either defend or consent to the AOC or be deemed to have denied coverage,* Travelers issued another "buy time" letter confirming it was reserving its rights with no mention of its position that a PRP letter is not a suit;

(H) 02/03/10        There is no documentation in the file that Travelers did anything further after sending its letter of 06/26/09 until 02/03/10. On the latter date, Travelers (Dalton) denied Alagasco a defense and per advice of counsel finally began an independent factual investigation.

No letters prior to 02/03/10 ever raised the issue that a PRP letter did not constitute a "suit" as defined in the St. Paul policies. In fact, the personnel in the St. Paul environmental claims unit, who were probably most knowledgeable about the interpretation of St. Paul policies, never raised that issue during their ten years of handling the MGP claims

(a) *Travelers' failure to follow its own procedures and/or business practices by not advising Alagasco of its coverage position in a reasonable time as evidencing an intentional or reckless failure to investigate Alagasco's right to coverage and/or Travelers' failure to subject the results of its investigation to cognitive evaluation in a timely fashion*

Travelers knew all along between 10/29/08 and 02/03/10 that the EPA had not filed a lawsuit and that Alagasco had subsequently received a formal PRP letter from the EPA threatening action by its Enforcement Division unless Alagasco as a targeted PRP cooperated and entered into a mutually agreeable AOC. Alagasco in its letters to Travelers routinely requested feedback from the Insurer by specifically stating that "if you would recommend that Alagasco take or refrain from taking any specific action, please let us know immediately." (See Alagasco and/or counsel letters at T001, T0027, T0086 and T0092) Yet the letter dated 02/03/11 is the first communication from Travelers to its Insured specifically mentioning the Insurer's coverage position that a PRP letter is not a suit and there was no duty to defend. Instead Travelers specialized environmental coverage claims personnel sent "buy time" letters generally advising Alagasco as follows:

(A) We are in the process of reviewing the file in conjunction with any potentially applicable policies;

(B) Once we have had an opportunity to complete our review, we will be in further contact regarding our coverage position;

(C) We can only advise Alagasco to act in a manner that it believes will best protect its interests with respect to the captioned matter; and

(D) We fully reserve our rights and specifically reserve the right to deny coverage. (T0169-0170)

It is standard procedure and consistent with the custom and practice in the insurance industry that the claims handler provide an insured with the insurer's position with some specificity within a reasonable time. Travelers confirmed that its reservation of rights letter should typically reference *the actual insurance contract language*. (Harris Depo.p.87) Travelers also confirmed that they address the coverage issues by comparing the language in the insurance contract to whatever the underlying matter is. (Harris Depo. p.87) In fact, the custom and practice in the industry in drafting a reservation of rights letter is to *specifically set out the policy provisions in the letter and apply them to the alleged facts* presented in the claim. (Mcgarick, Casualty Insurance Claims 4th Ed, Sec. 19.5)

Travelers' reservation of rights letters are clearly non-specific and fail to relate the specific coverage provisions relied upon to the factual information received from Alagasco. On an ongoing basis, Travelers had received the EPA Pollution Report, the RFI, the Proposed AOC, the 4500 pages from the St. Paul claims file, the GEI Report and the EPA's Offer to Negotiate. Beyond merely acknowledging receipt of these materials, the "buy time letters" ignored totally the substantive content of the materials and failed to apply the known policy provisions from the St. Paul policies to the EPA allegations. Those policies were received in the SPCU in December, 2008 and there is no documentation that anyone from Travelers bothered to review those materials and summarize them for the claims file.

The "buy time" letters are non-informative and contain boilerplate language which failed to reasonably inform the Insured of the coverage positions which Travelers was reserving. Travelers never attempted to narrow down the coverage issues by refining its coverage positions during the ongoing claims handling, which is the usual practice within the industry when an insurer sends an initial acknowledgement letter containing a broadly stated set of reservations.

Travelers has narrowed its reservation of rights letters on other cases. (Harris depo. p.86) There is no mention in any letters during the fifteen months prior to the denial letter dated 02/03/10 that Travelers had specifically reserved its rights relative to a PRP letter not constituting a "suit" and that Travelers was considering itself relieved from its ongoing duty to defend on that basis.

In my opinion, a reasonably competent claims professional would conclude that Travelers failed to follow its own procedures and/or business practices as well as industry custom and practice for reserving rights in the issuance of these "buy time" letters. In my opinion, a claims professional would conclude that such failure in not advising Alagasco of its coverage position in a reasonable time and with the requisite specificity did reflect an intentional or reckless failure to properly and timely advise the Insured of Travelers coverage position.

In my opinion, a claims professional would conclude that Travelers' failed to investigate Alagasco's right to coverage and/or the Insurer failed to subject the results of its investigation to a cognitive evaluation in a timely fashion. The file does not document any analysis by the SLCU personnel relative to applying the coverage to the facts gleaned from the materials known to Travelers as outlined above or in the Statement of Facts. In my opinion, a environmental claims professional would consider that it was unreasonable for Travelers to wait 15 months to advise its Insured that it was not defending because of its interpretation that a PRP letter is not a suit when its five previous letters never mentioned that position and Travelers was fully aware that no lawsuit had been filed from the date of the tender of defense by letter dated 10/29/08. It bears repeating that the Travelers 11/10/08 letter clearly implied that the carrier would evaluate its coverage position upon receipt of a "formal claim."   It is especially egregious, therefore, that Travelers failed to let Alagasco know immediately upon receipt of the PRP Letter in June of 2009 that the carrier apparently now wanted more than a "formal claim" in order so much as to even start a serious examination of the matter.

> (b) *Travelers' failure to follow its own procedures and/or business practices by not securing legal advice before its de facto denial of coverage as evidencing an intentional or reckless failure to investigate Alagasco's right to coverage and/or Travelers' failure to subject the results of its investigation to cognitive evaluation in a timely fashion*

Alagasco provided Travelers with immediate notice that the Insured was demanding that the Insurer provide a defense to the EPA claim related to Huntsville MGP. (T001) Travelers was further advised by letter dated 11/18/08 that Alagasco believed that the Insurer was obligated to either assume a complete defense or to pay for the defense subject to reservation of rights with counsel acceptable to the Insured, and that failure to do either was essentially a denial of coverage under Alabama law. (T0026) Travelers SLCU did not consult with counsel upon receipt of these letters despite the legal issues raised and did not document the existence of a specific coverage issue relative to limiting its defense duty to a suit.

Travelers failed to follow its own procedures and/or business practices by failing to consult counsel upon receipt of that letter. According to Travelers designated corporate representative,

the SLCU would touch base with counsel to verify whether the appropriate state law would require Travelers to treat a non-litigation matter as a lawsuit. (Harris Depo. p. 34) "If what's being tendered is not a suit, then if the policyholder is requesting a defense, then SLCU will consult with counsel at that point." (Harris Depo. p.36) The Travelers procedure or business practice to consult counsel when what is tendered is not a lawsuit was not followed in response to the 11/18/08 and SLCU responded with a "buy time" letter.

By letter dated 06/25/09, Alagasco's counsel (Laseter) forwarded to Travelers the EPA's Notice and Offer to Negotiate dated 06/24/09, by which the EPA established a 14 day deadline for Alagasco to continue negotiations regarding execution of the AOC. (T 0095-0134) Alagasco through counsel specifically advised Travelers as to the Insured's coverage position as follows:

    (A) Given past correspondence provided to Travelers dating back to 2008, the Notice and Offer to Negotiate has been anticipated for some time;

    (B) The EPA's demands plainly constitute a claim under the insurance policies and Alagasco renews its demand for defense;

    (C) Alagasco insists and demands that *Travelers either assume the defense or expressly consent to Alagasco's entry into the AOC*;

    (D) *Alagasco will interpret Travelers failure to either defend or consent as a denial of coverage, freeing its insured to negotiate with the EPA and other parties and pursue all claims against Travelers* (including the claim for its failure to state a coverage position);

    (E) Attached is an updated Opinion of Costs from GEI estimated at $540,128 (T0135)

The SLCU is clearly on notice that Travelers' failure to either accept the defense or consent to the AOC constituted a denial of coverage. Travelers SLCU again did not consult with counsel upon receipt of this letter despite the legal issues raised and did not document the existence of a specific coverage issue relative to limiting its defense duty to a suit. There is no documentation that SLCU ever reviewed the St. Paul claims materials or policies in response to this critical demand letter. The Travelers procedure or business practice to consult counsel when what is tendered is not a lawsuit was again not followed in response to the letter of 06/29/09 and SLCU again responded with a "buy time" letter, which had the effect of denying coverage and freeing the Insured to negotiate the AOC.

According to Travelers' corporate representative, the decision to decline coverage for defense of a lawsuit would normally require a collaborative effort as follows: (a) The supervisor (Dalton) performs a formal review; (b) Another supervisor or manager (Connaughton) would also possibly review; (c) Harris as the Quality Control person would review; and (d) SCLU would refer the matter to *four attorneys for a legal review*. (Harris Depo. pp. 32-33) There is no indication that these procedures were ever followed in the handling of this claims file.

In my opinion, an environmental claims professional would conclude that Travelers' failure to follow its own procedures and/or business practices by not securing legal advice before its de facto denial of coverage would evidence an intentional and/or reckless failure to investigate Alagasco's right to coverage and/or Travelers' failure to subject the results of its investigation to

25

cognitive evaluation in a timely fashion. Travelers failed to seek legal advice not just one time. Travelers did not seek legal advice in response to any of multiple letters described more fully in the Statement of Facts. It is undisputed that the SLCU did not consult with coverage counsel prior to February, 2010. (Dalton Depo. p.25) It is also undisputed that SLCU did not commence its own independent factual investigation until February 2010. (Dalton Depo. p.14) In the interim, Travelers sent out "buy time" reservation of rights letters which failed to meaningfully inform the Insured of Travelers coverage position relative to defense of a suit. A total failure to seek legal advice when needed and contrary to company procedures and the total failure to undertake an independent fact investigation until advised to do so by counsel some 15 months into the claims handling clearly reflects intentional and/or reckless claims handling behavior contrary to industry standards and the custom and practice in the industry for handling coverage and factual investigations.

> *(3) A reasonably competent claims professional would conclude that Travelers unreasonably failed to undertake an independent factual investigation of the EPA's claims and/or allegations on an ongoing basis throughout its handling of the tender by Alagasco of the claims from the EPA, especially in light of having been on notice of a potential claim for over ten years, or failed to properly subject the results of its investigation to a cognitive evaluation and/or review.*

Travelers (Tarczanin) admitted in its initial letter of 11/10/08 to Alagasco that the SLCU is responsible for investigating the facts and circumstances of the matter in order to determine coverage. (T0022) Yet as noted above it is undisputed that SLCU did not commence its own independent factual investigation until February 2010. (Dalton Depo. p.14) Gail Dalton handled the preliminary notice of potential claims when reported by Alagasco by letter of *06/02/98* as to the Huntsville MGP site and all the other twelve manufactured gas plants and five manufactured gas holder sites. Dalton's response was to send a general reservation of rights letter akin to the "buy time" letters described and discussed above. (T1337) *Travelers performed no investigation whatsoever into those claims between 1998 and 2008.*

Gail Dalton was the supervisor for Tarczanin upon receipt of the defense tender dated 10/29/08 and Tarczanin kept her advised as to the file developments. (Dalton Depo. p.19) In fact, Dalton was required to review every piece of correspondence created by her and consult on every determination made by her. (Harris Depo. p.31) Yet Dalton as an experienced supervisor and long time member of the SLCU did not document at any time that Tarczanin should conduct a factual investigation of the loss. Dalton ultimately took over direct handling of the Alagasco account and its claims after Tarczanin left the company. She did not undertake a factual investigation until advised to do so by counsel in February 2010.

Dalton sent a letter dated 02/03/10 advising of Travelers' determination that it had no obligation to defend (T1368) Travelers denied the defense without the benefit of its own factual investigation. Travelers' separate fact investigation was commenced only after discussion and

consultation with counsel and at the counsel's request. (Harris Depo. p.73) Dalton admitted that to her knowledge Travelers had not previously done any of the following:

(1) Contacted the EPA directly;
(2) Submitted a Freedom of Information Act request to the EPA;
(3) Hired an outside investigator;
(4) Engaged an environmental consultant;
(5) Sent a company claims employee to Huntsville in connection with the matter;
(6) Performed independent research beyond running a Dunn & Bradstreet report'
(7) Accessed EPA information on-line; or
(8) Performed an assessment of the human health or environmental risk at the site.
(See Dalton Depo. pp. 16-18)

Although Travelers' coverage letters went to great lengths to assert a blanket reservation of rights position, those letters are substantively lacking due to their failure to specify the additional factual information necessary to resolve any of those issues. More particularly the Travelers' letters did not request such basic information as verification of ownership dates, site usage, hazardous substance disposal practices, and environmental reports or studies related to the site. Combining this lack of inquiry with the lack of any independent factual investigation would lead any environmental claims professional to conclude that Travelers failed to properly investigate this loss. Even the most basic investigation would include some or all of the eight items listed above, *none of which were even attempted by Travelers* prior to its defense denial letter.

In my opinion, an environmental claims professional would conclude that failure to undertake a factual investigation prior to denying coverage is clearly contrary to industry custom and practice. Dalton also attempted to belatedly reserve Travelers' rights to further investigate the claim in her letter denying the defense tender. In my opinion, an environmental claims professional would conclude that failure to undertake a factual investigation for 15 months prior to attempting to specifically reserve rights relative to indemnity is clearly contrary to industry custom and practice. Needless to say, such factual investigation forms the basis for the coverage analysis and a lack of that information limits or precludes the ability to analyze the coverage and perform a cognitive evaluation or review of the claim.

In my opinion, a reasonably competent claims professional would conclude that Travelers unreasonably failed to undertake an independent factual investigation of the EPA's claims and/or allegations on an ongoing basis throughout its handling of the tender by Alagasco of the claims from the EPA. This is especially true in light of its express indication to Alagasco that it would state a coverage position upon receipt of a "formal claim", its having been on notice of a potential claim for over ten years and Travelers total failure to properly subject the results of any existing investigation to a cognitive evaluation and/or review. In my opinion, an environmental claims professional would conclude that the total failure to undertake an independent fact investigation until apparently advised to do so by counsel some 15 months into the claims handling is indicative of an intentional and/or reckless claims handling behavior contrary to

industry standards and the custom and practice in the industry for handling coverage and factual investigations.

> **(4)  *A reasonably competent claims professional would conclude that Travelers' failure to diligently review materials within its own possession, including the substantial evidence of many years of policies definitively providing general and excess liability coverage are indicative of Travelers' conscious and/or reckless disregard of the Insured's rights under the policy or a failure to subject the results of its investigation to cognitive evaluation.***

There is no indication in the Travelers claims file that the SLCU personnel actually attempted a cognitive evaluation of the merits of the EPA claim or that they applied the known coverage terms to the materials contained in the Travelers claims file prior to February 2010. Then there is no legal analysis or opinion letter contained in the file to support the sole decision that Travelers (Dalton) conveyed to Alagasco that a PRP letter is not a suit. The Travelers' claim file contained relatively little documentation of any mental impressions of either Tarczanin, Dalton or others. On an ongoing basis, Travelers had received the EPA Pollution Report, the RFI, the Proposed AOC, the 4500 pages from the St. Paul claims file, the GEI Report and the EPA's Offer to Negotiate. SLCU provided no analysis of that information whatsoever, much less from the context of coverage, liability or damages. Beyond merely acknowledging receipt of these materials, the "buy time letters" ignored totally the substantive content of the materials and failed to apply the known policy provisions from the St. Paul policies to the EPA allegations.

In my opinion, an environmental claims professional would conclude that the total failure to undertake a meaningful analysis of the factual investigation and the EPA materials provided by Alagasco for fifteen months and not until after the Insured reasonably entered into the AOC is indicative of an intentional and/or reckless claims handling behavior contrary to industry standards and the custom and practice in the industry for handling coverage and factual investigations. This is especially true when the Insured is faced with a time sensitive environmental clean-up with a potential exposure in excess of $7 million and in light of Travelers' repeated false assertions that evaluations were underway.

Travelers had the St. Paul claims file in its office for fourteen months prior to Dalton's letter denying defense. In my opinion, an environmental claims professional would further conclude that the lack of any documentation to demonstrate that anyone in SLCU ever reviewed the 4500 pages of material from the St. Paul claims file is indicative of an intentional and/or reckless claims handling behavior contrary to industry standards and the custom and practice in the industry for handling coverage and factual investigations. This is especially true given that Travelers was investigating and analyzing coverage under 16 years of GL coverage provided under St. Paul's policies which had been previously researched relative to a prior claim at the location in Pinson, Alabama.

28

The St. Paul claims file already contained the necessary policies and coverage forms to allow for completion of a coverage position in 2008 as opposed to 2010. In fact, the St. Paul claims file contained the previously referenced coverage verification email from Seline dated 11/01/96 sent to the claims hander (Colvin) which verified coverage as follows:

> After an exhaustive search, I've found policies (albeit file is in poor shape) that documents our primary limits from 1962 to 1984 and excess limits from 1967 to 1983. In short, the gl limits for policy periods 1967 thru 1983 were 50k/100k BI and 50k PD. From 7/10/83 – 8/10/84, the gl limits were a combined 250 csl. Excess limits from 7/10/67 – 7/10/83 (we didn't write the umbrella from 83/84) were always 1MM. The only policy with known fac reinsurance was the last (redacted) the 1mm umbrella was written 82/83. (Redacted) retained the 1st 100k umbrella (Redacted)...

> P.S. I see your exhaustive list of affected policies goes back to 1952. FYI – I found correspondence in the file that suggested we first wrote back in 1947 (vs 52) and then continuously thereafter until 84. Have fun! (T6559)

This email documented the existence of conclusive evidence that St. Paul had found policies sufficient to document decades of primary and years of excess coverage as well. A mere glance through the St. Paul file would have expedited the ability to complete the coverage analysis, a most basic step Travelers' SLCU apparently never performed. In other words, Travelers had the necessary coverage documents to complete a cognitive evaluation and review within the context of the EPA documents provided by Alagasco on an ongoing basis and failed to even attempt to do so because no one reviewed claims materials in the Insurer's possession.

In my opinion an environmental claims professional would conclude that Travelers' failure to review materials in its own possession which would have allowed for a prompt and timely determination of coverage is indicative of intentional and/or reckless claims handling behavior contrary to Travelers' own procedures and business practices and insurance industry custom and practice for responding to environmental clean-up claims. In my opinion, an environmental claims professional would conclude that Travelers could easily have provided its coverage position with sufficient time for Alagasco and its Insurer to fully address any legitimate coverage concerns raised by Travelers' review of these materials. This lack of cognitive analysis by Travelers precluded such discussions and forced Alagasco to go forward alone and without the assistance and cooperation of an insurer that provided it with coverage for over thirty years. Given Travelers' positions in this litigation despite clearly owing coverage, it appears that Travelers conduct has not changed and apparently continues in this case.

> *(5)  A reasonably competent claims professional would conclude that Traveler's misrepresentation as to the extent to which it was investigating the claims between 1998 and 2010 is indicative of an intent not to perform a reasonable investigation or a failure to subject the results of its investigation to cognitive evaluation.*

29

As previously mentioned, Alagasco's counsel (Laseter) emailed Travelers (Dalton) copies of correspondence dating back to 1998 (T0141-0168) and confirmed a telephone discussion on 06/26/09 in which he expressed frustration to her as to Travelers suggestion that it lacked sufficient time to investigate the terms of the policies. (T0136) Of course, most of this correspondence was contained in the St. Paul claims materials received in the SLCU in December, 2008 and there was no documentation in the Travelers claims file to suggest that anyone in the SLCU had reviewed and analyzed coverage based upon those materials. Even after receipt of the above mentioned emailed materials from Laseter, there is still no documentation thereafter to confirm that SLCU personnel had reviewed the 4500 pages of documents in the St. Paul claims file and this situation continued even after the denial letter of 02/03/10.

Travelers made numerous representations to Alagasco in the various reservation of rights letters sent prior to 02/03/10. By letter dated 11/10/08, Travelers represented that it cannot determine its potential coverage until receipt of a formal claim or a lawsuit and that it would monitor the matter to be in a better position to make a coverage determination. In my opinion an environmental claims professional would conclude that receipt of a "formal" claim is unnecessary to trigger the necessity of a coverage investigation for the receipt of a potential or possible claim also requires both a factual and coverage investigation. Travelers made no documented attempt to investigate the claim or to analyze coverage based upon the information in the RFI and in the EPA Pollution Report. In my view, an environmental claims professional can and must undertake a coverage analysis without a "formal" claim and Travelers did not properly represent that situation to its Insured.

In conjunction with investigating the claim, Travelers represented on multiple occasions in its "buy time" letters certain statements similar to that contained in a "buy time" letter sent certified mail dated 06/26/09 which stated as follows:

      (A) We are in the process of reviewing the file in conjunction with any potentially applicable policies;

      (B) Once we have had an opportunity to complete our review, we will be in further contact regarding our coverage position;

      (C) We can only advise Alagasco to act in a manner that it believes will best protect its interests with respect to the captioned matter; and

      (D) We fully reserve our rights and specifically reserve the right to deny coverage. (T0169-0170)

Certainly after receipt of the St. Paul file materials, Travelers had the ability to review the file in conjunction with any potentially applicable policies. Although SLCU claims personnel apparently had not taken the time to review the 4500 pages of file materials from St. Paul, they are certainly held accountable for the information known within their company and here materials they actually have in their possession. St. Paul had become part of the Travelers in 2004 and Tarczanin advised Alagasco by letter dated 12/19/08 that the SLCU was handling the St. Paul coverage as well dating back to her acknowledgement letter of 11/10/08. (T0078) In my opinion, an environmental claims professional would conclude that Travelers made a clear misrepresentation by saying that it was "in the process of reviewing the file in conjunction with

any potentially applicable policies." The statement is unsupported by the claims file or the deposition testimony and contrary to the undisputed facts that no one had reviewed the St. Paul claims file. Travelers failed to investigate the contents of the claims file of its own predecessor company.

Travelers goes on to state that once "we have an opportunity to complete our review," we will be in further contact regarding our coverage position. In my opinion, an environmental claims professional would conclude that Travelers made a clear misrepresentation by implying that it did not have the opportunity at that point in time to complete its review." Through improper claims handling and inadequate supervision, Travelers had allowed the Alagasco claim to linger without completion of the coverage analysis and review despite having the materials available in its own file for months. Not only did Travelers fail to review the St. Paul claims file as part of its investigation, but as previously addressed at length, Travelers failed to conduct any independent fact investigation whatsoever.

Travelers then claims that it can only advise Alagasco "to act in manner that it believes will best protect its interests." In my opinion, an environmental claims professional would conclude that Travelers made another clear misrepresentation for Travelers had the opportunity to compare the EPA materials with the coverage forms and either take a coverage position as required by its own procedures and/or business practices or to refine its reservation of rights letter in a way to narrow the coverage areas reserved for future investigation.

Alagasco requested on a number of occasions that Travelers provide it with the results of its coverage research, yet there is no indication in the file that Travelers ever shared either primary or secondary coverage information except to the extent it confirmed the discovery of an excess policy issued by Aetna which coincidentally had a pollution exclusion removing coverage for this EPA claim. Travelers never updated the disclosure despite ample information in its file related to the St. Paul policies and in particular, the coverage verification email from Seline mentioned above.

Based upon the above information and other information and opinions contained throughout this report, it is my opinion that a reasonably competent claims professional would conclude that Travelers misrepresented: (a) the extent to which it was investigating the claims between 1998 and 2010; (b) the extent to which it was in the process of reviewing the file in conjunction with the available policies; (c) the inference that it had no opportunity to complete an analysis or review of coverage based upon the available information; and (d) the extent of coverage advice that Travelers was capable of providing after receipt of St. Paul's claims file. In my opinion, a claims professional would conclude that Travelers failed to respond to information requests from the policyholder despite having coverage documents available. Travelers' conduct in that regard was indicative of a lack of cooperation on its part and in placing its interests above those of Alagasco in deferring coverage and requiring Alagasco to go it alone in paying clean-up costs and ongoing expenses for legal counsel and environmental experts without the assistance of its Insurer. In my opinion, this conduct and these misrepresentations are indicative of Travelers' conscious and/or reckless disregard of the Insured's rights under the policy and/or a failure to subject the results of the combined investigation of Travelers and St. Paul to a cognitive evaluation.

31

## CONCLUSION

This completes my report based upon the opinions I have been asked to render in this matter to date. All the opinions contained in this report are made to a reasonable degree of professional certainty based upon insurance industry standards and insurance industry custom and practice. It is my understanding that additional discovery will occur, including depositions of the persons involved in this matter. Likewise, I suspect that defendant will revisit this case with their expert (Miller) to update his opinions given the Order of the Court. I expect that Plaintiff's counsel will likely ask me to respond to any updated expert report. I reserve the right to supplement or modify the opinions in this report as necessary upon receipt of any additional information or materials and if requested to do so by counsel.

Respectfully submitted,

Peter J. Hildebrand, JD & CPCU

# EXPERT REPORT OF PETER J. HILDEBRAND

## EXHIBIT A -- CURRICULUM VITAE

### ALAGASCO v. TRAVELERS INSURANCE COMPANY

Peter J. Hildebrand, JD & CPCU

3418 Woodshire Crossing

Marietta, GA 30066-8714

(678) 560-3728(office) or (404) 384-0716 (cell) or (770) 579-7691(fax)

Internet: pjhildebrand@bellsouth.net

### EIN# 20-4114769

Overview: As president of Peter Hildebrand, LLC, Mr. Hildebrand relies on more than 25 years of insurance, reinsurance, management and legal experience to provide consulting services throughout the United States. As both an attorney and a CPCU, Mr. Hildebrand provides a unique blend of professional background that can be applied to a myriad of insurance and reinsurance matters. Mr. Hildebrand is licensed as an Insurance Counselor in the State of Georgia and maintains his license to practice law in the State of Wisconsin. Mr. Hildebrand qualifies as an expert in insurance coverage, claims handling, claims management, dispute resolution, employment/regulatory issues and a wide variety of other legal and insurance related fields. Mr. Hildebrand has extensive experience in handling reinsurance matters including dispute resolution, commutations, audits and contract interpretation and has been appointed as an arbitrator in various reinsurance arbitrations. Mr. Hildebrand also has extensive experience in the handling of claims involving issues related to good faith and fair dealing, unfair claim practice violations, and fair trade practice insurance regulations. He has consulted on cases throughout the United States and testified over twenty times with substantial success.

**EXPERIENCE**

**12-05 TO PRESENT: PETER HILDEBRAND, LLC – ATLANTA, GA**

- Insurance and reinsurance consultant providing expert opinions on insurance coverage, good faith claim handling, unfair claim practice violations, claims administration and procedures, reinsurance contract interpretation, employment practices, fee bill review and other related insurance issues.
- Mediator and Arbitrator of disputes involving coverage, claim handling, reinsurance, employment, fee mediation and all sorts of tort litigation.

- Claims evaluation and negotiation in cases of significant complexity or severity for nearly all lines of business.
- Auditor of insurance or reinsurance claims, claims handling practices, claims administration, attorney fee bills and financial transactions.
- Drafting and implementing specialized claim handling programs and procedures for insurers, claim handling companies and self insured corporations
- Review and consultation on insurance agency, broker and underwriting issues and projects.

### 6-99 TO 12-05: AMERICAN SAFETY INSURANCE SERVICES (ASIS) – ATLANTA, GA

VICE PRESIDENT – CLAIMS LEGAL DEPT (02-04 TO 12-05)

- Established a new department that specialized in addressing the largest most complicated environmental and E&S claims within the company.
- Directly managed all multi-million dollar cases with numerous defense verdicts and favorable settlements.
- Managed all claims in litigation involving allegations of a breach of the duty of good faith and fair dealing or similar allegations.
- Handled all reinsurance reporting, audits and dispute resolution.
- Supervised all ceded reinsurance claims and saved the company several million dollars through my coverage analysis and interpretation.
- Drafted complex coverage opinions and letters based upon interpretation of commercial lines policies, manuscript policies and endorsements.
- Managed outside panel counsel including the implementation of our Outside Counsel Monitoring and Litigation Management Programs.
- Spearheaded the identification of a state of the art automated litigation management program and directed the implementation team.
- Provided claims and coverage training to company personnel and TPA claims personnel and provided legal advice to units outside of Claims.

VICE PRESIDENT – CLAIMS DEPT (06-99 TO 02-04)

- Built the ASIS Claims area to a full service Claims Department as the company grew from $30MM to $250MM in premium.
- Managed all aspects of the claims function for ASIS including supervision of the Claims Department and the claims quality and contract compliance of outsourced claims being handled by Third Party Administrators (TPA's).
- Led multiple teams to complete revision of our Environmental and E&S coverage forms and endorsements including the drafting of manuscript exclusionary endorsements relating to Y2K, mold, total prior works, and Montrose continuing occurrence language.
- Guided the Claims Dept implementation of Genius, Heron (Surety System) and Apollo (WC System).
- Managed the audit and control of our Program partners and their TPA's, including such lines of business as legal professional, construction; taxi cab liability; pest control; various

WC Programs including PEO business, and NY General Liability and Labor Law
programs.

- Assumed and personally resolved book transfers on claims involving personal auto,
  AD&D, construction defect and environmental claims.
- Completed claims due diligence on several corporate acquisitions including evaluation of
  claims handling and reserves.
- Headed the Senior Managers Group responsible for addressing issues related to
  management of daily company operations during the growth years.
- Led the Strategic Planning Process for the company for two consecutive years with
  resultant establishment of all departmental goals and objectives.
- Selected by the Executive Board to head the Technical Services team which
  accomplished implementation of the following: Corporate Disaster Recovery Plan; New
  Employee Orientation Program; Performance Management Program; Streamlining
  corporate methods and procedures; and Corporate Training Program.
- Originated and led the Claims-Underwriting- Loss Control monthly meetings to review
  claims and loss control issues and assess renewals.
- Personally handled or supervised all claims of major exposure or complexity, both
  primary and excess, as well as claims involving alleged bad faith.

### 6-96 TO 6-99 VESTA-SHELBY INSURANCE COMPANIES – BIRMINGHAM, AL

VICE-PRESIDENT OF CLAIMS/REGULATORY & COMPLIANCE

- Managed two departments for a company that grew from $350MM to nearly $900MM in
  premium before it experienced financial problems.
- Personally handled or supervised all claims of major exposure or complexity, both
  personal lines and commercial lines.
- Managed all claims in litigation involving allegations of a breach of the duty of good faith
  and fair dealing or similar allegations.
- Cost effectively reengineered the Vesta Claims Department
- Implemented quality control standards and performed audits for MGA's handling non-
  standard auto claims through Vesta's County Mutual in Texas.
- Consolidated the Shelby Claims Department of 256 employees into Vesta Claims
  achieving efficiencies of scale.
- Personally directed the consolidation of Shelby WC claims into Vesta claims and
  supervised the newly WC claims unit.
- Implemented significant Cost Savings Measures to the combined operations maintaining
  claims quality while eliminating six offices
- Redesigned the entire Regulatory Department and brought company into compliance in
  both personal and commercial lines filings.
- Handled resolution of numerous reinsurance claims and participated in the commutation
  of several treaties with economically troubled reinsurers.

### 12-86 to 6-96 GREAT AMERICAN INSURANCE COMPANY- Cincinnati, OH

10-90 to 6-96 Regional Claims Vice President – Raleigh, NC

- Managed all the offices in the Mid-Atlantic, Southeast & Texas regions.
- Realigned claims personnel resulting in exceptional goal performance in all offices.
- Spearheaded the reorganization of offices after the company divisionalized.
- Personally handled or supervised all claims of major exposure or complexity, both primary and excess.
- The Raleigh claims operation was twice recognized as the best claims office in the Division.
- Recognized personally with the highest claims management award in the Commercial Division - The Claims MVP
- Developed technical materials for the handling of claims generated by our Optometry Professional Liability Program

12-86 to 10-90 Assistant Vice President – Home Office Liability Claims

- Directed the CAO Liability Staff with responsibility for all major claims litigation and reinsurance reporting.
- Managed the supervision of all umbrella and excess claims at GAI, as well as all claims involving alleged bad faith and unfair claim practice violations.
- Personally handled or supervised all claims of major exposure or complexity, both primary and excess.
- Handled and resolved all major reinsurance disputes with our over 100 reinsurers.
- Organized the consolidation of environmental claims into a specialized home office unit.
- Designed and implemented the programs for litigation management, structured settlements and ADR on a companywide basis.
- Developed and implemented an audit program for House Counsel Office operations.
- Implemented the Outside Counsel Monitoring Program and the Fee Bill Review Program.

**9-76 to 12-86 Milwaukee Insurance Company – Milwaukee, WI**

1/82 to 12/86 Vice President and General Counsel

- Responsible for all claims litigation and claim legal matters, as well as reporting to our reinsurers.
- Supervised staff attorneys responsible for claims litigation, workers compensation hearings, and arbitrations.
- Established and managed MIC's house counsel operation.
- Personally supervised or handled extra-contractual matters involving alleged violation of the duty of good faith and fair dealing.
- Managed all subrogation and collection matters for the company.
- Implemented claim standards and procedures for Milwaukee Safeguard, the non-standard auto subsidiary.
- Advised human resources department on employee matters and ultimately assumed responsibility for all corporate legal matters.

- Participated on the life insurance committee, investment committee and pension committee and provided advice to same.
- Provided advice to Milwaukee Life on contract and coverage matters and participated in handling claims under their life products.
- Corporate representative to the Wisconsin Insurance Alliance and the Conference of Mutual casualty Companies.

9/76 to 1/82 Assistant General Counsel/Associate Counsel

- Responsible for the supervision of litigation on cases pending nationwide, including coverage analysis, investigation, defense, settlement evaluation and ultimate resolution of all assigned matters.
- Responsible for the assignment of defense and working with defense counsel on litigated claims.
- Performed defense work including discovery and trial work on cases in Southeastern Wisconsin.
- Prepared filings and responses for Inter-company Arbitration and served on the local arbitration panels.
- Handled collection of subrogation against other insurance companies and uninsured drivers including filing collection suits.
- Provided coverage advice and/or legal opinions to claim handlers on non-litigated claims.

1/75 to 9/76 Trial Attorney – Private Practice of Law

**EDUCATION;**

UNIVERSITY OF WISCONSIN – MADISON

B.A. Degree – Economics (Honors Program)

Phi Beta Kappa, Phi Kappa Phi, Phi Eta Sigma, Evans Scholar, Rhodes Scholar Nominee

UNIVERSITY OF WISCONSIN LAW SCHOOL – MADISON

J.D. Degree – Admitted to Wisconsin State Bar; Eastern/Western Federal District Courts, Appellate Advocacy, Legal Aid Society, Evans Law Scholarship, Law Clerk

INSURANCE COURSES/ ACTIVITIES:

State of Georgia – Licensed Insurance Counselor for Property and Casualty Insurance.

CPCU – Chartered Property & Casualty Underwriter - Designation in 1988; CIC Property; Taught Insurance Law – CPCU 6; North Carolina Claims Adjuster License;

Current Memberships: The Society of Risk Management Consultants(SRMC); Defense Research Institute (DRI); DRI Lawyers Professionalism & Ethics Committee; American Bar Association (ABA); ABA Torts, Trial and Insurance Section; ABA Dispute Resolution Section; American Association of Justice (AAJ): AIDA Reinsurance and Insurance Arbitration Society (ARIAS); Chartered Property & Casualty Underwriters Society (CPCU); Atlanta Claims Association (ACA); and ACA Education Committee;

Activities: SRMC Professional Practices Committee Chairman; NAIC & IRES Meetings; NC Defense Counsel Arbitration Panelist); Wisconsin Insurance Alliance (Delegate); National Association of Mutual Insurance Companies (NAMIC); Conference of Mutual Casualty Insurance Companies; West Coast Casualty Construction Defect Seminars; Insurance Summit; Environmental Institute (Instructor); Southeast Claims Executives Association (Board of Directors); Cooper & Scully Bad Faith Seminar (presenter); ABA Surety Meeting (NYC); American Optometric Association Annual Conference (Presenter); ARIAS Arbitration Workshop;  DRI Insurance Bad Faith Seminar; SRMC 2008 -2010 Spring and/or Fall Meetings; CPCU – Central Chapter of Indiana – 2010 Annual Ethics Presentation (Presenter) and a multitude of DRI, ACA & other continuing claims and legal education presentations.

Publications: REINSURANCE BASICS FOR THE CLAIMS PROFESSIONAL RELATIVE TO BAD FAITH CLAIMS (2006)

## EXPERT REPORT – PETER J. HILDEBRAND, JD & CPCU

## EXHIBIT B – MATERIALS REVIEWED

## ALAGASCO v. TRVAELERS INSURANCE COMPANY

### Case # 2:10-CV-1840-IP

### *Pleadings:*

- Complaint for Declaratory Relief and Damages (07/09/10)
- Appendix to the Exhibits to the Complaint
- Plaintiff's Brief in Support of Motion for Partial Summary Judgment (09/27/10)
- Evidentiary Materials Support of Plaintiff's Motion for Partial Summary Judgment on the Duty to Defend with Exhibits A through J
- Defendant's Opposition to Plaintiff's Motion for Partial Summary Judgment on the Duty to Defend and Memorandum in Support of Cross Motion for Summary Judgment on the Duty to Defend (10/18/10)
- Plaintiff's Consolidated Response to Travelers' Cross Motion for Summary Judgment & to Travelers' Opposition to Alagasco's Motion for Partial Summary Judgment on the Duty to Defend (11/08/10)
- Defendant's Brief in Support of Cross Motion for Summary Judgment & in Opposition to Plaintiff's Motion for Partial Summary Judgment on the Duty to Defend
- Memorandum Opinion – U.S.D.C for N.D. of Alabama, Southern Division (12/07/10)
- Memorandum in Support of Defendant's Motion for Partial Reconsideration and/or Clarification of the Court's Opinion (01/03/11)Plaintiff's Response to Travelers' Motion for Partial Reconsideration and/or Clarification of the Court's Memorandum Opinion (01/18/11)
- Memorandum Opinion and Order (02/02/11)
- Plaintiff's Brief in Support of Motion for Partial Summary Judgment on Bad Faith with Exhibits 1-4 (01/11/11)
- Defendant's Response to Travelers' Motion for Partial Reconsideration and/or Clarification of the Court's December 7, 2010 Memorandum Opinion with Exhibit
- Defendant's Opposition to Plaintiff's Motion for Partial Summary Judgment on Bad Faith (01/26/11)
- Plaintiff's Reply Brief Regarding its Motion for Partial Summary Judgment on Bad Faith (01/29/11)
- Memorandum Opinion and Order on Reconsideration (02/02/11)
- Order Denying Plaintiff's Motion for Partial Summary Judgment on Bad Faith (02/02/11)

***Discovery:***

- Redacted Claims files – Travelers and St. Paul (T000001 – T004562)
- Redacted Claims files – Travelers and St. Paul (T004563 – T006599)
- Redacted Claims files – Travelers and St. Paul (T007241 – T008156)
- Travelers' Privilege Log

***Insurance Policies:***

- St. Paul Fire and Marine Insurance Company – Liability Policy # 501JB1000 – Policy Term with Renewals from 07/10/67 to 07/10/83

***Depositions and Exhibits:***

- Robert J. Harris  –  08/24/11
- Gail Dalton – 08/25/11

***Reference Materials:***

- *Casualty Insurance Claims, 4th Ed.*, Pat Magarick & Ken Brownlee (2006)
- *Insurance Law, A Guide to Fundamental Principles, Legal Doctrines, and Commercial Practices*, Robert Keeton & Alan Widiss (1988)
- *Insurance Claims and Disputes, 2nd Ed.*, Allan Windt (1995)
- *Unfair Insurance Practices: A Compendium of State Law*, DRI Defense Lawyer Series, (2008) and statutory sections cited therein
- *Insurance Bad Faith, A Compendium of State Law*, DRI Defense Library Series, (2006), and legal references cited therein.
- *General Liability Insurance Coverage,* Randy Maniloff & Jeffrey Stempel (2011)
- *Environmental Coverage Case Law, 20th Edition*, Munich Re America (2009)
- *Moody's Reports – Alagasco Corporate History - Various*
- *Company Profile – Travelers Casualty and Surety Company* (On-line)
- *The Travelers Companies – Wikipedia* (On-line)
- *LexisNexis – Case law – National Insurance Association v Sockwell* (On-line)

EXPERT REPORT – PETER J. HILDEBRAND, JD & CPCU

EXHIBIT C - TESTIMONY

ALAGASCO v. TRAVELERS INSURANCE COMPANY

I have testified as an expert in the following matters during the past five years:

1. Deposition - STATE NATIONAL INSURANCE COMPANY & GE REINSURANCE CORPORATION, PLAINTIFFS; vs ACCESS GENERAL AGENCY, INC., ACCESS CLAIMS ADMINISTRATORS, INC., MICHAEL MCMENAMIN, & TIM HARTSHORN;DEFENDANTS (CIVIL ACTION FILE NO. 1:04 – CV – 2594 – JTC in the U.S.D.C for the NORTHERN DISTRICT OF GEORGIA – ATLANTA DIVISION) – For Defendants.

2. Deposition – IN RE: PRIVATE ARBITRATION BEFORE SELECT TRIBUNAL (REFERENCE # 1200035432  matter before JAMS – ORANGE COUNTY, CALIFORNIA) – NEVADA JOCKEY CLUB INTERVAL OWNERS ASSOCIATION, PLAINTIFF VS FEDERAL INSURANCE COMPANY, DEFENDANT – For Petitioner.

3. Deposition – OHIO CASUALTY INSURANCE COMPANY vs GULF INSURANCE COMPANY, ADMIRAL INSURANCE COMPANY AND AMERICAN INTERNATIONAL SURPLUS LINES INSURANCE COMPANY (CASE NO. 04 CIV 10282 in U.S.D.C – SOUTHERN DISTRICT of NEW YORK) – For Plaintiff.

4. Deposition – HENRY F. SHEPARD, Administrator of the ESTATE OF MARC STANLEY SHEPARD v. NORTH FORK FOREST PRODUCTS,CHARLES KELLEY, NATIONAL CASUALTY COMPANY & DIAMOND STATE INSURANCE COMPANY (CASE NO.00-C-44 in the CIRCUIT COURT of RITCHIE COUNTY, WEST VIRGINIA) – For Defendant Diamond State.

5. Deposition – CONTINENTAL CASUALTY COMPANY & TRANSPORTATION INSURANCE COMPANY vs. CITY OF JACKSONVILLE, DUVAL COUNTY SCHOOL BOARD AND JACKSONVILLE ELECTRIC AUTHORITY (CASE NO. 3:04 CV 1170J – 20MCR in the U.S.D.C. for the MIDDLE DISTRICT of FLORIDA – JACKSONVILLE DIVISION) For Defendant City of Jacksonville.

6. Deposition – OLD REPUBLIC INSURANCE COMPANY v. CLAUSEN MILLER, P.C., MARGARET ORBON AND PETER BORA (CASE NO. CV-06-925-PHX-ROS in the U.S.D.C. for the DISTRICT OF ARIZONA) For Plaintiff.

7. Arbitration Hearing – IN RE: PRIVATE ARBITRATION BEFORE SELECT
TRIBUNAL (REFERENCE # 1200035432 matter before JAMS – ORANGE
COUNTY, CALIFORNIA) – NEVADA JOCKEY CLUB INTERVAL
OWNERS ASSOCIATION, PLAINTIFF VS FEDERAL INSURANCE
COMPANY, DEFENDANT – For Petitioner.

8. Deposition – NATIONAL SERVICES GROUP, INC v. CENTURY SURETY
COMPANY; NATIONAL INDEMNITY COMPANY OF THE SOUTH; AMY
CALHOUN, Individually and as Natural Parent and Next friend of ALEXIS
WHITE; NINA RHEA; PETER & SHIRRAL RHEA, Individually and as Natural
Parents & Next Friends of Minors PETER JOHN RHEA, JR., EMILY RHEA,
ASHLEY RHEA, & EVA RHEA; and TARESSIA RHEA SIMPSON,
Individually and as Natural Parent & Next Friend of Minors, AARON SIMPSON
& CATHERINE SIMPSON (CASE NO. CT-001094-05 in the CIRCUIT COURT
of TENNESSEE for the 13th JUDICIAL DISTRICT at MEMPHIS) For Plaintiff

9. Deposition – EDWARD WOOTEN & OCTAVIA WOOTEN v. BAILEY
BARFIELD, CRAIG BARFIELD, PAM BARFIELD, TYLER CARRAWAY,
DAVID CARRAWAY & KELLI CARRAWAY v. NATIONAL SURETY
CORPORATION (CASE NO. 1:06 – CV – 2799 in the U.S.D.C. for the
NORTHERN DISTRICT of GEORGIA – ATLANTA DIVISION) For the
Carraway Defendants/Third Party Plaintiffs

10. Deposition – SPX CORPORATION as successor in interest to LAYNE &
BOWLER PUMP COMPANY v. ACE PROPERTY & CASUALTY
COMPANY, ET AL (CASE NO. 06-CVS-11834 in the GENERAL COURT of
JUSTICE, SUPERIOR COURT DIVISION, MECKLENBERG COUNTY,
NORTH CAROLINA) For Defendant Pacific Indemnity Insurance Company

11. Deposition – MANSFIELD PLUMBING PRODUCTS, INC., Plaintiff, v.
POLYONE CORPORATION, defendant, (CASE NO. CV – 05 -56847 in the
COURT of COMMON PLEAS, COUNTY of CUYAHOGA, STATE of OHIO)
for the Plaintiff. Mansfield Plumbing Products

12. Deposition – RALPH BUTLER, as Assignee of Shalanna Banks, Plaintiff v.
FIRST ACCEPTANCE INSURANCE COMPANY INC., Defendant, (CIVIL
ACTION – FILE NO. 1:07 – CV – 3104) in the U.S.D.C. for the NORTHERN
DISTRICT of GEORGIA – ATLANTA DIVISION) For the Defendant

13. Deposition – AMY JARRARD, Surviving Spouse of JASON JODY JARRARD,
Deceased, Assignee of Robert D. Tippins, Plaintiff v. GRANGE MUTUAL
CASUALTY COMPANY, Defendant, (CASE NO. CV 5:08-031) U.S.D.C. for
the SOUTHERN DISTRICT of GEORGIA – WAYCROSS DIVISION) For the
Defendant

14. Deposition – HOME DEPOT USA, INC, Plaintiff v. BILJAX, INC. & ST.PAUL SURPLUS LINES INSURANCE COMPANY, Defendants, (CIVIL ACTION FILE NO. 06-1-1753-42, In the SUPERIOR COURT of COBB COUNTY, STATE of GEORGIA) For the Plaintiff

15. Deposition – 1800 SOUTH MAPLE STREET LLC, RALPH GIANELLA, WILLIAM AYYAD, WILLIAM AYYAD, INC & PREMIER COMMUNITIES, LLC, Plaintiffs vs ALLIED PROPERTY & CASUALTY INSURANCE COMPANY, AMCO INSURANCE COMPANY, NATIONWIDE MUTUAL INSURANCE COMPANY & MICHAEL EHRENFELD COMPANY – INSURANCE AGENTS & BROKERS, Defendants (CASE NO. 37-2007-00074662 In the SUPERIOR COURT of the STATE of CALIFORNIA COUNTY of SAN DIEGO, CENTRAL DIVISION) For the Defendant Insurance Companies

16. Deposition – UNIONAMERICA INSURANCE COMPANY LTD, Plaintiff, v. CUSTARD INSURANCE ADJUSTERS, INC, Defendant, v. EXECUTIVE RISK INDEMNITY, INC, Third Party Defendant, (CASE NO: 06-05039 – In the CIRCUIT COURT of the 13th JUDICIAL CIRCUIT, in the and for HILLSBOROUGH COUNTY, FLORIDA) For the Defendant Adjusting Company.

17. Trial – 1800 SOUTH MAPLE STREET LLC, RALPH GIANELLA, WILLIAM AYYAD, WILLIAM AYYAD, INC & PREMIER COMMUNITIES, LLC, Plaintiffs vs ALLIED PROPERTY & CASUALTY INSURANCE COMPANY, AMCO INSURANCE COMPANY, NATIONWIDE MUTUAL INSURANCE COMPANY & MICHAEL EHRENFELD COMPANY – INSURANCE AGENTS & BROKERS, Defendants (CASE NO. 37-2007-00074662 In the SUPERIOR COURT of the STATE of CALIFORNIA COUNTY of SAN DIEGO, CENTRAL DIVISION) For the Defendant Insurance Companies

18. Deposition – WEST AMERICAN INSURANCE COMPANY, Plaintiff vs RLI INSURANCE COMPANY & AGENCY SERVICES CORPORATION OF KANSAS, INC., Defendants (CASE # 07-0566-CV-W-ODS in the U.S.D.C. for the WESTERN DISTRICT of MISSOURI, WESTERN DIVISION) For the Plaintiff Insurance Company

19. Deposition – KEITH A. ANDERSON and STEPHANIE ALLEN, as Personal Representative of the ESTATE OF DWAYNE ALLEN SR, Deceased, Plaintiffs vs STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, a foreign corporation, Defendant (Case # 4:08-CV-00345 in the U.S.D.C. for the NORTHERN DISTRICT OF FLORIDA, TALLAHASSEE DIVISION) For the Plaintiff

20. Deposition – JUDITH H. McGRAW, individually and as Executor of the ESTATE OF JOSEPH S. McGRAW, and McGRAW AUTO BODY & FRAME SPECIALISTS, INC., Plaintiffs, vs STATE FARM FIRE & CASUALTY

COMPANY and UNIVERSAL UNDERWRITERS INSURANCE COMPANY, Defendants (Civil Action File No. 1:09-cv-720-WSD in the U.S.D.C. for the NOTHERN DISTRICT of GEORGIA, ATLANTA DIVISION) For the Plaintiff

21. Deposition – MICHAEL E. CULLEN, Plaintiff, vs. STATE FARM MUTUAL AUTO INSURANCE COMPANY, Defendant, (Case #: CV-05-555183 in the COURT of COMMON PLEAS, CUYAHOGA COUNTY, OHIO) For the Plaintiff

22. Deposition – KENNETH SELTING, Plaintiff vs SAFECO INSURANCE COMPANY OF AMERICA, Defendant , (Case No. 07-651 in the CIRCUIT COURT of the SEVENTH JUDICIAL CIRCUIT , PENNINGTON COUNTY, SOUTH DAKOTA) For the Defendant

23. Deposition – SANDRA A. BESHADA, As Administrator Ad Prosequendum of the ESTATE OF BRANDON BESHADA, deceased, and SANDRA A. BESHADA, Individually, Plaintiffs, vs. LIBERTY MUTUAL INSURANCE COMPANY; LIBERTY INSURANCE CORPORATION; LEON S. DICK, M.D., P.A.; ROBERT J. PARESI, JR, M.D.; MARK J. CAVARETTA, M.D.; SAINT BARNABAS HEALTHCARE SYSTEM, doing business as NEWARK BETH ISRAEL MEDICAL CENTER ; ABC PRACTICE GROUPS (fictitiously named unknown medical organizations and/or medical practice groups) and JOHN AND JANE DOES 1-10 (Unknown physicians and/or medical personnel who provided relevant medical care), Defendants (Docket # ESX-L-888-08 in the SUPERIOR COURT OF NEW JERSEY – LAW DIVISION - ESSEX COUNTY) For the Defendant Insurance Companies

24. Deposition – ARCH SPECIALTY INSURANCE COMPANY, Plaintiff vs. GO-MART INC., JOE MEADOWS, J.T. DAVENPORT & SONS, INC and ROBERT RADER, Defendants (U.S.D.C for SOUTHERN DISTRICT of WEST VIRGINIA, Civil Action No. 2:08-0285) For the Plaintiff

25. Deposition – ELMOTEC STATOMAT,INC., as the successor in interest to STATOMAT SPECIAL MACHINES, INC., Plaintiff, vs THE CHARTER OAK FIRE INSURANCE COMPANY and ST PAUL TRAVELERS INSURANCE COMPANY, Defendants (Cause No. 02D01-0803-PL-121 in the ALLEN SUPERIOR COURT, COUNTY of ALLEN, STATE of INDIANA) For the Defendants

26. Deposition – LIBERTY MUTUAL FIRE INSURANCE COMPANY and EMPLOYERS INSURANCE OF WAUSAU, a mutual company, Plaintiffs, vs J.T.WALKER INDUSTRIES,INC f/k/a METAL INDUSTRIES, INC; and MI WINDOWS & DOORS, INC, f/k/a MI HOME PRODUCTS, INC. and METAL INDUSTRIES, INC. OF CALIFORNIA, Defendants, (U.S.D.C for the DISTRICT of SOUTH CAROLINA, CHARLESTON DIVISION, Civil Action No. 2:08-2043-MBS) For the Plaintiffs

27. Deposition – PEDRO CARDENAS, Plaintiff, vs GEICO CASUALTY COMPANY, a foreign corporation, Defendant, (U.S.D.C. for the MIDDLE DISTRICT of FLORIDA, TAMPA DIVISION, Case No.8:09-CV-2357-T-23 JLH) For the Plaintiff

28. Deposition – EXECUTIVE RISK INDEMNITY, Plaintiff, vs CHARLESTON AREA MEDICAL CENTER and EMPLOYERS REINSURANCE COMPANY vs CHARLESTON AREA MEDICAL CENTER, Defendants, (U.S.D.C SOUTHERN DISTRICT OF WEST VIRGINIA, Case Nos. 2:08-CV-0303 and 2:08-CV-0810) For Defendant Charleston Area Medical Center

29. Deposition - VALLE VISTA LIMITED, LLC, Plaintiff, vs SELECTIVE INSURANCE COMPANY OF SOUTH CAROLINA, Defendant, (JOHNSON SUPERIOR COURT, JOHNSON COUNTY, INDIANA, Cause #: 41D01-1011-PL-00084) For the Defendant

30. Deposition – CONTINENTAL CASUALTY COMPANY, Plaintiff, vs PEERLESS INDUSTRIES, INC. D/B/A PEERLESS HEATER COMPANY, EASTERN FOUNDRY COMPANY, EAFCO FOUNDATION, PEERLESS PRODUCTS COMPANY, READING GRAY IRON CASTINGS, INC., EAFCO INDUSTRIES, INC., AND BOYERTOWN PRODUCTS COMPANY, and CENTURY INDEMNITY COMPANY, as successor to CIGNA SPECIALTY INSURANCE COMPANY, f/k/a CALIFORNIA UNION INSURANCE COMPANY and TIG INSURANCE COMPANY, as successor to INTERNATIONAL INSURANCE COMPANY, Defendants, (U.S.D.C. EASTERN DISTRICT OF PENNSYLVANIA, Civil Action No. 06-4621) For Defendant Insurance Companies

31. Deposition – JOSHUA HUFF, as Administrator cum testamenta annexo for the ESTATE of HARLAN E. HUFF, Plaintiff, vs. LIBERTY MUTUAL INSURANCE COMPANY, MEADOWS & MACIE, P.C., BONNIE L. BAKER, and RHONDA REANE JONES, as Executor for the ESTATE of PATRICIA F. HUFF, Defendants, (SUPERIOR COURT for GWINNETT COUNTY, GEORGIA, Civil Action File #: 08-A09759-5) For the Defendant Liberty Mutual Insurance Company

32. Deposition – LISIA BARNES, Plaintiff, vs. CHARLES K. OWEN, ALLSTATE INSURANCE COMPANY, a foreign corporation, and RICHARD V. STANTON and WESTERN AMERICAN AUCTIONS, INC., Defendants, (U.S.D.C., MIDDLE DISTRICT OF FLORIDA, TAMPA DIVISION, Case No. 8:10-cv-2434-T-30MAP) For the Plaintiff