FILED

2011 Dec 11 PM 03:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

2010 Dec 07 PM 02:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

ALABAMA GAS CORPORATION,  )

        Plaintiff,  )

vs.  )     CV 10-J-1840-S

TRAVELERS CASUALTY AND  )
SURETY COMPANY, et al.,

                    )

        Defendants.

                    )

## MEMORANDUM OPINION

Pending before the court is plaintiff's motion for partial summary judgment on the issue of defendants' duty to defend (doc. 21), plaintiff's brief and evidentiary submissions in support of said motion (doc. 22), defendants' cross motion for summary judgment on the duty to defend (doc. 40), and a brief and evidentiary submission in support of said cross motion (docs. 41 and 42). Plaintiff filed a consolidated response to defendants' cross motion for summary judgment on the duty to defend and defendants' opposition to plaintiff's motion for partial summary judgment (doc. 49), and defendants then filed a reply (doc. 50).

Further pending before the court is defendants' motion for summary

1

judgment (doc. 29) and brief and evidentiary submissions in support of said

motion (docs. 30 and 31).  Plaintiff filed a response to said motion (doc. 39) which

response was amended (doc. 43).  Defendants filed a reply (doc. 48).

## **Procedural Background**

Plaintiff, Alabama Gas Corporation (Alagasco), filed its complaint for

declaratory relief and damages against defendants, Travelers Casualty and Surety

Company, St. Paul Fire and Marine Insurance Company, St. Paul Surplus Lines

Insurance Company and St. Paul Mercury Insurance Company.[1]  This court has

jurisdiction pursuant to 20 USC §1332.  Alagasco seeks a declaration of the rights,

duties and obligation of the parties under certain liability policies issued by

defendants and covering Alagasco.  28 USC § 2201-2202 (Count I).  Plaintiff also

seeks damages alleging breach of contract, reimbursement of defense costs (Count

II), bad faith on the part of defendants (Count III), declaration of a duty to

---

[1] Filing this action on July 9, 2010, plaintiff has properly brought this action within the statute of limitations period.  The statutory period for breach of contract is six years.  ALA. CODE § 6-2-34(9) (1975).  The period begins to run at the time of breach for a contract claim.  *AC, Inc. v. Baker*, 622 So.2d 331, 333 (Ala. 1993).  The statutory period for bad faith claims is two years. ALA. CODE § 6-2-38 (1975).  The period begins to run when the party knew of facts which would put it on notice of possible existence of bad faith.  *ALFA Mut. Ins. Co. v. Smith*, 540 So.2d 691 (Ala. 1988).  The breach of contract began after June 2009, when plaintiff sent defendant the PRP letter.  The bad faith claims began after October 2008, when defendant failed to investigate the claim.  Further, timely notice was given to defendant.  Defendant first received notice of possible occurrences in 1998, more than a decade prior to the claims. Additionally, plaintiff forwarded the EPA's 104(e) information request as well as PRP letter to defendant within 26 days and 2 days, respectively, of receiving them.

indemnify (County IV), and waiver and estoppel (Count V).

Defendants St. Paul Fire & Marine Insurance Company ("St. Paul Fire"), St. Paul Surplus Lines Insurance ("St. Paul Surplus") and St. Paul Mercury Insurance Company ("St. Paul Mercury") are all direct and indirect subsidiaries of defendant Travelers Casualty and Surety Company ("Travelers Casualty").

### Statement of Facts

On or about February 1, 1944, Aetna Casualty and Surety Company issued liability insurance policy 1C522 with a policy period of February 1, 1944, to November 10, 1945, which policy included as an insured the Birmingham Gas Company, one of Alagasco's corporate predecessors.  Compl., ¶ 11 (Doc. 1).

From the late 1940s until the early 1980s, Alagasco was insured under primary liability insurance policies issued by St. Paul Fire, St. Paul Mercury or St. Paul Surplus, including:

| Policy Number | Period |
| --- | --- |
| 1101152-1 | July 10, 1947 to July 10, 1948 |
| 1102550-1-4 | July 10, 1948 to July 10, 1949 |
| 1104400-1 | July 10, 1949, to July 10, 1950 |
| 1107000-1 | July 10, 1950 to July 10, 1951 |
| 1108900-1 | July 10, 1951 to July 10, 1952 |

3

| | |
|---|---|
| 1111700-1 | July 10, 1952 to July 10, 1953 |
| 115000 | July 10, 1953, to July 10, 1954 |
| 118064 | July 10, 1954, to July 10, 1955 |
| 1122997 | July 10, 1055, to July 10, 1956 |
| 1128949 | July 10, 1956, to July 10, 1957 |
| 566JF5661 | July 10, 1957, to July 10, 1960 |
| 566JZ2700 | July 10, 1960, to July 10, 1963 |
| 501JB1000 | July 10, 1967, to July 10, 1983 |
| 501TC0200 | July 10, 1983, to July 10, 1984 |

Compl., ¶ 12 (Doc. 1).

St. Paul Fire policy number 5010JB1000 was renewed several times so that its policy covered the period July 10, 1967, to July 10, 1983. That policy provides that defendants must:

> (a) Defend in the name and on behalf of the insured any **suit** against the insured alleging such injury, death, damage, or destruction and seeking damages on account thereof, even if such suit is groundless, false, or fraudulent; but Company shall have the right to make such investigation, negotiation and settlement of any **claim** or **suit** as may be deemed expedient by the Company. (emphasis added).

Ex. A, at 3 (Doc. 22-2).

Said policy applies only to "occurrences" that occur during the policy

period. The term "occurrence" is defined in the policy to include "a continuous or repeated exposure during the policy period to conditions which unexpectedly and unintentionally cause...injury to or destruction of tangible property, including the loss or use thereof." Ex. A, at 4 (Doc. 22-2).

From sometime in the latter half of the 19th Century until approximately 1946, gas for lighting, cooking, heating and other purposes was supplied to the customers in Huntsville, Alabama by a manufactured gas plant located near the intersection of Holmes Avenue and Dallas Avenue (the "Huntsville MGP"). The basic operation of the Huntsville MGP involved the superheating of coal or a combination of coke and oil in low oxygen chambers to produce gas that was then purified and fed through a gas distribution system to the citizens of Huntsville. Compl., ¶ 16 (Doc. 1).

In 1918 the Huntsville Gas Company was incorporated and acquired an interest in the Huntsville MGP. Alagasco is a corporate successor to the Huntsville Gas Company. In or around 1946, Alagasco converted the Huntsville MGP from a gas manufacturing process to a propane air system, although on information and belief, at least some of the former gas manufacturing fixtures and facilities remained in place. Alagasco sold the Huntsville MGP and the city-wide distribution system to the City of Huntsville in 1949. Compl., ¶ 17 (Doc. 1).

5

The City of Huntsville operated the Huntsville MGP as a propane air operation until March 1952, when a natural gas pipeline reached that part of Alabama and the City converted to natural gas. The City of Huntsville continued to use the site for various purposes ancillary to its utility services until approximately 1967. Compl., ¶ 18 (Doc. 1).

In November 1967 the City of Huntsville conveyed the former Huntsville MGP site to an entity cooperating with the federal Department of Housing and Urban Development ("HUD") and the Huntsville Housing Authority. Between November 1967 and May 1970, entities working in cooperation with HUD and the Housing Authority demolished the remains of the former Huntsville MGP and, between May 1970 and April 1971, built the Searcy Homes public housing project on that site. Title to Searcy Homes passed to the Housing Authority in 1971. Compl., ¶ 19 (Doc. 1).

In June 1998 the parent company to plaintiff, Energen, alerted defendants that there were actual or potential claims arising from historical manufactured gas plant ("MGP") operations. This notification included the Huntsville MGP. Compl., ¶ 21 (Doc. 1).

Subsequently, Energen, as the "Policyholder," and St. Paul Fire and Marine Insurance Company, as the "Insurer," entered into a "Confidentiality Agreement

6

for Settlement Negotiations" (the "Agreement") in February 1999. Ex. A to Plotz

Aff. (doc. 31). This Agreement states that Energen "has received or expects to

receive one or more claims and/or lawsuits with respect to alleged environmental

contamination." Ex. A to Plotz Aff., first "WHEREAS" clause (doc. 31). The

second "WHEREAS" clause states that "Policyholder asserts that losses associated

with the Claims and potential Claims are covered under certain insurance policies

issued to Policyholder or its predecessors by various insurers, including St. Paul

Fire & Marine Insurance Company." Ex. A to Plotz Aff. (doc. 31). The third and

final "WHEREAS" clause states that "Policyholder and Insurer wish to enter into

good faith negotiations toward the possible resolution of claims." Ex. A to Plotz

Aff. (doc. 31). The Agreement further states that "[t]he sole and exclusive remedy

of any party hereto for any alleged failure to negotiate in good faith to resolve

issues during the Negotiation Period shall be cancellation of this Agreement." Ex.

A to Plotz Aff., ¶ 2 (doc. 31). The Agreement defines "Negotiation Period" as

"extending from the date of execution of this Agreement until this Agreement is

terminated by either party." Ex. A to Plotz Aff., ¶ 1 (doc. 31). Termination of the

Agreement requires twenty-four hours written notice to the other party's signatory.

Ex. A to Plotz Decl., ¶ 11 (doc. 31). Neither Energen nor defendants has ever

canceled the Agreement. Plotz Decl., ¶ 4 (doc. 31).

Plaintiff alleges the operations of the Huntsville MGP left behind what is considered hazardous substances under federal and state environmental laws. Compl., ¶ 20 (Doc. 1)  On October 8, 2008, plaintiff received an "information request" regarding the Huntsville MGP site from the Environmental Protection Agency ("EPA") under the authority of section 104(e) of the Comprehensive Environmental Response, Compensation and Liability Act.  Ex. B, at 5-15 (doc. 22-3).  Plaintiff also received a Pollution Report which stated:

> EPA's Enforcement Section is preparing an assessment of liability and ability to pay on Potential Responsible Parties (PRPs) related to the site. If it is determined that one or more PRPs are able to complete a removal action, [the agency] *may* pursue an Administrative Order on Consent (AOC) with them to carry out the time-critical removal action and provide reimbursement for past costs.

Ex. B, at 20 (emphasis in the original) (doc. 22-3).  On October 29, 2008, Alagasco forwarded the Information Request and Pollution Report to the defendants and stated that they may constitute a claim under defendants' policies. Alagasco additionally tendered the defense and made a demand for coverage.  Ex. B, at 1 (doc. 22-3).  On November 10, 2008, defendants responded stating their belief that the EPA's assertions did not rise to the level of a "formal claim" and therefore defendants were unable to state a coverage position until "such a claim or lawsuit is received."  Ex. C, at 3 (doc. 22-4).

8

From October 2008 to June 2009, plaintiff and the EPA held talks regarding the site and the fact that plaintiff was the lead PRP.  Plaintiff continued to update defendants on the communications with the EPA as well as demand a defense.  Ex. D, F and H (doc. 22-5, 7, and 9).  On June 24, 2009, plaintiff received a formal Notice of Potential Liability and Offer to Negotiate from the EPA (the "PRP Letter") and a draft AOC.  Plaintiff forwarded the PRP Letter to defendants and again reiterated a demand for defense.  Ex. F, at 1-46 (doc. 22-7).  Defendants twice responded saying it was still reviewing the file and plaintiff should act in what it believed was plaintiff's best interests.  Ex. E, at 1 (doc. 22-6); Ex. G, at 1 (doc. 22-8).  On February 3, 2010, defendants notified plaintiff that it did not believe any of the communications from the EPA constituted a "suit" such that it did not believe it had "any potential defense obligations at the time."  Ex. J, at 3 (doc. 22-11).

## Summary Judgment Standard

A moving party is entitled to summary judgment if there is no genuine issue of material fact, leaving final judgment to be decided as a matter of law.  *See* Fed. R. Civ. P. 56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1355-56 (1986).  The facts, and any reasonable inference therefrom, are to be viewed in the light most favorable to the non-moving party,

9

with any doubt resolved in the non-movant's favor. *See Adickes v. S.H. Kress &*
*Co.*, 398 U.S. 144, 158, 90 S.Ct. 1598, 1609 (1970).

A party opposing a properly submitted motion for summary judgment may
not rest upon mere allegations or denials of his pleadings, but must set forth
specific facts showing that there is a genuine issue for trial. *Eberhardt v. Waters*,
901 F.2d 1578, 1580 (11th Cir. 1990). The non-moving party's evidence on
rebuttal must be significantly probative and not based on mere assertion or merely
be colorable. *See* Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S.
242, 249050, 106 S.Ct. 2505, 2511 (1986). Speculation does not create a genuine
issue of fact. *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005).

### Legal Analysis

I.    *Plaintiff's motion for Partial Summary Judgment on the duty to defend.*

II.   *Defendants' cross motion on the duty to defend.*

The issue before the court on plaintiff's motion for summary judgment is
whether a PRP letter sent by the EPA constitutes a "suit" under a comprehensive
general liability insurance policy. The Policy states that defendants must
"[d]efend in the name and on behalf of the Insured any *suit* against the Insured
alleging such injury, death, damage, or destruction and seeking damages on
account thereof, even if such suit is groundless, false, or fraudulent." (emphasis

10

added).  The policy also states "[the defendants] shall have the right to make such

investigation, negotiation and settlement of any *claim* or *suit* as may be deemed

expedient by the [defendants]."  (emphasis added).

Though this is an issue of first impression in Alabama, the Alabama

Supreme Court has indicated that the majority rule from cases on environmental

coverage issues relating to standard-form insurance policies issued nationwide is

of guidance.  *See Alabama Plating Co. v. U.S. Fed. & Guar. Co.*, 690 So.2d 331,

336 (Ala. 1980).  In *Alabama Plating*, the court followed the majority of other

states in finding a broad definition of "damages" in the insurance policy in order

to include environmental remediation costs, rather than adopting a narrow

interpretation of "damages" as just those entered by a court of law.  *Id*. at 337

("...as noted previously, the policies in question are standard-form policies, issued

nationwide, so the ruling of courts in other states are of some guidance.  We find

that as to each issue above, the clear majority of courts that have answered the

questions have ruled against the arguments made by USF & G.  Thus, we adopt

the majority position on each issue: environmental remediation costs are damages

covered by CGL policies, .... These rulings are consistent with prior decisions of

this Court").  Further, Alabama has found that where terms of an insurance policy

are ambiguous, they shall be construed in favor of finding coverage.  *State Farm*

11

*Mut. Auto. Inc. Co. v. Brown*, 26 So.3d 1167, 1169-70 (Ala. 2009), *citing Crossett v. St. Louis Fire & Marine Inc. Co.*, 269 So.2d 869, 873 (Ala. 1972) ("policies of insurance should be construed liberally in respect to persons insured and strictly with respect to the insurer").

The majority of courts have held that a PRP letter does constitute a "suit." *See R.T. Vanderbilt Co., Inc. v. Continental Gas Co.*, 870 A.2d 1048, 1058 (Conn. 2005) ("The courts of Colorado, Iowa, Massachusetts, Michigan, Minnesota, New Hampshire, North Carolina and Wisconsin have all held that a PRP letter...constitutes a suit triggering an insurer's duty to defend"); *see also, Vermont v. CNA Inc. Co.*, 779 A.2d 662, 667 (Vt. 2001); *Aetna Cas. & Sur. Co. v. Kentucky*, 179 S.W.3d 830, 837 (Ky. 2005); *Dutton-Lainson Co. v. Continental Ins. Co.*, 778 N.W.2d 433, 449 (Neb. 2010) ("A PRP letter is the functional equivalent of a 'suit' as described in the insurance policies . . . The PRP letter from the EPA carried with it the EPA's coercive powers").

The majority of states have found that a PRP letter constitutes a "suit" because the term is ambiguous and " because CERCLA has given the EPA and governmental agencies statutory power to hold PRPs liable for substantial and significant cleanup costs." *R.T. Vanderbilt Co., Inc.*, 870 A.2d at 1058.  Alabama has found that where terms of an insurance policy are ambiguous, they should be

12

construed as a laymen would understand the terms, in favor of finding coverage. *State Farm Mut. Auto. Ins. Co.*, 26 So.3d at 1169-70. In doing so, it is appropriate to look at a dictionary definition from the proper era. *Cincinnati Ins. Co. v. Tuscaloosa County Parking and Transit Auth.*, 827 So.2d 765, 768 (Ala. 2002). In *R.T. Vanderbilt Co.*, the court used several dictionaries, including *Webster's New Twentieth Century Dictionary of the English Language* (2d Ed. 1964),[2] and found that the term "suit" is not defined solely as a court proceeding but rather includes "an attempt to recover a right or claim through a legal action." *R.T. Vanderbilt Co.*, 870 A.2d at 1059. The court went on to find that the broad definition of the term "suit" would lead a typical layperson to believe "suit" would apply to legal proceedings other than just a court action. *Id.* at 1059-60. In *Alabama Plating*, the Alabama Supreme Court followed the majority of other states in finding a broad definition of "damages" in the insurance policy in order to include environmental remediation costs, rather than adopting a narrow interpretation of "damages" as just those entered by a court of law. *See* 690 So.2d 331. By setting forth the plan to follow the majority of courts on environmental

---

[2] The parties in *R.T. Vanderbilt Co.* entered into the relevant insurance policies in the 1960s; therefore, dictionaries of that era were used to find the meaning of the term "suit." Similarly, the Policy was created in 1967; thus, the dictionary definitions found in *R.T. Vanderbilt* can be applied equally here.

remediation issues, as well as adopting broad definitions of terms in favor of finding coverage for insureds, Alabama has made it clear that it would not read a strict meaning into the term "suit," but rather would find it encompasses more than just a court proceeding.

In finding that a PRP letter falls within the broadened definition of a "suit," the majority of courts have emphasized the impact of a PRP letter:

> [A] PRP notice differs from a "garden variety demand letter" in that it carries "immediate and severe implications," rather than simply exposing a party to a potential threat of future litigation . . . "[T]he PRP's substantive rights and ultimate liability are affected from the start of the administrative process."

*Dutton-Lainson Co.*, 778 N.W.2d at 448 (*citing Aetna Cas. and Sur. Co., Inc. v. Pintlar Corp.,* 948 F.2d 1507, 1516 (9th Cir. 1991)). By failing to cooperate with the government after receiving a PRP letter, the insured, and potentially its insurers, are exposed to "much greater liability, including the EPA's litigation costs. As a result, 'an 'ordinary person' would believe that the receipt of a PRP notice is the effective commencement of a 'suit' necessitating a legal defense." *Id.* (*citing Aetna Cas. and Sur. Co.,* 948 F.2d at 1517 (9th Cir. 1991)). The PRP Letter in this case is equally indicative of the "immediate and severe implications" that would follow from failing to comply with the EPA:

> [Alagasco] is encouraged to contact EPA within fourteen days of receipt
> of this letter to indicate your willingness to participate in future
> negotiations at this Site. If EPA does not receive a timely response,
> EPA will assume that [Alagasco] does not wish to negotiate a resolution
> of its liabilities in connection with the response action, and that
> [Alagasco] has declined any involvement in performing the response
> activities. Moreover, if [Alagasco] does not contact EPA to indicate its
> willingness to participate in the response actions at the Site and/or does
> not participate in the negotiations, [Alagasco] may be issued an
> administrative order under Section 106 of CERCLA or be held liable
> under Section 107 of CERCLA for the cost of the response activities
> EPA performs at the Site and for any damages to natural resources.

Ex. F, at 7 (Doc. 22-7). The language in the PRP Letter would lead an ordinary

person to believe that it is equivalent to a "suit." Therefore, this court shall follow

the majority of other states and find that the PRP Letter sent by the EPA to

plaintiff falls within the broad definition of "suit," and thus, triggers the

defendants duty to defend.

III.    *Defendants' Motion for Summary Judgment.*

A.  *The 1999 Agreement Does Not Bar This Action.*

Where a contract is clear and unambiguous, the court must give the contract

language its plain meaning. *Black Diamond Dev., Inc. v. Thompson*, 979 So.2d 47

(Ala. 2007)(*citing Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of

N.Y.*, 375 F.3d 168, 177-78 (2d Cir. 2004)); *Cameron v. USAA Property and Cas.

Inc. Co.*, 733 A.2d 965, 968 (D.C. 1999); *see Safeway Ins. Co. v. Herrera,* 912

So.2d 1140, 1143 (Ala. 2005).  If a contract is "clear and unambiguous in its

terms, then there is no question of interpretation or construction."  *Twin City Fire*

*Inc. So. v. Alfa Mut. Ins. Co.*, 817 So.2d 687, 691-92 (Ala. 2001).  The plain

language of the Agreement shows that not only Alagasco is not a party to the

Agreement, but also, none of the claims before this court are barred by the

Agreement.

*1.  Alagasco Is Not a Party to the Agreement.*

The plain language of the Agreement states that only "Policyholder and

Insurer wish to enter into good faith negotiations toward the possible resolution of

claims for coverage for the Claims under any and all policies issued to

Policyholder by Insurer."  The Agreement further states that "Policyholder" is

Energen Corporation and "Insurer" is St. Paul Fire & Marine.  In addition, the

Agreement was signed only by Energen and St. Paul Fire & Marine.  Nothing in

the record indicates that eleven years ago Alagasco or the other defendants

intended to be parties to the Agreement.  Defendants contend that the second

"WHEREAS" clause binds plaintiff to the agreement by mentioning that there are

potential claims covered by policies issued to Policyholder or its *predecessors*.

Whether or not plaintiff may be considered a predecessor of Energen is irrelevant.

The 11th Circuit stated in *Whetstone Candy Co., Inc. v. Kraft Foods, Inc.* that

16

"'whereas' clauses are not binding when the contract is otherwise ambiguous. ...

They are merely prefatory recitations of the facts that lead the parties to enter the

agreement." 351 F.3d 1067, 1074 (11th Cir. 2003). The second "WHEREAS"

clause is just a recitation of the fact that there are potential claims related to

various insurance policies and that is one of the reasons the parties are entering

into the Agreement. It does not mean that the predecessors – if plaintiff is even a

predecessor to Energen – are parties to the Agreement. The Agreement, signed

only by Energen and St. Paul Fire & Marine, is unambiguous in stating that

"Policyholder" and "Insurer," not plaintiff, are the parties to the Agreement that

"will undertake a period of good faith negotiations." Ex. A to Plotz Aff., ¶ 1 (doc.

31).

Further, a parent corporation and a subsidiary are two separate and distinct

legal entities. *Whetstone Candy Co.*, 351 F.3d at 1074 ("[c]orporations are

separate legal entities and contracts made by a parent corporation do not bind a

subsidiary merely because one corporation owns all of the stock of the other

corporation"); *American Int'l Group, Inc. v. Cornerstone Businesses, Inc.* 872

So.2d 333, 336 (11th Cir. 2004) ("a parent corporation is not bound by an

arbitration clause in an agreement entered into by its subsidiary, and a parent

corporation cannot compel arbitration pursuant to an agreement between a

17

subsidiary and the opposing party"); *Nobles v. Rural Cmty. Inc. Services,* 303
F.Supp.2d 1279, 1288 (N.D. Ala. 2004) ("Under Alabama law, a corporation is a
legal entity existing separate and apart from other legal entities...The mere fact that
one party, including a corporation, owns all the stock in another corporation does
not destroy the separate corporate entities"). In *Whetstone Candy Co.,* the court
found that the language "THIS AGREEMENT is by and between Kraft Foods, Inc.
[now Kraft NA], ... and the Whetstone Candy Company" in addition to the
language in the first WHEREAS clause – "Kraft or one of its subsidiaries" – did
not bind the subsidiary company, Kraft UK, to the settlement agreement. 351 F.3d
at 1071-1074 ("The agreement, according to its terms, was between Kraft NA and
Whetstone. Absent facts that would allow us to disregard Kraft UK's status as a
separate entity, Kraft NA ... has no ability to bind Kraft UK, a separate entity,
without Kraft UK's permission"). Similarly, in the case before this court, the plain
language of the Agreement states that it is between Energen and St. Paul Fire &
Marine, and not plaintiff. Though plaintiff is a subsidiary of Energen, plaintiff is a
separate legal entity from Energen. While Energen may enter into a contract with
another party, that contract does not automatically bind any of its subsidiaries.
Without the plain language of this Agreement showing that plaintiff is a party to
the Agreement, plaintiff is not bound by the Agreement as a subsidiary to Energen.

18

*2. Plaintiff's Claims Not Barred by Language of the Agreement.*

*Assuming arguendo* that plaintiff is a party to the Agreement, the claims

before this court are not barred by the language of the Agreement. The plain

language of the Agreement indicates that it only bars lawsuits for "failure to

negotiate in good faith." Paragraph 2 of the Agreement states:

> Immediately upon execution of this Agreement, Policyholder and
> Insurer shall in good faith undertake efforts to resolve issues related to
> alleged coverage for the Claims by negotiation. The sole and exclusive
> remedy of any party hereto for any alleged failure to negotiate in good
> faith to resolve issues during the Negotiation Period shall be
> cancellation of this Agreement.

Ex. A to Plotz Aff. (doc. 31). Plaintiff has no claims before this court that allege a

failure to negotiate in good faith. Therefore, the Agreement does not cover the

claims in this case, and thus, does not bar the suit.

Plaintiff's complaint asserts five counts for relief, none of which seek

remedies for a failure to negotiate in good faith. Counts I and IV both seek

declaratory relief. Count I seeks a declaration that defendants had a duty to defend

against the claims against plaintiff by the EPA. Compl., ¶ 61 (doc. 1). Count IV

seeks declaratory relief on defendants' duty to indemnify. Compl., ¶ 76 (doc. 1).

Count II seeks a judgment for reimbursement of defense costs once the court

declares under Count I that a duty to defend was owed to plaintiff. Compl. ¶ 64

(doc. 1). Count V is an estoppel claim. Plaintiff asserts that after it sent letters to defendants tendering the defense and making a demand for coverage, plaintiff justifiably relied on defendants' written statements they would make a coverage determination once a "formal claim" was received. Compl., ¶ 84 (doc. 1). Though Count III's assertion of bad faith may look like it could be a "failure to negotiate in good faith" claim, it also is not barred by the Agreement. Plaintiff is not claiming a failure to negotiate in good faith. Rather, plaintiff claims defendants acted in bad faith in two ways. First, defendants refused to defend plaintiff against the EPA relying on a legal argument that had no basis in Alabama law. Second, defendants acted in bad faith when they failed to investigate the claims. Compl., ¶¶ 66-71 (doc. 1). It strains reason to find that any of these counts of the complaint are equivalent to a suit for a failure to negotiate in good faith.

## Conclusion

Having considered all of the foregoing, the court is of the opinion that plaintiff's motion for partial summary judgment (doc. 21) is due to be **GRANTED**.

Case 2:10-cv-01840-IPJ   Document 51   Filed 12/07/10   Page 21 of 21

Defendants' cross motion for summary judgment (doc. 40) and defendant's motion for summary judgment (doc. 29) are due to be **DENIED**, and the court shall so rule by separate order.

**DONE** and **ORDERED** this the 7th of December 2010.

INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE