**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

ALABAMA GAS CORPORATION,

     Plaintiff,

vs.                               CASE NO. CV-10-J-1840-S

TRAVELERS CASUALTY AND
SURETY COMPANY, et al.,

     Defendants.

## <u>MEMORANDUM OPINION</u>

Pending before the court are cross- motions for summary judgment filed by the parties. Each of the claims in this case arises out of defendants' refusal to defend or indemnify plaintiff on a claim for which the plaintiff asserts the insurance policies in question should provide coverage.

As previously set forth by the court, the facts relevant to this case began before 1900. The lengthy, relevant facts are not in dispute, and the court summarizes the same here. The Huntsville Gas Light Company incorporated in 1856 and manufactured gas. That company and its operations moved to the site relevant to this action prior to 1886, under the name Huntsville Gas Light and Coke Company ("HGLC"). *See e.g.*, doc. 130-3 (Exhibit B) at 3. HGLC, under several different names, provided gas produced from various sources to customers until 1946. Spills, leaks and emissions released substances classified as hazardous into the

environment.[1]  In 1946, the Huntsville facility was converted to a propane air system, and then plaintiff (a corporate successor to the Huntsville company) sold the plant and distribution system to the City of Huntsville in 1949.  Depo. of Dennis Unites (doc. 144-1), at 37-38.  Although a natural gas pipeline was installed in March 1952, ending the need for the propane system, the City of Huntsville used the site for various utility service purposes until 1967.  In 1967 ownership of the site was transferred for purposes of constructing public housing.  The plant was demolished, and the Searcy Homes public housing project was completed in 1971, with title to the land passing to the Huntsville Housing Authority at that time.  Doc. 133-1 at 6, ¶ 9.h.

From 1947 until 1984, plaintiff allegedly was insured under liability policies issued by various subsidiaries of defendant Travelers Casualty and Surety Company.[2]  In 2008 plaintiff received an "information request" letter from the EPA and a pollution report regarding this site.  *See e.g*, doc. 130-20 (Exhibit N) at 3.  Plaintiff forwarded the same to the defendants along with a demand for coverage in October

---

[1] More specifically, in both the coal gasification process and the carbureted gas manufacture process, tars and oils are generated which contain polynuclear aromatic hydrocarbons ("PAHs"), which are carcinogenic. *See e.g.*, doc. 133-1 at 8; Unites depo. (doc. 144-1) at 38.

[2] Defendants dispute that Travelers and its subsidiaries insured plaintiff continuously from 1947 until 1984 because portions of policies issued between 1947 and 1967 are missing. Defendants' brief in opposition (doc. 163) at 2.  No evidence of any policies issued prior to 1967 has been submitted to the court.  By Opinion and Order dated February 2, 2011, this court has previously ruled that the only proof of an insurance contract between the parties is for July 10, 1967, to July 10, 1983.  See Memorandum Opinion and Order of February 2, 2011 (doc. 66), at 2-3.

2

2008.  *Id*., at 1.  In November 2008 defendants notified plaintiff that there was no "formal claim" and thus there could be no coverage until "such a claim or lawsuit is received."  Doc. 130-22 (Exhibit P).  In June 2009 the plaintiff received a formal PRP letter, which it again forwarded to the defendant.[3]  Doc. 130-21 (Exhibit O).  On February 3, 2010, the defendants informed plaintiff that there was no "suit" and hence there was no defense obligation on its part.  *See* Memorandum Opinion of December 7, 2010 (doc. 51), at 8-9; *see also* doc. 130-23 (Exhibit Q).  The plaintiff's claims include  Declaration of Duty to Defend; Reimbursement for Defense Costs; Bad Faith; Declaration of Duty to Indemnify;  and Waiver and Estoppel.  In sum, this case concerns whether defendants' denial of insurance coverage to plaintiff was reasonable, and if not, whether such denial was in bad faith.[4]

Because the parties agreed that "no Alabama state court or any federal court applying Alabama law ha[s] ever addressed whether a PRP letter from the EPA

---

[3]Under CERCLA, a PRP shall be liable for: "(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan; (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan; (C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and (D) the costs of any health assessment or health effects study carried out under section 9604(i)." 42 U.S.C. § 9607(a)(4).

[4]By separate opinion, the court has already determined that the denial of coverage was not taken in "bad faith."

satisfies the "suit" requirement under a liability policy,"[5] the court certified this question to the Alabama Supreme Court.  *See Travelers Casualty and Surety Company v. Alabama Gas Corp*.., – So.3d – , 2012 WL 6720790 (Ala.2012).  The Supreme Court of Alabama responded by stating "[w]e answer this question in the affirmative."  *Id*., at 1.  With this background, the court considers the pending motions on the duty to indemnify.

   *A.  The Duty to Indemnify Claim:*

   The duty to indemnify does not rise out of the existence of a duty to defend.  *See e.g.*, *Allstate Indem. Co. v. Lewis,* 985 F.Supp. 1341, 1349 (M.D.Ala.1997) ("Although the existence of a duty to defend may be established by the allegations in the injured party's complaint, the insurer's liability to the insured is ultimately established by what is developed at trial.").  "Although the bare allegations of the complaint may trigger an insurer's duty to defend its insureds, '[t]he duty to pay ... must be analyzed separately.'"  *Porterfield v. Audubon Indem. Co.*, 856 So.2d 789, 792 (Ala.2002) (quoting *United States Fid. & Guar. Co. v. Armstrong*, 479 So.2d 1164, 1167 (Ala.1985)).  "The insured's conduct rather than the allegedly injured person's allegations determine whether the insurer has a duty to indemnify." *Tanner*

_____

[5]Defendants' brief in opposition to plaintiff's motion for summary judgment (doc. 162, at 12), citing to plaintiff's brief (doc. 22) at 1, 17, 19.

4

*v. State Farm Fire & Cas. Co.,* 874 So.2d 1058, 1066 (Ala.2003) (quoting *City Realty, Inc. v. Continental Cas. Co.*, 623 So.2d 1039, 1047 (Ala.1993)).

The court has before it the following documents on plaintiff's claim that defendants have a duty to indemnify:   Plaintiff's motion for partial summary judgment on defendants' duty to indemnify (doc. 128); plaintiff's brief and evidence in support of said motion (docs. 130, 140-148, 150, 175-176); defendants' opposition to plaintiff's motion and evidence in support of said opposition (doc. 163) and the plaintiff's reply thereto (doc. 182).  The defendants also filed a motion for summary judgment on "trigger of coverage" (doc. 132); and a brief and evidence in support of said motion (docs. 133-134, 149), to which the plaintiff filed a response and evidence in opposition (docs. 161, 165), and defendants thereafter filed a reply (doc. 180). Under the defendants' "trigger of coverage" argument, there is no duty to indemnify because no event triggered coverage during any of the policy periods.

Plaintiff seeks to have defendants indemnify it for the sums plaintiff agreed to pay to EPA pursuant to an Administrative Settlement Agreement and Order on Consent for Removal Action ("AOC").  Plaintiff's motion (doc. 128).  Conversely, the defendants argue that neither the use of the property nor the value of the property

was impaired in any way prior to 2008.[6]  Defendants' brief in support (doc. 133), at 4.

In response to plaintiff's requests for coverage to defendants, defendants informed plaintiff that defendants were reviewing the file and any potentially applicable policies, and repeatedly "advise[d] that Alagasco act in a manner that it believes will best protect its interests with respect to the USEPA's AOC." *See* docs. 130-27 (Exhibit U) and 130-28 (Exhibit V).  Thus, in October 2009, plaintiff executed the AOC with the Huntsville Housing Authority and the EPA.  Doc. 130-29 (Exhibit W).  In carrying out the work called for in the AOC, plaintiff expended approximately four million dollars.  Doc. 130-33 (Exhibit AA).  Plaintiff asserts that defendants have breached their duty to indemnify plaintiff.  Defendants raise several arguments in support of their position that there is no coverage under any of the multiple policies issued.[7]

---

[6]The testimony offered to support this statement does not do so directly.  For instance, Mr. Shea was asked if the City of Huntsville's use of the site was impaired by MGP contaminants, to which he replied,

> I don't think so.  And, again, I – It would surprise me.  I certainly have no knowledge that it was impaired, it would surprise – and it actually would surprise me if the fact that there has been a manufactured gas plant there years before really influenced anybody's decision about anything.  It was a different time.

Doc. 133-7, at 3-4.

[7]The issues before the court are questions of law.  *See B.D.B. v. State Farm Mut. Auto. Ins. Co.*, 814 So.2d 877, 879 (Ala.Civ.App. 2001) ("The interpretation of an insurance contract presents a question of law"); *American and Foreign Ins. Co. v. Tee Jays Mfg. Co.*, 699 So.2d 1226

*B.  The Duty to Indemnify* (plaintiff's brief in support (doc. 130), at 8)

Plaintiff relies on Alabama law for the proposition that having settled with the EPA, defendants have a duty to indemnify plaintiff for the amount of the settlement. In Alabama the general rule is that, "if indemnity is sought against an indemnitor without notice of either the original suit or of the settlement by the indemnitee," then the indemnitee has the burden of establishing that it was actually liable to the plaintiff and that the settlement was a reasonable one. *Watts v. Talladega Fed. Sav. & Loan Ass'n*, 445 So.2d 316, 320 (Ala.Civ.App.1984).  However, when the indemnitor has actual notice of the suit and refuses to participate in reaching a settlement, Alabama law requires a different burden of proof.

> ....A person legally liable for damages who is entitled to indemnity may settle the claim and recover over against the indemnitor, even though he has not been compelled by judgment to pay the loss....In the event that an indemnitor is not afforded the alternative of participating in a settlement or conducting the defense against the original claim, an indemnitee settling the claim will have the burden of establishing actual

(Ala.1997) ("interpretation of an insurance policy is a question of law for the court to decide.") A court must enforce the insurance policy as written if the terms are unambiguous. *Rogers v. State Farm Fire and Cas. Co.*, 2007 WL 2966694, *8 (Ala.2007); citing *Safeway Ins. Co. of Alabama v. Herrera*, 912 So.2d 1140, 1143 (Ala.2005).  *See also State Farm Fire and Casualty Co. v. Davis*, 612 So.2d 458, 466 (Ala.1993 ("if a contract is plain and free from ambiguity ... there is no room for construction, and it is the duty of the court to enforce it as written").

Whether a clause in an insurance policy is ambiguous is a question of law to be decided by the trial court.  *Auto-Owners Ins. Co. v. American Cent. Ins. Co.*, 739 So.2d 1078, 1081 (Ala.1999);  *First Mercury Syndicate, Inc. v. Franklin County*, 623 So.2d 1075 (Ala.1993). "A contract is not ambiguous merely because the parties disagree upon the correct interpretation or upon whether it is reasonably open to just one interpretation." *U.S. Quest, LTD*, 2000 WL 1300363, * 3 (5th Cir.2000), citing *Childers v. Pumping Systems, Inc.*, 968 F.2d 565, 569 (5th Cir.1992).

7

liability to the original plaintiff rather than the lesser burden of showing potential liability.

However, when the indemnitor has notice of the claim and refuses to defend, the indemnitor is bound by any good faith reasonable settlement, and the indemnitee need only show potential liability.

*Liberty Mutual Insurance Co. v. Wheelwright Trucking Co., Inc.*, 851 So.2d 466, 476 (Ala.2002)(quoting 41 Am.Jur.2d Indemnity § 46 (1995)) (emphasis and footnotes omitted).

Rather than participating in the settlement discussions, the defendants declared a lack of any duty to provide a defense or coverage.[8]   The record contains substantial evidence that plaintiff provided defendants notice and opportunity to participate in the negotiations which culminated in plaintiffs' 2009 AOC with the EPA.  *See e.g., Stone Bldg. Co. v. Star Elec. Contractors, Inc.*, 796 So.2d 1076, 1090-1091 (Ala.2000) (finding under similar facts duty to indemnify was created).  However, Alabama law contains yet a further limitation on the right to indemnification, namely that an indemnitee must show that the "fact situation of the original claim was covered by the contract of indemnity." *FabArc Steel Supply, Inc. v. Composite Const.*

---

[8] In December 2010 this court ordered that defendants had a duty to defend, but this was more than a year after plaintiff had already entered the AOC with the EPA.  Plaintiff mistakenly refers to this opinion as issuing in December 2011.  Plaintiff's brief in support (doc. 130) at 17.  Additionally, plaintiff omits the fact that the court modified the December 2010 Opinion and Order (docs. 51 and 52) by subsequent opinion and order on February 2, 2011 (doc. 66), specifically to hold that no evidence of an insurance policy from any of the defendant entities prior to 1967 was before the court.

*Systems, Inc.*, 914 So.2d 344, 356 (Ala.2005); see also *Peerless Landfill Co., Inc. v.*
*Haleyville Solid Waste Disposal Authority,* 941 So.2d 312, 317 (Ala.Civ.App.2006).

Thus, in order to rule on the question of indemnity, the court must first consider
whether there is policy coverage for clean up of environment contamination.

*C.   Whether plaintiff has proven the EPA directives requiring clean up of*
*contamination are covered by any policy of insurance issued by defendants*
(defendants' brief in opposition (doc. 133), at 5-6).

Defendants assert no "occurrence" took place during any policy period, thus
there is no coverage available.  Defendants' brief in opposition (doc. 133) at 7-9.  In
the 1967-1970 policy, "occurrence" is defined as follows:

(a) an accident that takes place during the policy period, or

(b) in the absence thereof, a continuous or repeated exposure during the
policy period to conditions which unexpectedly and unintentionally
causes personal injury or injury to or destruction of tangible property,
including the loss or use thereof.  When any one such exposure exists
prior to or after, as well as during the policy period, causing continuous
or repeated injury or destruction, this policy shall apply only to the
portion of each injury or destruction caused during the policy period.
All such exposure to substantially the same general conditions existing
at or emanating from each premises location shall be deemed one
occurrence.

Doc. 130-19, at 4.

Defendants allege that the continuous contamination of the property up to, during, and after the 1940s does not fit the policy definition of "occurrence."  Under Alabama law, the insured party bears the burden of proving coverage by showing that a claim falls within the policy.  *Employers Mut. Cas. Co. v. Smith Const. & Development*, LLC  2013 WL 2635649, *6 (N.D.Ala.2013).  See also *Colonial Life & Accident Ins. Co. v. Collins*, 280 Ala. 373, 194 So.2d 532, 535 (1967) (citation omitted); *Alabama Hosp. Ass'n Trust v. Mutual Assur. Soc. of Alabama*, 538 So.2d 1209, 1216 (Ala.1989) ("The trial court correctly placed the burden on AHAT as the one seeking coverage to prove that coverage existed within the terms of the policy."); *Jordan v. National Acc. Ins. Underwriters Inc.*, 922 F.2d 732, 735 (11th Cir.1991) ("Under Alabama law the general rule is that the insured bears the burden of proving coverage."); *Thorn v. American States Ins. Co.*, 266 F.Supp.2d 1346, 1349 (M.D.Ala.2002) ("Under Alabama law, the insured bears the burden to establish coverage by demonstrating that a claim falls within the policy ...").

The plaintiff argues that the "occurrences" which give rise to damages in this case include the demolition of the remaining structures at the site prior to the construction of the housing project, the construction of the housing project itself, and the commencement of continuous and repeated exposure to conditions on the part of

the residents of Searcy Homes.[9]  Plaintiff's brief in support (doc. 130), at 15.   The

plaintiff also argues each of these events took place during the 1967 to 1983 policy

period, and hence there must be coverage by the 1967 to 1983 policy.  *Id*. at 15, 20.

Defendants respond that none of these events constituted an "occurrence" because the

EPA found plaintiff to be a PRP solely on the ground that it is the successor to the

owner/operator of the site at the time of disposal of the hazardous substances.

Defendants' brief in opposition (doc. 133), at 10; citing doc. 133-1 at 8.  In the AOC,

the EPA held in relevant part that

---

[9]The plaintiff argues that the demolition and construction of new housing in the late 1960s through 1971 constitutes both the "occurrence" triggering coverage and the damages therefrom. Faced with a similar argument the District Court for the Southern District of New York commented

> In particular, with respect to environmental claims, the court held the policy required "an actual release of pollution" in order to trigger coverage... In explaining its conclusion, the court in *OneBeacon* relied significantly on the analysis in *Long Island Lighting Co. v. Allianz Underwriters Ins*. Co., 301 A.D.2d 23, 749 N.Y.S.2d 488 (1st Dep't 2002) ( "*LILCO*" ). The court in *LILCO* reasoned that if migration of preexisting contaminants was an "event" under the policy terms, the "event" and the "happening" resulting from the "event" would be one and the same. *See id.* at 31–32, 749 N.Y.S.2d 488. "It would be illogical to deem the continuing migration of preexisting contaminants to be both the damage itself and the cause of the damage." *Id.; but see, e.g.*, *Cessna Aircraft Co. v. Hartford Acc. & Indem. Co.*, 900 F.Supp. 1489, 1504 (D.Kan.1995) ("Exposure of groundwater to contaminants which occurs during the policy period could constitute an event within the meaning of the policy language."). The Court is persuaded by this analysis, and concludes that New York, Massachusetts, and Rhode Island would follow *LILCO*. Thus, any assertion that hazardous waste deposited at the Mendon Road site migrated to the surrounding environment during the relevant policy periods fails to allege an event under the moving defendants' policies.

*Narragansett Elec. Co. v. American Home Assur. Co.,*  2013 WL 432610, *19 (S.D.N.Y.2013).

d. In 1946, HG merged with the Alabama Gas Company, and the Alabama Natural Gas Corporation. The corporate successor emerged using the name Alabama Gas Company.

e. In the September 27, 1946, "Agreement of Merger," the new Alabama Gas Company assumed all of the "debts, liabilities, and duties" of its predecessors. During this same year, the corporation began to produce gas manufactured only from propane.

f. In 1948, Alabama Gas Company merged with Birmingham Gas Company and became the Alabama Gas Corporation (AGCorp). At some point in time, Alabama Gas Corporation, headquartered in Birmingham, Alabama, became commonly known as Alagasco.

g. On December 30, 1949, the City of Huntsville purchased the facility, with all of its structures and equipment, from AGCorp/Alagasco to construct its own natural gas system: Huntsville Gas System (HGS).

h. By the mid 1960's, the facility had ceased manufacturing operations and most structures were dismantled. On October 18, 1967, the City of Huntsville sold the property on which the facility had been located, along with other adjoining property, to HHA. By December 1970, no buildings from the original facility remained. The property along with adjoining property was subsequently developed into low income public housing, Searcy Homes, which was occupied in 1971.
....

l. Analytical data confirms that carcinogenic polynuclear aromatic hydrocarbons (cPAHs) exist at the Site at concentrations above established Removal Action Levels (RALs.). The Department of Health and Human Services (DHHS) has determined that some cPAHs may reasonably be expected to be carcinogens.

m. The Site is located within a low-income residential apartment complex that is freely accessible. Contaminated surface soils and contamination of a drainage ditch may present a health risk to residents, especially children. In addition, the Site is regularly mowed and soils

may become airborne. Children frequently play at the Site and are potentially exposed to cPAHs. A vegetable garden was maintained within the affected area for several years, and residents regularly consumed produce from the garden. Contaminants in dust or soil may have settled on leaf or fruit surfaces and presented a risk when food grown in the neighborhood garden was ingested.

n. The cPAHs detected in the surficial soils at the Site are hazardous substances which may be released posing an imminent and substantial threat to the health of nearby Site residents....

V.   EPA'S   CONCLUSIONS   OF   LAW   AND DETERMINATIONS

10. Based on the Findings of Fact set forth above, and the Administrative Record supporting this removal action, EPA has determined that:

d. Respondents are both responsible parties under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), and are liable for performance of the response actions and for response costs incurred and to be incurred at the Site.

e. Respondent Alagasco is the successor to the owner and/or operator of the facility at the time of disposal of hazardous substances, as defined by Section 101(20) of CERCLA, 42 U.S.C. 9601(20), and within the meaning of Section 107(a) (2) of CERCLA, 42 U.S.C. § 9607(a)(2).

Doc. 133-1 at 6-8.

In sum, plaintiff became a PRP by fact of its ownership of the land numerous years prior.  Turning back to the relevant policy definitions, as set forth *supra,* an "occurrence" is defined as either (a) an accident that takes place during the policy period, or (b) a continuous or repeated exposure during the policy period to

conditions which unexpectedly and unintentionally cause personal injury or injury to or destruction of tangible property."   The policy then states that if that continuous or repeated exposure "exists prior to or after, as well as during the policy period, causing continuous or repeated injury or destruction, this policy shall apply only to the portion of each injury or destruction caused during the policy period.  All such exposure to substantially the same general conditions existing at or emanating from each premises location shall be deemed one occurrence."  Doc. 130-19, at 4.

The question before this court is whether there was "a continuous or repeated exposure during the policy period to conditions which unexpectedly and unintentionally cause[d] personal injury or injury to or destruction of tangible property, including the loss or use thereof."

With the foregoing in mind, the court turns to the question of what policies of insurance the parties entered into.  The parties dispute what policies are actually provable.  According to plaintiff, it purchased insurance coverage from the various Travelers entities from 1947 until 1983.  Plaintiff's brief in support (doc. 130) at 4. According to defendants, even if the same is true, plaintiff bears the burden of establishing the terms and conditions of the policies, and plaintiff cannot meet this burden.  Defendants' brief in opposition (doc. 163), at 2.  Neither party has produced

to the court a policy of insurance predating 1967.[10]  Instead, the plaintiff argues that the policy entered in 1967 and continued through 1983 provides indemnity under the facts of this case.  Plaintiff's brief in support (doc. 130) at 9.  The plaintiff bases this argument on Alabama law which directs that the test for whether an occurrence is within a policy period turns on a review of when the "injurious exposure" took place, and not when the injurious condition itself was created.  Plaintiff's brief in support (doc. 130) at 10, *citing U.S. Fidelity and Guaranty Co. v. Warwick Development Co.*, 446 So.2d 1021, 1024 (Ala.1984).  In that case, the Alabama Supreme Court ruled that

> "[A]s a general rule the time of an 'occurrence' of an accident within the meaning of an indemnity policy is not the time the wrongful act was committed but the time the complaining party was actually damaged." *Muller Fuel Oil Co. v. Insurance Company of North America*, 95 N.J.Super. 564, 232 A.2d 168 (1967), quoted in *Deodato v. Hartford Ins.* Co., 363 A.2d at 365. *See also* Annot., 57 A.L.R.2d 1385. By adopting this view, we necessarily overrule *Wixom Brothers Co. v. Truck Insurance Exchange*, 435 So.2d 1231 (Ala.1983).

_____

[10]The parties do not dispute that the plaintiff bears the burden of proof to establish the existence and terms of a policy of insurance, although they dispute how exacting the standard of proof is.  While the existence of such is a question of fact, the plaintiff has failed to offer any such proof of a policy predating 1967, nor does plaintiff make any such argument.  Rather, the plaintiff limits itself to such obscure statements as "should Alagasco need to prove terms outside the 1967 to 1983 period already established, it will easily meet either standard," in reference to the standard of proof applied to the terms of "lost" policies.   Plaintiff's opposition (doc. 165), at 15, n. 4. Whether proof by a preponderance of the evidence or by clear and convincing evidence is the correct standard for establishing the existence and terms of lost insurance policies, the plaintiff has not met either.

*U.S. Fidelity & Guar. Co.*, 446 So.2d at 1024.  *See also American States Ins. Co. v.*

*Martin*, 662 So.2d 245, 250 (Ala.1995).  However, the United States District Court

for the Southern District of Alabama later clarified

> The issue in *Warwick* was not whether coverage extends to property
> damage occurring before the complaining party receives the property
> (there was not, as here, a succession of property owners) but whether
> coverage can be based on an insured's wrongful act within the policy
> period when the only injury from the wrongful act occurs outside the
> policy period.

*Sua Ins. Co. v. S & O Investments, LLC,* 2011 WL 5121285, *3 (S.D.Ala.2011).[11]

According to plaintiff, the exposure to injury occurred in 1971 when Searcy

Public Housing became occupied.  Plaintiff's brief in support (doc. 130) at 11-15.

According to defendant, plaintiff is simply wrong, because no directive to clean the

site came until 2008, and that directive is the time of injury to the plaintiff.

Defendants' response (doc. 163) at 13.

To make sense of the parties' widely divergent arguments, the court begins

with consideration of why plaintiff has any liability at all.  To have liability for any

portion of the clean up expenses as a PRP, the entity in question must be a "covered

person" under 42 U.S.C. § 9607(a).  *See e.g., Redwing Carriers, Inc., v. Saraland*

*Apartments*, 94 F.3d 1489, 1496–97 (11th  Cir.1996).  42 U.S.C. § 9607(a) defines

---

[11]In its reply, the plaintiff argues that this language somehow supports its argument that the
covered injury occurred in the 1960s and 1970s.  *See* plaintiff's reply (doc. 182) at 2-3 and n.1.

four categories of "covered persons" who may be liable under CERCLA: (1) current owners and operators of the facility; (2) past owners or operators of the facility when disposal of hazardous substances occurred; (3) arrangers for disposal of hazardous substances; and (4) transporters of hazardous substances. *Id., See also Redwing Carriers*, 94 F.3d at 1496. The only category into which plaintiff falls is the second, "past owners ... of the facility when disposal of hazardous substances occurred...." Plaintiff ceased ownership in 1949. Of course, while the pre-1949 activities were the cause of future exposure to injurious substances beginning in 1971, the injury to the land was already present. The plaintiff confuses the fact that the injury to land was not causing harm to humans prior to 1971, with the actual injury to land itself. Furthermore, there was certainly no injury or liability to the plaintiff at that time.[12]

The court must give the terms in the policy before it their plain meanings. The policy requires, "in the absence " of an accident, "a continuous or repeated exposure during the policy period to conditions which unexpectedly and unintentionally causes ... injury to ... tangible property.... When any one such exposure exists prior to or after, as well as during the policy period, causing continuous or repeated injury or destruction, this policy shall apply only to the portion of each injury or destruction

---

[12]If the plaintiff had been sued by a resident of Searcy Housing for injuries resulting from exposure to hazardous materials during the 1967 to 1983 policy periods, the plaintiff's analysis would be correct.

caused during the policy period." Doc. 130-19, at 4. On its face, the policy requires examination of the time of the injury to determine coverage. While there was "continuous ... exposure during the policy period," the relevant question is whether that exposure caused a continuous or repeated injury..." during the same. Thus, the policies, on their face, apply only to injuries which occurred from 1967 to 1983, regardless of when those injuries became known. The court finds this interpretation to be in line with Alabama law which defines an "occurrence" for purposes of indemnity as "the time the complaining party was actually damaged." *See e.g., State Farm Fire & Cas. Co. v. Gwin*, 658 So.2d 426, 428 (Ala.1995).

Courts around the country have formulated various tests for determining when, in the context of claims for indemnification for costs of environmental clean-up, an "occurrence" has taken place within the meaning of a liability insurance policy, including (1) the "exposure" trigger, (2) the "actual injury" or "injury-in-fact" trigger; (3) the "manifestation" or "discovery" trigger, and (4) the "continuous" trigger. *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 868 F.Supp. 1278, 1299 (D.Utah.1994); citing *Dow Chem. Co. v. Associated Indem. Corp.*, 724 F.Supp. 474, 478 (E.D.Mich.1989). *See also Martin J. McMahon, Annotation, Event Triggering Liability Insurance Coverage as Occurring Within Period of Time Covered by Liability Insurance Policy Where Injury or Damage Is Delayed-Modern Cases*, 14

18

A.L.R.5th 695, 1993 WL 837774 (2006). Courts are split as to which trigger to apply, and it is often dependent on the specific policy language at issue. *Id*. The court considers each "trigger" and its applicability here.

Under the "exposure" trigger, liability under a CGL policy is triggered at the time that the property is exposed to the hazardous substance. See e.g., *Continental Ins. Cos. v. Northeastern Pharmaceutical & Chem. Co.*, 811 F.2d 1180, 1190 (8th Cir.1987), *aff'd in part, rev'd in part on other grounds en banc*, 842 F.2d 977, 984 (8th Cir.), cert. denied, 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988). *See also Travelers Casualty and Surety Co. v. Providence Washington Ins. Co.*, 685 F.3d 22, 32-33 (1st Cir.2012) (a "continuous trigger" coverage standard "charges a loss to policies in effect from the time of exposure to manifestation, and, thus, presumes injury from the time of exposure through manifestation.")  Adoption of this theory would require the court to ignore the plain language of the insurance policies and Alabama law.

The "actual injury" or "injury-in-fact" trigger invokes coverage at the point when actual injury or damage to the person or property occurs.  "Under this theory, an actual injury must occur during the time the policy is in effect in order to be indemnifiable." F. Powell, *Insuring Environmental Cleanups; Triggering Coverage for Environmental Property Damage under the Terms of a Comprehensive General*

*Liability Insurance Policy*, 71 NEB.L.REV. 1194 (1992). The "actual injury" or "injury-in-fact" trigger is premised upon the literal language of the standard CGL policy's definition of "occurrence." See e.g., *Abex Corp. v. Maryland Casualty Co.*, 790 F.2d 119, 127 (D.C.Cir.1986); *accord, Detrex Chem. Indus. v. Employers Ins. Co.*, 746 F.Supp. 1310, 1323 (N.D.Ohio 1990) ("an actual injury must occur during the time the policy is in effect in order to be indemnifiable or compensable"); *Triangle Publications, Inc. v. Liberty Mutual Ins. Co.*, 703 F.Supp. 367, 370 (E.D.Pa.1989) ("the plain language of the CGL contract supports only one construction: the injury-in-fact analysis"). *See also Aetna Cas. & Sur. Co. v. Dow Chemical Co.*, 10 F.Supp.2d 771 (E.D.Mich.1998) (holding indemnification coverage under policy period is triggered if party could show that the relevant property damage; i.e., soil or groundwater contamination, occurred during the policy period); *Browder v. United States Fidelity & Guaranty Co.*, 893 P.2d 132, 134 (Colo.1995) (noting "basic tenet of liability insurance that a third party must suffer actual damage within the policy period to recover under a liability policy."); *Kirkham, Michael & Assoc., Inc. v. Travelers Indem. Co.*, 493 F.2d 475, 476 (8th Cir.1974) (applying South Dakota law, holding no coverage for accident occurring after policy period but caused by negligent design and supervision of water treatment plant during policy because

"[i]t is the damage incurred by 'accident' that triggers the policies' coverage, not the preceding wrongful acts.").

Applying this line of reasoning to the facts before this court, the injury to the land occurred prior to 1949.  The injury to the plaintiff occurred no earlier that 2008.[13]  The facts do not support a finding that the removal of structures from the land and the construction of housing thereon caused any new injury to the land, the hazardous substances were already present.  The plaintiff argues that "it would be virtually impossible to tear out multiple ancient industrial structures over the course of two decades, plow up paved roads, and re-grade a former industrial site for a housing development, all without causing some amount of redistribution of hazardous substances."  Plaintiff's response (doc. 165), at 4.  However, even if the plaintiff could prove a theoretical redistribution of hazardous substances, there is no allegation that the plaintiff is liable for damages resulting from the redistribution of the same between 1967 and 1983, and there is no evidence that additional hazardous substances were added by plaintiff during this time.  More importantly, plaintiff did not undertake the activities in question and did not own the property during the

---

[13]The plaintiff applies a "slipped on a banana peel" analogy to its theory of harm.  *See e.g.,* plaintiff's response (doc. 165), at 9.  Using the plaintiff's analogy, its activities on the land prior to 1949 left the banana peel on the ground.  The plaintiff had no injury from slipping on that peel until 2008.  More importantly, the fact that others may have slipped on that peel in the intervening years caused no harm to the plaintiff.

activities in question.  Rather, all of its liability arises from its activities prior to the 1949 sale of the land.

As to the injury to land, when faced with a similar issue, the Eighth Circuit Court of Appeals commented that "the crucial events-the improper disposal of the hazardous wastes (wrongful act), the release of hazardous wastes into the environment (exposure), the contamination of the environment (injury-in-fact),-all happened virtually simultaneously," and thus whether to apply the "exposure" trigger or the "injury in fact" trigger made little difference.  *Continental Ins. Companies v. Northeastern Pharmaceutical & Chemical Co., Inc.*,  842 F.2d 977, 984 (8th Cir.1988).

Moving on to the two remaining theories, the court again finds neither of them applicable to the facts before this court.  The "manifestation" trigger invokes coverage when, for example, in an asbestos contamination case, an asbestos-related disease becomes "reasonably capable of medical diagnosis" during the policy period.[14] *See, e.g., Eagle–Picher Indus., Inc. v. Liberty Mutual Ins. Co.*, 523 F.Supp.

---

[14]Plaintiff argues that defendants advocate for adoption of the manifestation theory. Plaintiff's response (doc. 165), at 1.  The court disagrees, finding no support in defendants' brief for adoption of such a trigger.  Plaintiff also asserts that defendants failed to comply with "section D.2.a of the Local Rules Appendix II, Summary Judgment Requirements...." *Id.,* at 3.  The undersigned notes that the "Local Rules" contain no requirements for summary judgment.  Rather, the "Uniform Initial Order" contains "Appendix II, Summary Judgment Requirements."  The same is not used by the undersigned, and certainly was never entered in this case.  See e.g., Order of October 21, 2010 (doc. 46) ("The parties shall not comply with the Uniform Initial Order.").

110 (D.Mass.1981), modified, 682 F.2d 12, 17 (1ˢᵗ Cir.1982), cert. denied, 460 U.S. 1028, 103 S.Ct. 1279, 75 L.Ed.2d 500 (1983). *See also Griffin v. Unocal Corp.*, 990 So.2d 291 (Ala.2008) (a cause of action accrues only when there is a manifest, present injury); *Mraz v. Canadian Universal Ins. Co.*, 804 F.2d 1325, 1328 (4ᵗʰ Cir.1986) ("we believe that the better rule is that the occurrence is deemed to take place when the injuries first manifest themselves"). Clearly, application of a manifestation trigger is of no benefit to the plaintiffs, because the contamination at issue here caused no injury for which the plaintiff is responsible until the AOC in 2009.[15]

The "continuous" trigger applies a theory that coverage is continuously triggered from the moment of exposure to hazardous materials through the time when the injury manifests itself. *See, e.g.*, F. Powell, *Insuring Environmental Cleanup: Triggering Coverage for Environmental Property Damage Under the Terms of a Comprehensive General Liability Insurance Policy*, 71 Neb.L.Rev. 1194 (1992) (citing *New Castle County v. Continental Casualty Co.* (CNA), 725 F. Supp. 800 (D.Del. 1989)). *See also Travelers Cas. and Sur. Co. v. Providence Washington Ins. Co., Inc.*, 685 F.3d 22, 29-30 (1ˢᵗ Cir.2012) (finding trigger for coverage as time when

---

[15]The court has no knowledge of whether any resident of Searcy Homes ever experienced any injury from the contamination, and the same would not be relevant to the issues before this court.

insured had some reason to test for contamination and could have actually discovered the same with reasonable diligence).

Applying the reasoning of the foregoing to the facts before this court, in light of Alabama law and the relevant policy language, the court finds Alabama applies an injury in fact requirement for indemnity under a policy of insurance.  As previously stated, any injury to land occurred prior to 1949.  The fact that the landscape was altered approximately twenty years later does not change this finding.  Similarly, the fact that people moved onto the land, and that the risk of exposure to those individuals triggered the EPA's clean up directives, and that those directives in turn triggered plaintiff becoming a PRP and entering an AOC, does not change the finding either.[16]

The court therefore finds that there is no indemnity coverage based on the 1967 policy of insurance which is in evidence before this court.  Based on the foregoing, the court shall rule by separate Order that the plaintiff's motion for partial summary judgment on the issue of indemnity is **DENIED.**  The court shall further rule that the defendant's motion for summary judgment on the trigger of coverage is **GRANTED**.

---

[16]Even if the court could somehow find the construction and occupation of Searcy Homes triggered coverage, there is no evidence that the plaintiff could not have discovered the contamination to the land at that time.  Hence, such a finding of a trigger of coverage would require the court to now find this action barred by the relevant statutes of limitations.

### D.  Other Policies of Insurance

The plaintiff makes passing references to the existence of other policies of

insurance.  For example, the plaintiff asserts that

> Travelers insured Alagasco from 1947 until 1984[17] through several
> policies, including St. Paul Fire and Marine Insurance Company policy
> number 501JB1000, which had a policy period from June 10, 1967, to
> July 10, 1983 (St. Paul Policy 501 JB1000 (attached as Exhibit M)
> (identified as Ex. 33 to the Deposition of Robert Harris, Aug. 24, 2011);
> see also Mem. Op. 4, Dec. 7, 2011 (sic) (Doc. 51); Mem.Op. and Order
> 2-3, Feb. 2, 2011 (Doc. 66).

Plaintiff's brief in support (doc. 130) at 4-5.

As stated above, the court has determined that the one policy on which plaintiff

relies does not provide coverage.  The defendant, however, continues on to discuss

umbrella policies issued by defendants' entities to plaintiff.  Defendants' brief in

support (doc. 133), at 13; defendants' brief in opposition (doc. 163), at 16.  That

policy was first issued on July 10, 1977, and renewed yearly through July 10, 1981.

*See* defendant exhibit 13 (doc. 133-15).  The court notes both that this policy does not

cover a relevant time period, and that the plaintiff has not argued that this policy

provides indemnity coverage to it for the AOC.  Rather, the plaintiff specifically

argues that

---

[17]Although Alagasco asserts it had insurance policies with defendants from 1947 through
1984, as the court has repeatedly noted, at this point only the 1967 policy, which the parties agree
was renewed until 1983, not 1984, is before the court.

the continuous exposure of resident individuals to hazardous substances from the former MPG that commenced in 1971, constitute occurrences falling within the grant of coverage under Travelers 1967 to 1983 insurance policy.

Plaintiff's brief in support (doc. 130, at 20).

The court declines to guess at the content and existence of policies not offered, relied on, or discussed by the plaintiff.

The plaintiff also argues that construction of the housing project on the land was an "accident" for purposes of the policy. Plaintiff's response (doc. 165) at 11. Even if the court could find that the release of the hazardous substances were themselves "accidents," those "accidents" happened long before the policy of insurance was entered or the housing was constructed. Although harm from building housing on a contaminated piece of property could be construes as accidental, that harm was not to plaintiff, and plaintiff is not liable for the harm caused by construction of Searcy Housing. Rather, as the court has already stated, plaintiff's liability is as a former owner/operator of the site.[18] Whether any residents of Searcy Homes ever suffered concrete injuries from construction of the homes on

---

[18]Plaintiff recognizes this, stating "Alagasco had no involvement in, or even knowledge of, the decision to convert the property to residential use... Similarly, Alagaso had no involvement in or knowledge of the demolition of the remaining structures from the former MGP, the removal of old roads, the re-grading of the property, or the construction of the housing project." Plaintiff's opposition (doc. 165) at 16.

contaminated land, and who could be held liable for those injuries, is not before this court.

Hence, for the reasons set forth herein, the court shall grant the defendants' motion for summary judgment (doc. 132) and deny the plaintiff's motion (doc. 128).

**DONE** and **ORDERED** this the 16th day of July, 2013.

_____
INGE PRYTZ JOHNSON
SENIOR U.S. DISTRICT JUDGE